UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAIL PUBLIC CHARTER SCHOOL,          :

    Plaintiff,          :

       v.          :          Civil Action No. 06-1821 (TFH)

MICHELLE HAWKINS, *et. al.,*          :

    Defendants          :

<u>NOTICE OF FILING OF RECORD</u>

Attached is the administrative record, with index, in the matter of *Hawkins v.*

*SAIL Public Charter School*, which is related to the instant civil action.[1]

Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

 

EDWARD P. TAPTICH [#012914]
Chief, Equity Section II

 

CARY D. POLLAK [#055400]
Senior Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-6604
(202) 727-0431 (fax)
email: cary.pollak@dc.gov

---

[1] The record appears to be missing some attachments to a disclosure letter filed by counsel for the student. The Student Hearing Office has represented that no further documents are contained in the record. These attachments will be filed if and when they become available.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAIL PUBLIC CHARTER SCHOOL | ) |
| Plaintiff, | ) |
| v. | Civil Action No.06-1821(TFH) |
| | ) |
| MICHELLE HAWKINS, et al., | ) |
| Defendants. | ) |

## INDEX OF RECORD

Certification of Record                                                        -        1

Hearing Officer's Determination (HOD) dated 9/19/06                            -        2

Due Process Hearing Attendance Sheet dated 8/30/06                             -        15

Due Process Complaint Notice dated 6/23/06 w/att.                              -        16

    Letter requesting hearing, 6/23/06                      -        24

Scheduling Memorandum, 6/26/06                                                 -        27

Motion to Dismiss or Motion to Join by SAIL PCS, dated 7/6/06    -        29

Motion to Dismiss by DCPS, 7/7/06                                              -        32

Plaintiff's Opposition to Motions by SAIL & DCPS dated 7/13/06 -        37

Order by Impartial Special Ed. Hearing Officer dated 7/13/06     -        46

Hearing Notice dated 7/31/06                                                   -        47

Motion to Join a Necessary Party by SAIL dated 8/1/06             -        49

Plaintiff's Response to Defendant's Motion to Join, 8/4/06 w/att.    -        52

Exh. 1-Motion to Dismiss or Motion to Join by SAIL PCS, 7/6/06  -        59

Exh. 2-Motion to Dismiss by DCPS, 7/7/06                                   -        61

Exh. 3-Plaintiff's Opposition to Motions by SAIL & DCPS                    -        64

Exh. 4-Order denying both Motions by Impartial Special Ed. H. O. -        73

Exh. 5-Resolution Meeting Notes dated 7/14/06                             -        74

Supplemental 5-day Disclosure by Plaintiff dated 8/23/06 w/att.    -        75

    Curriculum Vitae for Lauren Krivitzky, Ph. D.      -        76

SAIL 5-day Disclosure letter w/att. dated 8/24/06                          -        81

    Motion to Join a Necessary party dated 8/1/06       -        83

    Resolution Meeting Notes dated 7/14/06              -        86

Letter transmitting chart charter school cases dated 8/31/06        -        89

    Chart listing 4 Charter School cases, w/att         -        90

      IDEA Public Charter School v. Crystal Belton    -        92

      Hyde Leadership v. Wanda Clark et al.           -        103

      Friendship Edison v. William Morrow et al.      -        106

      Janis Parker v. D.C. et al.                     -        108

    Transcript of Hearing dated 8/30/06                 -        114

# CERTIFICATION OF RECORD

INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400

### DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### *STUDENT HEARING OFFICE*
### SPECIAL EDUCATION

In the Matter RE:          H██████, D████████ vs. SAIL PCS

Case Information:     Hearing Dates: **08/30/2006**
                      Held at: **District of Columbia Public Schools Headquarters**
                               **825 N. Capitol Street, N.E.**
                               **Washington, D.C. 20002**
                      Student Identification Number:  **9038030**
                      Student's Date of Birth: ██████/**1992**
                      Attending School: **Katherine Thomas School**
                      Managing School: **Katherine Thomas School**
                      Hearing Request Date(s): **06/26/2006**

## <u>CERTIFICATION OF RECORD</u>

     I, **Shawnta Maddox, Legal Assistant of the Student Hearing Office,**

DO HEREBY CERTIFY that the attached Record of Proceeding is the entire record in

the above entitled matter as of this date, consisting  of all letters, pleadings, orders,

exhibits and depositions.

     I FURTHER CERTIFY that the materials forwarded herewith are the true copy

of the original documents submitted in this matter.

EXECUTED this Thursday, July 12, 2007.

**LEGAL ASSISTANT**
**STUDENT HEARING OFFICE**

1

# District of Columbia Public Schools

### Office of Management Services
Tonya M. Butler-Truesdale, Due Process Hearing Officer
825 North Capitol Street, N.E.; Room 8076
Washington, D.C. 20002
(202) 518-6867
Facsimile: (202) 442-5556

## Confidential

| | |
|---|---|
| D⬛⬛⬛ H⬛⬛⬛, STUDENT )  | |
| ) | |
| Date of Birth: ⬛⬛⬛, 1992 ) | |
| ) | |
| Petitioner, ) | Hearing Date: August 30, 2006 |
| ) | |
| v. ) | |
| ) | |
| ) | |
| ) | Request for Hearing: June 26, 2006 |
| THE SCHOOL FOR ARTS IN ) | |
| LEARING PUBLIC(hereinafter SAIL) ) | |
| PUBLIC CHARTER SCHOOL ) | Held at: 825 North Capitol Street, N.E. |
| Respondent. ) | 8th Floor |
| ) | Washington, D.C. 20002 |
| ) | |
| ) | |
| ) | |

## HEARING OFFICER'S DECISION

**Parents:**            Ms. Michelle Hawkins, Mother
3001 20th Street, NE
Washington, DC 20018

**Counsel for Petitioner:**       Donna L. Wulkan, Esquire
1765 N Street, NW
Washington, D.C. 20036
(202) 682-3909; Fax: (202) 955-1015

**Counsel for Respondent:**      Paul Dalton, Esquire
1008 Pendleton Street
Alexandria, VA 22314

*In the Matter of D.H.*

An index of names is attached hereto for the benefit of the parties.  The index will permit the parties to identify specific witnesses and other relevant persons.  The index is designed to be detached before release of this Decision as a public record.

# INDEX OF NAMES

| | |
|---|---|
| Child | D███████ H██████ |
| Child's Parent(s) (specific relationship) | Michelle Hawkins, Mother |
| Child/Parent's Representative | Donna L. Wulkan, Esquire |
| | Gina Beck, Esquire |
| School's Representative | Paul Dalton, Esquire |
| DCPS Representative | Quinne Harris Lindsey |
| Coordinator | Katherine Thomas School |
| Special Education Coordinator | Jenna Umansky |
| Pediatric Neuropsychology | Dr. Joette James |
| | |
| | |
| | |

*In the Matter of D.H.*

### Jurisdiction

The Due Process Hearing was convened and this Order is written pursuant to Public Law 108-446, the *Individuals with Disabilities Education Improvement Act of 1997 (I.D.E.I.A.)*, 20 U.S.C.; 5 D.C.M.R. Section 3000.; Section 143 of the D.C. Appropriations Act, effective October 21, 1998; and the Rules of the Board of Education of the District of Columbia.

### Introduction

Petitioner is a fourteen year old student attending SAIL Public Charter School. On June 23, 2006, Petitioner submitted a hearing request alleging that SAIL Public Charter School failed to:

1. develop an appropriate IEP including but not limited to developing appropriate goals and an appropriate disability classification;
2. issue an appropriate notice of placement;
3. provide for and deliver appropriate instructional and related services;
4. evaluate the Petitioner in all areas of suspected disability;
5. ensure Petitioner makes adequate progress in his academic program; and,
6. provide appropriate special education instruction and therefore provide an appropriate placement.

A hearing was convened on August 30 2006 at 9:00 am at DCPS Headquarters, 825 North Capitol Street, N.E., 8th Floor, Washington, DC 20002. Petitioner submitted disclosures labeled P1-P17 and SAIL Public Charter school sought to admit SAIL01-SAIL-02 these disclosures were returned to the Respondent pursuant to a motion for exclusion by Petitioner due to the fact that the disclosures were received by Petitioner outside of the five day disclosure rule. Respondent argued that the documents included in the disclosure were already in Petitioner's possession and that the disclosures were untimely because Respondent initially believed that the hearing was scheduled for August 31, 2006.

The second preliminary issue argued in this case related to pre-hearing motions submitted by the Respondent. The initial pre-hearing motion argued that the matter should be dismissed since DCPS was not named as a respondent. DCPS submitted a motion in opposition. Chief Hearing Officer Smith ruled on this motion and it was denied on July 13, 2006. Chief Hearing Officer Smith determined that,

The allegations in the Complaint concerning a denial of FAPE are against SAIL. Furthermore, the Complaint does not state facts alleging that DCPS has denied the student FAPE,

4

*In the Matter of D.H.*

notwithstanding the parents requested remedy of a placement. Additionally, based on the allegations in the Complaint, SAIL, as its own LEA, may be able to provide the relief requested should it be determined that there was a denial of FAPE. Accordingly, Respondent SAIL's "Motion to Dismiss or in the Alternative Motion to Join in a Necessary Party," is Denied. DCPS' "Motion to Dismiss" concerning it being a party is Granted. See Order dated July 13, 2007 [should be 2006].

Respondent reentered its Motion to Join a Necessary Party as a preliminary matter arguing that now that DCPS participated in a placement meeting and issued a prior notice of Placement to Prospect, DCPS is a necessary party. Respondent further argued that SAIL can not issue a placement outside of its jurisdiction and that the ruling of Chief Hearing Officer Smith is no longer relevant. Respondent was unable to identify any binding statutory authority or case law which supported the argument that DCPS "participation" in a "placement meeting" constituted: (1) an effective prior notice of placement; prior notice to DCPS as the SEA that it was unable to meet the Petitioner's educational needs; and, or an effective joiner of DCPS as a party to the complaint. For these reasons Respondent's second preliminary motion was overruled.

Counsel for Respondent chose to depart prior to the adjournment of the hearing. The Special Education Coordinator of SAIL Public Charter School departed with her counsel prior to the adjournment of the hearing.

Prior to the adjournment of the hearing but after the departure of Respondent's counsel this hearing officer agreed to leave the record open for Petitioner to submit the following documents in lieu of a formal closing argument and to supplement the informal closing rendered:
1. copies of U.S. District Court cases regarding charter schools,
2. a proposed compensatory education plan; and,
3. a copy of Section 319 of the DCMR.
Petitioner also included a summary chart of the U.S. District Court cases which was not used in this hearing officer's determination.

The hearing officer also received Plaintiff's Opposition to Defendant's September 1, 2006 filing of a *Praecipe* and a copy of an amicus brief filed in the Blackman-Jones Class Action Suit. Petitioner argues that Respondent voluntarily waived his right to conduct a closing argument when counsel departed prior to the adjournment of the hearing. The hearing officer agrees that the Respondent specifically waived his right to a verbal closing argument prior to exiting the hearing before adjournment. However, there was no conversation in Respondent's presence regarding the consideration of written closing arguments. Without such clarity to Respondent, this hearing officer would consider the post hearing motion as a matter of equity since post hearing submissions were permitted for the Petitioner.

*In the Matter of D.H.*

However, since Respondent's disclosures were excluded from the record, pursuant to the five day disclosure rule, this hearing officer has no record of Respondent's answer to Petitioner's complaint. Any assertions in the *Praecipe* would have to have been consistent with Respondent's answer to which the hearing officer has no access. A new or additional legal argument not be pleaded in the answer could severely prejudice Petitioner's case and compromise Petitioner's ability to adequately represent her client. The hearing officer's inability to isolate issues or defenses in the *Praecipe* which the Petitioner would not have had notice to requires that the assertions of the *Praecipe* be given very limited weight.

The hearing officer also notes and that the Respondent's *Praecipe* and Blackman Amicus Brief were not received by the hearing officer prior to September 18, 2006. This hearing was alerted to its existence by the Petitioner's Opposition filed on September 11, 2006. The hearing officer called Counsel for Respondent and requested that the documents be resent to her home facsimile on September 19, 2006.

**Witness for SAIL Public Charter School**
 Jenna Umansky, Special Education Coordinator, SAIL Public Charter School

**Witnesses for Petitioner**
 Michelle Hawkins, Mother
 Dr. Joette James, Pediatric Neuropsychologist Fellow, Children's National
   Medical Center
 Debbie Louri, Admissions Coordinator, Katherine Thomas School

**Findings of Fact**

 1. Petitioner is a fourteen year old attending SAIL Public Charter School.[1]

 2. Petitioner attended SAIL Public Charter School for seven years. He began attendance in April of his first grade year and continued to March of his 7th grade year.

 3. Petitioner was retained in the 6th grade and spent approximately 8 years at SAIL Public Charter School.

 4. Petitioner's IEPs from March 15, 2006 and March 15, 2005 provides for 100% out of full time special education. See P-12 and P-13

---

[1] *Request* at 1.

*In the Matter of D.H.*

5. Petitioner attended Friendship Edison Public Charter School prior to enrollment in SAIL and has never attended a DC Public School.

6. A March 27, 2006 Neuropsychological Evaluation performed by Dr. Joette James determined that Petitioner is functioning two to five grade levels behind his grade level. See P-6, page 5

7. The same evaluation recommended, amongst other things, that Petitioner be placed in a highly structured classroom with a low student teacher ratio and that Petitioner requires intensive reading instruction. See P-6, page 7

8. During the hearing Dr. Joette James credibly testified that Petitioner evaluation revealed that he is testing more in the Mental Retardation range although his classification is Mentally Delayed, SLI and SLD. She further opined that his performance was quite a bit lower than what would be expected since he allegedly was receiving special education services.

9. Dr. Joette James stated that a placement where the student classification is predominantly ED would be detrimental to the Petitioner.

10. Debbie Lourie, the Admissions Coordinator for the Katherine Thomas School stated that after a review of Petitioner's records, admission was offered. She concluded that educational benefit could be afforded consistent with the recommendations of his evaluations and existing IEPs.

11. Petitioner's mother, Michelle Hawkins credibly testified that she has never received a prior notice of placement from DCPS with respect to placement for the Petitioner.

12. Ms. Hawkins further credibly testified that all of Petitioner's IEPs from the second grade forward required the same level of services.

13. Ms. Hawkins testified that prior to March of 2006 when she had a discussion with Petitioner's Speech and Language Pathologist, and his English teacher, no one at SAIL ever said they could not serve the Petitioner. She further elaborated that prior to that conversation, it was her understanding that SAIL personnel believed that Petitioner should continue his enrollment at SAIL. She further explained that although Ms. Umansky thought that Petitioner should be looking for another placement that she never said that SAIL was an inappropriate placement. While this testimony appears less credibly, Respondent did not provide any evidence or testimony which directly contradicted Ms. Hawkins' testimony since Ms. Umansky testified on cross examination that she did not discuss the appropriateness of SAIL for the Petitioner with Ms. Hawkins.

*In the Matter of D.H.*

14.    Ms. Hawkins credibly testified that when she attended the July 14, 2006 Resolution Meeting she had not been alerted or notified that there would be a placement meeting.  Nor did she expect that anyone other than SAIL personnel and her attorney would meet with her.

15.    Ms. Hawkins credibly testified that she did not receive a procedural safeguards manual at the July 14, 2006 meeting and that there was no notice of placement given to her at that same meeting.

16.    Dr. Peagler, a DCPS Placement Specialist participated in a conversation regarding placement with Petitioner and Respondent at the July 14, 2006 Resolution Meeting.

17.    No evidence was presented indicating that SAIL Public Charter School notified DCPS that it could not serve the Petitioner's needs.

18.    SAIL Public Charter School acknowledged that it could not provide educational benefit when is sought the participation of DCPS at the July 14, 2006 Resolution Meeting by unilaterally inviting Dr. Peagler to participate in the Resolution Meeting.

19.    Petitioner's recommended Compensatory Education Plan is comprehensive and addresses needs identified by related evaluations.

**Conclusions of Law**

1. SAIL Public Charter School denied Petitioner free appropriate public education by failing to:
   a.  ensure that Petitioner made progress in his academic program;
   b.  ensure the issuance of an appropriate notice of placement; or,
   c.  initiate SEA participation when it was determined that the Petitioner could not derive educational benefit from the placement at SAIL

2. Insufficient evidence was submitted to support a finding fact that Respondent did not provide for and deliver appropriate instructional and related services pursuant to the IEP since no witnesses testified with respect to compliance with the Petitioner's IEPs.

3. The Respondent's attempt to involve DCPS in the placement process after the filing of the complaint and during the Resolution Session for the Petitioner was ineffectual and a violation of Petitioner's due process rights since the agenda of the

*In the Matter of D.H.*

Resolution Session was altered by the unilateral invitation of a DCPS placement specialist by Respondent on the day of the Resolution meeting.

    4. Respondent's assertions that no Order can be issued against SAIL Public Charter School with respect to placement since the SAIL allegedly no authority to place student outside its jurisdiction is of little relevance.   Respondent failed to present any relevant case law or statute in support of this contention.  In opposite of this contention, The District of Columbia Municipal Regulations Section 5-3019 states in relevant part:

> **3019.2- LEA charters shall be responsible for ensuring that the requirements of Part B of the Act, including documentation of required policies and procedures**, are met in regard to children enrolled in their schools…
> **3019.3- …LEA Charters are responsible for special education… placements** for children enrolled in their facilities.
>
> **3019.8- LEA … are [is] responsible for providing all necessary related services to children with disabilities enrolled in their facilities, consistent with these children's IEPs**
>
> **3019.9 – When an LEA Charter concludes that it cannot serve a child with a disability** enrolled in its facility using the funds available to it, **it shall appeal to DCPS, in its role as designee for the State Education Agency (SEA) for assistance.**
>
> **3019.11- If, following an appeal or notification… DCPS agrees that a charter school can not serve the child in question, DCPS will assume responsibility for the child**….
>
> **3019.12-** DCPS, in its role as the SEA, will arrange for and fund special education mediation and due process hearings involving charter schools if asked to do so by the charter school.
>
> **3019.13-** ….**LEA Charters shall** provide their own representation at, and **be responsible for implementation of all agreements or decisions resulting from**, mediation and **due process hearings involving children enrolled in their school,** unless implementation of the agreement or decision is the responsibility of DCPS as a result of any actions or inactions of

*In the Matter of D.H.*

DCPS while a child had been enrolled at an LEA Charter school
or pursuant to federal or local law or regulation.

[Emphasis Added]

Given the broad discretion given to the LEA and the scope of responsibilities
delegated to the LEA pursuant to the above DCMR sections it is arguable that  when a
LEA has  defaulted on its obligations under the Act and the DCMR,  a private school
placement is "proper under the Act" if the education provided by the private school is
"reasonably calculated to enable the child to receive educational benefits."[2] "[O]nce a
court holds that the LEA placement violated IDEA, it is authorized to 'grant such relief as
the court determines is appropriate.' '...[E]quitable considerations are relevant in
fashioning relief'... and the court enjoys 'broad discretion' in so doing."[3]

If the LEA is acting as an agent of the SEA and has failed to alert the SEA prior to
the filing of the due process hearing complaint that its ability to meet its obligations to the
student/Petitioner and the SEA are compromised, then there has been no shift in the
burden of the LEA to the SEA.

There is nothing in the related DCMR sections which indicates that Petitioner's
withdrawal in March of 2006, approximately eight months into the school year and LEA
funding cycle, would abate its responsibility  for relief to a Petitioner who has suffered
educational harm.  There is nothing in the relevant DCMR sections which suggest that
the LEA's alleged inability to issue a notice of placement would preclude the LEA from
financial responsibility from any resulting placement award.   Moreover, Petitioner's
resulting unilateral placement of Petitioner at the Katherine Thomas School for the

---

[2] *Florence County School District Four v. Carter,* 510 U.S. 7, 11 (1993).
[3] *Id.,* 510 U.S. at 15-16.

*In the Matter of D.H.*

remainder of the 2005-2006 school year is less than relevant given that Petitioner did not seek reimbursement in the instant hearing complaint for Petitioner's enrollment from March 2006 to June 2006. The complaint does not ask for retroactive placement. The Petitioner seeks as relief placement for the denial of FAPE within the statute of limitations and the Petitioner's disclosures contain IEPs in question for the previous two school years.

5. Petitioner is the prevailing party in this proceeding.

## ORDER

Upon consideration of Petitioner's request for a due process hearing, the parties' Five Day Disclosure Notices, the testimony presented at the August 30, 2006 hearing, and the representations of the parties' counsel at the hearing, this 18th day of September 2006, it is hereby

**ORDERED,** that Respondent, SAIL Public Charter School fund Petitioner at The Katherine Thomas School including transportation for the 2006-2007 and the 2006-2007 school years.

**IT IS FURTHER ORDERED,** that within forty-five days of Petitioner's enrollment an IEP meeting shall be convened at the Katherine Thomas School to review and revise the Petitioner's IEP as need the team shall also discuss any issues related to the implementation of the compensatory education award enumerated below.

**IT IS FURTHER ORDERED,** Respondent shall fund forty-six hours of after school tutoring for reading at the Katherine Thomas School.

**IT IS FURTHER ORDERED,** Respondent shall fund twenty-three hours of after school tutoring in study skills and organization at the Katherine Thomas School.

**IT IS FURTHER ORDERED,** Respondent shall fund the following software within thirty calendar days of Petitioner's enrollment.
    Kurzweil 3000 Learn Station
    Inspiration or CoWriter or Write Out Loud

**IT IS FURTHER ORDERED,** that Respondent shall reimburse Petitioner for all reasonable attorneys fees consistent with any currently existing SEA attorney cost and fee guidelines and policy with respect to hourly rates.

*In the Matter of D.H.*

**IT IS FURTHER ORDERED,** that if Respondent fails to fund the following software within thirty days of Petitioner's enrollment, Petitioner may forward invoices for reimbursement directly to the Respondent and the Petitioner is to be reimbursed for the two software products within ten business days of submittal to Respondent.

**IT IS FURTHER ORDERED,** that no later than May 11, 2006 a MDT/IEP meeting shall be convened at the Katherine Thomas School. The team shall discuss and determine if ESY services are warranted. If the team determines that Petitioner demonstrates regression during breaks and ESY is required to retain emerging and progressing skills, the Respondent shall fund ESY services for the Petitioner for the Summer of 2007 since the record contains no evidence of ESY services rendered for 2006 pursuant to Petitioner's March 15, 2006 IEP meeting.

**IT IS FURTHER ORDERED,** that this Order is effective immediately.

**Notice of Right to Appeal Hearing Officer's Decision and Order**

**This is the FINAL ADMINISTRATIVE DECISION. An Appeal can be made to a court of competent jurisdiction within ninety (90) days of this Order's issue date.**

_____
Tonya M. Butler-Truesdale, Esquire
Hearing Officer

Date:   September 19, 2006 *

*Record held open for receipt of post hearing submissions until September 16, 2006. On September 11, 2006, the hearing officer received an additional post hearing motion (Plaintiff's Opposition to Defendant's September 1, 2006 Filing) from Petitioner requiring further consideration and affording response time to Respondent.

Issued:  _____

Copies to:

Donna L. Wulkan, Esquire

*In the Matter of D.H.*

1765 N Street, NW
Washington, D.C. 20036
(202) 682-3909; Fax: (202) 955-1015

Paul Dalton, Esquire
1008 Pendleton Street
Alexandria, VA 22314

Quinne Harris-Lindsey, Esquire
Office of the General Counsel, DCPS
825 North Capitol Street, N.E.
9th Floor
Washington, D.C. 20002

## FACSIMILE TRANSMITTAL FORM

### Law Office
### TONYA M. BUTLER - TRUESDALE
### Attorney At Law
### Washington, DC
### (202) 518-6867

Date of Transmission: _____

To: _____ SHO _____

Fax Number of Recipient: _____

From: _____

Fax Number of Sender: _____ (202) 518-3666 _____

Total Number of Pages (including cover sheet): ___ 12 _____

Comments: _____ ██████ HOD _____

_____

_____

This message is intended only for the use of the individual or entity to which it is addressed may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. you have received this communication in error, please notify us immediately by telephone. return the original message to the above address via the U.S. Postal Service.

# ATTENDANCE SHEET

| | | |
|---|---|---|
| **STUDENT'S NAME:** | D██████ H█████ | DoB (██/52) |
| **HEARING DATE:** | 08/30/04 | 8151 |

| PRINTED NAME | ON BEHALF OF DCPS OR STUDENT | TITLE |
|---|---|---|
| Donna Wilkau | student | attorney |
| Michelle Hawkins | student | Parent |
| Gina Beck | student | attorney |
| Quine Harris-Lindsey | DCPS | Atty Adv. |
| Jenna Umansky | SAIL | Special Education Coordinator |
| Paul S. Dalton | SAIL | Attorney |
| Dr. Joelle James | Parent | pediatric neuropsychology children's National Medical Center Fellow |
| Debbie Lourie | Parent  Admissions | Coord. Katherine Thomas School |

TMBTuesdell
Impartial Hearing Officer

**Complaint Intake Unit**
**825 North Capitol Street, NE- 8th Fl.**
**Washington, DC 20002**
**(202) 724-6556**

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

## Time Sensitive Materials Attached

# Fax

**Prompt Attention: Principal/Administrator**
       **Special Education Coordinator**

Telephone Number: **(202)**
  Fax Number: **(202) 261-0200**

Pages: **10**
Date: June 26, 2006

Please find attached a copy of a Scheduling Memorandum and a copy of the Due
Process Complaint Notice regarding:

Student: **D████████ H██████**

School:  **Attending SAIL PCS**

The Complaint Intake Unit is responsible for providing parties with information
notice that a Due Process Complaint has been filed with the Student Hearing
Office.  If you have questions about the attached Notice, please contact the
Complaint Intake Unit at (202) 724-6556.  Otherwise, if you have questions about
the content of the compliant you should contact your legal counsel for further
advice.

         **Thank You**
         **Pamela M. Brown**
         **Staff Assistant**

The  document(s)  accompanying  this  telecopy  transmission  contains  confidential  information  that  Is  legally
privileged.   The  information  is  intended  only  for  use  of  the  individual  or  entity  named  Above,  if  you  are  not  the
intended  recipient  you  are  hereby  notified  that  any  disclosure,  copying,  Distribution  or  the  taking  of  any  action  in
reliance  of  the  contents  of  this  copied  information  is  Strictly  prohibited.  If  you  receive  this  telecopy  in  error,  please
immediately  notify  us  by  telephone  For  return  of  the  original  document  to  us.

| TRANSMISSION VERIFICATION REPORT | |
|---|---|

```
                                        TIME : 06/26/2006 20:04
                                        NAME : STATE ENFORCEMENT
                                        FAX  : 2024425253
                                        TEL  :
                                        SER.# : 000D6J436181
```

```
DATE,TIME                06/26  20:01
FAX NO./NAME             92610200
DURATION                 00:03:08
PAGE(S)                  10
RESULT                   OK
MODE                     STANDARD
                         ECM
```

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# Time Sensitive Materials Attached

# Fax

**Prompt Attention: Principal/Administrator**
                        **Special Education Coordinator**

Telephone Number: **(202)**
          Fax Number: **(202) 261-0200**

**Pages: 10**
Date: June 26, 2006

Please find attached a copy of a Scheduling Memorandum and a copy of the Due
Process Complaint Notice regarding:

Student: D█████████ H████████

School:  **Attending SAIL PCS**

The Complaint Intake Unit is responsible for providing parties with information
notice that a Due Process Complaint has been filed with the Student Hearing

17

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# Fax

## Time Sensitive Materials Attached

**Prompt Attention: Attorney: Donna Wulkaw, Esq.**
**Parent: Michelle Hawkins**

Telephone Number: **(202) 682-3909**
Fax Number: **(202) 955-1015**

Pages: **3**
Date: **June 26, 2006**

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: D██████ H██████
School:  **Attending SAIL PCS**

The Complaint Intake Unit is responsible for providing parties with
information notice that a Due Process Complaint has been filed with the
Student Hearing Office.  If you have questions about the attached Notice,
please contact the Complaint Intake Unit at (202) 724-6556.  Otherwise, if
you have questions about the content of the compliant you should contact
your legal counsel for further advice.

**Thank You**

**Pamela M. Brown**

The document(s) accompanying this telecopy transmission contains confidential information that Is legally privileged.  The
information is intended only for use of the individual or entity named Above, if you are not the intended recipient you are hereby
notified that any disclosure, copying, Distribution or the taking of any action in reliance of the contents of this copied information
is Strictly prohibited.  If you receive this telecopy in error, please immediately notify us by telephone For return of the original
document to us.

TRANSMISSION VERIFICATION REPORT

```
TIME   : 06/26/2006 19:33
NAME   : STATE ENFORCEMENT
FAX    : 2024425253
TEL    :
SER.#  : 000D6J436181
```

```
DATE,TIME            06/26  19:32
FAX NO./NAME         92029551015
DURATION             00:00:56
PAGE(S)              03
RESULT               OK
MODE                 STANDARD
                     ECM
```

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# Fax

## Time Sensitive Materials Attached

**Prompt Attention: Attorney: Donna Wulkaw, Esq.**
**Parent: Michelle Hawkins**

Telephone Number: **(202) 682-3909**          Pages: **3**
Fax Number: **(202) 955-1015**                Date: **June 26, 2006**

---

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: **D████████ H████████**
School:  **Attending SAIL PCS**

The Complaint Intake Unit is responsible for providing parties with
information notice that a Due Process Complaint has been filed with the
Student Hearing Office.  If you have questions about the attached Notice,
please contact the Complaint Intake Unit at (202) 724-6556.  Otherwise, if
you have questions about the content of the compliant you should contact
your legal counsel for further advice.

                                        **Thank You**

                                        **Pamela M. Brown**

19

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**



# *Due Process Complaint Notice*

- The form is used to give notice of a due process complaint to the District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA) and/or parents with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. _A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA)._

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint

- Notice must be provided to the Student Hearing Office of the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- _Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice._ Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting (called a "**Resolution Session**") with the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. _The Student Hearing Office does NOT schedule resolution meetings._

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

**A.    INFORMATION ABOUT THE STUDENT:**

Student Name: D̶̶̶ H̶̶̶                    Birth Date: ̶̶̶/1992

Address: 3001 20th Street, NE    WDC 20018

Home School: ̶̶̶

Present School of Attendance: SAIL

Is this a charter school? Yes    (If yes, you must also provide a copy of this notice to the charter school principal or director)

Parent/Guardian of the Student: Michelle Hawkins

Address (if different from the student's above): 3001 20th Street, NE, WDC 20018

Phone/Contact Number: _____ Fax Number (if applicable): _____

SEID DPCN Rev'd 9.30.05                    1

**B.    Individual Making the Complaint/Request for Due Process Hearing:**

Name: Michelle Hawkins

Complete Address: 3001 20th Street, NE

Washington, DC 20018

Phone: (h) 202-832-7843 (w) _____ (Fax) _____ (e-mail) _____

Relationship to the Student:

☒  Parent              ☐  Legal Guardian                    ☐  Parent Surrogate
☐  Self/Student        ☐  Local Education Agency (LEA)      ☐  Parent Advocate

**C.    Legal Representative/Attorney (if applicable):**

Name: Donna L Wulkan

Address: 1765 N Street, N.W.  Carriage House

Washington, DC 20036

Phone (w) 202-682-3909 (Fax) 202-955-1015 (e-mail) donnawulkan@hotmail.com

Will attorney / legal representative attend the resolution session?    ☐ Yes    ☐ No

**D.    Complaint Made Against (check all that apply):**

☐ DCPS school (name of the school if different from page one) _____
☒ Charter school (name of the charter school if different from page one) _____
☐ Non-public school or residential treatment facility (name) _____
☐ Parent

**E.    Resolution Session Between Parent and LEA:**

I understand that it is my right to have a resolution session to resolve this complaint.  I also understand that I may voluntarily waive this right if I choose.  (Note:  All parties must agree to waive the resolution session to avoid having this meeting.)

☐  I wish to waive the Resolution Session.

**F.    Mediation Process:**

IDEA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent.  Both parties can request mediation as an alternative to the Resolution Session.  Mediation is also available prior to a due process hearing, but mediation may not be used to deny or delay a parent's right to a hearing on parent's due process complaint.  Please check all that apply:

☐    I am requesting mediation as an alternative to the resolution session meeting.
☐    I am requesting mediation services <u>only</u>.
☒    I do not wish to use a mediator at this time.

2

SEID DPCN Rev'd. 9/30/05

21

**G.**   <u>Facts and Reasons for the Complaint:</u>

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions. Provide complete details about all the facts supporting your claims. (You may attach additional pages if needed):

1.   What is the nature of the problem, including the facts relating to the problem, that will need to be addressed at a Resolution Session meeting, a Mediation Conference, and/or a Due Process Hearing?

     *See Attached letter.*

2.   To the extent known to you at this time, how can this problem be resolved?

     *See Attached letter*

3.   Issues presented:

     *See Attached letter*

**H.**   <u>Estimated amount of time needed for the hearing:</u>   *full day*

Note:   In the absence of a specified amount of time, the SHO schedules hearings in two hour blocks of time and will allocate two hours to conduct the hearing. Please indicate if you believe more than two hours will be needed.

**I.**   <u>Accommodations and Assistance Needed:</u>

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type)_____
- Special Communication (please describe the type)_____
- Special Accommodations for Disability (please be specific)_____
- Other_____

SED DPCN Rev'd. 9/30/05

3

**J.** **Waiver of Procedural Safeguards:**

☐ I (parent/guardian) waive receiving a copy of the procedural safeguards at this time.

**K.** **Parent Signature and Affirmation:**

I affirm that the information provided on this form is true and correct.

_____

Signature of Parent or Guardian                          Date

**L.** **Signature of Attorney/ Legal Representative:**

Donna Wulkan/gb          6/23/06

Legal Representative / Advocate                          Date

**M.** **Signature of LEA Representative (if hearing requested by LEA):**

_____

Representative of LEA                          Date

Mail, fax or deliver this complaint notice to:
State Enforcement and Investigation Division
For Special Education Programs (SEID)
Student Hearing Office (SHO)
825 North Capitol Street, NE, 8th Floor
Washington, DC 20002
Fax number: 202/442-5556

Law Office Of
**DONNA L. WULKAN**
1765 N Street, N.W.
Carriage House
Washington, D.C. 20036

(202) 682-3909
telecopier (202) 955-1015

June 23, 2006

Sheila Hall
State Enforcement and Investigation Division
For Special Education Programs
Student Hearing Office
825 N. Capitol St., N.E., 8th floor
Washington, D.C. 20002

BY FAX AND MAIL

RE: D████████ H████████
DOB: ████92

Dear Ms. Hall:

As the educational attorney for Mr. Carlton and Mrs. Michelle Hawkins, parents of D████████ H████████, I am writing pursuant to the IDEIA, DCMR and local DCPS rules and regulations to request that you schedule a special education administrative due process hearing regarding Dominique. This case requires a sit-down denial and appropriateness hearing.

D████████ is a 13-year-old student who is currently in the 7th grade at the School for Arts in Learning (hereinafter "SAIL") Public Charter School's Middle School program. D████████ has been diagnosed with Attention Deficit Hyperactivity Disorder, Predominantly Inattentive Type; Reading Disorder; Mathematics Disorder; Disorder of Written Expression; a moderate to severe speech and language impairment in both receptive and expressive language; and a severe impairment in language processing and language memory. Recent testing indicates that he is reading and writing at the second-grade level and his cognitive functioning is in the borderline range for his age. D████████ has been found eligible as a student in need of special education with disability classifications of speech/language impaired and learning disabled and his IEP calls for a full-time special education program.

D████████ has attended SAIL PCS since entering the 1st grade. However, his current middle school program at SAIL is inappropriate. D████████ is not making adequate academic progress and he is not receiving all of his required related services. D████████ classes are too large and unstructured and do not offer an adequate amount of individualized instruction or redirection. He is easily distracted and his placement in a classroom environment with disruptive classmates (and a previously "open classroom" setting) is inappropriate.

Instead, D████████ requires a highly structured, full-time special education program that

focuses on teaching students with severe learning disabilities and speech and language impairments. D▮▮▮▮▮ also requires small classes with a low student-to-teacher ratio. In addition, D▮▮▮▮▮ requires a placement with well-matched peers who do not present with behavior problems or cause distractions for D▮▮▮▮▮ in the classroom.

Therefore, Mr. and Mrs. Hawkins raise the following complaints:

1. In violation of the IDEIA and DCMR, SAIL has failed to develop an appropriate IEP, including, but not limited to, developing appropriate goals and an appropriate disability classification.

2. In violation of the IDEIA and DCMR, SAIL has failed to issue an appropriate notice of placement.

3. In violation of the IDEIA and DCMR, SAIL has failed to provide for and deliver appropriate instructional and related services.

4. In violation of the IDEIA and DCMR, SAIL has failed to evaluate the student in all areas of his disability.

5. In violation of the IDEIA and DCMR, SAIL has failed to ensure D▮▮▮▮▮ makes adequate progress in his academic program.

6. In violation of the IDEIA and DCMR, SAIL has failed to provide appropriate special education instruction and therefore has failed to provide an appropriate placement.

These failures constitute a denial of Free Appropriate Public Education (FAPE). As relief, the parents request that the hearing officer order SAIL to place and fund D▮▮▮▮▮, including transportation, at an appropriate full-time private special education program that can address his significant academic, language, organizational and attentional disabilities, such as the Chelsea School. The parents also request an IEP meeting, to be convened at D▮▮▮▮▮ new placement, to revise his IEP as needed. In addition, the parents request compensatory education.

Sincerely,

*Donna Wulkan/ ▮▮▮▮*

Donna Wulkan

CC:   Mr. and Mrs. Hawkins

   George Gaudette
   Principal, School for Arts in Learning
   1705 H. Street, NW
   Washington, DC 20006

# FAX TRANSMISSION

Law office of
**DONNA L. WULKAN**
1765 N Street, N.W.
Carriage House
Washington, D.C.  20036

———

(202) 682-3909
telecopier (202) 955-1015

| | | | |
|---|---|---|---|
| **To:** | Sheila Hall<br>State Enforcement and Investigation<br>For Special Education Programs<br>(202) 442-5669 | **Date:** | June 23, 2006 |
| **CC:** | | **Pages:** | 7, including this cover sheet. |
| **From:** | Stefan Black<br>Law Clerk<br>Law Office of Donna Wulkan | | |
| **Subject:** | D██████ H█████ | | |

Please see attached letter...

2006 JUN 26  AM 10: 25
DC PUBLIC
SCHOOL SYSTEM

The information contained in this telefacsimile message is transmitted by an attorney.  It is privileged and confidential, intended for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited.  If this communication has been received in error, please notify us immediately by telephone, collect if necessary, and return the original message to us at the above address via first class mail (we will reimburse postage).  Thank you.

# STATE EDUCATION AGENCY
# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the Matter of: | ) | BEFORE A SPECIAL EDUCATION |
| | ) | |
| H██████, D.     Petitioner | ) | |
| | ) | HEARING OFFICER |
| Vs. | ) | |
| | ) | |
| DCPS/NON-PUBLIC | ) | |
| Attending SAIL PCS | ) | DISTRICT OF COLUMBIA |
| | ) | |
| Respondent | ) | PUBLIC SCHOOLS |

## <u>SCHEDULING MEMORANDUM</u>

1.  A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint <u>within 15 calendar days of receiving notice of the parents' complaint</u>. The meeting shall include a representative of the Local Educational Agency who has decision-making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. **<u>The Student Hearing Office does not schedule or participate in resolution meetings</u>**.

2.  The complaint notice was filed on **June 26, 2006**

3.  The deadline for the resolution meeting is **July 11, 2006** unless the parent and Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

## <u>RESPONSE TO THE COMPLAINT</u>

A.  ***<u>Prior Written Notice Not Issued by the Local Educational Agency</u>***.  If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, <u>within 10 days of receiving the complaint</u>, send to the parent a response that shall include:

1.  An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;

2.  A description of other options that the IEP Team considered and the reasons why those options were rejected;

3.  A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and

Rev'd. 7/6/05

4.      A description of the factors that is relevant to the agency's proposal or refusal.

B.      Prior written notice, if not already provided to the parent, must be sent by the Local Educational Agency to the complaining party no later than **July 6, 2006**.

C.      ***Deficiency Notice***.   A complaint notice shall be deemed sufficient unless the party receiving the notice notifies the Student Hearing Office and the complaining party in writing, <u>within 15 days of receiving the notice of the complaint</u>, that the complaint does not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

D.      The deadline for filing a deficiency notice is **July 11, 2006**.

## DUE PROCESS HEARING

Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all applicable time lines for scheduling a due process hearing will commence.   A final hearing officer's decision must be issued within 45 days from the expiration of the 30-day resolution period.

## QUESTIONS AND INFORMATION

The staff with the Student Hearing Office does not provide legal advice.   The parties should consult with legal counsel or other representative to answer any legal questions about your rights, duties, and responsibilities under the law.   The school or the Local Education Agency responsible for scheduling the meeting will provide information about the time, date, and location of the resolution meeting.

Rev'd. 7/6/05

**STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA STATE
ENFORCEMENT AND INVESTIGATION DIVISION (SEID)
SPECIAL EDUCATION PROGRAMS**

In re                                    )
D████ H████                              )
                                         )
v.                                       )
                                         )        July 6, 2006
                                         )
SAIL PCS                                 )

## Motion to Dismiss or in the Alternative Motion to Join a Necessary Party

Comes now, SAIL Public Charter School and requests that the hearing complaint filed on June 26, 2006, be dismissed against SAIL PCS.  SAIL, as an LEA, cannot provide the relief the parent is seeking.  Only DCPS, as the SEA can place students in another LEA.

The complaint only names SAIL as a party to the action.  The parent alleges that SAIL failed to develop an inappropriate IEP, did not provide appropriate services and did not evaluate the student in all areas of disability.  To date, the student has a current IEP dated Mach 16, 2006, signed by the parent.  His most recent evaluations took place in 2005.  Additionally, the student receives speech language therapy and occupational therapy, so it is unclear as to what area of disability requires additional evaluations.  Lastly, the parent alleges SAIL failed to issue an appropriate notice of placement.  SAIL, as its own LEA, does not have the jurisdiction to place students outside of its own LEA.  Only DCPS, as the SEA, can place students in an alternative LEA.

1

Regardless of the above alleged violations, the only substantive relief requested by the parent is placement in a full-time, special education school, such as the Chelsea school. SAIL, as its own LEA, can only place students within its own program. It does not have authority to place students in other charter schools, in DCPS schools or in private schools. DCPS, as the SEA, is the agency that must place students into other LEA's within the District of Columbia. Consequently, SAIL requests that this hearing request be dismissed against SAIL since DCPS is the only party that can provide the relief requested.

In the alternative, SAIL requests that DCPS be joined as a necessary party to this action. As stated above the only substantive relief being requested is placement. Given that the student currently attends an LEA charter school, only DCPS as the SEA can place a student in an alternative placement.

Based on the above, we respectfully request that this hearing request be dismissed or in the alternative, that DCPS be joined as a necessary party.

Respectfully submitted,

Laura Duos, Esq.
Dalton, Dalton, & Houston, P.C.
1008 Pendleton Street
Alexandria, Virginia 22314
703-739-4300
703-642-2323 – fax

2

30

**FAX TRANSMISSION COVER SHEET**
**Dalton, Dalton & Houston P.C.**
**Attorneys at Law**
**1008 Pendleton Street**
**Alexandria, Virginia 22314**
**(703) 739-4300**
**FAX (703) 739-2323**

DATE:       July 6, 2006

TO:         Hearing Officer David Smith

AT FAX:     202-442-5556

FROM:       Laura Duos, Esq.

RE:         D████████ H███████ – Motion to Dismiss/Motion to Join

NUMBER OF PAGES INCLUDING THIS PAGE:       3

ADDITIONAL INFORMATION:

_____

**PLEASE DELIVER ASAP.**
**************************************************************

**THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE
PRIVILEGED PURSUANT TO THE ATTORNEY CLIENT PRIVILEGE AND
ATTORNEY WORK PRODUCT DOCTRINE.**

**IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECI-
PIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS
STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNI-
CATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELE-
PHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE
ABOVE ADDRESS.**
**************************************************************

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**

| | | |
|---|---|---|
| In the Matter of | ) | IMPARTIAL |
| | ) | DUE PROCESS HEARING |
| D█████████ H██████ | ) | |
| Date of Birth: ████/92 | ) | |
| | ) | |
| | ) Held at: | 825 North Capitol Street, NE |
| | ) | Eighth Floor |
| | ) | Washington, DC 20002 |

To:    Due Process Hearing Officer
       825 North Capitol Street, NE, 8th Floor
       Washington, DC 20002

## MOTION TO DISMISS

Petitioner, District of Columbia Public Schools, ("DCPS") by and through its attorneys, the Office of the General Counsel, files this Motion to Dismiss DCPS from this action, and in support states as follows:

1. On June 26, 2006, Donna Wulkan, Esq., filed a due process complaint ("Complaint") on behalf of parent, Michelle Hawkins against School for Arts in Learning Public Charter School. ("S.A.I.L. PCS").

2. This Complaint identifies D█████████ H██████ ("D█████████") present school of attendance as S.A.I.L. PCS. D█████████ home school is identified as the same. The Complaint is attached as DCPS Exhibit 1.

3. In five of the five legal claims in the Complaint, Parent's counsel makes allegations against S.A.I.L. PCS.

4. Parent's Counsel requests the following relief:

    a. S.A.I.L. to place/fund student w/transportation at an appropriate full-time private special education program

    b. S.A.I.L. PCS to convene an IEP meeting at new placement to revise IEP as necessary, and

32

c. S.A.I.L. PCS to provide compensatory education

5. Local law provides the following:

    3019.1    Pursuant to the DC School Reform Act, District charter schools shall elect to be Local Education Agencies ("LEA Charters") or District of Columbia Public Schools ("District Charters") for special education purposes.

    3019.2    LEA Charters shall be responsible for ensuring that the requirements of Part B of the Act, including documentation of required policies and procedures, are met in regard to children enrolled in their schools, consistent with the requirements of Chapter 38.

    3019.3    Except as provided in 3019.4 and 3019.5 below, LEA Charters are responsible for special education evaluations, and, if necessary, IEPS and placements for children with disabilities enrolled in their facilities

    3019.8    LEA and District Charters are responsible for providing all necessary related services to children with disabilities enrolled in their facilities, consistent with these children's IEPS.

    3019.9    When an LEA Charter concludes that it cannot serve a child with a disability enrolled in its facility using the funds available to it, it *shall* appeal to DCPS, in its role as designee for the State Education Agency (SEA), for assistance.

30 DCMR 3019.1,3019.2, 3019.8, 3019.9 (2003).

6. IDEA Charter is an LEA Charter and therefore is responsible for implementing the requirements of Part B of IDEA, including special education evaluations and IEPs.

7. Under the law, DCPS only plays a supervisory role, unless it is notified by the LEA Charter that it cannot service the student.

8. In this matter, the IDEA Charter never notified DCPS that it could no longer provide Part B services under the Act to D████████

9. Hence, IDEA Charter alone is solely responsible for the allegations made in the Complaint.

WHEREFORE, DCPS respectfully requests that DCPS be dismissed as a party in this matter.

Respectfully submitted,


*Quinne Harris-Lindsey* /signed electronically
Quinne Harris-Lindsey, Esq.,
DCPS Attorney-Advisor



Office of the General Counsel
825 North Capitol Street, NE
Room 9095
Washington, DC 20002
(202) 442-5000 main
(202) 442-5166 direct
(202) 442-5098 fax

# Fax

| **To:** | Donna Wulkan, Esq. | **From:** | Ann J. Williams, Paralegal Specialist |
|---|---|---|---|
| **Fax:** | 202/955-1015 | **Date:** | July 7, 2006 |
| **Phone:** | 202/682-3909 | **Pages:** | 4 |
| **Re:** | D. Hawkins | **CC:** | |

☐ Urgent  ☐ For Review  ☐ Please Comment  ☐ Please Reply  ☐ Please Recycle

**•Comments:**

## MESSAGE CONFIRMATION

07/07/2006  16:16
ID=OFFICE OF THE GENERAL COUNSEL

| DATE<br>07/07 | S.R-TIME<br>00'40" | DISTANT STATION ID<br>2029551015 | MODE<br>TX | PAGES<br>004 | RESULT<br>OK | S.C.<br>0000 |
|---|---|---|---|---|---|---|

07/07/2006    16:15    OFFICE OF THE GENERAL COUNSEL → 99551015                NO.421    [0001



Office of the General Counsel
825 North Capitol Street, NE
Room 9095
Washington, DC 20002
(202) 442-5000 main
(202) 442-5166 direct
(202) 442-5098 fax

# Fax

| To: | Donna Wulkan, Esq. | From: | Ann J. Williams<br>Paralegal Specialist |
|---|---|---|---|
| **Fax:** | 202/955-1015 | **Date:** | July 7, 2006 |
| **Phone:** | 202/682-3909 | **Pages:** | 4 |
| **Re:** | D. H███████ | **CC:** | |

☐ Urgent ☐ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

•**Comments:**

36

**STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA**
**STATE ENFORCEMENT AND INVESTIGATION DIVISION**
**SPECIAL EDUCATION PROGRAMS**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| D███████ H██████ | ) | |
| | ) | |
| v. | ) | July 13, 2006 |
| | ) | |
| SAIL PCS | ) | |

**PLAINTIFF'S OPPOSITION TO THE MOTIONS TO DISMISS**
**SUBMITTED BY BOTH SAIL AND DCPS**
**AND RESPONSE TO SAIL'S MOTION TO JOIN A NECESSARY PARTY**

## I. Introduction

COMES NOW, Carlton and Michelle Hawkins (Plaintiffs), parents of D███████

H██████, and request the Motions to Dismiss filed by School for Arts in Learning (SAIL) and

District of Columbia Public Schools (DCPS) be denied.  First, because all substantive claims

concerning the denial of FAPE are directed against SAIL and because SAIL would be

responsible for paying both compensatory education and attorneys' fees in the event that

Plaintiffs prevailed at the upcoming due process hearing, SAIL is a necessary party to the current

action. Furthermore, because all factual disputes must be resolved in favor of the nonmoving

party in summary judgment actions and because Plaintiffs have alleged sufficient facts to

establish a prima facie case of denial of free appropriate public education (FAPE), SAIL's factual

arguments are inapposite at this stage of the proceedings and as a result, their Motion to Dismiss

should be denied.  Second, because SAIL is likely authorized to provide Plaintiffs with complete

1

relief, DCPS may not in fact be a necessary party to the instant action at this stage of the proceedings. However, if the Hearing Officer should find that SAIL is not authorized to place D████████ at another school or is otherwise unable to provide Plaintiffs with complete relief, Plaintiffs move that DCPS be joined in the instant action and their Motion to Dismiss be denied.

## II. Background

In their Due Process Hearing Request dated June 23, 2006, Plaintiffs alleged that SAIL had denied D████████ FAPE on the following grounds: (1) that SAIL has failed to develop an appropriate IEP for D████████, (2) that SAIL has failed to deliver appropriate instructional and related services to D████████, and (3) that SAIL has failed to provide D████████ with an appropriate special education placement. As relief for these denials of FAPE, Plaintiffs requested placement and funding for D████████ at a full-time non-public special education program, a compensatory education award, and attorneys' fees.

On July 6, 2006, SAIL filed a Motion to Dismiss requesting that Plaintiffs' Hearing Request be dismissed or, in the alternative, that DCPS be joined as a necessary party. On July 7, 2006, DCPS filed a separate Motion to Dismiss requesting only that they be dismissed as a party. Plaintiffs now enter their opposition to both motions.

## III. Argument

**A. Because SAIL is solely responsible for the actions constituting the alleged denial of FAPE and because SAIL would be responsible for paying both the compensatory education award and Plaintiffs' attorneys' fees in the event that Plaintiffs prevail at the hearing, SAIL is a necessary party to the current action.**

Under the District of Columbia Municipal Regulations Section 5-3019.2, LEA Charters

2

such as SAIL are responsible for implementing the terms of the IDEIA with regard to children enrolled in their schools. Plaintiffs thus directed the allegations set forth in their Hearing Request against SAIL. Specifically, Plaintiffs alleged that SAIL failed to provide D██████ with an appropriate placement, denied him his required related services, and was unable to develop and implement an appropriate IEP to suit his unique academic needs. In addition, Plaintiffs alleged that the above-listed failures resulted in D██████ failure to progress. Because the responsibility for the provision of FAPE belonged to SAIL and because the decisions that led to the alleged denial of FAPE were made exclusively by SAIL officials, it is SAIL's responsibility to defend their actions at the hearing.

Furthermore, if the hearing officer should decide that SAIL did indeed deny D██████ FAPE, they alone would be responsible for providing D██████ with the compensatory education award and the attorneys' fees requested in Plaintiffs' hearing request. Despite SAIL's allegations that the only substantive relief requested by the parents was the placement at a private special education program, Plaintiffs explicitly requested compensatory education.[1] Furthermore, under 20 U.S.C. § 1415(i)(3), a prevailing party at a due process hearing is entitled to reasonable attorneys fees. A recent decision from the U.S. District Court for the District of Columbia stands for the proposition that so long as an LEA Charter school is capable of providing the services ordered by a hearing officer, the responsibility of providing both the ordered services themselves and the attorneys' fees incurred in preparation falls solely on the LEA charter school and not on DCPS. *See IDEA Public Charter School v. Belton*, 2006 U.S. Dist. LEXIS 13321, 45 IDELR 719 (D.D.C. March 15, 2006).

---

[1] "In Addition the parents request compensatory education." Hearing Request at 2.

3

39

In *Belton*, a hearing officer ordered a public charter school to provide one of its students with an occupational therapy evaluation. *Belton*, 2006 U.S. Dist. LEXIS 13321, 10.  The school objected and sued both the students' parents and DCPS, arguing that DCPS - not the school - should be responsible for funding the evaluation. *Id.* at 10-11.  The District Court disagreed, holding that because the school was an LEA charter school and thus "stands on its own under the IDEA," and because there was no indication that the school was unable to fund the occupational therapy evaluation, the school was solely responsible for providing the evaluation and to pay the student's attorneys' fees. *Id.* at 17.

Here, like the school in *Belton*, SAIL is an LEA Charter school and is thus solely responsible for ensuring that the terms of the IDEIA are met with respect to D███████.  As such, should the hearing officer determine that SAIL denied D███████ FAPE, the responsibility for implementing the ordered relief would also fall solely upon SAIL unless they were able to demonstrate that they were incapable of doing so.  As of the filing of this opposition, no such indication has been made.  Thus, just as the school in *Belton* was responsible for paying for the evaluation and the parents' attorneys' fees, SAIL - not DCPS - should be required to pay D███████ compensatory education and Plaintiffs' attorneys' fees.

Therefore, even if one accepts SAIL's argument that they are not authorized to place their students in other schools, they are still a necessary party to this action because they are the party responsible for denying D███████ FAPE and they are at the very least responsible for paying for D███████ compensatory education award and Plaintiffs' attorneys' fees.  The sole remaining issue raised in SAIL's Motion to Dismiss is whether summary judgment should be granted because the factual allegations raised in Plaintiffs' Hearing Request are untrue.

Under Federal Rule of Civil Procedure 56(c), a motion to dismiss should not be granted unless it is shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2]   A Court considering such a motion shall resolve all factual disputes in favor of the non-moving party and draw all logical inferences therefrom. *See Arnett v. Kennedy*, 416 U.S. 134, 139 (1973).  Because the Hearing Officer must assume the facts alleged in Plaintiffs' Hearing Request to be true when considering the merits of SAIL's Motion to Dismiss and because these allegations raise genuine issues regarding material facts, Plaintiffs respectfully request the hearing officer deny SAIL's Motion to Dismiss.  Defendant's contentions that D███████ IEP is current or that he has been comprehensively evaluated are factual arguments that are simply not pertinent in summary judgment proceedings.

### B.  Because SAIL is likely authorized to provide Plaintiffs with all the relief requested in the hearing request, DCPS may not be a necessary party to the instant action.

District of Columbia Municipal Regulation Section 5-3019.13 defines the responsibilities of LEA Charter Schools as follows:

> LEA Charters shall provide their own representation at, *and be responsible for implementation of all agreements or decisions resulting from,* mediation and due process hearings involving children in their school, unless implementation of the agreement or decision is the responsibility of DCPS as a result of any actions or inactions of DCPS while a child had been enrolled at an LEA Charter school or purusant to federal law or local law or regulation. (emphasis added)

However, if an LEA lacks the funds to properly implement a hearing officer's decision, it

---

[2] Under Rule 12(c), a 12(b)(6) motion is to be treated in all respects as a motion for summary judgment and disposed of as provided in Rule 56.  The same is true for any motion to dismiss.

shall appeal to the State Education Agency (SEA) for assistance.[3] Thus, the language of DCMR § 5-3019.13 and DCMR § 5-3019.9 suggests that DCPS is not a necessary party in disputes between LEA Charter schools and their students unless (1) some action or inaction on the part of DCPS indicates that it has taken responsibility for the child, or (2) the LEA can demonstrate that it is financially incapable of serving the child and appeals to the SEA for assistance.[4]

DCPS has not given SAIL any indication that it is willing to assume responsibility for D██████ education. The District of Columbia established the institution of public charter schools to provide public schools with "an option for more autonomy over their administration, operations and expenditures." D.C. Code § 38-1701.2(7). The District ceded greater autonomy to charter schools with the understanding such schools would be independently liable for the legal consequences of their policies. Specifically, D.C. Mun. Reg. § 5-3019.2 provides that LEA Charter schools are to be independently "responsible for ensuring that the requirements of [the IDEIA] ... are met in regard to children enrolled in their schools." Here, the educational decisions that deprived D██████ of FAPE were made solely by SAIL. DCPS had no knowledge of the programs and instruction strategies SAIL employed to teach D██████, nor did it play any role in the development of D██████ IEP. DCPS was not responsible for

---

[3] "When an LEA concludes that it cannot serve a child with a disability enrolled in its facility using the funds available to it, it shall appeal to DCPS, in its role as designee for the State Education Agency, for assistance." D.C. Mun. Reg. 5-3019.9. DCPS functions as the SEA for SAIL. *See IDEA Public Charter School v. Belton*, 2006 U.S. Dist. LEXIS 13321 (D.D.C. March 15, 2006).

[4] Contrary to SAIL's contention that it "does not have the authority" to place D██████ in another school, *see* SAIL's Motion to Dismiss at 1, District of Columbia Municipal Regulation Section 5-3019.3 provides that "Except as provided in §§ 3019.4 and 3019.5 below, LEA Charters are responsible for special education evaluations, and if necessary, IEPs and *placements for children with disabilities enrolled in their facilities*" (emphasis added). District regulations therefore indicate that public charter schools likely possess the authority to place and fund their students at different schools.

evaluating the extent of D██████ impairment or for ensuring that the learning environment at

SAIL was appropriate given D██████ needs. As such, it is simply counterfactual that DCPS

did anything to indicate that it had assumed responsibility for D██████ education.

Furthermore, SAIL has not yet demonstrated that it is financially incapable of providing

D██████ with the funding necessary to attend a full-time special education program or that it

has appealed to DCPS as its SEA for assistance. DCPS confirmed as much in its Motion to

Dismiss. DCPS Motion to Dismiss at 2. Thus, because DCPS has not assumed responsibility for

D██████ education and because SAIL has not demonstrated that it is incapable of

implementing the hearing officer's eventual decision or appealed to DCPS in its role as SEA for

assistance, it appears that at this time SAIL would be responsible for implementing the hearing

officer's order should the Plaintiffs prevail. Because Plaintiffs can likely obtain complete relief

from SAIL, they may not be required to join DCPS as a party to the current action.

In the event that SAIL is able to demonstrate that it cannot appropriate sufficient funds to

cover the costs of a non-public placement for D██████ or if the hearing officer should find that

SAIL is not authorized to place D██████ at another school, DCPS would then become a

necessary party because Plaintiffs would no longer be able to receive complete relief from SAIL.

In that situation, Plaintiffs would request that DCPS be joined as a necessary party and that

DCPS's Motion to Dismiss be denied.

To ensure that D██████ receives the relief due to him in a timely manner, Plaintiffs

respectfully request that the determination of whether it is SAIL or DCPS that is required to fund

D██████ placement at a private school (should one be ordered by the hearing officer at the

hearing) be made prior to the requested due process hearing. Equity demands that D██████

not be denied his due relief while DCPS and SAIL engage in a legal battle regarding who is

responsible for paying for this relief.


**IV. Conclusion**

For the reasons stated above, Plaintiffs respectfully request that the Hearing Officer deny

both Motions to Dismiss.


Respectfully submitted,

DONNA L. WULKAN, ESQ.
Unified D.C. Bar No. 370961
1765 N. Street, NW
Carriage House
Washington, DC 20036
202.682.3909

8

44

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Opposition was served upon the following parties via first-class mail and via fax (if available) on the 13th day of July, 2006.

Quinne Harris-Lindsey
Office of the General Counsel
825 N. Capitol St., NE
Room 90009
Washington, DC 20002

Laura Duos, Esq.
Dalton, Dalton, & Houston, P.C.
1008 Pendleton Street
Alexandria, VA 22314

George Gaudette
Principal, SAIL
1705 H. Street, NW
Washington, DC 20006

Mr. and Mrs. Hawkins.
3001 20th Street, NE
Washington, DC 20018

Donna Wulkan /gmb
Donna L. Wulkan, Esq.

9

45

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

In the Matter of:                                    )          BEFORE A SPECIAL EDUCATION
                                                     )
D~~~~~~~ H~~~~~~ (~~~-92)                             )          INDEPENDENT HEARING OFFICER
            *Petitioner*                             )
                Vs.                                  )
                                                     )          STATE EDUCATION AGENCY
SAIL PCS                                             )
            *Respondent*

ON THIS DAY came on to be heard Respondent SAIL's "Motion to Dismiss or in the Alternative Motion to

Join a Necessary Party," DCPS' "Motion to Dismiss" and Petitioner's Opposition to both Motions

in the above styled cause.

## ORDER

   After reviewing the evidence, the Motion of SAIL  is **DENIED** and the Motion of DCPS **GRANTED.**

The allegations in the Complaint concerning a denial of FAPE are against SAIL.  Furthermore, the Complaint
does not state facts alleging that DCPS has denied the student FAPE, notwithstanding the parent's requested
remedy of a placement.  Additionally, based on the allegations in the Complaint, SAIL, as its own LEA, may be
able to provide the relief requested should it be determined that there was a denial of FAPE. Accordingly,
Respondent SAIL's "Motion to Dismiss or in the Alternative Motion to Join a Necessary Party," is Denied.
DCPS' "Motion  to Dismiss" concerning it being a party is Granted.

SIGNED: this date____7-13-06_____

_____
Issue Date:_____          Impartial Special Education Hearing Officer

Original to SHO – Student's File
Copy To:          Parent' - C/O:
                  DCPS - C/O:           Donna Wulkan, Esq._____
                  Charter School - C/O: Quinne Harris-Lindsey, Esq.,_____
                                        Laura Duos, Esq._____

2007 JUL 13  PM 2: 33
DC PUBLIC
SCHOOL SYSTEM

46

TRANSMISSION VERIFICATION REPORT

```
TIME  : 07/31/2006 09:48
NAME  : STUDENT HEARINGS OFF
FAX   : 2024425556
TEL   : 2024425432
SER.# : BROH3J608601
```

```
DATE,TIME        07/31  09:47
FAX NO./NAME     97037392323
DURATION         00:00:28
PAGE(S)          01
RESULT           OK
MODE             STANDARD
                 ECM
```

## District of Columbia Public Schools
### State Enforcement & Investigation Division
## STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556

HEARING NOTICE

MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY

TO:   Parent (or Representative): _D. WULKAN/ L. DUOS_    Fax No.: _955 - 1015_
                                                                    _(703) 739-2323_

LEA Legal Counsel: _Q. HARRIS-LINDSEY_

RE:   H_____, De_____    and (LEA) DOB: _____/92_
              Student's Name

FROM:   __SHARON NEWSOME__
            Special Education Student Hearing Office Coordinator

DATE SENT: _____7/31/06_____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on _6/26/06_. Please be advised that the hearing has been scheduled for:

DATE: _____8/30/06_____

TIME: _9:00, 11:00, 1:00 & 3:00_

47

```
┌─────────────────────────────────────────┐
│   TRANSMISSION VERIFICATION REPORT       │
└─────────────────────────────────────────┘
                        TIME  : 07/31/2006 09:26
                        NAME  : STUDENT HEARINGS OFF
                        FAX   : 2024425556
                        TEL   : 2024425432
                        SER.# : BROH3J608601
```

```
┌──────────────────────────────────────────────────────────┐
│   DATE,TIME              07/31  09:26                       │
│   FAX NO./NAME           9202955l015                        │
│   DURATION               00:00:19                           │
│   PAGE(S)                01                                  │
│   RESULT                 OK                                  │
│   MODE                   STANDARD                           │
│                          ECM                                │
└──────────────────────────────────────────────────────────┘
```

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



HEARING NOTICE

| MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |

TO:   Parent (or Representative): D. WULKAN / L. DUOS   Fax No.: 955-1015
      (703) 739-2323

      LEA Legal Counsel: Q. HARRIS-LINDSEY

RE:   H▬▬▬▬ D▬▬▬▬  and (LEA) DOB: ▬▬▬ /92
              Student's Name

FROM:   SHARON NEWSOME
        Special Education Student Hearing Office Coordinator

DATE SENT:    7/31/06

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
6/26/06 .  Please be advised that the hearing has been scheduled for:

        DATE:     8/30/06

        TIME:   9:00, 11:00, 1:00 & 3:00

48

**STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA STATE
ENFORCEMENT AND INVESTIGATION DIVISION (SEID)
SPECIAL EDUCATION PROGRAMS**

In re                                          )
D███████ H██████                               )
                                               )
v.                                             )
                                               )      H.O. David Smith, Esq.
                                               )
SAIL PCS                                       )

## Motion to Join a Necessary Party

Comes now, SAIL Public Charter School and requests that DCPS be joined as a

necessary party. Subsequent to our July 6th Motion, Dr. Peggy Peagler of DCPS

participated in a resolution meeting on July 14, 2006. At this meeting it became clear

that the central issue was the parent's request that the student be placed at either the

Chelsea school or Katherine Thomas School.

Counsel for the parent, Donna Wulkan, stated that the parent expected to

receive acceptance letters around the first of August and Dr. Peagler requested that

copies of any acceptance letters be forwarded to her ASAP. Dr. Peagler also

requested copies of all evaluations and a copy of the student's current IEP, which have

been provided. In order to give Dr. Peagler time to review these documents and to

accommodate her schedule, the parties agreed to reconvene the resolution meeting on

August 8, 2006, at 10:00 a.m.

It is SAIL's position that one of two things will happen at this meeting. Dr.

Peagler will approve one of the parent's recommendations for placement or she will

offer a public placement. If the former, this matter is resolved and a hearing would be

unnecessary. If the latter, DCPS would need to be a party in order to defend their

1

49

recommendation of a public placement over the choice of the parent. Given the short

time remaining before the beginning of the new school year, SAIL requests that this

matter be scheduled for a hearing ASAP after August 8, 2006.


                                    Respectfully submitted,


                                    Paul S. Dalton, Esq.
                                    Dalton, Dalton, & Houston, P.C.
                                    1008 Pendleton Street
                                    Alexandria, Virginia 22314
                                    703-739-4300
                                    703-642-2323 – fax

## Certificate of Service

I certify that a copy of the foregoing, **Motion to Join a Necessary Party,** was faxed on this 1st day of August, 2006, to:

Donna Wulkan, Esq.
fax no. 202-955-1015

Quinne Harris-Lindsey, Esq.
fax  no. 202-442-5098

Paul S. Dalton
Counsel for SAIL

AUG-04-2006 15:16 From:LAW OFFICE          2029551015

# FAX TRANSMISSION

### Law office of
### DONNA L. WULKAN
1765 N Street, N.W.
Carriage House
Washington, D.C. 20036

(202) 682-3909
telecopier (202) 955-1015

| | | |
|---|---|---|
| **To:** | Sheila Hall<br>Student Hearing Office | **Date:** August 4, 2006 |
| **Fax #:** | (202) 442-5556 | **Pages:** 23, including this cover sheet |
| | CC:<br>Paul Dalton, Esq. (703) 642-2323<br>Quinne Harris-Lindsey, Esq. (202) 442-5098 | |

**From:** Donna Wulkan

**Subject:** Plaintiff's Response to Defendant's Motion to Join a Necessary Party

2006 AUG -4 PM 4:36
DC PUBLIC
SCHOOL SYSTEM

The information contained in this telefacsimile message is transmitted by an attorney. It is privileged and confidential, intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If this communication has been received in error, please notify us immediately by telephone, collect if necessary, and return the original message to us at the above address via first class mail (we will reimburse postage). Thank you.

52

**STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA**
**STATE ENFORCEMENT AND INVESTIGATION DIVISION**
**SPECIAL EDUCATION PROGRAM**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| D███████ H██████ | ) | |
| | ) | |
| v. | ) | **August 4, 2006** |
| | ) | |
| SAIL PCS | ) | |

<u>**Plaintiff's Response to Defendant's Motion to Join a Necessary Party**</u>

COMES NOW, Carlton and Michelle Hawkins (Plaintiffs), parents of D██████

H██████, and respectfully submit their response to Defendant's Motion to Join a Necessary

Party.


**I.  Background**

On July 6, 2006, SAIL submitted its Motion to Dismiss or In the Alternative Motion to

Join a Necessary Party, arguing that because they were not statutorily authorized to place their

students at another school,[1] the Hearing Officer should either dismiss them from the case or join

DCPS as a necessary party.  <u>See</u> Attachment 1.  The next day, DCPS  filed a preemptive Motion

to Dismiss, arguing that pursuant to D.C. Municipal Regulation Sections 5-3019.2, 5-3019.9, and

5-3019.11, DCPS only assumes an active role in a particular school's education after the charter

school cannot service a student.  <u>See</u> Attachment 2.  Because SAIL never notified DCPS that it

---

[1]Defendants did not cite any law in support of the proposition that they were not authorized by statute to place their students in other local education agencies.

1

could no longer serve D██████, DCPS requested that it be dismissed from the case.  Plaintiffs

filed a response on July 13, 2006, arguing that (1) SAIL is a necessary party because Plaintiffs

allegations are directed solely at SAIL, and (2) that SAIL may be statutorily authorized to place

their students at other schools.

On July 14, 2006, Hearing Officer David Smith denied both SAIL's Motion to Dismiss

and their Motion to Join a Necessary Party, finding that "based on the allegations in the

Complaint, SAIL, as its own LEA, may be able to provide the relief requested should it be

determined that there was a denial of FAPE."  See Attachment 4.  Hearing Officer Smith also

dismissed DCPS as a party because "the Complaint does not state facts alleging that DCPS has

denied the student FAPE, notwithstanding the parent's requested remedy of a placement."  Id.

The same day Hearing Officer Smith issued his ruling, Plaintiffs, SAIL, and DCPS

convened a resolution meeting.  At the meeting, representatives from SAIL conceded that their

school was an inappropriate placement for D██████, and the parties agreed that the remaining

issue was relief.  See Attachment 5.  The meeting concluded without a settlement, and the

parties agreed to meet again via teleconference on August 8, 2006 to discuss placement of

D██████.  Id.  Defense counsel wrongly characterizes this meeting as a continuation of the

July 14th resolution meeting.  As is clearly indicated by Dr. Peagler's resolution meeting notes,

the July 14th meeting concluded "unresolved."  Id.

On August 1, 2006, SAIL again moved to join DCPS as a necessary party, and Plaintiffs

now enter their response.


## II.  Argument

Pursuant to D.C. Municipal Regulation Section 5-3019.13,

> LEA Charters shall provide their own representation at, and *be responsible for implementation of all agreements or decisions resulting from, mediation and due process hearings involving children enrolled in their school,* unless implementation of the agreement or decision is the responsibility of DCPS as a result of any actions or inactions of DCPS while a child had been enrolled at an LEA Charter school or pursuant to federal or local law or regulation. (emphasis added)

DCPS is therefore only a necessary party to the instant action if they have assumed responsibility for the education of D███████. Because Hearing Officer Smith implicitly held that DCPS had not assumed that responsibility when he dismissed them as a party and denied SAIL's July 6, 2006 Motion to Join a Necessary Party, the instant motion must also be denied unless events subsequent to the July 14th Order indicate that DCPS is now accountable for D███████ education. The only circumstances that have changed since Hearing Officer Smith issued the July 14th Order are the following: (1) SAIL's representatives have now admitted that they cannot serve D███████ and that SAIL is not an appropriate setting for him, and (2) DCPS has agreed to participate in a meeting to discuss placement of D███████ on August 8, 2006. Plaintiffs take no position as to whether these facts are sufficient to indicate that DCPS is now responsible for D███████ education.

If the Hearing Officer should decide that DCPS is now responsible for D███████ placement, then Plaintiffs respectfully request that they be joined as a necessary party to the action. If the Hearing Officer concludes in spite of these new developments that SAIL would be responsible for implementing a new placement for D███████ should it be determined that there was a denial of FAPE, then Plaintiffs respectfully request that the Hearing Officer deny SAIL's Motion to Join a Necessary Party.

3

In its Motion to Join a Necessary Party, SAIL argues that at the agreed-upon August 8 meeting, one of two things will happen: either DCPS will approve one of the parents' recommended placements or it will offer a public placement. In the event of the former, SAIL wrongly concludes that the matter is resolved and that a hearing would be unnecessary. Even if Plaintiffs receive their requested placement at the meeting, the issue of compensatory education will still be unresolved and thus, a hearing will be required to settle that dispute. As to that issue, SAIL is the proper defendant. Furthermore, if DCPS offers a public placement, SAIL assumes that DCPS would need to be a party to defend their choice of placement. However, any new placement proposed by DCPS would not be the subject matter of the hearing already currently scheduled for August 30, 2006 as a result of Plaintiffs' Complaint. Any actions taken by DCPS at the August 8th meeting are irrelevant to the question of whether SAIL has denied the student a FAPE.

Currently, DCPS has set the hearing for the sixty-fifth day from the request on August 30, 2006. Plaintiffs and SAIL are the only two parties to this matter and are in absolute agreement, that the hearing must be held as soon as possible. Plaintiffs' preferred placement for D███████, the Katherine Thomas School in Rockville, Maryland, has conditioned their acceptance of D███████ upon funding being provided to them by August 30, 2006. However, orientation for the school begins on August 25th, and classes begin August 28th. Thus, in order for D███████ to have a chance to take advantage of the opportunities offered by this program, it is necessary that the due process hearing in this case be set no later than August 23. Because of prior obligations, Plaintiffs' counsel requests that the hearing be set anytime between August 18th and August

4

23rd.[2]


## III. Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the due process

hearing be set between August 18th and August 23nd.


Respectfully submitted,

DONNA L. WULKAN, ESQ.
Unified D.C. Bar No. 370961
1765 N. Street, NW
Carriage House
Washington, DC 20036
202.682.3909

---

[2] Because DCPS was dismissed as a party to this action, they currently do not have standing to delay the date of the hearing.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Response to Defendant's Motion to Join a Necessary Party was served upon the following parties via first-class mail and via fax (if available) on the 4th day of August, 2006.

Quinne Harris-Lindsey
Office of the General Counsel
825 N. Capitol St., NE
Washington, DC 20002

Paul Dalton, Esq.
Dalton, Dalton, & Houston, P.C.
1008 Pendleton Street
Alexandria, VA 22314

Esteban Morales
Principal, SAIL
1705 H. Street, NW
Washington, DC 20006

Mr. and Mrs. Hawkins.
3001 20th Street, NE
Washington, DC 20018

Donna L. Wulkan, Esq.

6

**STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA STATE
ENFORCEMENT AND INVESTIGATION DIVISION (SEID)
SPECIAL EDUCATION PROGRAMS**

In re                                                    )
Dominique H███████                                       )
                                                         )
v.                                                       )
                                                         )        July 6, 2006
                                                         )
SAIL PCS                                                 )

<u>**Motion to Dismiss or in the Alternative Motion to Join a Necessary Party**</u>

Comes now, SAIL Public Charter School and requests that the hearing complaint filed on June 26, 2006, be dismissed against SAIL PCS.  SAIL, as an LEA, cannot provide the relief the parent is seeking.  Only DCPS, as the SEA can place students in another LEA.

The complaint only names SAIL as a party to the action.  The parent alleges that SAIL failed to develop an inappropriate IEP, did not provide appropriate services and did not evaluate the student in all areas of disability.  To date, the student has a current IEP dated Mach 16, 2006, signed by the parent.  His most recent evaluations took place in 2005  Additionally, the student receives speech language therapy and occupational therapy, so it is unclear as to what area of disability requires additional evaluations.  Lastly, the parent alleges SAIL failed to issue an appropriate notice of placement.  SAIL, as its own LEA, does not have the jurisdiction to place students outside of its own LEA.  Only DCPS, as the SEA, can place students in an alternative LEA.

1

EXHIBIT

1

59

Regardless of the above alleged violations, the only substantive relief requested by the parent is placement in a full-time, special education school, such as the Chelsea school. SAIL, as its own LEA, can only place students within its own program. It does not have authority to place students in other charter schools, in DCPS schools or in private schools. DCPS, as the SEA, is the agency that must place students into other LEA's within the District of Columbia. Consequently, SAIL requests that this hearing request be dismissed against SAIL since DCPS is the only party that can provide the relief requested.

In the alternative, SAIL requests that DCPS be joined as a necessary party to this action. As stated above the only substantive relief being requested is placement. Given that the student currently attends an LEA charter school, only DCPS as the SEA can place a student in an alternative placement.

Based on the above, we respectfully request that this hearing request be dismissed or in the alternative, that DCPS be joined as a necessary party.

Respectfully submitted,

Laura Duos, Esq.
Dalton, Dalton, & Houston, P.C.
1008 Pendleton Street
Alexandria, Virginia 22314
703-739-4300
703-642-2323 – fax

2

60

State Education Agency for the District of Columbia
State Enforcement and Investigation Division (SEID)
Special Education Programs

| | |
|---|---|
| In the Matter of ) | IMPARTIAL |
| ) | DUE PROCESS HEARING |
| D███████ H██████ ) | |
| Date of Birth: ███/92 ) | |
| ) | |
| ) Held at: 825 North Capitol Street, NE |
| ) | Eighth Floor |
| ) | Washington, DC 20002 |

To:   Due Process Hearing Officer
      825 North Capitol Street, NE, 8th Floor
      Washington, DC 20002

## MOTION TO DISMISS

Petitioner, District of Columbia Public Schools, ("DCPS") by and
through its attorneys, the Office of the General Counsel, files this Motion to
Dismiss DCPS from this action, and in support states as follows:

1. On June 26, 2006, Donna Wulkan, Esq., filed a due process complaint
   ("Complaint") on behalf of parent, Michelle Hawkins against School for
   Arts in Learning Public Charter School. ("S.A.I.L. PCS").

2. This Complaint identifies D██████ H██████ ("D███████") present
   school of attendance as S.A.I.L. PCS.   D███████ home school is
   identified as the same. The Complaint is attached as DCPS Exhibit 1.

3. In five of the five legal claims in the Complaint, Parent's counsel makes
   allegations against S.A.I.L. PCS.

4. Parent's Counsel requests the following relief:

   a. S.A.I.L. to place/fund student w/transportation at an appropriate full-time
      private special education program

   b. S.A.I.L. PCS to convene an IEP meeting at new placement to revise IEP
      as necessary, and



EXHIBIT
2
61

    c.  S.A.I.L. PCS to provide compensatory education

5.  Local law provides the following:

    3019.1    Pursuant to the DC School Reform Act, District     charter schools shall elect to be Local Education Agencies ("LEA Charters") or District of Columbia Public Schools ("District Charters") for special education purposes.

    3019.2    LEA Charters shall be responsible for ensuring     that the requirements of Part B of the Act, including documentation of required policies and procedures, are met in regard to children enrolled in their schools, consistent with the requirements of Chapter 38.

    3019.3    Except as provided in 3019.4 and 3019.5 below, LEA Charters are responsible for special education evaluations, and, if necessary, IEPS and placements for children with disabilities enrolled in their facilities

    3019.8    LEA and District Charters are responsible for providing all necessary related services to children with disabilities enrolled in their facilities, consistent with these children's IEPS.

    3019.9    When an LEA Charter concludes that it cannot serve a child with a disability enrolled in its facility using the funds available to it, it *shall* appeal to DCPS, in its role as designee for the State Education Agency (SEA), for assistance.

30 DCMR 3019.1, 3019.2, 3019.8, 3019.9 (2003).

6.  IDEA Charter is an LEA Charter and therefore is responsible for implementing the requirements of Part B of IDEA, including special education evaluations and IEPs.

7.  Under the law, DCPS only plays a supervisory role, unless it is notified by the LEA Charter that it cannot service the student.

8.  In this matter, the IDEA Charter never notified DCPS that it could no longer provide Part B services under the Act to D███████.

9.  Hence, IDEA Charter alone is solely responsible for the allegations made in the Complaint.

WHEREFORE, DCPS respectfully requests that DCPS be dismissed as a party in this matter.

Respectfully submitted,


*Quinne Harris-Lindsey* signed electronically
Quinne Harris-Lindsey, Esq.,
DCPS Attorney-Advisor

**STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA**
**STATE ENFORCEMENT AND INVESTIGATION DIVISION**
**SPECIAL EDUCATION PROGRAMS**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| D⬛⬛⬛ H.⬛⬛⬛, | ) | |
| | ) | |
| v. | ) | July 13, 2006 |
| | ) | |
| SAIL PCS | ) | |

**PLAINTIFF'S OPPOSITION TO THE MOTIONS TO DISMISS**
**SUBMITTED BY BOTH SAIL AND DCPS**
**AND RESPONSE TO SAIL'S MOTION TO JOIN A NECESSARY PARTY**

## I. Introduction

COMES NOW, Carlton and Michelle Hawkins (Plaintiffs), parents of D⬛⬛

H⬛⬛, and request the Motions to Dismiss filed by School for Arts in Learning (SAIL) and

District of Columbia Public Schools (DCPS) be denied. First, because all substantive claims

concerning the denial of FAPE are directed against SAIL and because SAIL would be

responsible for paying both compensatory education and attorneys' fees in the event that

Plaintiffs prevailed at the upcoming due process hearing, SAIL is a necessary party to the current

action. Furthermore, because all factual disputes must be resolved in favor of the nonmoving

party in summary judgment actions and because Plaintiffs have alleged sufficient facts to

establish a prima facie case of denial of free appropriate public education (FAPE), SAIL's factual

arguments are inapposite at this stage of the proceedings and as a result, their Motion to Dismiss

should be denied. Second, because SAIL is likely authorized to provide Plaintiffs with complete

1


EXHIBIT
64

relief. DCPS may not in fact be a necessary party to the instant action at this stage of the

proceedings.  However, if the Hearing Officer should find that SAIL is not authorized to place

D███████ at another school or is otherwise unable to provide Plaintiffs with complete relief,

Plaintiffs move that DCPS be joined in the instant action and their Motion to Dismiss be denied.


## II. Background

In their Due Process Hearing Request dated June 23, 2006, Plaintiffs alleged that SAIL

had denied D███████ FAPE on the following grounds: (1) that SAIL has failed to develop an

appropriate IEP for D███████, (2) that SAIL has failed to deliver appropriate instructional and

related services to D███████, and (3) that SAIL has failed to provide D███████ with an

appropriate special education placement.   As relief for these denials of FAPE, Plaintiffs

requested placement and funding for D███████ at a full-time non-public special education

program, a compensatory education award, and attorneys' fees.

On July 6, 2006, SAIL filed a Motion to Dismiss requesting that Plaintiffs' Hearing

Request be dismissed or, in the alternative, that DCPS be joined as a necessary party.  On July 7,

2006, DCPS filed a separate Motion to Dismiss requesting only that they be dismissed as a party.

Plaintiffs now enter their opposition to both motions.


## III. Argument

**A.  Because SAIL is solely responsible for the actions constituting the alleged denial of FAPE and because SAIL would be responsible for paying both the compensatory education award and Plaintiffs' attorneys' fees in the event that Plaintiffs prevail at the hearing, SAIL is a necessary party to the current action.**

Under the District of Columbia Municipal Regulations Section 5-3019.2, LEA Charters

2

65

such as SAIL are responsible for implementing the terms of the IDEIA with regard to children

enrolled in their schools.  Plaintiffs thus directed the allegations set forth in their Hearing

Request against SAIL.  Specifically, Plaintiffs alleged that SAIL failed to provide D▮▮▮▮▮

with an appropriate placement, denied him his required related services, and was unable to

develop and implement an appropriate IEP to suit his unique academic needs.  In addition,

Plaintiffs alleged that the above-listed failures resulted in D▮▮▮▮▮▮ failure to progress.

Because the responsibility for the provision of FAPE belonged to SAIL and because the

decisions that led to the alleged denial of FAPE were made exclusively by SAIL officials, it is

SAIL's responsibility to defend their actions at the hearing.

Furthermore, if the hearing officer should decide that SAIL did indeed deny D▮▮▮▮▮

FAPE, they alone would be responsible for providing D▮▮▮▮▮ with the compensatory

education award and the attorneys' fees requested in Plaintiffs' hearing request.  Despite SAIL's

allegations that the only substantive relief requested by the parents was the placement at a private

special education program, Plaintiffs explicitly requested compensatory education.[1]  Furthermore,

under 20 U.S.C. § 1415(i)(3), a prevailing party at a due process hearing is entitled to reasonable

attorneys fees.  A recent decision from the U.S. District Court for the District of Columbia stands

for the proposition that so long as an LEA Charter school is capable of providing the services

ordered by a hearing officer, the responsibility of providing both the ordered services themselves

and the attorneys' fees incurred in preparation falls solely on the LEA charter school and not on

DCPS.  *See IDEA Public Charter School v. Belton*, 2006 U.S. Dist. LEXIS 13321, 45 IDELR

719 (D.D.C. March 15, 2006).

---

[1] "In Addition the parents request compensatory education."  Hearing Request at 2.

3

66

In *Belton*, a hearing officer ordered a public charter school to provide one of its students with an occupational therapy evaluation. *Belton*, 2006 U.S. Dist. LEXIS 13321, 10. The school objected and sued both the students' parents and DCPS, arguing that DCPS - not the school - should be responsible for funding the evaluation. *Id.* at 10-11. The District Court disagreed, holding that because the school was an LEA charter school and thus "stands on its own under the IDEA," and because there was no indication that the school was unable to fund the occupational therapy evaluation, the school was solely responsible for providing the evaluation and to pay the student's attorneys' fees. *Id.* at 17.

Here, like the school in *Belton,* SAIL is an LEA Charter school and is thus solely responsible for ensuring that the terms of the IDEIA are met with respect to D███████. As such, should the hearing officer determine that SAIL denied D███████ FAPE, the responsibility for implementing the ordered relief would also fall solely upon SAIL unless they were able to demonstrate that they were incapable of doing so. As of the filing of this opposition, no such indication has been made. Thus, just as the school in *Belton* was responsible for paying for the evaluation and the parents' attorneys' fees, SAIL - not DCPS - should be required to pay D███████ compensatory education and Plaintiffs' attorneys' fees.

Therefore, even if one accepts SAIL's argument that they are not authorized to place their students in other schools, they are still a necessary party to this action because they are the party responsible for denying D███████ FAPE and they are at the very least responsible for paying for D███████ compensatory education award and Plaintiffs' attorneys' fees. The sole remaining issue raised in SAIL's Motion to Dismiss is whether summary judgment should be granted because the factual allegations raised in Plaintiffs' Hearing Request are untrue.

4

67

Under Federal Rule of Civil Procedure 56(c), a motion to dismiss should not be granted unless it is shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2]  A Court considering such a motion shall resolve all factual disputes in favor of the non-moving party and draw all logical inferences therefrom. *See Arnett v. Kennedy*, 416 U.S. 134, 139 (1973).  Because the Hearing Officer must assume the facts alleged in Plaintiffs' Hearing Request to be true when considering the merits of SAIL's Motion to Dismiss and because these allegations raise genuine issues regarding material facts, Plaintiffs respectfully request the hearing officer deny SAIL's Motion to Dismiss.  Defendant's contentions that D█████████ IEP is current or that he has been comprehensively evaluated are factual arguments that are simply not pertinent in summary judgment proceedings.

**B.  Because SAIL is likely authorized to provide Plaintiffs with all the relief requested in the hearing request, DCPS may not be a necessary party to the instant action.**

District of Columbia Municipal Regulation Section 5-3019.13 defines the responsibilities of LEA Charter Schools as follows:

> LEA Charters shall provide their own representation at, *and be responsible for implementation of all agreements or decisions resulting from,* mediation and due process hearings involving children in their school, unless implementation of the agreement or decision is the responsibility of DCPS as a result of any actions or inactions of DCPS while a child had been enrolled at an LEA Charter school or purusant to federal law or local law or regulation. (emphasis added)

However, if an LEA lacks the funds to properly implement a hearing officer's decision, it

---

[2] Under Rule 12(c), a 12(b)(6) motion is to be treated in all respects as a motion for summary judgment and disposed of as provided in Rule 56.  The same is true for any motion to dismiss.

shall appeal to the State Education Agency (SEA) for assistance.[3]  Thus, the language of DCMR

§ 5-3019.13 and DCMR § 5-3019.9 suggests that DCPS is not a necessary party in disputes

between LEA Charter schools and their students unless (1) some action or inaction on the part of

DCPS indicates that it has taken responsibility for the child, or (2) the LEA can demonstrate that

it is financially incapable of serving the child and appeals to the SEA for assistance.[4]

DCPS has not given SAIL any indication that it is willing to assume responsibility for

D▬▬ education.   The District of Columbia established the institution of public charter

schools to provide public schools with "an option for more autonomy over their administration,

operations and expenditures."  D.C. Code § 38-1701.2(7).  The District ceded greater autonomy

to charter schools with the understanding such schools would be independently liable for the

legal consequences of their policies.  Specifically, D.C. Mun. Reg. § 5-3019.2 provides that LEA

Charter schools are to be independently "responsible for ensuring that the requirements of [the

IDEIA] ... are met in regard to children enrolled in their schools."  Here, the educational

decisions that deprived D▬▬ of FAPE were made solely by SAIL.  DCPS had no

knowledge of the programs and instruction strategies SAIL employed to teach D▬▬, nor

did it play any role in the development of D▬▬ IEP.  DCPS was not responsible for

---

[3] "When an LEA concludes that it cannot serve a child with a disability enrolled in its facility using the funds available to it, it shall appeal to DCPS, in its role as designee for the State Education Agency, for assistance." D.C. Mun. Reg. 5-3019.9.  DCPS functions as the SEA for SAIL. *See IDEA Public Charter School v. Belton*, 2006 U.S. Dist. LEXIS 13321 (D.D.C. March 15, 2006).

[4] Contrary to SAIL's contention that it "does not have the authority" to place D▬▬ in another school, *see* SAIL's Motion to Dismiss at 1, District of Columbia Municipal Regulation Section 5-3019.3 provides that "Except as provided in §§ 3019.4 and 3019.5 below, LEA Charters are responsible for special education evaluations, and if necessary, IEPs and *placements for children with disabilities enrolled in their facilities*" (emphasis added).  District regulations therefore indicate that public charter schools likely possess the authority to place and fund their students at different schools.

6

evaluating the extent of D███████ impairment or for ensuring that the learning environment at SAIL was appropriate given D███████ needs. As such, it is simply counterfactual that DCPS did anything to indicate that it had assumed responsibility for D███████ education.

Furthermore, SAIL has not yet demonstrated that it is financially incapable of providing D███████ with the funding necessary to attend a full-time special education program or that it has appealed to DCPS as its SEA for assistance. DCPS confirmed as much in its Motion to Dismiss. DCPS Motion to Dismiss at 2. Thus, because DCPS has not assumed responsibility for D███████ education and because SAIL has not demonstrated that it is incapable of implementing the hearing officer's eventual decision or appealed to DCPS in its role as SEA for assistance, it appears that at this time SAIL would be responsible for implementing the hearing officer's order should the Plaintiffs prevail. Because Plaintiffs can likely obtain complete relief from SAIL, they may not be required to join DCPS as a party to the current action.

In the event that SAIL is able to demonstrate that it cannot appropriate sufficient funds to cover the costs of a non-public placement for D███████ or if the hearing officer should find that SAIL is not authorized to place D███████ at another school, DCPS would then become a necessary party because Plaintiffs would no longer be able to receive complete relief from SAIL. In that situation, Plaintiffs would request that DCPS be joined as a necessary party and that DCPS's Motion to Dismiss be denied.

To ensure that D███████ receives the relief due to him in a timely manner, Plaintiffs respectfully request that the determination of whether it is SAIL or DCPS that is required to fund D███████ placement at a private school (should one be ordered by the hearing officer at the hearing) be made prior to the requested due process hearing. Equity demands that D███████

7

70

not be denied his due relief while DCPS and SAIL engage in a legal battle regarding who is responsible for paying for this relief.

## IV. Conclusion

For the reasons stated above, Plaintiffs respectfully request that the Hearing Officer deny both Motions to Dismiss.

Respectfully submitted,

DONNA L. WULKAN, ESQ.
Unified D.C. Bar No. 370961
1765 N. Street, NW
Carriage House
Washington, DC 20036
202.682.3909

8

71

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Opposition was served upon the following parties via first-class mail and via fax (if available) on the 13th day of July, 2006.

Quinne Harris-Lindsey
Office of the General Counsel
825 N. Capitol St., NE
Room 90009
Washington, DC 20002

Laura Duos, Esq.
Dalton, Dalton, & Houston, P.C.
1008 Pendleton Street
Alexandria, VA 22314

George Gaudette
Principal, SAIL
1705 H. Street, NW
Washington, DC 20006

Mr. and Mrs. Hawkins.
3001 20th Street, NE
Washington, DC 20018

_Donna Wulkan /gmb_
Donna L. Wulkan, Esq.

9

72

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

In the Matter of:                              )        BEFORE A SPECIAL EDUCATION
                                               )
D~~~~~~ H~~~~~~ (~~~~92)                        )        INDEPENDENT HEARING OFFICER
                     *Petitioner*              )
              Vs.                              )
SAIL PCS                                        )        STATE EDUCATION AGENCY
                     *Respondent*

ON THIS DAY came on to be heard Respondent SAIL's "Motion to Dismiss or in the Alternative Motion to Join a Necessary Party," DCPS' "Motion to Dismiss" and Petitioner's Opposition to both Motions in the above styled cause.

## ORDER

After reviewing the evidence, the Motion of SAIL is **DENIED** and the Motion of DCPS **GRANTED**.

The allegations in the Complaint concerning a denial of FAPE are against SAIL. Furthermore, the Complaint does not state facts alleging that DCPS has denied the student FAPE, notwithstanding the parent's requested remedy of a placement. Additionally, based on the allegations in the Complaint, SAIL, as its own LEA, may be able to provide the relief requested should it be determined that there was a denial of FAPE. Accordingly, Respondent SAIL's "Motion to Dismiss or in the Alternative Motion to Join a Necessary Party," is Denied. DCPS' "Motion to Dismiss" concerning it being a party is Granted.

SIGNED: this date ___7-13-06___

_____
Impartial Special Education Hearing Officer

Issue Date: 7/14/06

Original to SHO – Student's File
Copy To:     Parent – C/O:        Donna Wulkan, Esq.
             DCPS – C/O:          Quinne Harris-Lindsey, Esq.,
             Charter School – C/O:  Laura Duos, Esq.

2007 JUL 13  PM 2:3  DC PUBLIC SCHOOL SYSTEM



EXHIBIT
4
73

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

_ PUBLIC     X  DPCS CHARTER     _ LEA CHARTER     _ NONPUBLIC     _ PRIVATE/RELIGIOUS

## RESOLUTION MEETING NOTES

Meeting Confirmation Date: [          ]     Meeting Held: [ 7/14/06 ]

Student: D████████ H██████     DOB: ███/92     School: [ SAIL PCS ]

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Peggy L. Peagler | *Peggy L. Peagler* Via Telephone | SEA/CRS |
| Paul Dalton | | Attorney for School |
| Donna L. Wulkan | | Attorney for parent |
| Jenna Umansky | | SEC- SAIL |
| Esteban Morales | | Principal @ SAIL |
| Laura Duos | | Attorney for SAIL |
| Stefan Black | | Law Clerk for parent |
| Michelle Hawkins | | Parent |
| | | |
| | | |

[   ] Resolved     [ X ] Unresolved

Participants introduced themselves to each other. A copy of the parent manual was provided to the parent's attorney. The complaint was reviewed and discussed. DCPS was invited to participate in the resolution meeting held at SAIL PCS, today at 10am by SAIL PCS. DCPS received via fax today a cover letter from parent attorney, outlining complaint against SAIL PCS  and a copy of the Due Process Complaint Notice. To date, DCPS has not received pertinent information from SAIL to determine placement consideration. SAIL PCS stated their school is not an appropriate setting for this student. Parent and attorney are requesting school placement at Katherine Thomas or Chelsea School for the 2006-2007 school year. Attorney for parent stated, as of today, the student has not been accepted to either of these schools, however the student has completed visitation to one of the schools. Letters of acceptance will be submitted to DCPS in August. A MDT meeting is scheduled for Tuesday, August 8, 2006 at 10am to discuss school placement for the 2006-2007 school year. SAIL PCS will submit to DCPS by the close of the business, (7/14/06), relevant and pertinent information about this student in order to determine school placement for the 2006-2007 school year. The complaint was not resolved.

**EXHIBIT**
**5**

# FAX TRANSMISSION

### Law office of
### DONNA L. WULKAN
1765 N Street, N.W.
Carriage House
Washington, D.C. 20036

(202) 682-3909
telecopier (202) 955-1015

**To:**       Paul Dalton, Esq.

**Fax #:**    (703) 739-2323

              CC:
              Sheila Hall, Student Hearing Office
              (202) 442-5556

**From:**     Law Office of Donna Wulkan

**Subject:**  D██████ H█████ 5-day

**Date:**     August 23, 2006

**Pages:**    6, including this cover
              sheet

Mr. Dalton,

        Attached please find Parents' Exhibit P-17 to be added to the 5-day disclosure for
D██████ H█████. P-1 through P-16 were submitted by courier. Thank you.

                                    Sincerely,

                                    Gina Beck
                                    On behalf of Donna Wulkan, Attorney for
                                    Parents

The information contained in this telefacsimile message is transmitted by an attorney. It is privileged and confidential, intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If this communication has been received in error, please notify us immediately by telephone, collect if necessary, and return the original message to us at the above address via first class mail (we will reimburse postage). Thank you.

75

AUG-23-2006  14:33 From:LAW OFFICE
AUG-23-2006  03:40        Childrens Nat Med Ctr

August 2006

# CURRICULUM VITAE

# LAUREN S. KRIVITZKY, Ph.D.

**Address:**

Work:
Children's National Medical Center    (CNMC)
Montgomery County Outpatient Center
14801 Physicians Lane
Suite 173
Rockville, MD 20805

National Rehabilitation Hospital    (NRH)
Department of Psychology
102 Irving Street, NW
Washington, DC 20010

**Phone:**    Primary office: (202) 877-1697 at NRH
CNMC office: (301)-738-8930 (no voicemail)

**Email:**    lkrivitz@cnmc.org or lauren.krivitzky@medstar.net

# EDUCATION

**MCP-HAHNEMANN UNIVERSITY,** *APA Accredited, Philadelphia, PA*
Ph.D. Degree in Clinical and Health Psychology, May 2002
Concentration in Neuropsychology
Cumulative GPA: 3.93/4.00

**MCP-HAHNEMANN UNIVERSITY,** *Philadelphia, PA*
Masters in Clinical and Health Psychology, 1999

**UNIVERSITY OF PENNSYLVANIA,** *Philadelphia, PA*
Bachelor of Arts in Biological Basis of Behavior, May 1997
Concentration in Behavioral Neuroscience
Bachelor of Arts in Psychology
Minor in Anthropology
Cumulative GPA: 3.7/4.00

P-17 76

AUG-23-2006 14:33 From:LAW OFFICE
AUG-23-2006  03:40    Childrens Nat Med Ctr
2029551015
776-802442558

*Lauren S. Krivitzky, page 2*

# CLINICAL POSITIONS

## CHILDREN'S NATIONAL MEDICAL CENTER, *Washington, DC*     **August 2004-present**
**Faculty member**
Full time faculty position in the Division of Psychiatry/Psychology in the Pediatric Neuropsychology Program. Position is part of the joint pediatric rehabilitation consortium established between CNMC, National Rehabilitation Hospital (National Center for Children's Rehabilitation), and the HSC Pediatric Center. Primary duties include providing psychological and neuropsychological services to children in the inpatient rehabilitation setting. Position will also include research responsibilities, which currently entail designing a study to examine neuroimaging in children with mild Traumatic Brain Injury. Licensed in the District of Columbia and Maryland.

## CINCINNATI CHILDREN'S HOSPITAL MEDICAL CENTER, *Cincinnati, OH*     **2002-2004**
**Postdoctoral Fellowship in Neuropsychology**
Two year postdoctoral fellowship (APPCN Member Program) specializing in pediatric neuropsychology following the guidelines established by the INS and APA Division 40 for training in clinical neuropsychology. Program involves concentrated training with pediatric populations referred from various disciplines (i.e., neuro-oncology, neurology, pediatrics, and rehabilitation), as well as part-time training with adult populations at the Cincinnati V.A. Medical Center. Responsibilities include year long rotations working in the first year with the neuro-oncology team and in the second year with the inpatient brain injury rehabilitation team. Clinical activities include comprehensive assessment, inpatient consultation services, individual and group psychotherapy, and a rotation rounding with the pediatric house-staff in neurology and neurosurgery. Supervised by M. Douglas Ris, Ph.D., ABPP-Cn, E. Ted Barrett, Ph.D., ABPP-Cn, Dean Beebe, Ph.D., and Marsha Nortz, Ph.D.

## KENNEDY KRIEGER INSTITUTE/JOHNS HOPKINS UNIVERSITY HOSPITAL, *Baltimore, MD*
**Predoctoral Psychology Internship- APA accredited**     **2001-2002**
*Major Rotation: Department of Neuropsychology:*
Duties involved comprehensive neuropsychological assessment, cognitive rehabilitation, and consultation with children birth through young adulthood. Working within an interdisciplinary rehabilitation team was also an integral part of this rotation. Patients were seen through the inpatient brain injury service, the outpatient department, and consultation with other medical services (e.g., orthopedic rehabilitation, genetics, and metabolic disorders). Supervised by E. Mark Mahone, Ph.D., ABPP-Cn and Beth Slomine, Ph.D., ABPP-Cn.

*Major Rotation: Behavior Management Clinic:*
Provided short-term, outcome based training to care providers to address behavior problems common to preschool and school age children (e.g., noncompliance, tantrums, meal and bedtime problems, toileting difficulties, school behavior difficulties). Treatment was often protocol driven and typically occurred across multiple environments such as the clinic, home, and school/daycare. Duties also included conducting evaluations, brief functional assessments, developing treatment objectives, and implementing treatment programs. Supervised by Susan Perkins-Parks, Ph.D.

## ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN, *Section of Neurology, Philadelphia, PA*
**Pediatric Neuropsychology Practicum Student**     **1999-2001**
Conducted neuropsychological assessments with children with various medical diagnoses and associated neuropsychological complications. Other responsibilities included interpretation of test results, report writing, and participating in research projects on different samples of clinical populations. Supervised by Mitzie Grant, Ph.D.

AUG-23-2006 14:33 From:LAW OFFICE
AUG-23-2006 03:40     Childrens Nat Med Ctr
2029551015     To:2024425558     P.04

*Lauren S. Krivitzky, page 3*

**PRIVATE PRACTICE**, *Mt. Laurel, New Jersey*                                                **2000**
**Psychometrician**
    Duties included administration and scoring of a full neuropsychological battery, mostly with an adult
    population. Legal issues were the primary reason for referral.

**PROJECT CHALLENGE**, *MCP-Hahnemann University, Philadelphia, PA*                     **Spring 1999**
**Assessment Clinician**
    Duties included administering a full assessment battery to mentally retarded individuals and writing full
    reports of these evaluations. Assessment battery included various measures of intellectual assessment,
    academic functioning, and behavior competency.

**JUVENILE JUSTICE CENTER**, *Philadelphia, PA*                                          **1998-1999**
**Therapy Practicum Student**
    Provided therapy to children and their families referred to the agency with various psychological
    problems. Most cases involved children in foster care because of issues of abuse or neglect by their
    natural parents. Responsibilities involved providing therapy in an outpatient clinic along with providing
    mobile therapy and WRAP around services.

## RESEARCH EXPERIENCE

**CINCINNATI CHILDREN'S HOSPITAL MEDICAL CENTER**, *Cincinnati, OH*                     **2002-Present**
**Postdoctoral Fellowship in Neuropsychology**
    Involved in research activities focusing on the examining sleep problems in a population of children with
    traumatic brain injuries.

**EASTERN PENNSYLVANIA PSYCHIATRIC INSTITUTE (EPPI)**, *Philadelphia, PA*                **1997-2001**
**Research Assistant**
    Duties included being in charge of data management for a research project on selective attention deficits
    in schizophrenic patients and data analysis on a study of patients dually diagnosed with substance abuse
    and schizophrenia. Duties also included administering a neuropsychological testing battery to both
    normal controls and schizophrenic patients in both an inpatient and outpatient setting at EPPI and
    Norristown State Hospital. Other responsibilities included designing studies, analyzing data and writing
    up findings for poster presentation and publication. Supervised by Joseph Tracy, Ph.D.

**ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN**, *Section of Neurology, Philadelphia, PA*    **1999-2001**
**Pediatric Neuropsychology Researcher**
    Experience included participating in research projects on different samples of clinical populations,
    including the pediatric AIDS population, and the children in the Phenylketonuria clinic. One specific
    project involved investigating the relationship between neuropsychological functioning in HIV positive
    children and immunologic and virologic markers of disease progression. A second project, and topic of
    my dissertation research, examined daily cognitive functioning in children with PKU.

**MEDICAL COLLEGE OF PENNSYLVANIA/ HAHNEMANN UNIVERSITY**, *Philadelphia, PA*            **1997-2001**
**Researcher**
    Experience included working in collaboration with fellow students and professors on various research
    projects in the field of Neuropsychology. Areas of study included mild traumatic brain injury and visual
    and verbal memory. Supervised by Mike Williams, Ph.D.

**THE BRAIN AND BEHAVIOR LABORATORY,** *The Hospital of the University of Pennsylvania,*
*Philadelphia, PA*                                                                **1996-1997**
**Research Assistant**
    Under the direction of Dr. Ruben Gur, duties included: designing and implementing a research project studying different aspects of emotion including cross-cultural differences in expression, inputting neuropsychological data, and assisting on data searches.

## TEACHING EXPERIENCE/ CONFERENCE PRESENTATIONS

**CONFERENCE PRESENTATION:** "Real Life Rehabilitation: Behavior and Transition"
                                                                                **March 2004**
**Speaker**
    Presented two conference sessions entitled "Tips for Navigating Behavioral Problems in the School for Children/Adolescents with TBI". Conference was at Cincinnati Children's hospital and was geared towards healthcare professionals, educators and families dealing with the brain injured individual.

**PSYCOLOGY COLLOQUIM,** *Cincinnati OH*                                           **Spring 2004**
**Speaker**
    Presented on "The Basics of Brain Injury and Behavior" to psychologists and other mental health providers at Cincinnati Children's Hospital.

**CINCINNATI CHILDREN'S HOSPITAL MEDICAL CENTER,** *Cincinnati, OH*
                                                                                **2002-Present**
**Postdoctoral Fellowship in Neuropsychology**
    Provided supervision to graduate students and research assistants through didactics and clinical cases.

**MCP-HAHNEMANN UNIVERSITY,** *Philadelphia, PA*                                   **1999-2000**
**Instructor**
    Taught master's level classes in the Clinical and Health Psychology Program on the topics of basic psychometric principles, intellectual and academic assessment, and basics of report writing.

## PROFESSIONAL AFFILIATIONS:

Member of the National Academy of Neuropsychology
Member of the International Neuropsychology Society
American Psychological Association

## RESEARCH PRESENTED AT A CONFERENCE SESSION

Askinazi, L., Kervick, R. & Williams, J.M. (1998, November).  In search of lost factors: A monte carlo study of the factor structure of memory tests.  Poster session presented at the annual meeting of the National Academy of Neuropsychology (NAN), Washington, DC.

AUG-23-2006 14:34 From:LAW OFFICE    2009551015    4425556    P.06
AUG-23-2006 03:41    Childrens Nat Med Ctr

*Lauren S. Krivitzky, page 5*

Kervick, R., Askinazi, L. & Williams, J.M. (1998, November). The neuropsychological outcome of mild traumatic brain injury: A narrative and meta-analytic review. Poster session presented at the annual meeting of the National Academy of Neuropsychology (NAN), Washington, DC.

Askinazi, L., Tracy, J.I. Christensen, H.L., & Josiassen, R.C. (1999, November). The relative influence of cognitive and language deficits on the severity of "speech" disorder in schizophrenia. Poster session presented at the annual meeting of the National Academy of Neuropsychology (NAN), San Antonio, TX.

Askinazi, L.A., Grant, M.L., Legido, A. & Bagarazzi, M.L. (2000, November). The relationship between performance on neuropsychological test measures and immunologic and virologic markers of disease progression in children who are HIV positive. Poster session presented at the annual meeting of the National Academy of Neuropsychology (NAN), Orlando, FL.

Askinazi, L.S., D. Beebe, D., Wells, C., Wade, S., Taylor, H.G., & Yeates, K.O. (2003, February). Sleep disturbances following pediatric traumatic brain injury. Poster session presented at the Associated Professional Sleep Societies, Chicago, IL.

Askinazi, L.S., Grant, M., Melvin, J. Legido, A. (2003, August). Parental perceptions of cognitive and academic functioning in children with PKU. Poster session presented at the annual meeting of the American Psychological Association (APA), Toronto, ON.

## MANUSCRIPTS SUBMITTED/IN PREPARATION

Beebe, D., Askinazi, L.S., Wells, C., Wade, S., Taylor, H.G., & Yeates, K.O. (submitted to Journal of PM&R). Sleep disturbances following pediatric traumatic brain injury.

Askinazi, L.S., Grant, M., Melvin, & J. Legido, A. (in preparation). Parental perceptions of cognitive and academic functioning in children With PKU.

80

Aug. 24. 2006  4:46PM    Dalton, Dalton,& Houston                No.5971  P. 2/8

Law Offices
# DALTON, DALTON & HOUSTON, P.C.

1008 Pendleton Street
Alexandria, Virginia 22314-1837
Telephone: (703)-739-4300
Facsimile:  (703)-739-2323
E-MAIL: DCSPEDLAW@AOL.COM

Paul S. Dalton*
Ellen Douglass Dalton*
William E. Houston+
Talib Abdus Shahid+
Laura E. Duos~
*ALSO ADMITTED IN D.C. & W.VA
+ ADMITTED IN D.C. & PA
~ADMITTED IN MD

Washington DC. Office:
601 Pennsylvania Avenue, N.W.
South Building, Suite 900
Washington, DC 20004
Telephone: (202)-393-0060
Facsimile: (202)-393-1555

August 24, 2006

**VIA FACSIMILE ONLY** 202-610-1881

Donna L. Wulkan, Esq.
1765 N Street, N.W.
Carriage House
Washington, DC 20036

RE: D███████ H██████
5 Day Disclosure Notice

Dear Ms. Wulkan:

A Due Process Hearing has been scheduled for D███████ H██████ on August ██, 2006, pursuant to 34 C.F.R. 300.509(b)(1).  The purpose of this letter is to provide you with the following list of witnesses and documents we may rely on in the hearing.

## WITNESSES:

1.    Jenna Umanski, Special Education Coordinator, SAIL PCS
2.    Esteban Morales, Principal, SAIL PCS
3.    Katy N. Rizvi, Speech-Language Pathologist
4.    Michelle Hawkins, Parent

  * **Some of the above witnesses may testify by telephone or use a designee.**

## DOCUMENTS

| | | |
|---|---|---|
| SAIL - 01 | Motion to Join a Necessary Party | 08/01/06 |
| SAIL - 02 | Resolution Meeting Notes | 07/14/06 |

81

* We reserve the right to examine any witnesses disclosed by DCPS or the PARENT as if they were witnesses for our client and the right to rely on all other documents in the possession or previously filed or filed in a 5 Day Disclosure filed by the District of Columbia Public Schools (DCPS) or the PARENT or presented at the DPH.

Sincerely,

Paul S. Dalton, Esq.

cc: Student Hearing Office
Quinne Harris-Lindsey, Esq.

82

**STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA STATE
ENFORCEMENT AND INVESTIGATION DIVISION (SEID)
SPECIAL EDUCATION PROGRAMS**

| | |
|---|---|
| In re | ) |
| D███████ H██████ | ) |
| | ) |
| v. | ) |
| | )    H.O. David Smith, Esq. |
| | ) |
| SAIL PCS | ) |

### Motion to Join a Necessary Party

Comes now, SAIL Public Charter School and requests that DCPS be joined as a necessary party. Subsequent to our July 6th Motion, Dr. Peggy Peagler of DCPS participated in a resolution meeting on July 14, 2006. At this meeting it became clear that the central issue was the parent's request that the student be placed at either the Chelsea school or Katherine Thomas School.

Counsel for the parent, Donna Wulkan, stated that the parent expected to receive acceptance letters around the first of August and Dr. Peagler requested that copies of any acceptance letters be forwarded to her ASAP. Dr. Peagler also requested copies of all evaluations and a copy of the student's current IEP, which have been provided. In order to give Dr. Peagler time to review these documents and to accommodate her schedule, the parties agreed to reconvene the resolution meeting on August 8, 2006, at 10:00 a.m.

It is SAIL's position that one of two things will happen at this meeting. Dr. Peagler will approve one of the parent's recommendations for placement or she will offer a public placement. If the former, this matter is resolved and a hearing would be unnecessary. If the latter, DCPS would need to be a party in order to defend their

1

**SAIL – 01**

83

recommendation of a public placement over the choice of the parent. Given the short time remaining before the beginning of the new school year, SAIL requests that this matter be scheduled for a hearing ASAP after August 8, 2006.

Respectfully submitted,

Paul S. Dalton, Esq.
Dalton, Dalton, & Houston, P.C.
1008 Pendleton Street
Alexandria, Virginia 22314
703-739-4300
703-642-2323 – fax

2

84

### Certificate of Service

I certify that a copy of the foregoing, **Motion to Join a Necessary Party,** was faxed on this 1st day of August, 2006, to:

Donna Wulkan, Esq.
fax no. 202-955-1015

Quinne Harris-Lindsey, Esq.
fax no. 202-442-5098

Paul S. Dalton
Counsel for SAIL

D███████ H██████ Resolution Meeting
July 14th, 2006

Stefan Black- Law Clerk
Donna Wilkins-Attorney for Parent
Michelle Hawkins-Parent
Paul Dalton-Attorney for SAIL
Laura Duos-Attorney for SAIL
Esteban Morales-Principal of SAIL
Jenna Umansky-Special Education Coordinator, SAIL
Peggy Peagler via phone-DCPS representative

Introductions were made.

Complaint sent out June 23rd on behalf of D███████ H██████ stating that he has been at
SAIL since first grade. Issues are his placement, not making adequate academic
progress, not receiving services, not structured, not individualized instruction, disrupted
by other students.

Dr. Peagler has no information on student.

Why is IEP inappropriate?
DW: Does not want to have hearing. She wants to discuss resolution. She is seeking
denial of FAPE, asking for compensatory education and he be placed at an appropriate
full time special education program at a private school. When placed the IEP should be
revised at the new placement to add additional services and appropriate goals.

PP: You want a change in diagnosis.
PD: Wants to know what the parent wants and why. We need assistance regarding
placement.
PP: does not have information to make placement. DCPS wants necessary
documentation for placement consideration. Once they have information they will
reconvene meeting to discuss placement. Are there are specific placements?
DW: They are looking at Chelsea School or Katherine Thomas School. Pending
acceptance letters. They expect letters by the first of August.
PP: Dr. Peagler would like copies of the acceptance letters when they are received.
JU: Hours on IEP are full time but that has been the case for the last three years.
PD: Wants to know from Ms. Hawkins why she feels comp ed is appropriate.
DW: She has made complaint, is SAIL saying that we cannot providing that an
appropriate education.
PD: Does not want to get to that issue at this point because SAIL legislatively cannot
cover.
PP: DCPS is willing to review all pertinent information and give consideration for
placement but all that she has received is cover letter which is the cover letter for fax to
Dr. Peagler that she was sent the complaint.

SAIL – 02

86

DW: DCPS position is that you are involved in terms of relief or are you the one doing the resolution meeting?

PP: SAIL is own LEA, DCPS serves as SEA. DCPS is involved with the placement. She was invited to be involved in resolution meeting.

DW: She is here for resolution meeting

PD: They do not have the permission to place

PP: They can say that SAIL is an appropriate placement. DCPS can determine where he should be placed.

DW: We cannot get to the second piece if we cannot cover the first piece.

PD: Would like to take a 5-minute break to discuss with council to take place between council. They are physically leaving the room.


PD: We would like to postpone the meeting until you have had a chance to look at evals and IEP and we would like to reconvene through an operator so we don't have to be in the same room.

PP: Is away from 23rd until August 7th. She cannot meet between now and next week. She is willing to work with the team today.

DW: They are no longer questioning special education classification.

PD: Dr. Peagler would you agree that DCPS is only involved with the placement?

DW: Sail is agreeing that it is not appropriate placement and now we are moving to what is going to happen next. If we are at that agreed stage we are at the next step of will DC fund the placement for D███████? We know you don't have the information and that we are going to send the information to DCPS today.

PP: Is available the week of August 7th.

PD 10:00 on the 8th of August, placement for D███████ H██████.

JU: I will courier info so she has it by close of business today.

PP: Placement meeting will be held by conference call on August 8th at 10:00.

87

AUG. 24. 2006  4:40PM   Dalton, Dalton & Houston                                    No. 5971  P. 1/8

## FAX TRANSMISSION COVER SHEET
## Dalton, Dalton & Houston P.C.
## Attorneys at Law
## 1008 Pendleton Street
## Alexandria, Virginia 22314
## (703) 739-4300
## FAX (703) 739-2323

DATE:        August 24, 2006

TO:          Sharon Newsome

AT FAX:      202-442-5556

FROM:        Paul S. Dalton, Esq.

RE:          D███████ H██████ 5-day

NUMBER OF PAGES INCLUDING THIS PAGE:  3

ADDITIONAL INFORMATION:

---

**PLEASE DELIVER ASAP.**
**********************************************************************
**THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE
PRIVILEGED PURSUANT TO THE ATTORNEY CLIENT PRIVILEGE AND
ATTORNEY WORK PRODUCT DOCTRINE.**

**IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECI-
PIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS
STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNI-
CATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELE-
PHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE
ABOVE ADDRESS.**
**********************************************************************

# FAX TRANSMISSION

**Law office of**
**DONNA L. WULKAN**
1765 N Street, N.W.
Carriage House
Washington, D.C. 20036
———
(202) 682-3909
telecopier (202) 955-1015

| | | | |
|---|---|---|---|
| **To:** | Paul Dalton, Esq. | **Date:** | August 31, 2006 |
| **Fax #:** | (703) 642-2323 | **Pages:** | 3, including this cover sheet |
| | CC: Hearing Officer Butler-Truesdale (202) 442-5556 | | |
| **From:** | Donna Wulkan | | |
| **Subject:** | D▇▇▇, H▇▇ | | |

Mr. Dalton,

The Hearing Officer directed me to provide to you a copy of a chart prepared by my office regarding charter school cases in U.S. District Court. This was used as part of my closing argument yesterday in D▇▇ Due Process hearing and a copy was requested by the Hearing Officer at that time. In addition, the Hearing Officer was provided copies of the charter school regulations from the DCMR and copies of the full decisions that were outlined in the prepared chart.

Sincerely,

Donna Wulkan

The information contained in this telefacsimile message is transmitted by an attorney. It is privileged and confidential, intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If this communication has been received in error, please notify us immediately by telephone, collect if necessary, and return the original message to us at the above address via first class mail (we will reimburse postage). Thank you.

89

| Name | Date | Procedural Posture | Issue | Outcome/Reasoning |
|---|---|---|---|---|
| IDEA PCS v. Belton | 3/15/06 | PCS appeal from HOD ordering evaluation. Names DCPS as Defendant. | Is DCPS a necessary party when review is sought of an evaluations. DCPS does a dispute between a PCS and parent? | No. LEA Charter are responsible for own evaluations. DCPS does not control hearing officers and not involved in relief here. Dismissed out. |
| Hyde Leadership PCS v. Clark | 3/27/06 | Appeal from HOD finding FAPE denial. Joined DCPS as Defendant. | Whether the District must be joined as a necessary party where the desired relief is reversal of a hearing officer's decision | No. Because LEA Charter schools are solely responsible for providing their students with FAPE and because hearing officers are impartial independent contractors, the District has no authority to rescind an HOD. |
| Friendship Edison Public Charter v. William Morrow & Edwina Sumpter | 4/28/06 | LEA appeals from HOD, suing both DC and the child's parents. DC moves to dismiss. | Same as *Belton* and *Hyde Leadership* | No. An appeal from an HOD concerning an LEA does not require joinder of DC. (same reasoning as above) |
| Friendship Edison PCS v. Ebony Smith | 5/5/06 | LEA appeals from HOD ordering add'l evals. LEA sued DC & parents, and DC now moves to dismiss itself as an improperly joined party | Whether DC is a proper party to an LEA's appeal of the HOD | No. Because LEA can obtain complete relief w/o joining DC as a defendant and because DC's absence would not impair its ability to protect its interests, DC is neither a proper party nor a necessary party to this action. |

90

| Parker v. DC | 6/5/06 | Unclear, but it appears as though Parent is appealing an HOD and joined DC as a defendant | Whether DC is a necessary party when a parent is appealing an HOD decision | No. Because Edison is an LEA, DC plays no role in IDEA proceedings involving Edison. Thus, if there was an error in the HOD, DC cannot provide a remedy. |

91

Case 1:06-cv-01821    Document 14-6    Filed 07/25/2007    Page 1 of 22
Case 1:97-cv-01629-PLF    Document 1867    Filed 08/18/2006    Page 2 of 23
Case 1:05-cv-00467-RMC    Document 9    Filed 03/15/2006    Page 1 of 11

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IDEA PUBLIC CHARTER SCHOOL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05-467 (RMC) |
| ) | |
| CRYSTAL BELTON, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

### MEMORANDUM OPINION ON THE DISTRICT OF COLUMBIA'S
### MOTION TO DISMISS

The IDEA Public Charter School ("the School") appeals a Hearing Officer's Determination ordering it to perform certain medical evaluations of C.M., a special education student covered by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* (2000). As defendants, the School names Crystal Belton, as next friend of her minor child, C.M.; C.M. herself; and the District of Columbia. The docket indicates that while service was effected on the District of Columbia, neither Ms. Belton nor C.M. has been served. The District has responded with a motion to dismiss or, in the alternative, for summary judgment.

The District argues that this case is, in essence, a challenge to the administrative decision of the hearing officer — a decision over which it has no control. Thus, the District submits that it is not a proper party to this case. The School points, however, to two decisions of this Court that appear to hold to the contrary. *Integrated Design Elecs. Acad. Pub. Charter Sch. v. Gooding*, No. 03-1224 (D.D.C. Dec. 5, 2003) (Mem. Op. & Order); *Sch. for the Arts in Learning (SAIL) Pub. Charter Sch. v. Mena*, No. 02-1772 (D.D.C. July 25, 2003) (Memorandum). With great respect to

Case 1:06-cv-01821    Document 14-6    Filed 07/25/2007    Page 2 of 22
Case 1:97-cv-01629-PLF    Document 1867    Filed 08/18/2006    Page 3 of 23
Case 1:05-cv-00467-RMC    Document 9    Filed 03/15/2006    Page 2 of 11

my colleagues, the undersigned will disagree and dismiss the complaint against the District.

## I. BACKGROUND

The School has neatly summarized its case:

This is an action by [the School] to appeal the decision made by Mr. Coles B. Ruff in his February 2, 2005, Hearing Officer's Determination. The hearing officer ruled that [the School] denied C.M. a free, appropriate public education, and ordered [the School] to hold a meeting to discuss whether or not the student needed a neurological evaluation. The meeting was ordered after another hearing officer previously ruled that a neurological [evaluation] was not warranted. The hearing officer also ordered [the School] to conduct an occupational therapy evaluation despite the fact that the student had an occupational therapy evaluation which did not recommend additional testing. [The School] seeks reversal of that determination.

Pl.'s Opp'n at 1-2. This issue will have to wait for another day. The question now before the Court

is whether the District of Columbia is a necessary party when review is sought of a Hearing Officer's

Determination concerning a dispute between a public charter school and a parent.

### A. Statutory Framework

Under the IDEA, "states and territories, including the District of Columbia, that

receive federal educational assistance must establish policies and procedures to ensure, among other

things, that free appropriate public education, or FAPE, is available to disabled children." *Reid v.*

*District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005) (citing 20 U.S.C. § 1412(a)(1)(A))

(internal quotation marks omitted). As the D.C. Circuit recently summarized:

School districts may not ignore disabled students' needs, nor may they await parental demands before providing special instruction. . . . Once such children are identified, a "team" including the child's parents and select teachers, as well as a representative of the local educational agency with knowledge about the school's resources and curriculum, develops an "individualized education program," or

-2-

93

> "IEP," for the child. . . . [T]he IEP must, at a minimum, provide
> personalized instruction with sufficient support services to permit the
> child to benefit educationally from that instruction. . . . If no suitable
> public school is available, the [school system] must pay the costs of
> sending the child to an appropriate private school.

*Id.* at 518-19 (internal quotation marks and citations omitted; second alteration in original). The

statute contains a number of procedural safeguards. Parents of a disabled child must be notified in

writing of any proposed change in "the identification, evaluation, or educational placement of the

child" and are permitted to challenge "any matter relating [there]to." 20 U.S.C. § 1415(b)(3)(B),

(b)(6). After the possibility of mediation, parents can have their complaints considered in "an

impartial due process hearing." *Id.* § 1415(f). Any party aggrieved by the result of such a hearing

may "bring a civil action . . . in any State court of competent jurisdiction . . . or in a district court of

the United States." *Id.* § 1415(i)(2)(A).

The School is a D.C. Public Charter School. *See* D.C. Code §§ 38-1701.01(8)

(defining "Charter school"), § 38-1800.02(29) (defining "Public charter school"). Public Charter

Schools were established in the District of Columbia to provide public schools, among other things,

"an option for more autonomy over their administration, operations and expenditures." *Id.* § 38-

1701.2(7). To that end, a Public Charter School has the power to "be responsible for its own

operation, including preparation of a budget and personnel matters" and to "sue and be sued in its

own name." *Id.* § 38-1702.5(b)(7), (8). A Public Charter School is "a publicly funded school in the

District of Columbia that . . . is not a part of the District of Columbia public schools." *Id.* § 38-

1800.02(29).[1] Moreover, a Public Charter School "shall not be deemed, considered, or construed

--------

[1] This provision is subject to exception when a Public Charter School's charter is revoked
or is not renewed; however, neither situation is applicable here. D.C. Code §§ 38-1800.02(29)
(noting exceptions), 38-1800.12(d)(5) (not renewed), 38-1800.13(c)(5) (revoked).

to be an entity of the District of Columbia government." *Id.* § 38-1702.5(p).

In the District of Columbia, Public Charter Schools must elect to be treated as a local education agency ("LEA Charter") or a D.C. public school ("District Charter") for purposes of the IDEA. *Id.* § 38-1802.10(c); D.C. Mun. Reg. § 5-3019.1. The School has elected to be its own LEA for IDEA purposes. Compl. ¶ 2; Def.'s Mot. at 3; Pl.'s Opp'n at 2. When a Public Charter School elects to be its own LEA, District Columbia Public Schools ("DCPS") fulfills the role of the State Education Agency ("SEA") under the IDEA. *See* D.C. Mun. Reg. § 5-3019.9. When an LEA Charter concludes that it cannot serve a child with a disability enrolled in its facility with the funds available to it, it must appeal to DCPS, in DCPS's role as the SEA, for assistance. *Id.* If DCPS agrees that the LEA Charter cannot serve the student, DCPS will assume responsibility for the child. *Id.* § 5-3019.11.

LEA Charters are responsible for IDEA compliance in their schools, including "documentation of required policies and procedures," *id.* § 5-3019.2, "special education evaluations, and, if necessary, IEPs and placements for [disabled] children," *id.* § 5-3019.4. By contrast, DCPS is responsible for these duties for District Charters. *Id.* § 3019.7. LEA Charters, moreover, must "provide their own representation at, and be responsible for implementation of all agreements or decisions resulting from, mediation and due process hearings involving children enrolled in their school, unless implementation of the agreement or decision is the responsibility of DCPS as a result of any actions or inactions of DCPS while a child had been enrolled at an LEA Charter school or pursuant to federal or local law or regulation." *Id.* § 5-3019.13.

Due process hearings are conducted by impartial hearing officers, who are contracted for by DCPS. *Id.* § 5-2406. Hearing officers are independent contractors who are neither officers

-4-

nor employees of the D.C. Board of Education or the LEA Charter; by regulation, they cannot have participated in the development of the recommendations on appeal. *See id.* §§ 5-3001.1 (defining "Impartial hearing officer"), 5-2406.1 (requiring impartiality and objectivity). These same hearing officers hear appeals involving LEA Charters, District Charters, and non-charter Public Schools when any of those educational institutions is alleged to have failed to provide FAPE. Def.'s Mot. at 8. However, DCPS "ha[s] no authority to direct, rescind, overrule, modify, or alter the substantive decision of any hearing officer." D.C. Mun. Reg. § 5-2407.4.[2]

### B. Facts Behind the Instant Dispute

C.M. was enrolled at the School and was evaluated in February 2004 for special education services. Compl. ¶¶ 5-6. This evaluation included a psychoeducational evaluation, which recommended that a neurological evaluation be completed. *Id.* ¶ 6. On February 18, 2004, C.M.'s parent requested a due process hearing and, on April 5, 2004, amended that request to specifically seek a neuropsychological evaluation.[3] *Id.* ¶ 7. A due process hearing was held on April 26, 2004, at which time the hearing officer reviewed the results of the psychoeducational evaluation. *Id.* ¶ 8. In a decision issued on May 11, 2004, the hearing officer dismissed the parent's request for a neurological evaluation with prejudice, and instead ordered that a Multi-Disciplinary Team ("MDT")

---

[2] Although DCPS retains some oversight responsibility over hearing officers with respect to procedural matters in some statutory contexts, *see* D.C. Mun. Reg. § 5-2407.5, that duty does not apply to IDEA due process hearings. *See id.* ("This subsection shall not apply to hearings held on matters arising pursuant to Pub. L. No. 94-142, 89 Stat. 773, (1975), as amended, and its implementing regulations."); *Schaffer v. Weast*, 126 S. Ct. 528, 531 (2005) (explaining that "Congress first passed IDEA as part of the Education of the Handicapped Act in 1970 . . . and amended it substantially in the Education for All Handicapped Children Act of 1975, 89 Stat. 773.")

[3] It is unclear to what extent, if at all, a "neuropsychological" evaluation differs from a "neurological" evaluation. The Court borrows these terms from the Complaint. Compl. ¶¶ 6-7.

meeting take place. *Id.*

The School held a MDT meeting for C.M. on August 17, 2004. *Id.* ¶ 9. The School, the parent, and C.M.'s advocate were present. *Id.* The advocate asked the School to perform a neurological evaluation; this request was apparently based on the recommendation of the initial psychoeducational evaluation. *Id.* The School declined, asserting that "they did not need a medical evaluation in order to educationally program for C.M." and that the hearing officer had already ruled on that issue. *Id.*; Def.'s Mot. at 4. An occupational therapy evaluation was also requested, but the School did not agree. Compl. ¶ 10.

The parent requested another due process hearing in November 2004, and one was convened on January 18, 2005. *Id.* ¶ 11. The parent again requested a neurological evaluation and an occupational therapy evaluation. The School sought dismissal on the basis of *res judicata* but its motion was denied. *Id.* In a decision issued on February 2, 2005, the hearing officer ordered the School to convene a Special Education Plan ("SEP") meeting to determine whether the neurological evaluation of C.M. was needed. *Id.* ¶ 12. The hearing officer also ordered the School to perform an occupational therapy evaluation. *Id.*

This lawsuit followed. The School complains that the second hearing officer erred in three respects: (1) denying the School's *res judicata* motion; (2) ordering that an SEP meeting be convened; and (3) ordering an occupational therapy evaluation.[4] *Id.* ¶¶ 13-18.

---

[4] Curiously, the School also seeks relief for denial of its rights to due process, equal protection, and equal access to education, pursuant to the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1985; Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 *et seq.*; the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*; and the Fifth Amendment. Compl. ¶ 1. These statutes (and constitutional provision) are not referenced in Plaintiff's substantive counts or prayer for relief. For present purposes, the Court will rely on the IDEA alone for its jurisdiction. 20 U.S.C. § 1415(i)(2).

-6-

## II. LEGAL STANDARDS

The District moves to dismiss the School's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). A motion to dismiss pursuant to Rule 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The plaintiff need not plead the elements of a *prima facie* case in the complaint. *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). In deciding a Rule 12(b)(6) motion, the Court "may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citation omitted).

## III. DISCUSSION

The only question presently before the Court is whether the District of Columbia is a necessary party to this litigation. As the recitation of facts makes clear, DCPS played no role in the School's decisions at issue, in advancing any arguments before the hearing officer, or in deciding whether C.M. had received FAPE. In point of fact, the School agrees with the District's argument that, because the School has elected to be its own LEA, it is the School, rather than DCPS, that bears the responsibility of providing FAPE to its special education students. Pl.'s Opp'n at 2. It explains that it named the District as a defendant only because two judges on this Court have, under similar circumstances in the past, required charter schools to do so. *Id.* at 2-4.

-7-

98

Case 1:06-cv-01821    Document 14-6    Filed 07/25/2007    Page 8 of 22
Case 1:97-cv-01629-PLF    Document 1867    Filed 08/18/2006    Page 9 of 23
Case 1:05-cv-00467-RMC    Document 9    Filed 03/15/2006    Page 8 of 11

In *School for the Arts in Learning (SAIL) Public Charter School v. Mena*, No. 02-1772 (D.D.C. July 25, 2003), a D.C. Charter School sought review of a hearing officer's decision entitling the student to certain services under the IDEA. The school named only the student's parents as defendants. Stating that the parents could not provide the relief sought by the school, the court found that "[r]elief cannot be granted unless the District of Columbia or DCPS, which is the educational agency responsible for ensuring compliance with the IDEA, is the named defendant." Slip Op. at 1. Without elaborating on the relief sought, the court granted the parents' motion to dismiss under Rule 12(b)(7) for failure to join a necessary party.[5] *Id.* at 2.

Similarly, in *Integrated Design Electronics Academy Public Charter School v. Gooding*, No. 03-1224 (D.D.C. December 5, 2003), another D.C. Charter School — in fact, the Plaintiff in the instant case — sought review of a hearing officer's decision directing it to perform certain evaluations, on the ground that it had not received adequate (or any) notice of the due process hearing. Slip Op. at 2, 4. The court stated: "DCPS is the agency responsible for ensuring school compliance with the IDEA in the District of Columbia, and it held the due process hearing that plaintiff seeks to have reviewed. If plaintiff were to prevail and the Court vacated the determination or ordered a second due process hearing, DCPS would have to provide the relief as the agency responsible for IDEA compliance." *Id.* at 3 (citation omitted). Concluding that, "[i]n other words, any relief could be provided only by DCPS," the court directed the school to join DCPS as a party defendant pursuant to Rule 19(a). *Id.*

---

[5] Unless otherwise indicated, "Rule" refers to the Federal Rules of Civil Procedure.

-8-

There is nothing in these decisions to indicate that the precise argument made to this Court was advanced before: that is, that the School is an LEA Charter, not a District Charter, and thus stands on its own under the IDEA, unless DCPS has responsibility for implementing the decision appealed from, *see* D.C. Mun. Reg. § 5-3019.13, or assumes responsibility for the student, in its role as SEA, because the LEA Charter cannot serve the student, *see id.* § 5-3019.11. Neither *SAIL* nor *Integrated Design* suggests that the distinction between an LEA Charter and a District Charter school for IDEA purposes was argued or relied upon by the parties to those cases.[6] Neither decision addresses the independence of hearing officers; instead of recognizing their status as independent contractors who are required to be impartial neutrals, *id.* §§ 5-2406, 5-3001.1, both appear to perceive the hearing officers to be DCPS employees. And neither appears to have recognized that DCPS is without authority to alter the substantive decision of the hearing officer. *Id.* § 5-2407.4. With the benefit of the more explicit statutory and regulatory references and arguments made by the District of Columbia here, this Court can comfortably come to a different conclusion.

At bottom, the School is an LEA Charter involved in a dispute with the parent of a child concerning what is necessary to provide FAPE to the child. There is no indication that the School is unable to provide the ordered services and would thus need to ask DCPS, in its role as

---

[6] "Judicial decisions do not stand as binding 'precedent' for points that were not raised, not argued, and hence not analyzed." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 557 (2001) (Scalia, J., dissenting) (citing, *inter alia, United States v. Verdugo-Urquidez*, 494 U.S. 259, 272 (1990)). In any event, "one district court decision is not binding on another district court." *Am. Council of the Blind v. Wash. Metro. Area Transit Auth.*, 133 F. Supp. 2d 66, 74 n.2 (D.D.C. 2001); *see In re Executive Office of the President*, 215 F.3d 20, 24 (D.C. Cir. 2000) ("District Court decisions do not establish the law of the circuit, nor, indeed, do they even establish the law of the district.") (citations and internal quotation marks omitted).

-9-

SEA, for assistance. Def.'s Mot. at 9. If the School prevails on the merits of its appeal, the ordered services will not be required. If C.M.'s parent prevails on the merits, the School — not DCPS — will be required to provide the special services and to pay attorneys' fees and costs. Neither scenario requires the involvement of the District of Columbia in this appeal.

That DCPS contracts to provide hearing officers and, in that sense, might be viewed as having "held the due process hearing that plaintiff seeks to have reviewed," *Integrated Design*, No. 03-1224, Slip Op. at 3, is not enough to make DCPS or the District of Columbia a necessary party on appeal to this Court. The hearing officers are independent contractors to DCPS in its role as SEA, not employees of DCPS. They are bound to apply the requirements of IDEA in a neutral and impartial manner. D.C. Mun. Reg. §§ 5-2406, 5-3001.1. There is no reason to believe that a hearing officer would not obey a court order to rehear a case, were it remanded. Requiring the School to join the District as a defendant in this appeal, simply by virtue of DCPS having contracted to provide the independent and impartial hearing officer, is rather like requiring a litigant disappointed at trial to join the district court as a defendant on appeal.

The Court is therefore convinced that, under these circumstances, complete relief can be afforded to the parties without requiring the School to join the District as a defendant, and that the District's absence will neither impair its ability to protect its interests nor leave the remaining parties subject to inconsistent judgments. *See* Fed. R. Civ. P. 19(a).

### IV. CONCLUSION

The School simply seeks judicial review of a Hearing Officer Determination that affects only C.M., C.M.'s parent, and itself. Under these circumstances, the District of Columbia is not a necessary party to the adjudication of the case or to the implementation of any available

-10-

remedy. The District of Columbia's motion to dismiss will be granted. The School shall promptly

effect service on C.M. and C.M.'s parent as directed in the accompanying Order.

A memorializing order accompanies this Memorandum Opinion.


Date: March 15, 2006

                                        _____/s/_____
                                        ROSEMARY M. COLLYER
                                        United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HYDE LEADERSHIP PUBLIC CHARTER
SCHOOL,                                            :
                                                   :
                Plaintiff,                         :
                                                   :
        v.                                         :   Civil Action No. 05-0722 (JR)
                                                   :
WANDA CLARK, *et al.*,                             :
                                                   :
                Defendants.                        :

**MEMORANDUM ORDER**

        This is an appeal authorized by the Individuals with
Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*
(2000), from a hearing officer's determination that Hyde Public
Charter School (Hyde) failed to prove that it had provided
appropriate specialized instruction to a special education
student.  The plaintiff is the Hyde School.  Defendants are Wanda
Clark, next friend to the student, and the District of Columbia
as a defendant.  The District moves to dismiss for failure to
state a claim, arguing that it has been improperly joined and
that it cannot provide the relief Hyde seeks.

        Hyde actually agrees with the District's contention.
It explains that it named the District as a party only to follow
two prior rulings of this court in similar IDEA appeals.  See
Integrated Design Elecs. Acad. Pub. Charter Sch. v. Gooding, No.
03-1224 (D.D.C. Dec. 5, 2003) (Mem. Op. & Order); Sch. For the
Arts in Learning (SAIL) Pub. Charter Sch. v. Mena, No. 02-1772

103

(D.D.C. July 25, 2003) (Memorandum).  In both cases, the district court ordered the charter school to join the District as a necessary party, notwithstanding arguments advanced by the schools that were identical to those raised here by the District. The court in both cases believed that only the District could provide the desired relief, which was the reversal of a hearing officer's determination.

At least one of those decisions--my own in Mena--failed to distinguish a local education agency charter from a D.C. public school charter.  See D.C. Code § 38-1802.  The distinction was properly recognized, and applied, in a recent decision of Judge Collyer in IDEA v. Pub. Charter Sch. v. Belton, No. 05-467 (D.D.C. March 15, 2006) (Mem. Op.).  As that opinion explains, LEA charters stand on their own under the IDEA, and are responsible for providing the free appropriate public education mandated under the IDEA.  Id. at 4.  Disputes with LEA charters are presented to impartial hearing officers, independent contractors who are neither officers nor employees of the D.C. Board of Education.  See D.C. Code § 5-3001.1 (defining "Impartial hearing officer.").  The District "ha[s] no authority to direct, rescind, overrule, modify, or alter the substantive decision of any hearing officer."  D.C. Mun. Reg. § 5-2407.4.  In Belton, the District was dismissed as an improperly joined party.

- 2 -

104

Case 1:06-cv-01821    Document 14-6    Filed 07/25/2007    Page 14 of 22
Case 1:97-cv-01629-PLF    Document 1867    Filed 08/18/2006    Page 15 of 23
Case 1:05-cv-00722-JR    Document 9    Filed 03/27/2006    Page 3 of 3

Judge Collyer is correct.  The District's motion to dismiss [Dk. # 5] will be **granted**.  If plaintiff wishes to pursue its claim, it may have 30 days from the date of this order to file proof of service upon the remaining named defendants.

It is **SO ORDERED**.


JAMES ROBERTSON
United States District Judge

- 3 -

105

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRIENDSHIP EDISON PUBLIC     )
CHARTER SCHOOL WOODRIDGE  )
CAMPUS,                     )
                         )
     Plaintiff,         )
                         )
    v.                 )     Civil Action No. 05-2054 (RMC)
                         )
WILLIAM MORROW and EDWINA  )
SUMPTER, as next friend of minor child )
A.M., et al.,               )
                         )
     Defendants.       )
                         )

## ORDER

The District of Columbia, named as a defendant in this lawsuit under the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, is sued by Friendship Edison Public Charter School ("Edison"), which has elected to be its own local education agency ("LEA"). Compl. ¶ 2. Edison also names William Marrow and Edwina Sumpter, as next friends of the minor child A.M., and A.M., individually, as defendants. The District of Columbia moves to dismiss the complaint against D.C. because Edison is an LEA and can appeal an administrative decision by a Hearing Officer without suing the District of Columbia, inasmuch as D.C. had no role in the administrative decision and is not a necessary party to obtain relief.

The issue presented by the motion is identical to the issue decided in *IDEA Public Charter School v. Crystal Belton, et al.*, No. 05-467, 2006 WL 667072 (D.D.C. March 15, 2006), and *Hyde Leadership Public Charter School v. Clark, et al.*, No. 05-722, 2006 WL 845807 (D.D.C.

Case 1:06-cv-01821    Document 14-6    Filed 07/25/2007    Page 16 of 22
Case 1:97-cv-01629-PLF    Document 1867    Filed 08/18/2006    Page 17 of 23
Case 1:05-cv-02054-RMC    Document 11    Filed 04/28/2006    Page 2 of 2

March 27, 2006), both of which recognized that an appeal from an IDEA Hearing Officer Decision

concerning an LEA does not require the joinder of the District of Columbia.

For the reasons stated in *IDEA v. Belton* and *Hyde v. Clark*, it is hereby

ORDERED that the District of Columbia's motion to dismiss is **GRANTED**.


**SO ORDERED.**

Date: April 28, 2006                                            _____/s/_____
                                                               ROSEMARY M. COLLYER
                                                               United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FRIENDSHIP EDISON PUBLIC CHARTER SCHOOL CHAMBERLAIN CAMPUS, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 05-2461 (RCL) |
| EBONY SMITH, next friend of L.S. and L.S., individually, | ) ) ) | |
| and | ) ) | |
| DISTRICT OF COLUMBIA, | ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

This case comes before the Court on defendant's motion [3] to dismiss, or in the alternative, for summary judgment, filed on behalf of the District of Columbia, and the plaintiff's opposition [4] thereto, filed on behalf of Friendship Edison Public Charter School, Chamberlain Campus ("Edison"). Specifically, the defendant requests that plaintiff's complaint be dismissed with respect to the District of Columbia for failure to state a claim for which relief can be granted.

For the reasons set forth herein, the defendant's motion will be granted.

## I. FACTUAL BACKGROUND

In January of 2005, Ebony Smith submitted to L.S.'s teacher a written request to evaluate L.S. for eligibility to receive special education services. (Def.'s Mot. 2.) On July 18, 2005, Smith filed a request for a due process hearing, pursuant to the Individuals with Disabilities Education Act ("IDEA"), against plaintiff for failure to evaluate L.S. within 120 days. (*Id.*) She also requested

108

independent evaluations and compensatory education. (*Id.*)

In response to this request, plaintiff held a "resolution meeting" with Smith on August 2,
2005, where the school offered to complete the requested evaluations within thirty days and to hold
an eligibility meeting for L.S., as well as, the need for compensatory education. (Pl.'s Opp'n 1.)
During the resolution meeting, on the advice of counsel, Smith refused the offer to evaluate L.S., in
favor of pursuing the due process hearing. (*Id.* at 2.) The due process hearing was held on
September 18, 2005. (*Id.*)

At the hearing, the Independent Hearing Officer ("IHO") declined to admit into evidence
notes from or testimony regarding the resolution meeting, on the ground that it was "a confidential
settlement discussion." (*Id.*) On September 27, 2005, the IHO issued a determination that plaintiff
had failed to timely evaluate L.S., and ordered plaintiff to pay for independent psycho-educational
and speech-language evaluations arranged for by Smith. (Def.'s Mot. 2.) The IHO further
authorized additional evaluations, should the psycho-educational evaluator recommend them, as
well as the implementation of the appropriate services. (*Id.*)

Plaintiff appeals the IHO's determination. The District argues that this case is essentially a
challenge to the administrative decision of the hearing officer (a decision over which it has no
control), and therefore, the District submits that it is not a proper party to this case. (*Id.* at 3.)

## II. LEGAL STANDARDS

The defendant filed a motion to dismiss, or in the alternative, for summary judgment. (*Id.* at
1.) A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether a plaintiff has
properly stated a claim upon which relief can be granted. *Scheuer v. Rhodes*, 416 U.S. 232, 236
(1974), *overruled on other grounds* by *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). The explicit
language of Rule 8(a)(2) provides that the complaint need only contain "a short and plain statement

109

of the claim showing that the pleader is entitled to relief . . ." *Conley v. Gibson*, 355 U.S. 41, 47 (1957); *U.S. ex. rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 5 (D.D.C. 2003). The complaint need not plead the elements of a prima facie case. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-14 (2002) (holding that a complainant in an employment discrimination case need not plead the prima facie elements); *see also Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000).

In deciding a motion to dismiss under Rule 12(b)(6), the court is bound to consider all well-pleaded facts as true, and to draw all reasonable inferences in favor of the non-movant. *Scheuer*, 416 U.S. at 236; *Bernad*, 275 F. Supp. 2d at 5. Therefore "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley*, 355 U.S. at 45-46.

### III. DISCUSSION

The question before the Court is whether the District of Columbia is a proper party to plaintiff's appeal of the IHO's administrative decision. The defendant contends that:

> [t]he District of Columbia is not a proper party to [plaintiff's] "appeal" here of the challenged administrative decision. [Plaintiff] is responsible for complying with IDEA unless it has been found unable or unwilling to comply with the Act prior to initiation of a due process hearing request, or unless DCPS itself was involved in the actions or decisions at issue in the administrative proceedings. Also, DCPS has no control over the due process hearing officer's decisions. Finally, DCPS does not have a stake in the outcome of the litigation, and is not a necessary party to obtain the relief sought by either plaintiff or co-defendant.

(Def.'s Mot. 3.) The Court agrees with the defendant.

In a recent case analogous to the present case, Judge Collyer of this Court found that "complete relief [could] be afforded to the parties without requiring the School to join the District [of Columbia] as a defendant, and that the District's absence [would] neither impair its ability to protect its interests nor leave the remaining parties subject to inconsistent judgments." *Idea Pub.*

Case 1:06-cv-01821    Document 14-6    Filed 07/25/2007    Page 20 of 22

Case 1:97-cv-01629-PLF    Document 1867    Filed 08/18/2006    Page 21 of 23
Case 1:05-cv-02461-RCL    Document 7    Filed 05/05/2006    Page 4 of 4

*Charter Sch. v. Belton*, Civ. A. No. 05-467 (RMC) (D.D.C. Mar. 15, 2006) (where a charter school appealed from an IHO decision mandating that the school perform medical evaluations of a student). This determination is based on District of Columbia Municipal Regulations, which provide that:

> [Local education agency ("LEA")] charters stand on their own under the IDEA, and are responsible for providing the free appropriate public education mandated under the IDEA. Disputes with LEA charters are presented to impartial hearing officers, independent contractors who are neither officers nor employees of the D.C. Board of Education. The District "has no authority to direct, rescind, overrule, modify, or alter the substantive decision of any hearing officer."

*Hyde Leadership Pub. Charter Sch. v. Clark*, Civ. A. No. 05-0722, 2 (D.D.C. 2006) (citing D.C. Mun. Reg. § 5-3001.1 (defining "Impartial hearing officer"); D.C. Mun. Reg. § 5-2407.4).

In the instant case, the plaintiff is seeking judicial review of an IHO decision which only affects the student, the student's parents, and the plaintiff. If the plaintiff prevails, the evaluations and services ordered by the IHO will be obviated. If the defense prevails, the plaintiff will be required to provide the ordered evaluations and services. Either way, the District of Columbia will not be affected. Accordingly, the District of Columbia is neither a proper or necessary party therefore the defendant's motion to dismiss must be granted.

### IV. CONCLUSION

For the foregoing reasons, this Court concludes that the defendant has met its burden for dismissal. Accordingly, and for the reasons stated herein, defendant's motion to dismiss will be GRANTED.

A separate Order shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, May 5, 2006.

111

Case 1:06-cv-01821    Document 14-6    Filed 07/25/2007    Page 21 of 22
Case 1:97-cv-01629-PLF    Document 1867    Filed 08/18/2006    Page 22 of 23
Case 1:05-cv-00188-RWR    Document 19    Filed 07/06/2006    Page 1 of 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANIS PARKER, )<br><br>Plaintiff, )<br><br>v. )<br><br>DISTRICT OF COLUMBIA, )<br>et al., )<br><br>Defendants. ) | Civil Action No. 05-0188 (RWR) |

**ORDER**

On May 24, 2006, the District of Columbia moved to dismiss the complaint against it.  It argued that it is not a proper party to this lawsuit because as a public charter school, the Friendship Edison Public Charter School ("Edison") is solely responsible for the administration of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, et seq. The District notes that a public charter school is a "publicly funded school in the District of Columbia that . . . is not a part of the District of Columbia schools."  D.C. Official Code § 38-1800.02(29)(B)(2001).  A charter school that elects to be treated as a local education agency ("LEA") is responsible for special education evaluations, individual education plans ("IEP"), placements, and services to children with disabilities under their IEPs.  Because Edison is a LEA, the District asserts that the District plays no role in IDEA proceeding, and

112

Case 1:06-cv-01821    Document 14-6    Filed 07/25/2007    Page 22 of 22

Case 1:97-cv-01629-PLF    Document 1867    Filed 08/18/2006    Page 23 of 23
Case 1:05-cv-00188-RWR    Document 19    Filed 07/06/2006    Page 2 of 2

- 2 -

therefore, if there was an error in these proceedings, the District can provide no remedy.

Plaintiff has filed no opposition to the motion.  The motion is deemed conceded.  With defendant's undisputed factual assertions accepted as true, defendant is entitled to dismissal. See, e.g., <u>IDEA Public Charter School v. Belton</u>, 05-467, 2006 WL 667072, *3 (D.D.C. March 15, 2006).  Accordingly, it is hereby

ORDERED that the District's unopposed motion to dismiss [18] be, and hereby is GRANTED

SIGNED this 5th day of July, 2006.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge

113

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF PUBLIC SCHOOLS
OFFICE OF STUDENT HEARINGS

+  +  +  +  +

IN THE MATTER OF:

D

Washington, D.C.

Wednesday,
August 30, 2006

The above-entitled matter came on
for hearing, pursuant to notice.

BEFORE:

TONYA BUTLER-TRUESDALE, Hearing Officer

APPEARANCES:

On Behalf of the Student/Parent:

DONNA WULKAN, ESQ.

On Behalf of the D.C. Public Schools:

PAUL DALTON, ESQ.

This transcript was produced from
an audio CD provided by D.C. Public Schools.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433     WASHINGTON, D.C. 20005-3701     www.nealrgross.com

<u>I-N-D-E-X</u>

<u>PRELIMINARY MATTER</u>:
Determine Parties in the Case: ............19
Dismiss DCPS as Party in Case: ..........118

Opening Statement on Behalf of Petitioner 119
Opening Statement on Behalf of Plaintiff .129

Closing Statement on Behalf of Petitioner 389

| <u>WITNESSES</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> |
|---|---|---|---|
| Joette James | 161 | | |
| Deborah Laurie | 239 | | |
| Michelle Hawkins | 258 | 298 | 356 |
| Jenna Umansky | 364 | 377 | |

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

3

1                    P-R-O-C-E-E-D-I-N-G-S

2                                        9:00 a.m.

3              HEARING  OFFICER  BUTLER-TRUESDALE:

4    Thank you so much for your patience.  I'll

5    start out by saying promptness is extremely

6    important to me.  And on those rare occasions

7    when I am participating in a tardy behavior,

8    I do not take it lightly.  I value your time

9    very highly and you have my sincere apologies

10   that I was not here when you walked into the

11   room at 9:00.  That is not my practice or

12   habit as Ms. Lindsey will verify for you.

13   I'm always upstairs bothering OTC about it's

14   9:01 where are you?

15              Okay.  This is the matter of

16   D▆▆▆▆▆ H▆▆▆▆, whose birth date is listed

17   as ▆▆▆▆▆, 1992, recently had a birthday.

18   And this is an administrative hearing which

19   is being conducted in accordance with the

20   guidelines and rights established by Public

21   Law  108-446,  the  Individuals  With

22   Disabilities  Education  Improvement  Act

1    reauthorizes the IDEIA of 2004 and the rules

2    of the Board of Education for the District of

3    Columbia in Section 145 of the D.C.

4    Appropriations Act.

5        I'm Tonya Butler-Truesdale, an

6    independent Hearing Officer. As a Hearing

7    Officer I'm not an employee of the District

8    of Columbia Public Schools and I have no

9    relationship or close acquaintance with any

10   of the parties involved in this hearing. I

11   will hear the evidence presented in this

12   hearing and make a ruling in accordance with

13   the applicable laws, rules and regulations.

14       This hearing is closed to the

15   public, unless the parent explicitly states

16   to be open to the public. The matters

17   discussed here today are confidential and

18   must remain confidential, even after the

19   hearing is completed. A copy of the tape or

20   written transcript may be acquired by writing

21   to the Student Hearing Office at 825 North

22   Capitol Street, N.E., 8th Floor, Washington,

1    D.C. 20002.

2              I would now like to request that

3    each party present introduce themselves for

4    the record starting with Mr. Dalton, on the

5    right.

6              MR.    DALTON:    Good    morning,

7    everyone.  My name is Paul Dalton and I'm

8    counsel for SAIL Public Charter School.

9              MS.  UMANSKY:    My name is Jenna

10   Umansky  and  I'm  the  Special  Education

11   Coordinator for SAIL Operating School.

12             MS.    HARRIS-LINDSEY:    Quinne

13   Harris-Lindsey, I'm the attorney on behalf of

14   the D.C. Public Schools.

15             MS.  BECK:   Gina Beck, Associate

16   for the Law Office of Donna Wulkan, who is

17   the parent attorney.

18             MS.  HAWKINS:   Michelle Hawkins,

19   parent of D███████ H██████.

20             MR. HAWKINS:  Hi, mom.

21             MS. HAWKINS:  Hi.

22             MS.  WULKAN:   Good  morning.   I'm

1    Donna    Wulkan    and    I'm    the    attorney    for

2    Michelle and D████████ H███████.

3              MS. HAWKINS:    Oh, it's a pleasure

4    to finally meet you.

5              MS. WULKAN:    It's a pleasure to

6    finally meet you.

7              MS. HAWKINS:    20 months without

8    having met you.

9              MS. WULKAN:    It is amazing.    I'm

10   real happy to meet you.

11             MS. HAWKINS:    Okay.    Oh, really,

12   you shouldn't have told me that, my head will

13   grow.    Just kidding.

14             MS. WULKAN:    It's just strange not

15   running into each other.

16             HEARING    OFFICER    BUTLER-TRUESDALE:

17    Has    the    parent    been    advised    of    her    due

18   process rights?

19             MS. WULKAN:    She has not, other

20   than my having advised her of them.

21             HEARING    OFFICER    BUTLER-TRUESDALE:

22    All right.

1        MS. WULKAN:  She didn't receive

2  anything or get anything to address this

3  hearing.  She didn't' get anything.

4        HEARING OFFICER BUTLER-TRUESDALE:

5  Okay.  But you have advised her of her due

6  process rights?

7        MS. WULKAN:  I have spoken with

8  her on the due process rights.

9        HEARING OFFICER BUTLER-TRUESDALE:

10  Okay.

11        MS. WULKAN:  And I would waive the

12  reading of them, but I would ask you to make

13  a finding that she has not been advised of

14  her due process rights.

15        HEARING OFFICER BUTLER-TRUESDALE:

16  I see.  So that's one of the counts of the

17  allegation on the hearing complaint?

18        MS. WULKAN:  That was not one of

19  the counts on the allegations.

20        HEARING OFFICER BUTLER-TRUESDALE:

21  Okay.  What I would like to do since there

22  is some ambiguity around that, rather than

1    taking the time to read them into the record,

2    we'll read them to her.  And I'm sorry, this

3    is going to sound like a very insulting

4    question, but I ask this to people when I

5    hand them the due process rights, I must ask

6    you.

7                    Are you literate?  Are you able to

8    read?

9                    MS. HAWKINS:  Yes.

10                   HEARING OFFICER BUTLER-TRUESDALE:

11    All right.  Okay.

12                   MS. HAWKINS:  Very.

13                   HEARING OFFICER BUTLER-TRUESDALE:

14    Okay.  I have to ask that, you know, but I'm

15    going to hand you a copy of the due process

16    rights for you to read and peruse while we go

17    forward with the hearing, because you must be

18    advised of your due process rights.  And I

19    want to make sure that you are aware of that,

20    actually prior to the hearing, but we're

21    going to go forward in the interest of time.

22                   Are there any objections to the

1    disclosures?    And  hopefully  I  have  all  of

2    them.  I have, okay --

3                MS.    WULKAN:    I    do    have    an

4    objection    to    the    due    process    to    the

5    disclosure.  Not to mine.

6                HEARING  OFFICER  BUTLER-TRUESDALE:

7    Okay.

8                MS. WULKAN:  We'll get to those.

9                HEARING  OFFICER  BUTLER-TRUESDALE:

10   Okay.  All right.

11               MS. WULKAN:  Mr. Dalton signed it.

12               HEARING  OFFICER  BUTLER-TRUESDALE:

13   Okay.

14               MS.   WULKAN:    I   don't  have  any

15   problem with those.

16               HEARING  OFFICER  BUTLER-TRUESDALE:

17   Mr. Dalton, any objection to P-1 through P-

18   17?

19               MR. DALTON:  No objection.

20               HEARING  OFFICER  BUTLER-TRUESDALE:

21   No objection.  Okay.  Ms. Wulkan, I'm going

22   to hand you some tabs.  I'm known as the tab

10

1    pointer.

2            MS. WULKAN:  Okay.

3            HEARING  OFFICER  BUTLER-TRUESDALE:

4    And I require my documents to be tabbed.

5            MS. WULKAN:  I just want you to

6    say one thing.  I got my little -- I should

7    have done them for you, but I never had one.

8            HEARING  OFFICER  BUTLER-TRUESDALE:

9    Okay.  I don't know why my colleagues don't

10   need tabs.

11           MS. WULKAN:  I don't either.  See,

12   I need the little ring guides.  Thank you.

13           HEARING  OFFICER  BUTLER-TRUESDALE:

14   I thought I saw yours in here, Mr. Dalton.

15           MR. DALTON:  You don't see mine?

16           HEARING  OFFICER  BUTLER-TRUESDALE:

17   No.  I had my hand on it.  I thought for

18   sure I looked at it.  Okay.  And are there

19   any objections to SAIL Public Charter School

20   1 and 2?

21           MS. WULKAN:  Yes.  I'm afraid that

22   SAIL did not get them to us in time.  They

1  sent -- they got them to us the day after

2  they were due.

3            HEARING OFFICER BUTLER-TRUESDALE:

4   Mr. Dalton?

5            MR. DALTON:   I wasn't aware of

6  that.  We checked the fax cover sheet.

7            HEARING OFFICER BUTLER-TRUESDALE:

8   Okay.

9            MS. WULKAN:   I believe that you

10  were think that the hearing was tomorrow and

11  not today and so they did it five days

12  commencement with that.  I mean, I would have

13  to look and see exactly what day, but we got

14  ours in on August 23rd and they got theirs in

15  on August 24th.

16            HEARING OFFICER BUTLER-TRUESDALE:

17   Okay.

18            MR. DALTON:   It is true that we

19  had this hearing scheduled on our calendar

20  for tomorrow.  We became aware of the fact

21  that the hearing was on a different date when

22  in talking with a family friend of the

12

1    parent, but I don't see prejudice.   The --

2    both of the documents were in possession of

3    counsel well prior to the 23rd.  So it's only

4    a technical violation.

5            The purpose of the five day

6    disclosure it to make sure that counsel is

7    aware of documents, if they already are in

8    the possession, I'm not even sure there is a

9    requirement to disclose them, except for the

10   purpose of having them entered into the

11   record.  So since counsel had the documents

12   prior to the five day, I don't understand the

13   objection,    except    from    a    technical

14   standpoint.

15           HEARING OFFICER BUTLER-TRUESDALE:

16    Ms. Wulkan?

17           MS. WULKAN:  I mean, I know I make

18   a huge deal out of it, except that's actually

19   not accurate in terms of the law.  The law

20   says that you have to disclose documents five

21   days and that they can -- must be precluded.

22           MR. DALTON:  Well, I think it's in

1   perfect --

2          MS. WULKAN:   So, you know, it's --

3          MR. DALTON:   I'm sorry.

4          MS. WULKAN:   -- not just a matter

5   of whether I know about them or not.   There

6   is a question of whether it's going to be

7   entered into evidence or not.   I mean,

8   obviously, there are some things I know about

9   and some things I don't.   It's not sort of a

10  give -- it's not sort of an option to decide

11  whether or not, you know, I'm going to --

12  whether or not I've seen it before.   That

13  really isn't the standard of disclosure.

14  It's five business days before.

15         HEARING OFFICER BUTLER-TRUESDALE:

16  Well, I'm going to go on and make a ruling,

17  because I know that we have a lot to discuss.

18         MS. WULKAN:   Okay.

19         HEARING OFFICER BUTLER-TRUESDALE:

20  Before we get to the substance of the matter

21  of the case.   I will go on and bar the

22  disclosures, mainly because I think that it's

1    not also whether or not you already have them

2    in your possession, but knowledge of whether

3    or not the opposing party is going to use

4    them in the case.

5            But I do want to make sure that

6    it's understood mainly because we have not

7    been on an adjudication team together, that I

8    have a very liberal evidentiary rule

9    practice. In other words, my tendency is to

10   let as much in as possible and hope that you

11   will rely on my ability to determine what is

12   relevant and what is not.

13           But I do not think that I have

14   that much discretion with respect to the five

15   day disclosure rule. I thought that it was

16   probably helpful to let you know that with

17   respect to hearsay, objections and so on, my

18   tendency is to overrule those issues, simply

19   because I want as much information as

20   possible.

21           MS. WULKAN: I understand.

22           HEARING OFFICER BUTLER-TRUESDALE:

1    Okay.  Thank you.

2            MR. DALTON:  I would just note my

3    objection for appeal purposes.

4            HEARING OFFICER BUTLER-TRUESDALE:

5    Yes, sir.  And are there any other

6    preliminary issues?

7            MS. WULKAN: Yes.  Well, no.  Yes.

8    Yes, no, I don't know.  I think the scope of

9    this hearing is, obviously, from what our

10   complaint was filed and it was filed timely

11   and the hearing was set on the very last day

12   it could have been set via the taut lines,

13   literally the last day for a due process

14   hearing on junior, something like that.  And

15   they waited until the 75th day and set this

16   hearing despite Mr. Dalton and I both in

17   motions requested this hearing be set sooner.

18           HEARING OFFICER BUTLER-TRUESDALE:

19   Did you get a response from Chief Hearing

20   Officer Smith?

21           MS. WULKAN:  No.  No, we didn't.

22   The problem being is that the child had to

1    start school and the child had no place to go

2    to school and he had to start school on

3    August 28th and that's a couple of days ago.

4    So the fact that this hearing took place

5    today is extremely prejudicial to us.  And

6    Mr. Dalton and I actually both requested this

7    hearing to be set up in time and we never got

8    a response from the Student Hearing Office.

9              So I just wanted to say that that

10   was an issue for us.

11             HEARING  OFFICER  BUTLER-TRUESDALE:

12   Okay.

13             MS. WULKAN:  With regard to that.

14             HEARING  OFFICER  BUTLER-TRUESDALE:

15   I want to respond to that.

16             MS. WULKAN:  Um-hum.

17             HEARING  OFFICER  BUTLER-TRUESDALE:

18   Although  I  want  to  make  sure  that  all

19   parties are -- and I know that you know, I

20   want to make sure you know that I understand,

21   that I am not a representative of the Student

22   Hearing Office.  But I did want to say to you

1    that I'm not excusing what you have

2    experienced, but I haven't had a free time

3    block in probably six weeks.

4          I do remember one falling out last

5    week.  I think an 11:00 that just fell out.

6    They haven't even been falling out like they

7    sometimes do.  So there may simply -- it is

8    very possible that they simply didn't have

9    another block of time to give you.  And I

10   can't -- well, yes, I can.  I have decided to

11   even stop asking them for dates, for

12   continuance dates at the hearings, because I

13   usually will ask for a continuance date while

14   the parties are all here, so we can plan

15   already on the calendar.

16         I don't even do that any more,

17   because scheduling is so tight right now,

18   that it's difficult for them to even give me

19   a date while we're in the hearings.  So that

20   is not an apology for them.

21         MS. WULKAN:  Yes, I understand.

22         HEARING OFFICER BUTLER-TRUESDALE:

1    I just wanted to say that it may not have

2    been simply being ignored.

3            MS. WULKAN:  I just wanted to set

4    the context of, you know, the difficulty that

5    the parent has experienced, because she had

6    to find a placement for the child.

7            HEARING OFFICER BUTLER-TRUESDALE:

8    Okay.  Okay.

9            MS. WULKAN:  Having to place the

10   child on the 28th, because we didn't get to

11   this.  You know, it's extreme difficulty, so

12   that was one thing.  As to -- you know, there

13   are a number of other issues.  I mean,

14   obviously, our complaint is against SAIL.

15   This child -- I mean, I can give you a brief

16   background and tell you sort of the -- what

17   the preliminary issue is, because I see Ms.

18   Lindsey, Harris-Lindsey sitting down there,

19   you know.  She really, in our view, has no

20   need to be here.  We filed a complaint

21   against SAIL.

22           HEARING OFFICER BUTLER-TRUESDALE:

1    Yes.

2              MS. WULKAN:  The child has been at

3    SAIL from first grade through the seventh

4    grade and he has just finished that grade.

5    And so he has never been in any D.C. public

6    school.  He has never had any contact with

7    any D.C. representatives.

8              MR. DALTON:  Excuse me, I am very

9    sorry to interrupt, but this does sound like

10   an opening statement and there are still

11   preliminary matters to be addressed.

12             HEARING OFFICER BUTLER-TRUESDALE:

13   Okay.

14             MR. DALTON:  And so I would ask

15   that the Hearing Officer hear our preliminary

16   matters before allowing Ms. Wulkan to give

17   her story, her opening statement.

18             HEARING OFFICER BUTLER-TRUESDALE:

19   Okay.  So I'm gathering the first

20   preliminary issue you all would like to deal

21   with is who are the actual parties and who

22   should be in the room?

20

1    MS. WULKAN:  Yes.

2    HEARING  OFFICER  BUTLER-TRUESDALE:

3    Okay.

4    MS. WULKAN:   That  is  the  issue,

5    given the background.

6    HEARING  OFFICER  BUTLER-TRUESDALE:

7    Okay.

8    MS. WULKAN:   Which I think I do

9    need to do in order to get to preliminary

10   matters, since the complaint is against SAIL

11   and the child has never attended any -- if

12   you'll indulge me, Mr. Dalton, to please

13   finish the statement.  Since the child has

14   never been in any D.C. public school.

15   HEARING  OFFICER  BUTLER-TRUESDALE:

16   Um-hum.

17   MS. WULKAN:   And the complaint is

18   totally against SAIL for the denial of their

19   free and public education.   There are a

20   number of allegations against SAIL in this

21   and since the young man has never been in any

22   D.C. public school, other than SAIL, our

allegations are against SAIL.  And so it is --

- and that was what the complaint says.

And so we have moved against SAIL

and therefore, we don't think that D.C. is a

necessary party to this, because D.C. --

there is a statute which says that if D.C.

has never served the child and/or is not

giving, providing any services to the child,

then there can't be any allegations against

them, because they, in fact, have not

provided any education to the child.

And so you can read that statute

if you want, but anyway, they are -- so that

is the issue.  And if -- we can go through

the complaint if you want, you'll see that

there's nothing against DCPS.

HEARING  OFFICER  BUTLER-TRUESDALE:

Okay.

MS. WULKAN:    And so we filed --

apparently, there were some pretrial motions.

I  don't  know  whether  you  have  had  an

opportunity  to  read  them  and  there  were

1    several pretrial motions in this matter that

2    were filed.  There was a motion filed both by

3    SAIL, a motion to dismiss this matter,

4    dismiss SAIL out as well as a motion in the

5    alternative to join DCPS as a necessary

6    party.

7          Mr. -- I flied in opposition to

8    that motion and I have the -- our plaintiff's

9    opposition to the motion to dismiss that was

10   submitted by both SAIL and DCPS also filed

11   one.  And the response to SAIL's motion

12   adjoining necessary party was dated July 13,

13   2006.  It is in our disclosure.

14          HEARING OFFICER BUTLER-TRUESDALE:

15   Any response from Chief Hearing Officer

16   Smith on that?

17          MS. WULKAN:  Yes.

18          HEARING OFFICER BUTLER-TRUESDALE:

19   Okay.

20          MS. WULKAN:  He wrote them and he

21   granted -- he denied their motion to dismiss

22   and he denied to join DCPS as a necessary

1  party.  DCPS also filed a motion to dismiss

2  them saying they weren't a necessary party,

3  which, obviously, the Hearing Officer granted

4  and said yes, you're not a necessary party.

5          So there has been a ruling made in

6  this case as to that already.  And Mr.

7  Smith's ruling is in our documents at, I

8  believe it's, P-2.

9          HEARING OFFICER BUTLER-TRUESDALE:

10  P-2?

11         MS. WULKAN:  Yes, it's P-2.

12         HEARING OFFICER BUTLER-TRUESDALE:

13  Okay.

14         MS. WULKAN:  And Ms. Harris-

15  Lindsey filed a motion to dismiss as against

16  DCPS, but clearly she didn't, because there

17  weren't any allegations against DCPS, so

18  there was no need to dismiss them, because

19  there weren't actually any allegations

20  against them to begin with.

21         But anyway, it did turn out that

22  he did issue an order and the issues were

1   briefed, at least in our brief, with regard

2   to responsibilities of charter schools when

3   they   are   their   own   LEA,   SAIL   and

4   responsibilities of DCPS.

5           And so our position is that D.C.

6   doesn't have any place at this table.

7           HEARING   OFFICER   BUTLER-TRUESDALE:

8   Okay.

9           MS. WULKAN:   And that Mr. Smith

10  has already ruled.   Mr. Dalton then filed

11  another motion to -- which is now no longer

12  in the record, although it may be at a

13  hearing -- for hearing, I don't know, but

14  now, it is part of his disclosure, but it's

15  no longer -- it was not admitted.

16          HEARING   OFFICER   BUTLER-TRUESDALE:

17  Okay.

18          MS. WULKAN:   So he filed another

19  motion.   It was not a motion to reconsider,

20  it was simply another motion to join D.C. as

21  a   necessary   party   and   that,   I   filed   in

22  opposition   to   that   as   well,   even   though   I

1  felt like he had already had the ruling on it

2  and I didn't see why he was filing another

3  one without filing a motion to reconsider.

4           Nonetheless, I filed in opposition

5  to that and our opposition to that is that at

6  P-4 --

7           HEARING  OFFICER  BUTLER-TRUESDALE:

8   You said P-4?

9           MS. WULKAN:  Uh-huh, that's in the

10  record at P-4.  And there has not been any

11  ruling as of today.  There has not been any

12  further action as to that.  So here we are.

13           HEARING  OFFICER  BUTLER-TRUESDALE:

14   Okay.

15           MR. DALTON:  Well, there is a big

16  gaping hole in here, the scenario presented

17  by counsel for the merits.  I'm not certain

18  why she chose to admit something that is

19  almost jurisdictional to the case and that is

20  the fact that a placement meeting was held.

21  DCPS did participate.  Dr. Piegler (phonetic)

22  did issue another placement for Prospect.

1          As you know, once that occurred,

2     the  issue  has  now  shifted  to  the

3     appropriateness of the public placement that

4     DCPS has offered and if that placement is not

5     appropriate, then counsel for the parent has

6     an obligation to prove that private placement

7     for the student is appropriate.

8          SAIL  by  law  cannot  issue

9     placement.  It's outside of its jurisdiction.

10     And therefore, SAIL should not be part of

11     this case.  DCPS has acted, while it may have

12     been true at one point in the time line of

13     this  case  that  Mr.  Smith's  ruling  was

14     correct, it is no longer the case, because

15     intervening between the time of the original

16     ruling and where I made my second motion, we

17     have a placement view.

18          DCPS was put on notice that SAIL

19     was not an appropriate placement, that the

20     child needed a full-time placement.  DCPS did

21     not  contest  the  child  needed  a  full-time

22     placement and, in fact, issued a notice of

1    placement for Prospect.

2            So it is not -- the person that

3    should not be here today is SAIL, because now

4    this fight is between DCPS, who has issued a

5    notice of placement, the child is not

6    attending our school, is not in our

7    jurisdiction.  DCPS has accepted jurisdiction

8    of the child, because it has issued a notice

9    of placement.

10           The child is attending a private

11   school and SAIL has no control over any of

12   these matters.  Any allegation that the

13   parent has made is moot at this point as to

14   SAIL.

15           HEARING OFFICER BUTLER-TRUESDALE:

16   I understand.  Let me have Ms. Lindsey

17   respond if she chooses to make a comment.

18   I've got to get a mike to you.

19           MS. HARRIS-LINDSEY:  I don't need

20   a mike.  That's fine.

21           HEARING OFFICER BUTLER-TRUESDALE:

22   Can you -- okay.  Let me hear you?

1    MR. DALTON:  You can borrow ours.

2    MS. HARRIS-LINDSEY:  Oh, I'm fine.

3    I don't necessarily need one, a mike.

4    HEARING OFFICER BUTLER-TRUESDALE:

5    Actually, you are right.  It's picking you

6    up.

7    MS. HARRIS-LINDSEY:  Of course.

8    First of all, let me say, I have no

9    disclosures in front of me, so we were not

10   served disclosures in the case.  As I think I

11   usually tell the Hearing Officers, whatever

12   complaint is filed against a charter school,

13   we routinely file a motion to this.  It's

14   eventually called a motion for clarification

15   of DCPS as a party, because when we don't, we

16   get HODs ordering DCPS to do that.

17   We were never equally included in

18   the complaint.  So we always, as a matter of

19   course, file something, so that it's clear

20   for whoever issued the order who you're going

21   to include the DCPS in the relief sought

22   category.

1          HEARING OFFICER BUTLER-TRUESDALE:
2     Guilty.
3          MS. HARRIS-LINDSEY:   They'll be
4     charged by DCPS.
5          HEARING OFFICER BUTLER-TRUESDALE:
6     Yes.
7          MS. HARRIS-LINDSEY:   In order to
8     do things and they were never a party.
9          HEARING OFFICER BUTLER-TRUESDALE:
10     I'm sorry.   I know they're probably guilty
11     of that, too.
12          MS. HARRIS-LINDSEY:   That's why
13     the motion is always filed.
14          HEARING OFFICER BUTLER-TRUESDALE:
15     Um-hum.
16          MS. HARRIS-LINDSEY:   Generally,
17     counsel will clarify this building is charged
18     with, so then we don't do anything.   But a
19     lot of times it doesn't matter.
20          HEARING OFFICER BUTLER-TRUESDALE:
21     Um-hum.
22          MS. HARRIS-LINDSEY:   We're always

1  running somehow whether we know it or not.

2         HEARING OFFICER BUTLER-TRUESDALE:

3  Um-hum.

4         MS. HARRIS-LINDSEY:  And this went

5  back and forth.  My client did not consent to

6  be a party.  They weren't named in any.  And

7  the issues that are raised involving the IUP,

8  we didn't have anything to do with this DCPS

9  instruction and related services that haven't

10  (inaudible) DCPS, evaluate and also expect

11  that the disability doesn't have anything to

12  do with DCPS.  And making good progress still

13  has nothing to do with DCPS.

14         The child never attended DCPS and

15  LEA in this system.  So, you know, we don't

16  have anything to do with that.  If you get

17  into the point of relief, I don't know what

18  happened at the meeting that occurred that

19  precipitated the IEP, precipitated this

20  hearing request.

21         Again, the only way DCPS is

22  involved in the case is if the charter school

1    appeals to the allegation that they can't

2    service the student and there is some failure

3    to act or the complaint alleges that DCPS has

4    the packet.  You weren't a part to the case.

5    It really is that simple.  You weren't --

6    there was no allegation that DCPS failed to

7    do something.

8            And anything that happens

9    subsequent to, I still can't speak to it,

10   because I'm hearing this for the first time.

11   Because there have been no meetings, no need

12   for my client to even come to the meeting,

13   because we weren't put on notice that we

14   needed to -- that -- the issue that is

15   raised, if there is a challenge to Prospect,

16   that issue hasn't been raised.

17           So that's not an issue that I

18   would be able to address.  And I -- my plate

19   is full enough, so I'm not going to add

20   perspective claims once they, you know --

21   just on the chance that we may have something

22   that may be brought in maybe in another

1  jurisdiction.  I have a little time on my

2  hands.  I can create one.

3           But if I don't have to work on a

4  case, I'm not going to.  And in this case, we

5  are not a party to the case.  Whatever relief

6  you grant, that's statutory.  So whatever you

7  have within your officer rule, the IDEA

8  (inaudible), that's fine.  But until we are

9  actually named in the case or brought in the

10  hearing -- we've been done in this case

11  twice.

12           One, we weren't named in it, but

13  Mr. Smith said okay, if you're not named in

14  the case and then ruled on a subsequent

15  motion, you're not part of the case.  I came

16  down because you kept coming to our meetings

17  saying you are calling for it.  And because I

18  need to --

19           HEARING OFFICER BUTLER-TRUESDALE:

20   I hadn't called you.

21           MS.  HARRIS-LINDSEY:    It wasn't

22  you.

1           HEARING OFFICER BUTLER-TRUESDALE:

2   I was late. Okay. Okay.

3           MS. HARRIS-LINDSEY: Right. So I

4   -- needing to come down here, because I was

5   concerned, once again, that I was just going

6   to be an HOD issue about DCPS being, you

7   know, rightfully or wrongfully not paying

8   attention to the matter, so I came down. But

9   the reality is we're not a party. We aren't

10   and we're going to -- we're not going to take

11   responsibility for things that occurred

12   before DCPS is a party for a student in the

13   system.

14           MS. WULKAN: If I could just brief

15   this?

16           HEARING OFFICER BUTLER-TRUESDALE:

17   Um-hum.

18           MS. WULKAN: Maybe this will

19   illuminate some of the stuff on Mr. Smith's

20   ruling.

21           HEARING OFFICER BUTLER-TRUESDALE:

22   Sure.

1          MS. WULKAN:   It's very brief and

2     so I think it will just be easier.   It says

3     "After reviewing the evidence, the motion of

4     SAIL is denied and the motion of DCPS to

5     dismiss is granted.   The allegations in the

6     complaint are concerning a denial of faith

7     against SAIL.   Furthermore, the complaint

8     does not state facts alleging that DCPS has

9     denied the student faith.   Notwithstanding,

10    the parents requested remedy of a placement.

11          Additionally,   based   on   the

12    allegations of the complaint, SAIL as its own

13    LEA may be able to provide the relief

14    requested should it be determined that there

15    was a denial of faith, which is what we're

16    asking you to do is determine that there was

17    a denial of faith against SAIL.

18          Accordingly,   respondents   SAIL's

19    motion to dismiss or in the alternative

20    motion to join the necessary party is denied.

21     DCPS' motion to dismiss concerning it being

22    a party is granted."   Therefore, Ms. Harris-

1      Lindsey is correct.

2              And so if we look at the

3      allegations in the complaint, they are

4      essentially --

5              HEARING OFFICER BUTLER-TRUESDALE:

6       Let me just ask you this. I think what

7      would be more logical for me is if you were

8      to address the relevancy of what Mr. Dalton

9      describes as the intervening event.

10             MS. WULKAN: Okay. Well, let me

11     just explain how this went. Okay. So we had

12     these motions. This was all granted before

13     there was a -- this was all decided before

14     there was a resolution meeting. There was a

15     resolution meeting. It was held at SAIL.

16     And we came to the resolution meeting, as we

17     were ordered, as we are required to do so.

18     Mrs. Hawkins and I came to the resolution

19     meeting. It was out at SAIL.

20             When we got there, Mr. Dalton --

21     one thing that happened there was that SAIL

22     admitted that they were not an appropriate

1    placement.  And you will see that that is in

2    the notes from the resolution meeting, which

3    are a document here.  So the allegation

4    against SAIL, which is that they were not an

5    appropriate placement, was admitted by SAIL

6    at that meeting and it's documented in the

7    resolution meeting notes, which are, I

8    believe, P-10.  I just want to be sure that I

9    have the right document.

10        HEARING OFFICER BUTLER-TRUESDALE:

11   While you're checking that, could I get my

12   due process rights back?

13        MS. WULKAN:  Yes.  Okay.  So

14   that's the first thing that happened.  The

15   second thing that happened is that Mr. Dalton

16   called Ms. Piegler without our knowing

17   anything about this.  Ms. Piegler who,

18   apparently, must be the liaison between --

19        MR. DALTON:  Dr. Piegler.

20        MS. WULKAN:  Dr. Piegler, sorry.

21   Dr. Piegler who is, apparently, the liaison

22   between charter schools who are their own

1    LEAs, I guess, and the SEA.  I guess, she is.

2     I don't know.  But she was on the phone when

3    we got there and we had no idea that she was

4    going to be involved or that there was no

5    indication that she was going to be involved,

6    since we had already had a motion to dismiss

7    granted against DCPS.

8         But Mr. Dalton asked her to be

9    involved.  I don't think he -- I don't know

10   whether he told her that there had been a

11   motion to dismiss that had been granted

12   against DCPS.  But she assumed, I think, that

13   she needed to be there and so she got on the

14   phone.

15        At that time, she knew nothing

16   about the complaint, because nothing had been

17   served on DCPS.  And so apparently, right

18   prior to our appearing at the resolution

19   meeting, Mr. Dalton sent her, sent Dr.

20   Piegler, the -- our due process hearing

21   request, which she must have read.  I don't

22   know if she read it or not before the

1   meeting.

2         But she participated at the

3   meeting and Mr. Dalton, at that time, said --

4   she participated by phone in the meeting.

5   And at that time, he said we have sent you

6   the due process hearing complaint.  We think

7   that this is your problem and not ours,

8   essentially, because they are asking for

9   relief and the relief we were asking for is

10   placing him in a private school.

11         And he said so we think this is

12   your issue, Dr. Piegler.  And she basically

13   conducted the meeting and she issued notes

14   which, as I said, are at P-10 and the notes

15   from the meeting basically talk about, a

16   little bit about -- just introduce themselves

17   to each other, blah, blah, blah.  The

18   complaint was reviewed and discussed.  DCPS

19   was invited to participate in the resolution.

20         It says a copy of the parent

21   manual was provided to the parent, but it

22   wasn't.  She was in DCPS and we were at SAIL

1  and there was no parent manual. The

2  complaint was reviewed, discussed. DCPS was

3  invited to participate in the resolution

4  meeting held at SAIL PCS today, at 10:00 a.m.

5  by SAIL DCPS -- I mean, PCS.

6         And I know that was without Ms.

7  Harris-Lindsey's knowledge. DCPS reviewed

8  via fax today a cover letter from the parent

9  attorney outlining complaint against SAIL PCS

10  and a copy of the due process compliant

11  notes. Now, that's not something we sent to

12  DCPS. That's something Mr. Dalton did.

13         To date, DCPS has not received

14  pertinent information from SAIL to determine

15  placement consideration. SAIL PCS stated

16  their school is not an appropriate setting

17  for the student. So as far as I'm concerned,

18  that's an admission to the allegations in the

19  complaint of a denial of faith.

20         Parent and attorney are requesting

21  school placement in Katherine Thomas or

22  Chelsea School for the '06/07 school year.

1    Attorney for parent stated as of today the

2    student has not been accepted to either of

3    these schools.   However, the student has

4    completed visitation to one of the schools.

5    Letters of acceptance will be submitted to

6    DCPS in August, which we did submit, it's our

7    document.

8                HEARING OFFICER BUTLER-TRUESDALE:

9    Submitted to?

10               MS. WULKAN:  Submitted to --

11               HEARING OFFICER BUTLER-TRUESDALE:

12    SAIL?

13               MS. WULKAN:    -- DCPS, because

14    that's what they asked us to ask SAIL.

15               HEARING OFFICER BUTLER-TRUESDALE:

16    Okay.

17               MS. WULKAN:  We sent it to both

18    DCPS and SAIL.   We sent the letter of

19    acceptance to DCPS and to SAIL on, I believe,

20    it's P-5, on August 1st.  Yes, it's "Dear Dr.

21    Piegler," and there is a copy to Paul Dalton.

22    "On July 14th the resolution meeting was

1  held.    You requested the appearance of

2  parents' attorney to submit an acceptance

3  letter from the preferred placement.    I'm

4  writing to you to submit that letter to

5  Katherine Thomas School."    And that was --

6  the letter of acceptance is also in the

7  documents.

8        Sorry, I just need to go back to

9  these meeting notes, resolution meeting

10  notes.    Letters of acceptance be submitted

11  and then it says "An MDT meeting is scheduled

12  for Tuesday, August 8th at 10:00 a.m. to

13  discuss school placement in the '06/07 school

14  year.    SAIL will submit to DCPS by the close

15  of business, 7/14, relevant and pertinent

16  information about the student in order to

17  determine school placement for the '06/07

18  year."

19        And then it says "Pertinently, the

20  complaint is not resolved."    So the

21  resolution meeting was over.    The complaint

22  was not resolved.    These are the notes that

1   were submitted by Dr. Piegler to the

2   resolution office and that was it, as far as

3   I was concerned.  That was the end of it.

4           Mr. Dalton insisted that we have

5   another meeting on the 14th to come back for

6   placement, because he kept saying that his

7   position was that they couldn't place.  I

8   didn't agree with that.  I have written a

9   whole brief on that.  You can see that.  That

10  brief on the ability of SAIL to place is at

11  P-3.  It's a long opposition and a long

12  citation to the charter school statutes.

13          And I can also give you -- I have

14  for you also a chart of five hearings.  There

15  have been five LEA charter school hearings,

16  not hearings, trials before in the U.S.

17  District Court in the last like five months.

18   The first one was 3/15/06.  There was one

19  3/27/06.  There was a decision 4/28/06.  A

20  decision on 5/5/06.  And a decision on

21  6/5/06.

22          There are five cases that were all

1    filed in the U.S. District Court, all of them

2    were filed by charter schools that were LEAs,

3    all of them were on the very issue of whether

4    or not DCPS needs to be a necessary party or

5    whether or not the relief can be granted

6    against the LEA.   In every single one of

7    them, the U.S. District Court, five different

8    Judges, determined that DCPS was not a

9    necessary party.

10           MR. DALTON:  Well --

11           MS. WULKAN:  Please, I will give

12   you the briefs for every one of them and I

13   have every one of the cases.  I have --

14           MR. DALTON:  That's -- well, what

15   I'm objecting to, counsel, this is merely a

16   perpetration of fraud on this by this

17   counsel.  The position that we have took in

18   each one of those cases was, in fact, that

19   DCPS was not a party to that, to the case.

20   Should not be a party to that case.  But

21   because of two prior decisions that required

22   us to maybe suggest over our objection, we

1  continued to do that over the course of the

2  time period from 2003 to 2006.

3          The court finally got it right,

4  Judge Kohler (phonetic) and Judge Robertson.

5  Judge Robertson even admitted that he

6  initially had it wrong, that Judge Kohler's

7  decision convinced him that the position that

8  we took as counsel for the charter school was

9  the correct one, that DCPS should not be a

10  party.

11          And the reason we took that

12  position was because it involved situations

13  like the fact pattern in this case prior to

14  the resolution meeting.  In other words,

15  where the student was a student of a charter

16  school and it was an issue regarding

17  something that could be done by the charter

18  school.

19          If you notice when she read Mr.

20  Smith's opinion, he said notwithstanding the

21  placement issue that is a red flag, i.e,

22  charter schools don't place in private

1    placements.   And that they may be able to
2    provide the remedy, which, in fact, we cannot
3    because  the  issue  is  a  private  placement
4    versus a public placement.
5            Also, it appeared to me in the
6    beginning that counsel was insinuating that
7    we tried to get over on DCPS by not informing
8    Dr. Piegler.  She corrected that by saying,
9    in fact, that we did send the due process
10   hearing request to her and, in fact, she read
11   that into the record, okay, because we wanted
12   Dr. Piegler to know that there was a due
13   process hearing.
14           This is an unfortunate case, but
15   it's not an unfortunate case because of what
16   SAIL has done.  Had counsel sued both DCPS
17   and SAIL, we wouldn't have any problems in
18   this case.
19           MS. WULKAN:  Well --
20           MR. DALTON:  Now, let me finish.
21   What has happened here is that there may be a
22   situation where you find no denial of faith,

1    because we did not request DCPS' assistance,

2    according to them.  According to our records,

3    we did, but they wouldn't acknowledge it.

4    And this has been an ongoing problem of us

5    delivering documents to DCPS and having

6    people then say we don't have the documents

7    and therefore we have gone to a courier

8    service where everything has to be signed

9    for.

10              Okay.  But we said okay, we will

11    send the documents again to Dr. Piegler and

12    we'll have this meeting on August 8th.  We

13    have the meeting.  They indicate they have a

14    placement, so now, unfortunately, the issue

15    is DCPS is in the case.  They have been

16    brought into the case.  The issue for you to

17    decide is which placement is appropriate.

18              The public placement offer or the

19    private?  It would be unfair to make counsel

20    go forward because she did not get a

21    disclosure and she was -- she had every right

22    to rely on a previous determination.  She got

1    a disclosure from us.  She apparently did not

2    get a disclosure from Ms. Wulkan's office.

3           But even with our disclosure, I

4    think she still had the right to why on Mr.

5    Smith's previous ruling.  But that ruling was

6    based solely on the fact that there was no

7    documentation under the regulations that we

8    requested the help.  Now, that is clearly not

9    the case.  Clearly, DCPS has accepted our

10   request, acted on it and now there is -- the

11   child should be attending Prospect.

12          HEARING OFFICER BUTLER-TRUESDALE:

13   Was your motion for joint -- filed before or

14   after the resolution meeting?

15          MR. DALTON:   Probably after,

16   because it would have been the same fact

17   pattern as the previous ruling if we had done

18   it before, and therefore it would not have

19   made any sense.

20          MS. WULKAN:  It's just that there

21   are a number of -- I'm sorry.

22          HEARING OFFICER BUTLER-TRUESDALE:

1    Let me make sure he was finished.

2            MS. WULKAN:  Oh.

3            HEARING  OFFICER  BUTLER-TRUESDALE:

4    Were you finished?

5            MR. DALTON:  So I wasn't finished

6    and I appreciate that.  So what it comes down

7    to is, and there's a catch-22 for this, too,

8    the situation is that the allegations against

9    SAIL are now moot.  And because statutorily

10   or by regulation we don't make those rules.

11   We appeal to the SEA DCPS.  They make the

12   determination as to whether or not they have

13   an appropriate public placement and act on

14   that or issue a private placement or make a

15   determination that no, the LEA can serve the

16   child.

17           They     did     not     make     the

18   determination that the LEA could serve the

19   child.  They made the determination that they

20   could serve the child in one of their public

21   placements, and I understand that the parent

22   doesn't -- objects to that placement.  We

1    objected to the placement on its face,

2    because it appears that the child has aged

3    out, approximately.  Well, again, I think

4    DCPS should have an opportunity to defend

5    their placement, but not today.

6         MS. WULKAN:  Well, clearly not

7    today, Mr. Dalton, because there is

8    absolutely no indication in this record, not

9    by any disclosure by you, not by any

10   disclosure by DCPS and not by any disclosure

11   by the parent, that there is such a notice of

12   placement or anything else.  It is not an

13   allegation in this complaint.  There is not a

14   mention of Prospect anywhere.  There is not a

15   document having to do with Prospect.

16        Mr. Dalton's disclosures that were

17   not admitted, that you didn't admit, didn't

18   even -- didn't include anything having to do

19   with Prospect even if you had admitted them.

20    So there was nothing.  There is no notice of

21   placement anywhere and even if there was a

22   notice of placement issue, my client never

1    got anything in the mail with regard to it.

2           So if there was one issued, it was

3    not served on my client, on the parent.  So

4    it  doesn't  matter.   The  whole  issue  of

5    Prospect  and  DCPS'  notice  of  placement  or

6    whatever it was is not for this hearing.  It

7    has nothing to do with this hearing.  There

8    is nothing.  There has been no -- there has

9    been  nothing  submitted  that  DCPS  did  issue,

10   didn't issue or announced.

11          It  has  nothing  to  do  with  this

12   hearing, so Mr. Dalton is wrong that that is-

13   - is  clearly  wrong  that  that  is  an  issue.

14   There is no document.  There is nothing that

15   puts that -- if you look at the complaint,

16   the complaint is that it's against SAIL.

17          Mr.   Dalton   says   that   the

18   allegations  in  SAIL  are  not  moot.   They  are

19   not moot.  We have a hearing here saying that

20   SAIL who, as their own LEA, denied this child

21   an  appropriate  education  and  we  have  a  number

22   of issues against SAIL.  And SAIL has now, at

the resolution meeting, admitted that they did deny him -- that they do not have an appropriate program for him, that they are an inappropriate program for him.

I can put evidence on to show why SAIL is inappropriate or you can take their admission, but in our view the only thing that you have to -- the thing that you have to do is address the allegations in the complaint, which are against SAIL, that their own LEA -- they are their own LEA.

And if we look at this, it says -- if you look at my argument at page 2, it says "Because SAIL is solely responsible for the actions constituting the alleged denial of faith and because SAIL would be responsible for paying both the compensatory education award," which we also asked for -- not only did we ask for a finding a denial of faith against SAIL, we asked for a compensatory education award and the plaintiff's attorney's fees in the event the plaintiffs

52

1    prevail at the hearing.

2          SAIL is a necessary party in the

3    current action. And, basically, a summary of

4    our complaints are in this motion where -- or

5    you can look at the due process hearing

6    request, and the due process hearing request

7    is two.

8          It says "In violation of the IDEA,

9    DCMR, SAIL failed to develop an appropriate

10   IEP including, but not limited to, developing

11   appropriate goals and appropriate disability

12   classification, failed to issue an

13   appropriate notice of placement, failed to

14   provide for and deliver appropriate

15   instructional and related services, failed to

16   evaluate the student in all areas of

17   disability, failed to ensure Dominique makes

18   adequate progress in his academic program and

19   SAIL has failed to provide an appropriate

20   special education instruction and, therefore,

21   has failed to provide an appropriate

22   placement."

1          Those are all issues that are

2     directly against SAIL.  They are not moot by

3     the fact that SAIL admitted that that was so.

4      That doesn't moot them for this hearing.

5     There has not been a finding by his Hearing

6     Officer.

7          And, of course, as Mr. Smith says,

8     there needs to be a finding of denial of

9     faith, which is -- the allegations of the

10    complaint concerning a denial of faith are

11    against SAIL.  And so it says -- we said

12    these failures constitute a denial of faith.

13          As relief, the parents request the

14    Hearing Officer order SAIL to place and find

15    Dominique, including transportation, at an

16    appropriate  full-time  private  special

17    education  program  that  can  address  his

18    academic,  language,  organizational  and

19    attention disabilities.

20          Parents  also  request  an  IEP

21    meeting to be convened at Dominique's new

22    placement to revise his IEP as needed.  In

1    addition, the parents request comp ed.  That

2    is the complaint.

3              Now, I am prepared to argue, if

4    you want, why I think and why I think the

5    court would agree with me, why SAIL has the

6    jurisdiction to place this child at the

7    parents' proposed placement.

8              HEARING OFFICER BUTLER-TRUESDALE:

9    I do think that that will be highly relevant

10   in the closing.  I'm keeping an eye on the

11   clock, because I know that when I came in

12   this morning I was scheduled for -- I think I

13   saw I have an 11:00, a 1:00 and a 3:00.  And

14   you have already indicated to me that

15   placement --

16             MR. DALTON:   That's all for this

17   case.

18             HEARING OFFICER BUTLER-TRUESDALE:

19   Oh, they are all the same?

20             MS. WULKAN:  Yes.

21             HEARING OFFICER BUTLER-TRUESDALE:

22   Oh, this is all day?

1          MR. DALTON:  This is all day.

2          HEARING  OFFICER  BUTLER-TRUESDALE:

3    All day.

4          MS. WULKAN:  All day.

5          HEARING  OFFICER  BUTLER-TRUESDALE:

6    Oh, okay.  Well --

7          MR. DALTON:  We got lots of time.

8          HEARING  OFFICER  BUTLER-TRUESDALE:

9    Okay.

10          MR. DALTON:  Before we get to the

11    jurisdictional issue, the problem for counsel

12    is that she wants the case to be about what

13    she  has  complained  about,  but  that's  the

14    problem.

15          HEARING  OFFICER  BUTLER-TRUESDALE:

16    Um-hum.

17          MS.  WULKAN:    That's  just  the

18    legal.

19          MR. DALTON:  No.  The problem is

20    when  you  have  a  change  that  occurs,  that

21    change cannot be ignored and the fact that we

22    -- you  know,  here  is  the  rub.  Okay?  The

1    parent was at the meeting.  Counsel was at

2    the meeting.  They both objected to the

3    placement.  For her to say we don't have any

4    evidence of the placement at Prospect is

5    ludicrous.

6              I will put the parent on the stand

7    and ask her these questions and then you will

8    have the evidence.  Okay?  So, I mean, the

9    reason, the whole reason --

10             HEARING OFFICER BUTLER-TRUESDALE:

11   Well, let me ask this, because I want to

12   make -- even if we have all day, I have a

13   feeling that we're going to need every minute

14   of all day.  So I want to let you know where

15   I am and if I'm skipping a beat or I have

16   missed a critical factor, I want to be

17   reminded of that now.

18             I understand the issue of the

19   intervening event and I think that that is

20   critical.  I'm wondering whether or not Dr.

21   Piegler's participation or how relevant Dr.

22   Piegler's participation is by way of

1    informing the SEA that the LEA cannot serve

2    the -- could not serve the petitioner since

3    the hearing complaint had already been filed.

4              It seems to me that with respect

5    to the timing, the issues of the complaint

6    may not be moot because the SEA had not been

7    informed by the LEA of the inability to serve

8    the petitioner, the alleged inability to

9    serve the petitioner prior to the filing of

10   the complaint.

11             I think that is the controlling

12   issue of whether or not a joiner or maybe

13   even, and I hope I get this term right, I

14   haven't used it in a long time, intervener --

15             MR. DALTON:  Um-hum.

16             HEARING OFFICER BUTLER-TRUESDALE:

17   -- is appropriate.  I think that it -- the

18   critical fact is when the SEA was invited to

19   become a member of -- if the -- what does --

20   the   resolution   meeting   notice.    The

21   resolution meeting notice says that it is at

22   SAIL?

1          MS. WULKAN:   It was at SAIL and it

2     is my understanding that --

3          HEARING   OFFICER   BUTLER-TRUESDALE:

4     And does the resolution meeting notice have

5     any indication that DCPS is going to attend?

6          MS. WULKAN:   No, no.

7          HEARING   OFFICER   BUTLER-TRUESDALE:

8     Okay.

9          MS. WULKAN:   Absolutely not.

10         HEARING   OFFICER   BUTLER-TRUESDALE:

11    All right.

12         MS.   WULKAN:      There   was   a

13    resolution meeting notice that was sent by

14    SAIL, because SAIL was the only one that was

15    complained against.   By that time, there had

16    already been a ruling on the motion that DCPS

17    had nothing to do with it.   I was shocked

18    that they were at the resolution meeting,

19    because the parent wasn't noticed that they

20    were going to be there.

21         What happened was, I understand,

22    right   before   the   resolution   meeting,

1    literally right before, Mr. Dalton faxed to

2    Dr. Piegler, without going through counsel,

3    faxed to Dr. Piegler the due process hearing

4    complaint.

5            HEARING OFFICER BUTLER-TRUESDALE:

6     All right.

7            MS. WULKAN:  And that's what she

8    says ended up, so that's exactly what she

9    said.  She said, well, I'm going to come, but

10   I don't know anything about this because I

11   just got the due process hearing complaint

12   and I don't know one other thing about this

13   child.  I don't have one other piece of

14   information.

15           And if you look at Mr. Dalton's

16   motion, original motion to -- the one that

17   Mr. Smith ruled on, he -- his position in

18   that motion was that SAIL should be dismissed

19   because my -- there was no substance to my

20   allegations, that SAIL had not denied him,

21   that he had a current IEP and that he was

22   being served appropriately is what he said in

1   his motion.

2          So he clearly -- and that was in

3   response to -- he filed a motion to dismiss

4   and, in the alternative, to add DCPS and he

5   clearly was defending his placement at that

6   point.   And so that was just prior to the

7   resolution meeting.   So, at that point, he

8   was still defending his placement.

9          HEARING   OFFICER   BUTLER-TRUESDALE:

10   I want --

11          MS. WULKAN:   And saying we have

12   provided an appropriate education.

13          HEARING   OFFICER   BUTLER-TRUESDALE:

14   I wanted to give Mr. Dalton an opportunity

15   to respond to the statement that I made about

16   where I am logically so far with respect to

17   what I have heard from you so far.

18          But, Ms. Lindsey, I think -- were

19   you raising your hand?   Were you trying to

20   get my attention?

21          MS. HARRIS-LINDSEY:   Yes, I just

22   have some questions and just, you know, you

1    get all kinds of thoughts back here.    It

2    seems that if -- I was trying to clarify that

3    the position of being a party, not DCPS, the

4    question really comes down to whether the

5    hearing officer and, you know, the LEA

6    charter school, to my understanding, does not

7    have an independent right to issue a

8    placement for a student.    They can't

9    independently do it.

10    The question is whether the

11    Hearing Officer in a finding of denial of

12    faith has the authority to order them to find

13    one.    That is the only distinction, because

14    if DCPS is not a part of the case or had not

15    been brought into the case, and I'm not

16    proffering one way or the other, they weren't

17    brought into the case until after, because as

18    far as I see it, all these things occurred

19    back in June and for the hearing, whatever

20    notice DCPS, however way DCPS actually

21    stepped in, it was sometime in August after

22    the resolution meeting where Dr. Piegler

62

1    appears after they filed the motion, the

2    complaint.

3            The question, the legal question

4    that I'm hearing, is really whether they

5    spoke -- with the Hearing Officer's authority

6    is going to be even able to grant, whether

7    you can grant the relief that the parent is

8    seeking.

9            HEARING OFFICER BUTLER-TRUESDALE:

10   Um-hum.

11           MS. HARRIS-LINDSEY:  Not whether--

12   I mean, it's not that we were brought in.  We

13   were brought in and the allegation is DCPS

14   did not step in at whatever point they should

15   have stepped in or DCPS didn't monitor.

16   Those weren't the allegations.  It's that

17   SAIL didn't do all these things that resulted

18   into -- that resulted in a denial of faith

19   and whether, based on those allegations, upon

20   a finding by the Hearing Officer, if you find

21   a denial of faith, whether your authority

22   extends that far.

1          Can  you  order  an  LEA  charter

2  school  who  receives  federal  funds  to  divert

3  some  of  those  funds  as  a  penalty  to  what  the

4  relief  includes,  whether  you  can  order  them

5  to  fund  and  provide  private  placement.    I

6  take  no   position  on  that.    Now,  that,  that's

7  easily  a  school  issue.

8          HEARING  OFFICER  BUTLER-TRUESDALE:

9   Um hum.

10          MS.  HARRIS-LINDSEY:    Everything

11  that  is  talked  about,  that  inferred  that  the

12  DCPS  --  we  don't  think  it's  --  honestly,  it's

13  not  the  issue  that  is  before  the  Hearing

14  Officer,  because  the  only  one  that  shapes  the

15  scope  of  the  hearing  request  or  the  complaint

16  is  the  parent  and  a  parent  never  amended  the

17  complaint.

18          And,  really,  the  law  has  been

19  really  clear  since  the  amendment,  and  that's

20  that  you  can't  amend  at  the  table.    They

21  can't  decide  amendments.    The  amendment  has

22  to  be  in  writing.    It  can't  be,  oh,  I  decided

1    today I'm going to amend the complaint and I

2    just sat there and write it on notice.  DCPS

3    has not been very honest and Mr. Dalton

4    called and said you all are going to be a

5    party.  I tell him no, not my party.

6          My client is not going to consent

7    to step into a case and it's okay.  My client

8    is against that I am, as a counselor, not

9    going to sit here and take on responsibility

10   for facts and nuances that I have no part in

11   and my client had no part in until after the

12   fact.

13         So the question is -- it's a real

14   simple question and it comes down to what

15   your authority is, whether under IDEA you can

16   grant them.  And I don't -- the statute, what

17   the LEA charter does is it tells the LEA

18   charter what their responsibilities are.  If

19   you're going to be an LEA charter in this

20   jurisdiction, this is what you must do.

21         But it doesn't say that you as the

22   Hearing Officer can't order that LEA charter

1  school to do things or can't order relief.

2  Just like if we were in the case, it would be

3  different, but here we are, we're basically

4  the deep pocket that everyone comes to, but

5  we weren't brought in this party, in this

6  case.  We weren't.

7       MS. WULKAN:  Okay.

8       MS. HARRIS-LINDSEY:  So, I mean,

9  that's just -- you know, sitting back here --

10       HEARING OFFICER BUTLER-TRUESDALE:

11  Okay.

12       MS. HARRIS-LINDSEY:  -- what I

13  believe.

14       HEARING OFFICER BUTLER-TRUESDALE:

15  I promised to give Mr. Dalton the

16  opportunity to respond.

17       MR. DALTON:  Okay.

18       HEARING OFFICER BUTLER-TRUESDALE:

19  And that's coming.

20       MR. DALTON:  All right.

21       HEARING OFFICER BUTLER-TRUESDALE:

22  Let me just say this to the parent.

1    MS. HARRIS-LINDSEY:  They are --

2    HEARING  OFFICER  BUTLER-TRUESDALE:

3 Hold  on  a  second.   Mr.  Dalton  and  Ms.

4 Lindsey probably know, have an idea, of where

5 I'm getting ready to go next.

6    It  is  now  10:00  and  I  want  to

7 apologize  to  the  parent,  because  I  know  how

8 uncomfortable  it  must  feel  to  come  into  a

9 hearing  about  your  child  and  issues

10 specifically  related  to  your  child  and  have

11 to  sit  through  these  type  of  preliminary

12 issues  prior  to  anyone  even  naming  your

13 child.

14    Your child's name hasn't even been

15 mentioned  yet,  and  I  want  you  to  understand

16 that  I  don't  take  that  lightly.   However,

17 adjudication  of  your  due  process  rights  have

18 now  turned  into  something  extremely  close  to

19 litigation  and  litigation  does  involve  in

20 many  instances  all  of  these  preliminary

21 motions, which are very technical and have to

22 do  with  issues  of  law  and  are  not  directly

1    tainted to the fact pattern related to your

2    child.

3              And I just wanted to say to you as

4    briefly as possible, I understand how you may

5    be feeling now.  All of this, unfortunately,

6    is very necessary and I do hope that we will

7    get to the meat of the case very soon, but I

8    don't want you to think that we're

9    overlooking what you came here about today.

10   Okay?

11             MS. HAWKINS:  Oh, no, I

12   understand --

13             HEARING OFFICER BUTLER-TRUESDALE:

14    Okay.

15             MS. HAWKINS:    -- what you're

16   doing.

17             HEARING OFFICER BUTLER-TRUESDALE:

18    All right.

19             MS. HAWKINS:  Okay.

20             HEARING OFFICER BUTLER-TRUESDALE:

21    Mr. Dalton?

22             MR. DALTON:  The problem, with all

1    due respect to counsel, analysis is that if I

2    assume that she's correct, we still have this

3    issue of a public placement.  You would have

4    to determine that the public placement is

5    inappropriate before you could -- if you had

6    the authority, which we don't believe you do,

7    you would have to determine the public

8    placement is inappropriate before you could

9    order us to pay for a private placement.

10              MS. WULKAN:  Well --

11              MR. DALTON:  Please, counsel, let

12   me -- you will have your turn.  So, I mean, I

13   think the reason there is this objection is

14   because that's the truth and that's the heart

15   of the case and that's the big problem.  You

16   know, all of --

17              HEARING  OFFICER  BUTLER-TRUESDALE:

18   Let me make sure I understand, because I

19   hear you.  I think I'm following you, but if

20   she did not name DCPS and DCPS attended a

21   resolution meeting, made -- and issued a

22   prior notice of placement, which they are

1    alleging they didn't even receive --

2            MR. DALTON:  Um-hum.

3            HEARING  OFFICER  BUTLER-TRUESDALE:

4    -- and they are also alleging that they were

5    not  even  aware  that  DCPS  was  going  to  be

6    there participating in the meeting, what does

7    DCPS' actions have to do with this complaint?

8            MR. DALTON:  Well --

9            HEARING  OFFICER  BUTLER-TRUESDALE:

10   Should  they  have  just  --  are  you  arguing  to

11   me  that  they  should  have  gotten  up  out  of

12   that  resolution  meeting  and  walked  out

13   because  there  was  a  party  there  that  they

14   didn't  think  should  be  there  discussing

15   resolution of the issues?

16           MR.  DALTON:   I  don't  even  really

17   want  to  --  you  know,  as  much  as  I  want  to

18   answer each and every question, you know, I'm

19   not  even  sure  that  that  is  a  question  that

20   has any relevance to your finding.

21           HEARING  OFFICER  BUTLER-TRUESDALE:

22   Okay.

1          MR. DALTON:  You know, I think

2    we're getting into a level of minutia that

3    doesn't -- that takes away from what the real

4    issue is.  It is not a comfortable position

5    for me to be in to see the situation that

6    this case is in procedurally.

7          HEARING OFFICER BUTLER-TRUESDALE:

8    Um-hum.

9          MR. DALTON:  I think that you have

10   no choice but to grant a continuance in the

11   matter to allow DCPS time to defend its

12   public placement and --

13          HEARING OFFICER BUTLER-TRUESDALE:

14   And how do I get them in as a named party?

15          MR. DALTON:  Well, you can either

16   dismiss the hearing request and ask them to

17   re-file.

18          HEARING OFFICER BUTLER-TRUESDALE:

19   Um-hum.

20          MR. DALTON:  Dismiss it without

21   prejudice or you can grant the motion that's

22   pending for joiner.  You can use either one

1    of those vehicles, but no matter what we say

2    now or 11:00 or 12:00, the issue of Prospect

3    being DCPS' position that they can serve is

4    not going to go away.  It's going to have to

5    be dealt with.

6                    MS. WULKAN:  Excuse me.

7                    MR. DALTON:  And it doesn't matter

8    what SAIL did or did not do with regard to

9    that issue.  It still has to be determined

10   whether that is an appropriate placement.

11   Then you might get to some other issues, but

12   if it is an appropriate placement --

13                   HEARING  OFFICER  BUTLER-TRUESDALE:

14    And I follow you.

15                   MR. DALTON:  -- we're done.

16                   HEARING  OFFICER  BUTLER-TRUESDALE:

17    But I follow you.  I follow.  Let me --

18   because I want to make sure I'm staying on

19   track with you.  I follow you but for I think

20   that it is critical when the LEA brought the

21   SEA to the table.

22                   MR.  DALTON:      That    is    only

1    critical, ma'am, with all due respect, to the

2    issue of whether DCPS denied faith, not

3    critical to whether or not it is an issue of-

4    - and I don't think they were -- they were

5    because they weren't put on notice and when

6    they were put on notice, they acted.  Okay?

7            But that doesn't mean that now

8    that they have acted that we don't have to

9    deal with it.  We still have to deal with it

10   because if you look at Carter, Carter says --

11           HEARING OFFICER BUTLER-TRUESDALE:

12    Okay.  So --

13           MR. DALTON:   -- you don't pay for

14   a private placement.

15           HEARING OFFICER BUTLER-TRUESDALE:

16    So it doesn't -- it's not relevant that SAIL

17   contacted the SEA after the hearing complaint

18   was filed.

19           MR. DALTON:  It's only relevant to

20   the issue of whether DCPS violated the

21   student's faith.   It's relevant to that

22   issue, only that issue and that is not an

1    issue before you right now, because they are

2    not a party at this point and there has been

3    no allegation that they have violated the

4    student's rights.

5         But now that they have issued a

6    notice of placement, we have to deal with

7    whether or not that a placement is

8    appropriate. If it is appropriate, we're

9    done as far as the parent wanting SAIL to pay

10   for it, because it's a public placement.

11   There is no cost to the parent.

12        Now, we may not be done on the

13   other issues. I will at least leave that to

14   counsel. Okay? But I don't think we get to

15   those issues, okay, until we have resolved

16   that issue, because that is the linchpin of

17   all the other issues. If the public

18   placement is appropriate, then we are done as

19   far as the request for the replacement fund.

20        HEARING OFFICER BUTLER-TRUESDALE:

21   I'm lost with that because I don't know that

22   the petitioner's hearing complaint mentions

1    anything   about   an   inappropriateness   of   a

2    public placement.

3                  MS. HARRIS-LINDSEY:  It doesn't.

4                  MR. DALTON:  Yes, it doesn't.

5                  HEARING  OFFICER  BUTLER-TRUESDALE:

6    The   parameter   is   --   chronologically,   the

7    parameters  of  her  complaint  and  what  would

8    define  what  is  moot  and  what  is  not  moot

9    would  be  allegations  of  facts,  fact  patterns

10   that  occurred  prior  to  the  filing  date  of  the

11   complaint.   And  the  resolution  meeting  and

12   the  participation  of  DCPS  occurred  after,  of

13   course,  the  filing  of  the  due  process

14   complaint.

15                  So I'm just not certain and I know

16   that  there  must  be  something  I'm  missing,  but

17   I'm  just  not  certain  why  it's  important  what

18   DCPS did when they got there.

19                  MR.  DALTON:   Okay.   Let's  assume

20   we follow that line of thought.

21                  HEARING   OFFICER   BUTLER-TRUESDALE:

22   Um-hum.

1          MR. DALTON:  Okay?

2          HEARING  OFFICER  BUTLER-TRUESDALE:

3    Okay.

4          MR. DALTON:  And let's assume that

5    the parent is right.  Okay.  The day after

6    this hearing, we file a due process hearing.

7    Okay?

8          HEARING  OFFICER  BUTLER-TRUESDALE:

9    Um-hum.

10          MR. DALTON:  Against DCPS.

11          HEARING  OFFICER  BUTLER-TRUESDALE:

12    Um-hum.

13          MS. WULKAN:  But you didn't.

14          MR. DALTON:  No, no, it's not a

15    question of didn't, counsel.  It's a question

16    of we wouldn't do it until we had some kind

17    of ruling adverse to our interest.  Okay.

18    But once we did that, then we would be right

19    back to the situation of having to deal with

20    Prospect.  That's why I'm saying you can't

21    get around the public placement offer now

22    that it has been made.

1      MS. WULKAN:  Can I respond?

2      HEARING  OFFICER  BUTLER-TRUESDALE:

3  Sure.  Okay.

4      MS. WULKAN:  Fair enough.

5      HEARING  OFFICER  BUTLER-TRUESDALE:

6   No problem.

7      MS. WULKAN:  Okay?  This has been

8  -- first of all, the issue of Prospect or any

9  enrollment in DCPS is not an issue for this

10  hearing.  There is nothing.  The issues in

11  this hearing are what is in the complaint,

12  which I have read to you.  The issues are

13  against SAIL.

14      Whether or not DCPS came in and

15  issued a notice of placement, which we would

16  say they did not and they had nothing to do

17  with this, are not the issues for this

18  complaint.  And so the issues that you have

19  to do, have to make a ruling on, are what's

20  in the complaint.

21      As Ms. Lindsey said, we didn't

22  amend the complaint nor did SAIL come in and

1    amend the complaint, so -- nor is there any
2    document in evidence that has anything to do
3    with a public placement or an issuance of a
4    notice for a public placement.

5    The only document that is in
6    evidence about DCPS' participation in any
7    way, shape or form in this was that Mr.
8    Dalton called them. They did a resolution
9    meeting. She issued the notes saying that
10   SAIL, at that time on August 1st or whatever
11   it was, or on July 14th or whenever the
12   resolution meeting was, that at that time
13   SAIL said we admit that we're an
14   inappropriate placement.

15   That was it. That was the only
16   thing. That didn't invoke any DCPS
17   jurisdiction. That didn't amend the
18   complaint. That had nothing to do with that.

19   So the question is this hearing
20   needs a ruling and there is no reason to
21   grant a continuance on this hearing, because
22   you have live issues before you. And the

1    live   issues   before   you   have   not   been

2    resolved.   And  the  issues  are  against  SAIL

3    and SAIL is their own LEA.

4            And I'm going to read you a couple

5    of charter schools, a couple of regulations,

6    DCMR Regulations which I think can guide you

7    and resolve a lot of these issues.

8            First  of  all,  it  says  in  D.C.

9    Municipal Code Regulations, Section 53019.13,

10   defines the responsibilities of LEA charter

11   schools as follows:

12           "LEA charter schools shall provide

13   their   own   representation   at   and   be

14   responsible   for   implementation   of   all

15   agreements   or   decisions   resulting   from

16   mediation and due process hearings involving

17   children   and   their   school,   unless

18   implementation of the agreement or decision

19   is the responsibility of DCPS as a result of

20   any  actions  or  inactions  of  DCPS  while  a

21   child  has  been  enrolled  in  an  LEA  charter

22   school  or  pursuant  to  federal  law  or  local

1    rule regulations."

2              Now, let's take it apart.  So the

3    LEA charter is responsible for implementation

4    of    all    due    process    hearing    decisions.

5    Meaning if you order that this child should

6    go  to  a  private  school,  LEA  is  responsible

7    for implementing that decision.

8              Then  it  says  unless  --  the  only

9    exception  to  that,  that's  for  all  children

10   involved  in  their  school,  and  this  children

11   has  been  involved  in  that  school  for  six

12   years,  not  just  15  minutes,  six  years,  never

13   in a D.C. public school.

14              Unless    implementation    of    the

15   agreement  --  unless.  The  only  exception  is

16   "unless  implementation  of  the  agreement  or

17   decision  is  the  responsibility  of  DCPS  as  a

18   result  of  any  actions  or  inactions  of  DCPS

19   while  the  child  has  been  enrolled  in  an  LEA

20   charter school."

21              Well,  there  were  no  actions  by

22   DCPS  or  reactions.  DCPS  never  participated

80

1    in any IEP meetings, never had anything to do

2    with this case.    Therefore, there was no

3    action or inaction by DCPS, which is why we

4    didn't file a complaint against DCPS in this

5    matter.    We filed a complaint against SAIL

6    because it was SAIL's actions and inactions

7    that denied this child faith.

8         And so the LEA charter school is

9    responsible and Mr. Dalton says by law, by

10   statute.    He doesn't cite anything to you.

11   There is nothing in any of his motions.

12   There is not one.    In any of his motions that

13   he has filed, there is not one piece of law

14   cited.    We have cited to all the D.C., all of

15   this -- all of the regulations.

16        So contrary to SAIL's contention

17   that they don't have the authority to place

18   Dominique in another school, which is in

19   SAIL's motion to dismiss at 1, D.C. Code MR5-

20   3019.3 provides that "Except as provided in

21   30194 and 5 below, LEA charters are

22   responsible for special ed evaluations and,

1    if necessary, IEPs and," and I emphasize

2    this, "placements for children with

3    disabilities enrolled in their facilities."

4              There is a direct statute on

5    point.  It says "LEA charters are responsible

6    for placements for children with disabilities

7    enrolled in their facilities."

8              I don't know why he keeps

9    insisting that they have no authority to

10   place and it's very clear in all the

11   statutes.  Because it's very clear in the

12   statute under DCMR 53019.3 that LEA charter

13   schools have the authority to do placements

14   for children with disabilities enrolled in

15   their facilities and LEA charter schools also

16   must implement Hearing Officers' decisions

17   unless DCPS has -- there was some inaction on

18   the part of DCPS while the child was on an

19   LEA charter school, which there wasn't.

20             And so I think you have absolute

21   authority to do exactly what we're asking you

22   to do in this decision, which is at the first

instance make a finding of denial of faith as against SAIL and then to issue -- and then to consider the parents' proposed placement, which we informed both SAIL and DCPS that we were requesting placement in Katherine Thomas.

Because this hearing was set two days after, we had no choice. The child had no place to go to school, couldn't go back to SAIL. He had no place to go to school. We unilaterally placed him at Katherine Thomas two days ago and we're asking for a reimbursement for that unilateral placement, because we didn't get this hearing before to resolve it, and we think that you have the absolute authority to do this.

All of this stuff is nothing but red herrings about -- you have no document before you that there has been a public placement that has been issued, a notice of placement that has been issued, that the parents participated in any meeting having to

1    do with anything with a public placement.

2              You have no ability to make a

3    finding that a public placement is or isn't

4    appropriate, because you don't have anything

5    here that says that there has even been

6    anything issued nor is there a document here

7    that there is such a placement or that it

8    would or wouldn't be appropriate.

9              There is no notice to the parent,

10   according to what's in these documents, in

11   these hearing documents.  What is before you

12   is not -- it's not in the paperwork.

13              MR. DALTON:  Well, this --

14              HEARING OFFICER BUTLER-TRUESDALE:

15   All right.  Response, Mr. Dalton?

16              MR. DALTON:  Yes.  When she quotes

17   you the regulation, she placed an emphasis on

18   our duties and she placed an emphasis on

19   enrolled in their school.

20              HEARING OFFICER BUTLER-TRUESDALE:

21   Um-hum.

22              MR. DALTON:  That's the whole

1   point I have been trying to make.  A student

2   has to be within our jurisdiction.  The

3   student is no longer in our jurisdiction.

4   That is why the regulations provide when we

5   cannot serve the child, we appeal the DCPS.

6            DCPS could have told us we don't

7   agree and they do sometimes.  They say you

8   haven't done enough to serve the student.

9   You know, you need to increase the student's

10  hours.  We don't agree with the fact that

11  you're -- the number of hours are correct,

12  that the child needs a full-time placement.

13           And in those cases, if I feel that

14  my client's position is defendable, I sue

15  DCPS and then we argue about whether or not

16  the Hearing Officer feels that the child does

17  need a full-time placement or doesn't.

18           And if the Hearing Officer finds

19  the child needs a full-time placement, then

20  the issue becomes does DCPS have a private

21  placement or a public placement or is a

22  private placement warranted?  That is exactly

1    where we are on this case.

2                HEARING OFFICER BUTLER-TRUESDALE:

3    Now, was -- if I'm following your argument,

4    is it the case that the petitioner fell

5    outside of your jurisdiction at the

6    resolution meeting or when it was determined

7    that the LEA could not serve the child?

8                MR. DALTON:    It became -- it

9    depends on what position you want to argue as

10   to who -- what your thinking is, okay, but I

11   want to take that off the table.  It became

12   at least legally out of our jurisdiction the

13   moment DCPS indicated they had a public

14   placement.  It may -- and I'm saying that for

15   the record, because I don't want to give up

16   the argument that it occurred before that.

17               But for the purpose of this

18   hearing, I think that is way soon enough and,

19   therefore, I don't need to go into the other

20   issues, but I want to leave that open

21   because --

22               HEARING OFFICER BUTLER-TRUESDALE:

1    And, you know, let me ask you this now.  If

2    that  is  the  case,  wouldn't  the  parent  --

3    would  the  parent  have  had  to  have  been

4    invited  to  a  placement  meeting?   Parent

5    arrives  thinking  she  is  participating  in  a

6    resolution  meeting,  which  all  of  a  sudden

7    sounds  like  it  turned  into  a  placement

8    meeting.

9         MR. DALTON:  But it didn't.  Okay?

10   And we all agreed, the parent and counsel

11   agreed, to come back and discuss placement at

12   the  next  meeting.   So  they  had  all  the

13   notice.

14         They participated in the placement

15   meeting  and  they  objected  to  the  public

16   placement.   That  is  why  I  think  these

17   arguments  are  ludicrous,  because  the  moment

18   you  take  any  evidence,  we're  going  to  find

19   out that Prospect was offered and rejected.

20        MS. WULKAN:  May I?

21        HEARING  OFFICER  BUTLER-TRUESDALE:

22   Yes.

1        MS. WULKAN:  First of all, I would

2   like to read to you in terms of time line.  I

3   would like to read to you from Mr. Dalton's

4   motion, which he filed on July 6th, which was

5   significantly after the complaint was filed.

6        We're talking about a complaint

7   that's before you, not what happened

8   subsequently.  Nothing happened subsequently.

9   There is no evidence before you.  Whatever

10  Mr. Dalton says about what happened at

11  resolution meetings or what happened

12  afterwards, there is no evidence about that

13  before you.

14       There is nothing about those

15  issues of what happened in this hearing.

16  There is no documents before you and there is

17  nothing being disclosed.  There is no

18  witnesses that he can produce with regard to

19  this, because you denied his closure.

20       Whatever happened beyond what I

21  have submitted is not within your

22  jurisdiction.  As of the time of whatever was

1    done here, DCPS -- Mr. Dalton's position was

2    that -- it says "The complaint only named

3    SAIL as a party to the action.  The parent

4    alleges that SAIL failed to develop an

5    inappropriate IEP, did not provide

6    appropriate services and didn't evaluate the

7    student in all areas of disability."

8          To date, the student has a current

9    IEP dated March 16th signed by the parent.

10   His most recent evaluations took place in

11   2005.  Additionally, the student receives

12   speech and language therapy and occupational

13   therapy.  So it is unclear as to what area of

14   disability requires additional evaluations.

15         Lastly, the parent alleges SAIL

16   failed to issue an appropriate notice of

17   placement.  SAIL, as its own LEA, does not

18   have the jurisdiction to place students

19   outside of its own LEA.  Only DCPS as the SEA

20   can place students in an alternative LEA.

21         This is not a referral to the SEA

22   saying we can't serve anymore.  This is a

89

1   defense of their own actions.  They have

2   always submitted that they -- up until the

3   time that we came to a resolution meeting

4   and, as you know, evidence from a resolution

5   meeting is not evidence in this hearing and

6   we came to that resolution meeting not

7   knowing that DCPS was going to have anything

8   to do with this.

9           HEARING OFFICER BUTLER-TRUESDALE:

10  That's in the resolution meeting notes in

11  your disclosures?

12          MS. WULKAN:  Yes.

13          HEARING OFFICER BUTLER-TRUESDALE:

14  Okay.  All right.  Go ahead.

15          MS. WULKAN:  Yes, it is.  Let's

16  see, it's page P.

17          HEARING OFFICER BUTLER-TRUESDALE:

18  I didn't want to get you off.  You don't

19  need to tell me where they are.  It's okay.

20  Go ahead.

21          MS. WULKAN:  The resolution

22  meetings are at P-10.

1              HEARING  OFFICER  BUTLER-TRUESDALE:

2      Okay.

3              MS.  WULKAN:   And,  as  I  said,  my

4      understanding  from  this,  we  had  no  idea  that

5      this     resolution     --     that     DCPS     was

6      participating  in  this  resolution  meeting  and,

7      apparently,  Ms.  Harris-Lindsey  knew  nothing

8      about  this  either.

9              He  didn't  call  DCPS.   The  counsel,

10     who  we  had  already  been  dealing  with  about

11     this  and  the  motions  to  dismiss,  once  it  got-

12     -  once  his  motion  to  join  D.C.  as  a  necessary

13     party  got  denied,  he  decided  to  call  Dr.

14     Piegler  on  his  own  and  invite  her  to  conduct

15     a  resolution  meeting  in  a  case  in  which  he

16     had  not  talked  to  counsel,  had  not  agreed  --

17     DCPS  had  not  agreed  to  come  into  this  case  at

18     that  point.

19              In  fact,  they  specifically  wrote  a

20     motion  to  dismiss  saying  we're  not  a  party  to

21     this  case.   He  went  right  around  Ms.  Lindsey,

22     called  Dr.  Piegler  and  sent  her  the  due

1    process hearing complaint without -- she

2    decided at that point to participate in the

3    resolution meeting.  The notes are right

4    here.  You can read the notes.

5          They are right at P-10.  You can

6    read the notes where she says I was sent -- I

7    don't have any documents on this child.  I

8    wasn't -- the LEA was not told at that time.

9    The LEA didn't say up until that point we

10    have this thing, this motion that says we are

11    defending this.  So the LEA wasn't saying we

12    can't serve this child.

13          Up until we walked into the

14    meeting and suddenly, Dr. Piegler is at this-

15    - on the phone at this resolution meeting and

16    suddenly they are saying we can't serve this

17    child anymore.  That was the first time that

18    we heard anything about that.

19          In fact, we got a response from

20    Mr. Dalton's office to the due process

21    hearing complaint, which basically said we

22    deny the allegations in the complaint.  So

92

they weren't saying, oh, we admit that we're
not an appropriate placement and we're going
to ask the SEA for help.   They didn't do
that.   They didn't do that with Ms. Lindsey.
They didn't do that any time.

Then they came in and they finally
must have decided to change their position at
the resolution meeting, and that is all you
have in this evidence where it says SAIL PCS
stated their school is not an inappropriate
setting for this student, according to Dr.
Piegler, and that is what is in the
resolution meeting notes.

The first time that the parent
knew that DCPS -- that SAIL was saying we
don't think we're appropriate, completely
different from what we have got and what we
have in the record.   And now he is saying,
well, it's clear that DCPS always knew that
we wanted them to take over and it's clear
that they didn't, because you can see from
the history of what the documents are that

1      are in evidence.

2              You can see that they didn't, and

3      already the ruling was made by Mr. Smith.

4      And so I don't see why we're having a

5      discussion about what happened after this,

6      after this resolution meeting, which was not

7      resolved.  We're back to square one which is

8      our due process hearing complaint and there

9      is -- we are prepared to put on evidence

10     about our relief in the complaint.

11             And, at this point, I don't see

12     what -- DCPS has not been made a party.  They

13     are not clearly going to be.  I don't know if

14     they are going to be made a party, but they

15     are not made a party.  They are the only

16     school that is in this record.  That's the

17     only school that is in this record.  There is

18     nothing about a public placement in this

19     record.  Nothing.

20             No documents, no witnesses, no

21     nothing that has been admitted in this record

22     about anything having to do with public

1    placement.    Then    we    believe    that    you    can

2    grant    this    relief    and    we    can    --    we    have

3    already    briefed    the    issue.    We    can    give    you

4    more,    you    know,    charter    school    statutes.    I

5    believe    that    Mr.    Dalton    has    not    cited    to    one

6    section    that    says    that    they    don't    have    the

7    authority    to    place    or    you    can    go    ahead    and

8    order    that    the    placement    be    made.

9            You    know,    I    think    what    you    said

10    earlier    really,    really    is    of    moment    to    me    and

11    that    is    Ms.    Hawkins    is    sitting    here    listening

12    to    all    of    this    and    D▬▬▬▬    name    hasn't

13    even    been    mentioned    in    this    hearing.

14            MS.    HAWKINS:    Thank    you.

15            MS.    WULKAN:    And    the    truth    is

16    what's    going    on    is    that    you    have    DCPS    not

17    saying    very    much    and    you    have    Mr.    Dalton

18    sitting    here.    And    what    they    are    doing    is

19    they    are    saying    you    pay    for    the    private

20    placement.    You    pay    for    the    private

21    placement.    We    agree,    we    SAIL    agree,    we

22    didn't    provide    this    kid    with    the    appropriate

1    placement.  We can't serve this kid.

2    Okay.  We didn't decide that until

3    July.  The kid has already finished with six

4    years of SAIL.  We didn't decide that until

5    July, but we decided that in July and now

6    we're going to pass the buck to DCPS.  And

7    DCPS says hey, we have nothing to do with

8    this kid.  We're not doing this.

9    And so they are both pointing the

10    finger and saying, you know, you guys pay for

11    the private placement.  No, you guys pay for

12    the private placement.  No, I'm not paying

13    for the private placement he says.  She says

14    no, I'm not paying for the private placement.

15    There's no allegations against me.  He says

16    I'm not paying for it.  I don't have to pay

17    for it, that's the SEA's problem.  It's not

18    my problem.

19    Well, I'm here to tell you that

20    that's not fair to this.  We have done

21    everything that we have to do.  We filed a

22    complaint appropriately.  We did all of the

1    motions.    We were granted the motions.    We

2    have evidence ready to go, but those issues

3    of the denial of faith are properly before

4    you as against SAIL.    And the relief that we

5    are    requesting,    which    is    placement    in

6    Katherine Thomas.

7            We're asking you to take evidence

8    on that, because we don't think there are any

9    other intervening issues.    There is nothing –

10   – there would be no reason to continue this

11   hearing, because everything that's in this

12   complaint can be litigated before you.    And,

13   you know, this is a money issue.    This is a

14   money issue and you haven't heard a word

15   about this anyway, not even --

16           MR. DALTON:    If she wants evidence

17   taken on Katherine Thomas, how are you going

18   to make a decision that the public placement

19   isn't    appropriate?        Isn't    that    a

20   prerequisite?

21           MS.    WULKAN:    That    is    not    a

22   prerequisite, because it's been a unilateral

placement, number one, and number two, we
didn't ask for relief and there has been no
issue of a public placement before you and
there is nothing in the record that requires
you to make anything, because there is no
notice of placement before you.

     MR. DALTON:    All right.    All
right.    Let's assume that I put the mother on
the witness stand and that she confirms that.

     HEARING OFFICER BUTLER-TRUESDALE:
Well, let me ask this.

     MR. DALTON:    All these things --

     HEARING OFFICER BUTLER-TRUESDALE:
Is that question going to be relevant when I
don't have your disclosures?

     MR. DALTON:    Yes, absolutely.

     HEARING OFFICER BUTLER-TRUESDALE:
For the witness?

     MR. DALTON:    Absolutely.    It's
rebuttal to the arguments that counsel is
making.

     HEARING OFFICER BUTLER-TRUESDALE:

98

1    Okay.

2    MR. DALTON:  All right?  So let's

3    -- so for the purposes of your trying to

4    decide on this, let's just put this in a box.

5    Okay.  In the box we have testimony --

6    HEARING OFFICER BUTLER-TRUESDALE:

7    Um-hum.

8    MR. DALTON:  -- that substantiates

9    that DCPS issued a public placement.  Now, if

10   we have that, then I want to ask you, as the

11   Hearing Officer, as a matter of law can you

12   rule on a private placement without hearing

13   evidence as to the appropriateness of the

14   public placement?

15   MS. WULKAN:  Absolutely.

16   MR. DALTON:  Absolutely not.

17   HEARING OFFICER BUTLER-TRUESDALE:

18   You know what, I'm following you, Mr.

19   Dalton.  Where I'm stuck at with respect to

20   your argument is that I don't know that I get

21   there when the parent wasn't thinking that

22   she was going to a placement meeting.  She

1    was attending a resolution meeting.

2              MR. DALTON:   No, no, that's not

3    true.  No, that is absolutely not true.

4              HEARING OFFICER BUTLER-TRUESDALE:

5     Okay.

6              MR. DALTON:   That might have been

7    true for the August 1st meeting.

8              HEARING OFFICER BUTLER-TRUESDALE:

9     Okay.

10             MR. DALTON:   But it sure isn't

11   true for the August 8th.

12             HEARING OFFICER BUTLER-TRUESDALE:

13    Oh.

14             MR. DALTON:  Because they sat down

15   with us.  They scheduled it.  They knew what

16   the purpose was.  They came to it.  They

17   decided that they weren't going to accept it.

18    Come on.  No way.

19             HEARING OFFICER BUTLER-TRUESDALE:

20    Okay.

21             MS. WULKAN:   No, absolutely not.

22   You cannot --

1          HEARING OFFICER BUTLER-TRUESDALE:

2   Now --

3          MS. WULKAN:   -- take any evidence

4   with regard to what happened at that -- there

5   is no evidence in this record that there was

6   an August 8th meeting.

7          MR. DALTON:   That's what counsel

8   is hoping that you will not take this

9   evidence so that you can be blindsided as to

10  what the truth is.

11         MS. WULKAN:   No, I'm talking about

12  the legalities of what is in evidence at this

13  hearing.   You can only consider what is in

14  the complaint.

15         HEARING OFFICER BUTLER-TRUESDALE:

16  Um-hum.

17         MS. WULKAN:   We can only take

18  testimony on what's in the complaint and what

19  the disclosures were and what the evidence

20  is.   There is nothing in any disclosure that

21  says there wasn't even a meeting on August

22  8th.   No matter who participated or what was

1    done.   And you certainly can't take evidence

2    as to what was or wasn't done.   And I'll

3    proffer to you right now that this parent

4    never got notice of this.

5              MR. DALTON:  Okay.

6              MS. WULKAN:  So I'll proffer that

7    right now before Mr. Dalton.   And Mr. Dalton

8    cannot call this parent as a witness.

9              MR. DALTON:  Oh, yes, I can.

10             MS. WULKAN:  No, he can't, because

11   he has no disclosure.   He has no witnesses on

12   his disclosure, so he can't call anybody as a

13   witness.

14             MR. DALTON:  No, party does not

15   need to be disclosed.   Party does not need to

16   be disclosed.

17             MS. WULKAN:  You --

18             MR. DALTON:  I can call a party

19   any time.

20             MS. WULKAN:  You can cross examine

21   is all it is.

22             MR. DALTON:  And I will ask for an

1      immediate right to appeal this case if that

2      right is denied.

3                  MS. WULKAN:  Fine.

4                  HEARING  OFFICER  BUTLER-TRUESDALE:

5      Now, you're saying that you can call a

6      witness at any time?

7                  MR. DALTON:  A party.

8                  HEARING  OFFICER  BUTLER-TRUESDALE:

9      A party at any time?

10                 MR. DALTON:  That's correct.

11                 HEARING  OFFICER  BUTLER-TRUESDALE:

12     Okay.  Tell me on the basis of what.

13                 MR. DALTON:  On the basis that

14     only a party can bring an action and that I

15     have the right to cross examine any --

16                 HEARING  OFFICER  BUTLER-TRUESDALE:

17     Cross examine, right.

18                 MS. WULKAN:  Cross examine.

19                 MR. DALTON:  Right.

20                 HEARING  OFFICER  BUTLER-TRUESDALE:

21     Okay.

22                 MR. DALTON:  So I --

1    HEARING OFFICER BUTLER-TRUESDALE:

2 So you're talking about cross.  You're not

3 talking about direct in that context.

4    MR. DALTON:  I can request that

5 you make her a hostile witness, if she is my

6 witness.  Okay.  This is not a court of law.

7 We are not supposed to rely on

8 technicalities to prevent getting at the

9 truth.  Now, counsel has not denied

10 participation in the meeting, has not denied

11 that they have objected to Prospect.

12    The only thing that she has said

13 to you cleverly is that they haven't received

14 the notice.  But that's an issue that you

15 would have to resolve against DCPS.

16    MS. WULKAN:  No.

17    MR. DALTON:  Because we cannot

18 give them a copy of DCPS' notice of -- prior

19 notice of placement.

20    MS. WULKAN:  Mr. Dalton, the issue

21 of Prospect or a meeting or anything else is

22 not at issue in this hearing.  It is not even

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433  WASHINGTON, D.C. 20005-3701  www.nealrgross.com

1    an issue.   And I would object to anything

2    that comes up about it.   There is no

3    document.   There is no anything about it.

4    There is nothing.   Once we have -- the last

5    thing that's in evidence as to this hearing

6    sequentially in our documents or with our

7    witnesses is the resolution meeting that was

8    held on the 1st and that's it.   There is

9    nothing beyond that.

10           MR. DALTON:  Yes.

11           MS.  WULKAN:   There  is  nothing

12   beyond that.   DCPS hasn't participated beyond

13   that.   DCPS isn't a party.   Hasn't issued any

14   witnesses.   You don't have it before you.

15           HEARING  OFFICER  BUTLER-TRUESDALE:

16    Um-hum.

17           MS.  WULKAN:   Mr. Dalton can want

18   to argue some -- whatever was happening, but

19   it's as if we have a hearing where you only

20   have certain evidence before you and I don't

21   see how Mr. Dalton can bring in evidence

22   about something else that is not the subject

1  matter of this hearing.  It's not what we

2  asked for in our complaint.

3             MR. DALTON:  It --

4             MS. WULKAN:    And  I  don't  see

5  anything that's -- and there is nothing in

6  the law that says if we ask for relief in our

7  complaint, our complaint is we are asking you

8  to find a denial of faith against SAIL's

9  denying this child a faith and that they did

10  not have an appropriate placement for this

11  child, which they have now admitted.

12             And we are asking you to give us

13  relief which is that after the fact, because

14  we didn't get this hearing in time, and that

15  is that we are asking you to allow us to put

16  evidence on as to the appropriateness of

17  Katherine Thomas.  And we are asking you to

18  order that they place in fund, that some

19  money, I don't care who you do, you can order

20  DCPS, you can order SAIL, I don't care who it

21  is, this is the parent.

22             The parent is saying to you the

1    child needs a placement.  He doesn't have a

2    placement.  We had to unilaterally place him.

3    We placed him.  We're asking you to look at

4    that placement, allow us to put evidence in

5    as to that placement.  The only standard that

6    you have to look at with what turns out to be

7    unilateral placement, under Carter, are two

8    things.

9                One, whether the LEA has offered

10   an appropriate placement, because DCPS is not

11   a party.  Whether the LEA has offered an

12   appropriate placement and if they have, then

13   you have to find that that's appropriate.

14   But the LEA hasn't offered any placement.

15   You have no placement on the table from the

16   LEA.

17               You have no notice of placement.

18   You have no witnesses.  You have nothing that

19   says that the LEA has offered an appropriate

20   placement, LEA can't make a placement anyway,

21   or whether DCPS has made that placement.  You

22   have nothing on the table.  And if not, then

1    you have to find out under the Carter

2    standard whether Katherine Thomas is

3    appropriate.  And you don't have to hold this

4    to a regular DCPS standard.

5          MR. DALTON:  I move for directive

6    finding on the issue of the relief requested

7    that SAIL pay for the private placement,

8    based on counsel's admission that legally we

9    are without the authority to make a

10   placement.

11         MS. WULKAN:  And I would like you

12   to cite some law for that, because --

13         MR. DALTON:  No.

14         MS. WULKAN:  -- I just read you

15   two statutes.

16         MR. DALTON:  I'm relying on

17   counsel's own proffer to the court, to the

18   Hearing Officer.

19         MS. WULKAN:  May I respond?

20         HEARING OFFICER BUTLER-TRUESDALE:

21    Okay.

22         MS. WULKAN:  I'm sorry, what did I

108

1    just say?

2              HEARING  OFFICER  BUTLER-TRUESDALE:

3    Do  I  need  to  roll  back?   I'm  sorry,  I

4    started taking --

5              MS. WULKAN:   I don't know what I

6    said.

7              HEARING  OFFICER  BUTLER-TRUESDALE:

8    I started taking notes.  I'm not aware.  You

9    need to go back.  No problem.

10             MS. WULKAN:   I need to hear what I

11   said that would create a --

12             HEARING  OFFICER  BUTLER-TRUESDALE:

13   Let me wait until DCPS is able to come back

14   into the room.

15             MS. WULKAN:   I don't --

16             MR. DALTON:   I need to get some of

17   my cases.

18             HEARING  OFFICER  BUTLER-TRUESDALE:

19   Okay.   I'll  go  off  the  record  for  five

20   minutes.

21             (Whereupon,  off  the  record  for  a

22   recess.)

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1          HEARING  OFFICER  BUTLER-TRUESDALE:

2    That wasn't a ruling.   That wasn't a ruling.

3    I was trying to be careful in the way I -- I

4    was trying to be careful in the way I worded

5    that.    That  wasn't  a  ruling,  but  I  am

6    actually -- I do believe that I am ready to

7    rule  unless  there  are  --  we're  back  on  the

8    record also.

9          MS.   WULKAN:     I   just   need   to

10   correct a misstatement.   Apparently, I made a

11   misstatement.

12         HEARING  OFFICER  BUTLER-TRUESDALE:

13   Okay.   Did you want to hear what you said

14   first to make sure?

15         MS.   WULKAN:     I   think   I   --   my

16   associates all heard what I said.

17         HEARING  OFFICER  BUTLER-TRUESDALE:

18   Okay.   Okay.

19         MS.   WULKAN:    I  mean,  I  think  I

20   said -- what I thought I said is that under

21   the Carter standard that the LEA has to show

22   that  they  had  an  appropriate  placement  and

1      that the LEA, SAIL, has not shown that they

2      have an appropriate placement and has not

3      offered an appropriate placement.    In fact,

4      they have admitted that they have an

5      inappropriate placement.

6                HEARING OFFICER BUTLER-TRUESDALE:

7       Um-hum.

8                MS. WULKAN:    And then the next

9      standard is that once we -- and there is no

10     evidence.    They can't put in any evidence

11     because they don't have any documents or any

12     witnesses that they can provide, because

13     their disclosure has been excluded.    So,

14     therefore, they can't prove that they had an

15     appropriate placement.

16               And then the bar standard is that

17     we have to show that Katherine Thomas is

18     appropriate under the Carter standard, and

19     that that is primarily a somewhat lesser

20     standard under the Carter standard when it's

21     placement has been made by the parent.

22               HEARING OFFICER BUTLER-TRUESDALE:

1    Okay.

2    MS. WULKAN: So that was my

3    argument. I think I misspoke something and

4    if I did, I apologize for misspeaking, but

5    that is our position.

6    HEARING OFFICER BUTLER-TRUESDALE:

7    Okay. Is your motion for directed findings

8    still standing?

9    MR. DALTON: The only comment that

10   I would make since counsel has made her

11   comment is that the reason that the LEA

12   cannot meet that standard under Carter is

13   because jurisdictionally the LEA does not

14   have the authority to make placements outside

15   of its jurisdiction. Only DCPS does. DCPS

16   has issued a notice of placement.

17   That notice of placement as to

18   Prospect, the Hearing Officer must under

19   Carter evaluate that placement. We only

20   reach the issue of the appropriateness of the

21   parents' placement once the Hearing Officer

22   has determined that the public placement is

112

1    not appropriate.

2            Now, you can decide any number of

3    things and you can rule against every motion

4    I have made, but it will not resolve that

5    issue.  That issue is an issue that --

6            HEARING OFFICER BUTLER-TRUESDALE:

7    And that issue is the jurisdiction issue,

8    right?

9            MR. DALTON:  No, it is the issue

10   that you must -- before you reach a

11   conclusion that the parents' placement is

12   appropriate, you must determine that the

13   public placement is inappropriate.

14           MS. WULKAN:  Right.

15           MR. DALTON:  And that will not be

16   altered by --

17           HEARING OFFICER BUTLER-TRUESDALE:

18   Now, am I determining that the public

19   placement is inappropriate?  Would I be

20   considering determining whether the public

21   placement is inappropriate because, in

22   effect, SAIL ceded jurisdiction?  Is that the

1    jurisdiction?

2         MR. DALTON:  Well, it's not -- we

3    didn't --

4         HEARING OFFICER BUTLER-TRUESDALE:

5    I'm trying to determine when the

6    jurisdiction issue comes into play.  That's

7    what I'm trying to understand.

8         MR. DALTON:  The jurisdiction

9    issue came into place once DCPS decided, had

10   a little bit more time to think about it.

11   Once DCPS accepted our offer of help, our

12   request for help, I'm sorry, our request for

13   help and did not contest that the placement

14   was out, that the child's required placement,

15   whether it be public or private, was outside

16   of our jurisdiction.

17        At that point, DCPS had the right

18   to make a decision that we were wrong and not

19   accept jurisdiction, but they did accept

20   jurisdiction having accepted jurisdiction.

21        HEARING OFFICER BUTLER-TRUESDALE:

22   By participating in the meeting?

1           MR. DALTON:    No, by making the

2    decision that the evidence that they examined

3    did require that the student be placed in a

4    full-time placement, which SAIL does not

5    offer by its charter and by the regulations.

6           MS. WULKAN:    There's two issues.

7    The first -- the last issue really needs to

8    be addressed first.

9           SAIL saying that they don't offer

10   a full-time placement is very difficult

11   because this child has been at SAIL for six

12   years.  You don't know anything about him,

13   but he has had full-time IEP for a 30 hour

14   IEP at SAIL for at least three years and they

15   are in the record.  At least the last two

16   years are in the record, the full-time IEPs.

17          MR. DALTON:  So that's --

18          MS. WULKAN:    So whether or not

19   SAIL does or doesn't, I mean, obviously

20   that's why it was inappropriate, but

21   nonetheless they knew and did IEPs for this

22   child for six years, all of which were full-

1    time IEPs.

2              MR. DALTON:  No, that's not true.

3              MS. WULKAN:   That's it.   That's

4    not true?

5              MR. DALTON:   No.   The last three

6    years it is true, but that was to accommodate

7    the parent.  And, you know, I didn't want to

8    bring this up because we don't want to have -

9    - you know, make it a personal issue with the

10   parent,  especially  when  we  haven't  even

11   gotten  into  any  evidentiary  issues,  so  I

12   apologize to you for bringing this up.

13             MS. WULKAN:  You better apologize,

14   because  it's  not  true,  what  you're  about  to

15   say and so I think --

16             MR.   DALTON:    Well,  counsel's

17   allegations  or  comments  are  not  evidence  and

18    unfortunately --

19             MS. WULKAN:  Nor are yours.

20             MR. DALTON:   Well, I'm going to

21   present  evidence  both  through  the  parent  and

22   Ms. Umansky that that isn't the case.  So we

116

1    accommodated   the   parent   while   she   was

2    searching   for   counsel   and   for   a   private

3    placement.

4              MS. HAWKINS:   That's not true.

5              MR. DALTON:   Okay.   Well, whether

6    it's -- that's why I didn't want to get into

7    this.

8              HEARING   OFFICER   BUTLER-TRUESDALE:

9    Okay.   Let me make sure.   In order to make

10   sure we -- I do want the primary tenet of my

11   job, which is maintaining decorum during the

12   process of the hearing.   Let me state that no

13   one is to be heard on the record other than

14   the attorneys in actuality until I have sworn

15   them   in,   because   I   can't   accept   your

16   proffers,  testimony,  anything  that  you  have

17   to say unless I have sworn you in.

18             MS. WULKAN:   I'm going to object

19   to Mr. Dalton proffering what he -- happened

20   at SAIL.

21             MR. DALTON:   Well --

22             MS. WULKAN:   He made an allegation

1    in his argument that SAIL --

2          HEARING OFFICER BUTLER-TRUESDALE:

3    Well, we're getting lost, because I haven't

4    made a ruling yet.

5          MR. DALTON:  Right.

6          MS. WULKAN:  Okay.

7          HEARING OFFICER BUTLER-TRUESDALE:

8    And I want to make sure that we have all of

9    the --

10          MS. WULKAN:  Let me address the

11    other --

12          HEARING OFFICER BUTLER-TRUESDALE:

13    No, no, wait a second.

14          MS. WULKAN:  Okay.

15          HEARING OFFICER BUTLER-TRUESDALE:

16    I want to make sure that I have taken into

17    consideration each and every factor that both

18    of you think is pertinent to me making a

19    correct issue, sorry, a correct ruling on the

20    motion, but I am not afraid to rule on the

21    motion.  Okay?

22          I have given you all almost two

1    hours to present it, to make sure that when I

2    think I'm hearing a circular argument that it

3    is, indeed, circular and/or that there is not

4    something that I'm missing or just don't have

5    a full understanding of.

6         I have reached the point where I

7    don't think that there is anything more that

8    can be explained to me, so that I can make a

9    more enlightened ruling, even though I still

10    suspect that there is some missing link, that

11    there is something that I may not have heard,

12    but I still do not understand the intervening

13    event changing what is being pled on the

14    hearing complaint.

15         I don't know that I have any

16    reason to bring DCPS in as a party on this

17    issue, mainly because I don't know that the

18    second meeting, which occurred, is a matter

19    which is before me.  I think that I have to

20    proceed on the case on what is the four

21    corners of the complaint and contain the

22    issues that I hear today to the complaint as

1    pled and against whom it is pled.

2    I don't know that there is

3    anything that happened at any meeting that

4    will be an intervening cause substantial

5    enough to continue the matter or dismiss the

6    matter without prejudice, because the

7    complaint seems to be narrowly tailored to

8    events that happened at the LEA.

9    And the matters which respondent

10    is -- the matters which respondent is telling

11    me about that could be an intervening issue

12    all occurred after the complaint was filed.

13    So I'm not certain how they are relevant.

14    I'm just not there, and I know you have done

15    your best.

16    MR. DALTON: Um-hum.

17    HEARING OFFICER BUTLER-TRUESDALE:

18    But I just don't see it. I don't see it.

19    MR. DALTON: Well, there is

20    nothing further I can add, except my

21    objection for the record.

22    HEARING OFFICER BUTLER-TRUESDALE:

1    All right.    Now, Ms. Lindsey, you are

2    dismissed.

3                MS. HARRIS-LINDSEY:  Okay.

4                HEARING  OFFICER  BUTLER-TRUESDALE:

5    And I'm sorry that that took two hours, but

6    I  really  needed  to  make  sure  that  I

7    understood  the  motion  and  that  I  wasn't

8    missing anything.

9                Are  there  any  other  preliminary

10   motions, preliminary matters?   Ms. Wulkan,

11   are you ready to make your opening statement?

12               MS. WULKAN:  I think I am.  Okay.

13               HEARING  OFFICER  BUTLER-TRUESDALE:

14   Thank you for your patience, Ms. Lindsey.

15               MR. DALTON:   Sorry you were here

16   for so long.

17               MS. HARRIS-LINDSEY:   That's okay.

18   I'm at work anyway.

19               HEARING  OFFICER  BUTLER-TRUESDALE:

20   All right.

21               MS. WULKAN:  Hope you feel better.

22               MS.  HARRIS-LINDSEY:    All  right.

1  Thank you.

2          HEARING  OFFICER  BUTLER-TRUESDALE:

3  And I'm sure you'll take into consideration

4  what I --

5          MS. WULKAN:  I'm going to take all

6  this --

7          HEARING  OFFICER  BUTLER-TRUESDALE:

8  -- have already heard.  Okay.

9          MS.  WULKAN:    I  mean,  with  my

10  issues, too.  Okay.  Okay.  This hearing is

11  about D███████ H██████.  He is the son of

12  Mr.  Carlton  and  Mrs.  Michelle  Hawkins  and

13  D██████ is a just-turned 14 year-old young

14  man yesterday, two days ago, and he has been

15  attending SAIL since the first grade.

16          He did start out in the very -- in

17  the early -- in the first grade he attended

18  Edison  Charter  School  and  he  was  there  for

19  about eight months until April, and then he

20  was transferred to SAIL and finished out that

21  first grade year.

22          And  then  he  attended  SAIL  from

1    first through seventh grade, and he repeated

2    the sixth grade, the sixth grade at SAIL.  So

3    he has actually been at SAIL more than six

4    years.   He has been at SAIL seven years,

5    because he repeated the sixth grade at SAIL.

6           He has a -- his diagnosis on his

7    IEP are multiple disabilities, which include

8    speech and language impairment and SLD, and

9    he additionally has been diagnosed with ADHD

10   in all of the evaluations, etcetera.

11          D██████ is currently attending

12   the Katherine Thomas School where he started

13   on Monday and, as we indicated earlier, he

14   was not going back to SAIL based on this

15   complaint and based on SAIL's admitting that

16   they were not an appropriate placement for

17   him and could not serve him.  And we and the

18   parents unilaterally placed him at Katherine

19   Thomas because we couldn't get this hearing

20   to resolve this issue prior to the time.

21          D██████ began special education

22   from the very first grade that he was, the

first year that he was in school.  He had an IEP since the first grade after he had an evaluation from Georgetown University Hospital, and his IEP has for at least the last three years, I didn't get records back further than three years, so I can only tell you that the ones that are in evidence and the ones that I know about were full-time IEPs.

He has had, you know, 30 hours of special education, full-time IEP.  He gets now, as I said, a full-time special education IEP at SAIL and has for the last three years.  He has 60 minutes a week of occupational therapy and 60 minutes a week of speech and language therapy as his related services.  And so he is getting full-time special ed services in addition to those related services.

D_____, when he changed at SAIL from the lower school to the -- there was kind of a middle school/junior high school

1    that they just created in the '05/06 school
2    year.    It was in a different building than
3    where SAIL was and you will hear testimony
4    that that building was, basically, an office
5    building with no walls in it, kind of open
6    space classroom.
7            It was a very difficult learning
8    situation for D███████ his last year.    It
9    was open space.    It was not well-kept.    It
10   had very small classroom space.    There were
11   sheets that were holding debris to keep the
12   things from hitting into the classroom and to
13   muffle the sounds and the noise level was
14   excruciatingly high.
15           The students were very disruptive.
16    There were a lot of out of control students
17   and    the    teachers    were    not    terribly
18   experienced    and    not    in    control    of    the
19   classroom,  and  you  will  hear  testimony  that
20   he had a very difficult year.
21           The    other    thing    that    is    really
22   much  at  the  moment  is  that  D███████  has  a

1    lower average IQ.   You will hear testimony

2    from Dr. James who is a neuropsychologist on

3    the faculty at Children's Hospital and who

4    did an evaluation of D█████████ just this last

5    summer, and that that is also in evidence,

6    that D████████ has below average intelligence

7    and he is functioning, essentially, on the

8    second grade in writing and spelling, on the

9    low third grade in reading, on the upper

10   fourth grade in math.

11          And   he   has   had,   obviously,

12   intensive special education or what purported

13   to be intensive special education from SAIL,

14   and  he  has  made  virtually  little  to  no

15   progress in all these years.   The progress

16   level that he has made is commensurate with a

17   student with MR, as opposed to a student who

18   has average intelligence, and that is because

19   his program has been inappropriate for him.

20          We are -- Ms. Hawkins came to an

21   IEP meeting in March and indicated in that

22   IEP meeting that she was very unhappy about

1    what was happening in the school, that it was

2    inappropriate, and that she wanted a

3    different school placement for him.

4         And you will hear testimony that

5    the school, at that point, not until that

6    point, but at that point agreed that they

7    were an inappropriate placement for him.

8    They told her that they would help her to try

9    to find a more appropriate placement for him,

10   but she went out and started looking at some

11   schools and sent some observation e-forms and

12   other things to the school and that they

13   participated in, and they agreed at that

14   time, although we then went through the

15   school year.

16        And at the end of the school year,

17   we filed this due process hearing complaint

18   and, you know, the effects from the previous

19   part of the hearing that SAIL responded by

20   saying that they thought that they were an

21   inappropriate placement, and I read you the

22   motion that was filed in the motion to

1  dismiss SAIL as a party saying that there was

2  no -- that the allegations against them for

3  denial of faith were not true.

4      You will hear testimony about the

5  extent   and   nature   of   D⬛⬛⬛⬛⬛⬛

6  disabilities, which are extensive.  He has a

7  moderate  to  severe  speech  and  language

8  impairment, which affects him in every single

9  one of his domains.

10     He has impairment in the verbal

11 domain.   He has impairments in the visual-

12 spatial  domain.   He  has  impairments  in

13 attention,  which  resulted  in  an  ADHD

14 diagnosis,  and  serious  impairments  in

15 executive  functioning,  all  of  which  really

16 have impacted his academics.

17     You will hear testimony about what

18 kind of placement he requires.  He requires a

19 full-time  special  education  placement  with

20 intensive  supervision  and  much  structure,  a

21 language-based  program  with  much  repetition

22 and  with  a  multi-modal  and  multi-sensory

1    approach.

2            And you will hear testimony that

3    he requires a lot of specific instruction

4    with organization and working because he is

5    headed into his high school years.  He is

6    going into the eight grade.  He should be, by

7    age, going into the ninth grade and he is

8    headed into his high school years and his

9    skills are really, really deficient and it's

10   not certainly for lack of his parents having

11   worked with him and providing tutors for him

12   and outside tutoring, any outside

13   evaluations, and working extensively with

14   SAIL.

15           This is very sophisticated

16   parents, very interested parents who are --

17   you will hear row testimony about that and

18   who have advocated for their son to the best

19   extent that they could.

20           And so because we're in the time

21   crunch that we are in, we sent a -- we

22   participated in a resolution meeting, as you

1    know, and we sent to DCPS -- SAIL requested,

2    DCPS requested, that we send them the

3    acceptance letter to Katherine Thomas.    When

4    we got the acceptance letter from Katherine

5    Thomas, we did.

6            We sent that to Mr. Dalton.

7    That's in evidence.    We also sent it to DCPS

8    when he was accepted to Katherine Thomas,

9    which was August 1st.    You will hear testimony

10   from Katherine Thomas about his visit to

11   Katherine Thomas, about their review of the

12   records and about their finding that he is an

13   appropriate student and that he was admitted.

14           You have an acceptance letter from

15   Katherine Thomas in the record.    And we are

16   going to ask you to -- and you will hear

17   testimony about why it's an appropriate

18   placement for him and why he can get

19   educational benefit from that placement.

20           And we are going to ask you at the

21   end of this hearing to place, to make a

22   finding against faith that they have --

1    against SAIL that they have denied him the

2    appropriate public education and we're going

3    to ask you to determine compensatory

4    education for the denial of faith for these

5    number of years.

6            And we're also going to ask you to

7    make a finding that he should -- that

8    placement at Katherine Thomas, to confirm the

9    placement at Katherine Thomas and ask that he

10   be placed and funded for this '06/07 school

11   year at Katherine Thomas.

12           HEARING OFFICER BUTLER-TRUESDALE:

13   Okay. Are you done?

14           MS. WULKAN: Yes.

15           HEARING OFFICER BUTLER-TRUESDALE:

16   Mr. Dalton?

17           MR. DALTON: Could I have two or

18   three minutes with my client, please?

19           HEARING OFFICER BUTLER-TRUESDALE:

20   Um-hum.

21           MR. DALTON: Thank you.

22           HEARING OFFICER BUTLER-TRUESDALE:

1    Back on the record.

2            MR.  DALTON:    All  right.    The

3    purpose  of  my  discussion  with  my  client  was

4    my   contention   that   it   would   really   be

5    ludicrous   on   my   part   to   contest   that

6    Katherine   Thomas   could   provide   educational

7    benefit.    Inasmuch  as  the  parent's  attorney,

8    I   have   advocated   that   placement   numerous

9    times.    And  I  just  wanted  to  make  sure  that

10   my  client  agreed.    My  client  also  agrees  that

11   the   child   can   receive   educational   benefit

12   there.

13           HEARING   OFFICER   BUTLER-TRUESDALE:

14    Um-hum.

15           MR.  DALTON:    So  we  are  not  going

16   to  require  the  parent  to  put  on  evidence.    We

17   are  not  waiving  our  total  objection  to  the

18   Hearing  Officer  considering  Katherine  Thomas,

19   because  we  believe  sincerely  that  it  violates

20   the  standards  under  Carter.

21           HEARING   OFFICER   BUTLER-TRUESDALE:

22    Um-hum.

1         MR. DALTON: We also believe we

2  have no jurisdiction in this matter with

3  regard to placement that the Hearing Officer

4  has no authority to order us to pay for a

5  placement outside of our jurisdiction and

6  that the DCPS in its capacity as the SEA has

7  agreed to accept jurisdiction of this child,

8  has issued a notice of placement and we

9  intend to provide rebuttal evidence that this

10  has all been done, done with the consent of

11  the parent and her participation and her

12  counsel's participation in a placement

13  meeting with due notice.

14        And that I think what is most

15  appropriate is they don't really care who

16  pays for this. They just want somebody to

17  pay for it and it has got to be us, because,

18  unfortunately, they only sued us. But that's

19  not really my fault. So I can't help it that

20  counsel chose not to sue DCPS when they were

21  the appropriate party. I can't help it that

22  charter schools don't make placements outside

1    their    jurisdiction.    That's    why    the

2    regulations were written the way they are.

3            Now, in Virginia and Maryland, it

4    should be noted that that is not the case,

5    because legislatively there, charter schools

6    do have to accept the responsibility for

7    placement outside their charter. But in the

8    District, we have a different rule. And that

9    -- and we are in the District. So that is

10   the rule that applies.

11           And I'm not going to debate all

12   this, because, obviously, this case is headed

13   for an appeal to the federal court for a

14   decision on these issues. So I think in the

15   interest of the parent and the Hearing

16   Officer, we should move to allowing us to put

17   on a rebuttal case.

18           Also, under Reed, it's not for the

19   Hearing Officer to determine the comp ed.

20   Counsel must present a comp ed plan, so we

21   object to the Hearing Officer making any

22   decisions with regard to comp ed.

1          HEARING OFFICER BUTLER-TRUESDALE:

2    Do you have a response to that, Ms. Wulkan?

3          MS. WULKAN:    Yes, I do have a

4    response.   I've got two issues.   As to the

5    issue about -- it's very difficult to figure

6    out how to present the case.   Mr. Dalton is

7    saying he is not going to contest Katherine

8    Thomas, that Katherine Thomas will provide

9    educational benefits.   I don't know whether

10   that means that I'm not supposed to put

11   evidence on about Katherine Thomas.    I

12   certainly would want a ruling one way or

13   another about that.

14          Secondly, with regard to -- I

15   would like to know that Mr. Dalton's position

16   is whether he is -- whether I need to put on

17   evidence about the denial of faith and the

18   fact that that -- that SAIL was not an

19   appropriate placement.   They admitted that in

20   all the papers and they then admitted that in

21   terms of their saying that they invoke the

22   SEA, etcetera.

1          So the question is whether I need

2     to put on a whole case with regard to the

3     denial of faith or whether there is an

4     admission with regard to that.  So it's --

5     depending upon where these legal rulings come

6     out, will depend upon how much evidence I'll

7     put on.  I'm prepared to put on an evidence

8     about the inappropriateness of SAIL in the

9     denial of faith.

10          I'm prepared to put on evidence.

11     You know, I have a neuro-psychologist who

12     will talk about his needs and talk about what

13     kind of program he needs and I have Katherine

14     Thomas to put on evidence about the

15     appropriateness of Katherine Thomas and I

16     have the parent to put on evidence about

17     what's happened with SAIL for the last number

18     of years.

19          We can do the whole hearing or if

20     there is an admission by the LEA, SAIL that

21     they did deny him faith, then --

22          HEARING OFFICER BUTLER-TRUESDALE:

1    Well, let him answer that question first.

2              MS. WULKAN:  Okay.  Then we can --

3              HEARING  OFFICER  BUTLER-TRUESDALE:

4    Is there an admission?

5              MR. DALTON:  No, of course not.

6              HEARING  OFFICER  BUTLER-TRUESDALE:

7    With respect to the resolution meeting, the

8    statement of the resolution meeting?

9              MR.  DALTON:   No,  the  statement

10   that Katherine Thomas is an appropriate is

11   only acknowledgement of both what the parent

12   knew and what we knew.

13             HEARING  OFFICER  BUTLER-TRUESDALE:

14   About -- you say Katherine Thomas, you mean

15   SAIL?

16             MR. DALTON:  I mean, SAIL, yes.

17             HEARING  OFFICER  BUTLER-TRUESDALE:

18   Okay.

19             MR.  DALTON:   So,  I  mean,  that's

20   not a denial of faith.  When the parent knows

21   it's inappropriate and signs off on IEPs and

22   says -- you know, is looking for a placement,

1    that's not a denial of faith.

2              HEARING  OFFICER  BUTLER-TRUESDALE:

3     Um-hum.

4              MR.  DALTON:    I  mean,  what  we're

5    guilty of, okay, is cooperating.

6              HEARING  OFFICER  BUTLER-TRUESDALE:

7     Um-hum.

8              MR.  DALTON:    That's  what  we're

9    guilty of.   We're guilty of cooperating with

10   the  parent  and  not  moving  immediately  to

11   notifying DCPS three years ago.   That's what

12   we're guilty of.

13             HEARING  OFFICER  BUTLER-TRUESDALE:

14    Okay.

15             MR.  DALTON:    And  if  you  want  to

16   rule against us for that reason and provide

17   relief, have at it.

18             HEARING  OFFICER  BUTLER-TRUESDALE:

19    Um-hum.

20             MR.  DALTON:    But  that  is  what

21   we're guilty of and that is what I will admit

22   as  counsel  and  my  client  will  admit  that,

1    too.  Very definitely three years ago, when

2    we -- when the parent signed the full-time

3    IEP, we should not have allowed the parent

4    time to deal with her other child and to deal

5    with her legal and placement issues.

6            We should have immediately ignored

7    that request and gone to a placement meeting

8    with  DCPS  and  DCPS  would  have  probably

9    offered  Prospect  and  three  years  ago  the

10   issue  of  Prospect  being  appropriate  or  not

11   being  appropriate  would  have  been  litigated

12   and  the  issue  of  the  appropriateness  of  the

13   private  placement  would  have  been  litigated.

14           MS.  WULKAN:   I'm going to object

15   to  all  of  this.   This  is  some  kind  of

16   testimony  and  it  has  nothing  to  do  with  the

17   issue.

18           MR. DALTON:  No.

19           MS. WULKAN:  The issue is --

20           MR. DALTON:  It's an answer to the

21   question.

22           MS.  WULKAN:    -- whether  or  not

1   they have admitted and we need to put on

2   evidence that SAIL is an inappropriate

3   placement.

4           HEARING OFFICER BUTLER-TRUESDALE:

5   Okay.  So in his --

6           MS. WULKAN:  And I don't know -- I

7   still don't know the answer.

8           HEARING OFFICER BUTLER-TRUESDALE:

9   His response is that there is no admission.

10          MS. WULKAN:  Okay.

11          HEARING OFFICER BUTLER-TRUESDALE:

12  So we're putting on a full case.

13          MS. WULKAN:  Fine.

14          MR. DALTON:  No, counsel has made

15  two different arguments here.  Okay.  I think

16  it needs to be very, very clear.

17          HEARING OFFICER BUTLER-TRUESDALE:

18  Okay.

19          MR. DALTON:  All right.  She is

20  saying that she needs to put on evidence --

21          HEARING OFFICER BUTLER-TRUESDALE:

22  Um-hum.

1          MR.  DALTON:    -- that  SAIL  is

2   inappropriate.   That  is  not  true.   We  admit

3   that.

4          HEARING  OFFICER  BUTLER-TRUESDALE:

5   Oh, so  there  is  an  admission  that  SAIL  is

6   inappropriate?

7          MR.  DALTON:  Correct, but not --

8          HEARING  OFFICER  BUTLER-TRUESDALE:

9   But there is still an issue --

10          MR.  DALTON:   -- a denial of faith.

11          HEARING  OFFICER  BUTLER-TRUESDALE:

12   -- of denial of faith.   Okay.

13          MR.  DALTON:  Absolutely.

14          HEARING  OFFICER  BUTLER-TRUESDALE:

15   You're  appreciating  the  difference  between

16   what he's saying?

17          MS.  WULKAN:  No.  No, I don't.   I

18   don't  understand  how  you  could  --  that  SAIL

19   is  an  inappropriate  placement  having  the

20   denial  of  faith.   So,  you  know,  if  you  want

21   me  to  put  on  the  evidence  that  it's

22   inappropriate  and  therefore  that  rises  to

1    denial of faith, I mean, we made all the

2    allegations and I don't understand that it's

3    a distinction about it.

4              HEARING OFFICER BUTLER-TRUESDALE:

5     Okay.

6              MS. WULKAN:    One is a legal

7    conclusion and one is the evidence that leads

8    to that.    If you find that SAIL is an

9    inappropriate placement for this child, then

10   you have to conclude that they have denied in

11   faith.    I think.    I don't see representing

12   that's certainly what the standard is under

13   Riley and everything else.    There is an

14   inappropriate placement because there is

15   inappropriate services.

16             HEARING OFFICER BUTLER-TRUESDALE:

17    Yes.    If at the close of the hearing you

18   choose to submit any briefs or cases to me

19   relevant to dual culpability and what that

20   has to do with a denial of faith, I certainly

21   will receive it.

22             MS. WULKAN:    Okay.

1          HEARING OFFICER BUTLER-TRUESDALE:

2    Because I think what I hear you arguing is

3    that there is dual culpability for any

4    deficiencies in the delivery of faith.

5          MR. DALTON:  No, we don't believe

6    we inefficiently delivered services.

7          HEARING OFFICER BUTLER-TRUESDALE:

8     No?

9          MR. DALTON:  Here is the

10   prerequisite.  In order for you to make the

11   request for assistance, you have to have a

12   full-time IEP, because counsel correctly

13   pointed out that when you are within the

14   jurisdiction, in other words, the student is

15   enrolled in your school, okay, and the five

16   cases at the federal court level where we

17   tried to argue, was that DCPS should not be a

18   party, because when you are in that

19   situation, it is the LEA's responsibility.

20        The SEA does not have

21   responsibility until they are asked to be

22   brought in.  They have asked to be brought in

1   this case.   They have been brought in.   They

2   have consented to being brought in.   They

3   have issued a placement notice.   The fact the

4   parent doesn't have it, doesn't matter.

5   That's an issue that will be resolved at

6   another hearing.

7              HEARING OFFICER BUTLER-TRUESDALE:

8   So if we're saying that the SEA consented to

9   being brought in, am I hearing from Dr.

10  Piegler today?

11             MS. WULKAN:   No.   They have not

12  consented to be brought in and that's why I'm

13  going to object to that.   The SEA has clearly

14  not consented to be brought in.

15             MR. DALTON:   Yes, they have.

16             MS. WULKAN:   They filed a motion.

17  DCPS --

18             HEARING OFFICER BUTLER-TRUESDALE:

19  You're saying that there was a constructive

20  consent to be brought in by Dr. Piegler's

21  participation in the meeting?

22             MR. DALTON:   Absolutely.

1          MS. WULKAN:  Well, that's --

2          MR. DALTON:  Absolutely.

3          MS.  WULKAN:    As  far  as  I'm

4     concerned, there is no --

5          MR. DALTON:  And we don't need

6     to --

7          MS.  WULKAN:     --  consent  to  be

8     brought in.

9          MR. DALTON:  We don't even need to

10    bring  in  Dr.  Piegler,  because  there  are

11    witnesses  right  here  that  can  substantiate

12    it.

13         MS.  WULKAN:    I  know.    There  is

14    nothing in the record that says that DCPS has

15    consented.   In fact, Ms. Harris-Lindsey sat

16    here and told you that she did not consent to

17    be brought in, that her client didn't consent

18    to being brought in.  So I don't know whether

19    Dr.  Piegler  and  Ms.  Harris-Lindsey  talked,

20    but  the  SEA  has  not  consented  to  be  brought

21    in.

22              Not  any  --  you  have  already  ruled

1     that that's irrelevant at this point anyway.

2     We're down the road in terms of the time

3     frame.  So that's --

4                    HEARING OFFICER BUTLER-TRUESDALE:

5     I'm expecting you to present a full case.

6                    MS. WULKAN:  Okay.  I'm going to

7     present a full case, but I want to say just

8     two more brief things in response to this.

9     I'm more than happy to put on evidence about

10    Katherine Thomas.  You know, I'm assuming --

11                   HEARING OFFICER BUTLER-TRUESDALE:

12    I'm asking that you do, mainly because I

13    assume in the public interest that has been

14    entrusted in me, as the Hearing Officer, not

15    as an ALJ, which is, you know, a different

16    level of expectation.  But I assume that

17    there probably is some expectation that I

18    will act in the public interest to ensure

19    that, even though there is a lower standard

20    under Carter with respect to what the school

21    must offer, I will at least do the minimum of

22    making sure that I have testimony that stays

1    there.

2              MS. WULKAN:  Absolutely.

3              HEARING  OFFICER  BUTLER-TRUESDALE:

4    There  is  educational  benefit,  even  though

5    counsel for respondent is stating that due to

6    their  parties  --  I'm  sorry,  their  firm's

7    representation of that school, that they are

8    certainly  not  going  to  contest  that  the

9    school can provide educational benefits.

10             I still think that I probably have

11   a  duty  to  go  even  further  and  hear  some

12   testimony.

13             MS. WULKAN:  I'm glad to do that.

14   And the last thing I wanted to say is that I

15   would ask you to read the Carter case, which

16   I  don't  think  --  which  Mr.  Dalton  keeps

17   making  representations  about  what  Carter

18   requires  about  something  about  public

19   placements.  Carter  never  even  mentions

20   public placements. It's not about that.  It's

21   about a parent making unilateral placements.

22             It's a Supreme Court case.  It's

1          about  a  parent  making  unilateral  placement

2          and what the standard is in terms of deciding

3          unilateral placement.  This has nothing to do

4          with public placements being offered or not.

5          We don't have any evidence that the public

6          placement has been offered anyway.  And so

7          you  couldn't  make  a  finding  one  way  or

8          another  about  whether  it  was  adequate  or

9          wasn't adequate.

10                 You  have  already  set  the  time

11         line, but I just want to say that I'm going

12         to  ask  you  to  read  Carter,  because  I  believe

13         that  it  has  been  misrepresented  in  terms  of

14         what  Carter  requires,  because  it  doesn't

15         require that.  So with that, I'm more than

16         happy  to  start  my  presentation  whenever  you

17         are ready.

18                 HEARING  OFFICER  BUTLER-TRUESDALE:

19          All right.  Now, the --

20                 MR.  DALTON:   We're  a  little  bit

21         confused.

22                 HEARING  OFFICER  BUTLER-TRUESDALE:

1    Yes.  I think she knows that you are going

2    first.

3                MR. DALTON:  It didn't sound like

4    it.

5                MS. WULKAN:  Well, I don't think

6    he can go first, because he has no witnesses.

7    He can't put any witnesses on, because you

8    have excluded his disclosure.

9                HEARING OFFICER BUTLER-TRUESDALE:

10   Well --

11               MS. WULKAN:  And you've excluded--

12   when you excluded his disclosure, that

13   includes not only documents, but it excludes

14   witnesses.

15               HEARING OFFICER BUTLER-TRUESDALE:

16   But what I'm -- first of all, I'm not even

17   sure that Mr. Dalton is finished with his

18   opening statement.

19               MS. WULKAN:  Oh.

20               HEARING OFFICER BUTLER-TRUESDALE:

21   Number one.

22               MR. DALTON:  Yes.

1          HEARING  OFFICER  BUTLER-TRUESDALE:

2     Are    you    finished    with    your    opening

3     statement?

4          MR. DALTON:  Yes.

5          HEARING  OFFICER  BUTLER-TRUESDALE:

6     Okay.  Number two, I want to make sure that

7     with  the  disclosures  that  you  submitted,

8     first of all, who would you have called that

9     are also on Ms. Wulkan's list?

10         MR. DALTON:  The parent.

11         HEARING  OFFICER  BUTLER-TRUESDALE:

12    Simply the parent.  Okay.  Now, the thing

13    is--

14         MR. DALTON:  This isn't even --

15         HEARING  OFFICER  BUTLER-TRUESDALE:

16    -- the disclosures -- what you brought up

17    earlier, I want to make sure that I have an

18    understanding of this also, that we're all on

19    the same page with it.  The disclosures have

20    not been admitted.  With respect to the

21    calling of witnesses, the five day disclosure

22    rule I know applies to documentary evidence.

1    I'm not taking your disclosures.

2         MR. DALTON:  Um-hum.

3         HEARING  OFFICER  BUTLER-TRUESDALE:

4    But  I  am  uncertain  with  respect  to  whether

5    or  not  it  also  applies  simply  to  the

6    disclosure  letter  and  whether  or  not  that

7    prevents  you  from  calling  any  witnesses  that

8    would  have  been  named  in  the  disclosure

9    letter.

10         MR. DALTON:  No, I think --

11         HEARING  OFFICER  BUTLER-TRUESDALE:

12    I know it applies to the attached --

13         MR. DALTON:  I think it applies to

14    everything.

15         HEARING  OFFICER  BUTLER-TRUESDALE:

16    Okay.

17         MR. DALTON:  Absolutely.

18         HEARING  OFFICER  BUTLER-TRUESDALE:

19    All right.

20         MR. DALTON:  Now, I disagreed with

21    your  ruling,  because  not  only  did  --  were

22    they disclosed, okay --

1          HEARING  OFFICER  BUTLER-TRUESDALE:

2     By counsel and her --

3          MR. DALTON:  No, to -- well, first

4     of  all,  as  to  the  parent,  yes,  it  was

5     disclosed.    She  has  disclosed  her  as  a

6     witness.   There  has  been  no  showing  of  any

7     prejudice  whatsoever  inasmuch  as  the  parent

8     has  been  disclosed.    The  parent  is  a  party.

9     I  have  called  parents  in  dozens  of  hearings

10    with  no  objection  from  anyone,  because  until

11    today  I  have  never  heard  that  anyone,  even

12    making  the  argument  that  a  party,  cannot  be

13    called.

14          A  party  can  always  be  called  as  a

15    witness  in  a  civil  case,  in  an  administrative

16    hearing,  even  in  a  civil  case  it's  --  which

17    has  a  much  higher  standard  than  an

18    administrative  hearing,  a  party  can  always  be

19    called.    It's  the  very  nature  of  being  a

20    party.   You  put  yourself  out  there.   You  have

21    made  allegations.   We  are  entitled  to  call

22    you  as  a  witness.

1          HEARING OFFICER BUTLER-TRUESDALE:

2   That's the argument that I was trying to go

3   back to and get resolved.   Do you have a

4   response to that argument, Ms. Wulkan?

5        MS. WULKAN:    I don't have any

6   objection.   Mr. Dalton is going to cross

7   examine.   I'm going to put my client on.   I'm

8   going to do the direct examination, because

9   is my witness and I am going to put her on as

10   direct.   If he would like to cross examine

11   her, he obviously has the right to do that.

12       Now, whether or not you are going

13   to allow him to raise issues on cross

14   examination that I don't raise on direct

15   examination, I think is a relevant issue,

16   because he is going to get to examine her one

17   way or another.   It's clearly going to be in

18   a cross examination roster, because whether

19   or not he would call her on direct or not,

20   which I don't he can do, because the

21   disclosure includes witnesses and he can't

22   bring any witnesses, so he therefore couldn't

1    call her on direct anyway.

2           But let's assume that he is going

3    to cross examine her.  I would -- my position

4    is that he has to cross examine her within

5    the scope of my direct examination and that

6    would be the limitation.  And if you decide

7    to rule otherwise, then you decide to rule

8    otherwise and you can allow him to cross

9    examine her and let him ask her about

10   everything based on whatever, you know, let

11   him ask her.

12          HEARING  OFFICER  BUTLER-TRUESDALE:

13   Okay.

14          MS.  WULKAN:    And  so,  you  now,

15   that's my vision.  Certainly, he can cross

16   examine her.  I have no objection to that.

17          HEARING  OFFICER  BUTLER-TRUESDALE:

18   I'm going to, just because it's 11:30 and I

19   know we're going to take our lunch break in a

20   second, I just want to put parties on notice,

21   allow  his  cross  to  be  extremely  broad,

22   because remember I explained to you before --

1          MS. WULKAN:  Yes.

2          HEARING  OFFICER  BUTLER-TRUESDALE:

3    --  that  I  want  as  much  information  as

4    possible.    For  purposes  of,  I  guess,

5    convenience,  I  will  allow  that  to  be  done  on

6    cross.    What  I  was  considering  was  allowing

7    you  to  do  a  direct  examination  also,  because

8    I  knew  I  was  going  to  be  very  liberal  on

9    cross.

10          MR.  DALTON:  Well,  as  a  practical

11   matter,  I'm  allowed  to  ask  any  questions  that

12   I  believe  is  rebuttal.

13          HEARING  OFFICER  BUTLER-TRUESDALE:

14    Um-hum.

15          MR.  DALTON:    And  therefore,  it

16   wouldn't  be  limited  to  direct  examination

17   anyway.    So,  I  mean,  you  get  to  the  same

18   place  at  the  end  of  the  day  regardless.

19          HEARING  OFFICER  BUTLER-TRUESDALE:

20    Okay.

21          MR.  DALTON:  But,  you  know,  I'll

22   abide  by  the  Hearing  Officer's  determination,

1    but I think it just -- just as taking

2    evidence, when we conceded educational

3    benefit is simply an extenuation of the time

4    that both parties have to be here.

5            HEARING OFFICER BUTLER-TRUESDALE:

6    Yes, I know.  I understand that.  Whenever

7    possible I like to leave here well before

8    5:00, but I do think that there is some

9    investment of public trust in the Hearing

10   Officer, even though I'm not a sworn

11   Administrative Law Judge and I think that I'm

12   supposed to hear some type of statement on

13   educational benefit on any placement

14   involving the use of federal funds.  So I'm

15   going to do that.

16           It is now 11:30, so we will come

17   back here at 12:00 and we'll begin your case

18   in chief.

19           MS. WULKAN:  Okay.  Thank you.

20           (Whereupon, the hearing was

21   recessed at 11:30 a.m. to reconvene at 12:00

22   p.m. this same day.)

156

1

2

3

4

5

6

7

1        A-F-T-E-R-N-O-O-N  S-E-S-S-I-O-N

2                        12:00 p.m.

3        HEARING  OFFICER  BUTLER-TRUESDALE:

4  Okay.  We're back on the record.  Are all of

5  your witnesses already listed on the witness

6  sheet?  Okay.  Great.  I mean, I'm sorry, on

7  my attendance sheet.  That's what I was

8  talking about.

9        MS.  WULKAN:  Oh, no, not your

10  attendance sheet.

11        HEARING  OFFICER  BUTLER-TRUESDALE:

12  Okay.  I'm going to hand that to you.  If

13  you could just give it back in order.

14        MS.  WULKAN:  Do you want me to put

15  the witnesses on the attendance sheet?

16        HEARING  OFFICER  BUTLER-TRUESDALE:

17  Um-hum.  That we're calling, yes.

18        MS.  WULKAN:  Okay.

19        MR.  DALTON:  This is a little --

20        HEARING  OFFICER  BUTLER-TRUESDALE:

21  I will just hand you the sheet and you can

22  give it back to me at the end.

1          MR.  DALTON:    If  anybody  says
2  anything  that  you  think  there's  room  for,
3  then  you  write  that  down.    Then  you  write
4  down  what  you  were  saying.
5          HEARING  OFFICER  BUTLER-TRUESDALE:
6  Okay.    That's  fine.
7          MR.  DALTON:    And  I  have  got  more
8  pages.    I've  got  a  brief  thing  here.
9          HEARING  OFFICER  BUTLER-TRUESDALE:
10  Okay.
11          MR.  DALTON:    So  if  we  need  20  or
12  30  pages,  I  have  got  it.
13          HEARING  OFFICER  BUTLER-TRUESDALE:
14  Whenever  you  are  ready.
15          MR.  DALTON:    But  this  is  --
16          HEARING  OFFICER  BUTLER-TRUESDALE:
17  Direct  testimony.
18          MR.  DALTON:    All  right.    This  is
19  the  first  basis  of  --
20          MS.  WULKAN:    Okay.    Can  we  call
21  Dr.  James?
22          HEARING  OFFICER  BUTLER-TRUESDALE:

1    The phone won't extend over -- all the way

2    over there.

3           MS. WULKAN:    Oh, okay.    Do you

4    want me to -- I'll just do it.    (301) 469-

5    0223.

6           OPERATOR:  Training, Ivy Mountain.

7           HEARING OFFICER BUTLER-TRUESDALE:

8    I'm sorry, who did you say you were?

9           OPERATOR:  Ivy Mountain School.

10           HEARING OFFICER BUTLER-TRUESDALE:

11    Oh.

12           MS. WULKAN:    She said it was

13    training at Ivy Mountain.

14           HEARING OFFICER BUTLER-TRUESDALE:

15    Oh, she said training.

16           MS. WULKAN:  Joette James.

17           HEARING OFFICER BUTLER-TRUESDALE:

18    We're looking for Dr. James.

19           MS. HAWKINS:    I know the

20    receptionist.

21           MS. WULKAN:  Because they are --

22           MS. HAWKINS:    Yes, that's Becky.

1    I'm sorry, that's why I explained to her the

2    phone number, because I'm going through my

3    head to get that.  It's one that I used to

4    dial frequently.

5              MS. WULKAN:  Did you work there?

6              MS. HAWKINS:  For five years.

7              MS. WULKAN:  Oh, my God.

8              DR. JAMES:  Hello.  Joette James

9    speaking.

10             HEARING  OFFICER  BUTLER-TRUESDALE:

11    Dr. James?

12             DR. JAMES:  Hello?

13             HEARING  OFFICER  BUTLER-TRUESDALE:

14    Can you hear us?

15             DR. JAMES:  Yes, I can hear.  It's

16    sounds -- you're sounding a little far away

17    though.

18             HEARING  OFFICER  BUTLER-TRUESDALE:

19    Okay.

20             MR. DALTON:  It's the tunnel.

21             HEARING  OFFICER  BUTLER-TRUESDALE:

22    We're going to try to remedy that.  This is

1    Tonya  Butler-Truesdale  and  I'm  in  the

2    hearing.

3               DR. JAMES:  Yes.

4               HEARING  OFFICER  BUTLER-TRUESDALE:

5    For  --  I'm  sorry,  what's  D██████  last

6    name?

7               MS. WULKAN:  Hawkins.

8               MR. DALTON:  Hawkins.

9               HEARING  OFFICER  BUTLER-TRUESDALE:

10    Hawkins.  Okay.

11               DR. JAMES:  Yes.

12               HEARING  OFFICER  BUTLER-TRUESDALE:

13    And --

14               DR.  JAMES:  I'm  going  actually

15    have  to  close  the  door,  okay,  because  the

16    door  is  open  for  this  office.

17               HEARING  OFFICER  BUTLER-TRUESDALE:

18    No  problem.

19               DR.  JAMES:  So  hold  on  just  one

20    moment.

21               MS.  WULKAN:  She's  a

22    neuropsychological  fellow  on  the  faculty  at

1    Children's.

2            DR. JAMES:  Okay.

3            HEARING  OFFICER  BUTLER-TRUESDALE:

4    First, let me tell you that you're going to

5    hear  a  little  bit  of  crunching.   We  are

6    eating.

7            DR. JAMES:   Okay.   I am actually

8    doing the same thing.

9            HEARING  OFFICER  BUTLER-TRUESDALE:

10    Okay.   All right.

11            MS. WULKAN:   We can do it stereo.

12            MR. DALTON:   Join in the party.

13            HEARING  OFFICER  BUTLER-TRUESDALE:

14    We jointly apologize to the stenographer on

15    this, okay, because we're crunching, eating

16    and slurping.   We are already on the record

17    and I'm going to go on and swear you in.

18            DR. JAMES:  Okay.

19            HEARING  OFFICER  BUTLER-TRUESDALE:

20    And then you will be stating your name and

21    spelling it out for the record, please.

22            DR. JAMES:  Okay.

1          HEARING OFFICER BUTLER-TRUESDALE:

2     And then Ms. Wulkan will take over.  Okay?

3          DR. JAMES:  Okay.

4          HEARING OFFICER BUTLER-TRUESDALE:

5     All right.  Would you raise your right hand,

6     please?

7          DR. JAMES:  Okay.

8     Whereupon,

9          DR. JOETTE JAMES

10    a witness, was called by Counsel for the

11    Petitioner, and having been first duly sworn,

12    was examined and testified as follows:

13          HEARING OFFICER BUTLER-TRUESDALE:

14     Thank you so much.  And would you spell your

15    complete name for me, please?

16          THE WITNESS:  Yes.  My first name

17    is Joette and it's spelled J-O-E-T-T-E.  My

18    last name is James, J-A-M-E-S.

19          HEARING OFFICER BUTLER-TRUESDALE:

20     Your witness, Ms. Wulkan.

21          MS. WULKAN:  Okay.  I'm going to

22    ask just before, for one second, Dr. James,

1    I'm going to ask the Hearing Officer to refer

2    to Dr. James' neuropsychological evaluation.

3     It's at P-6, and Mr. Dalton, and also her

4    resume is at, I wrote it down, P-16.  Yes, P-

5    16 is her resume.

6                    HEARING  OFFICER  BUTLER-TRUESDALE:

7     Okay.

8                    MS.  WULKAN:   And  I  believe  that

9    Mr. Dalton has agreed to -- I'm just going to

10   do a little bit of background, and I believe

11   that he has agreed to her qualifications as

12   an expert.

13                   HEARING  OFFICER  BUTLER-TRUESDALE:

14    Okay.

15                   MS.  WULKAN:   So  we  don't  have  to

16   do an (inaudible).

17                   DIRECT EXAMINATION

18                   BY MS. WULKAN:

19       Q    Okay.   Dr.  James,  where  do  you

20   work?

21       A    I  work  for  Children's  National

22   Medical  Center  in  Washington,  D.C.  and

1    Rockville, Maryland.

2        Q    And what is your occupation?

3        A    Title?

4        Q    Yes.   What is your title?   That's

5    fine.

6        A    I am a pediatric neuropsychology

7    fellow, which means I am at the end of a two

8    year postdoctoral fellowship in pediatric

9    neuropsychology, and I am a licensed

10   psychologist in Maryland.

11       Q    Okay.   And are you about headed

12   out of your fellowship?

13       A    Yes, in two days.

14       Q    And what will your next job be?

15       A    I will be on the faculty at

16   Children's National Medical Center in George

17   Washington University and I will be a

18   pediatric neuropsychologist.

19       Q    Okay.   And, Dr. James, you -- I'm

20   just going to -- how long have you been --

21   when did you get your Ph.D in psychology?

22       A    I got my Ph.D in clinical

1  psychology in December of 2003.

2       Q    Um-hum.    And you have been at

3  Children's since that time?

4       A    I have been at Children's National

5  Medical Center since 2004.

6       Q    Okay.

7       A    September 1st of 2004.  It's a two

8  year fellowship.

9       Q    And have you conducted many

10  neuropsychological evaluations?

11      A    I would say I have probably

12  conducted hundreds of neuropsychological

13  evaluations over the past seven or eight

14  years.

15      Q    And primarily those are with

16  children?

17      A    They are about 98 percent with

18  children, yes.

19      Q    Okay.

20           MS. WULKAN:  And I would ask that

21  Dr. -- by stipulation and upon your review of

22  her resume at P-16, I would ask that Dr.

1   James be certified as an expert in the field

2   of pediatric neuropsychology.

3           HEARING OFFICER BUTLER-TRUESDALE:

4    Just for the record, I just realize that I

5   don't have 16 and 17 in this folder.  Mine

6   stop at 15.  And you have --

7           MR. DALTON:  I have no objection.

8           HEARING OFFICER BUTLER-TRUESDALE:

9    Okay.  All right.

10          MS. WULKAN:  Well, let me give you

11  16 and 17.

12          HEARING OFFICER BUTLER-TRUESDALE:

13   Okay.

14          MS. WULKAN:  Then we won't have

15  any problems.  I'm sorry.

16          HEARING OFFICER BUTLER-TRUESDALE:

17   No problem.

18          MS. WULKAN:  I don't understand

19  how that happened.

20          HEARING OFFICER BUTLER-TRUESDALE:

21   I just noticed it myself.

22          MS. WULKAN:  Okay.  I'll give you

1    my extras.

2            HEARING OFFICER BUTLER-TRUESDALE:

3    Okay.

4            MS. WULKAN:  Here's 16.  And 17,

5    we're not able to use anyway, so that's fine.

6            HEARING OFFICER BUTLER-TRUESDALE:

7    Okay.

8            BY MS. WULKAN:

9        Q    Okay.  Dr. James, do you know

10   D███████ H██████?

11       A    Yes, I do.

12       Q    And how do you know D████████?

13       A    I evaluated D███████ on March the

14   27th of this year of 2006 in the Pediatric

15   Neuropsychology Program at Children's for a

16   neuropsychological evaluation.

17       Q    And what did that evaluation

18   consist of?

19       A    I evaluated D████████ in a number

20   of different domains, including overall

21   general intellectual functioning, his verbal

22   functioning, his non-verbal visual-spacial

1  functioning,  memory,  attention,  executive

2  skills,  academic  functioning  and  his

3  emotional-behavioral functioning.

4      Q    And did you have any information

5  that you reviewed prior to the evaluation?

6      A    Yes.   I -- typically,  in  our

7  evaluations  we have a questionnaire that we

8  give  to  parents,  a  developmental  history

9  questionnaire.

10      We  also  give  them  a  parent  form

11  that  really  covers  emotional  and  behavioral

12  functioning,  a  teacher  form  that  goes  to  the

13  teacher  that  covers  the  same  kinds  of  issues,

14  emotional-behavioral  functioning,  and  then  we

15  do  a  review  of  just  any  records  that  the

16  parent  has  given  us.   We  talk  to  the  parent

17  informally  about  what  their  concerns  are,

18  what  school  concerns  are  as  well.

19      Q    And  did  you  receive  all  of  that

20  information  either  from  Mrs.  Hawkins  or  from

21  the  school  on  D██████████?

22      A    Yes, I did.

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS

1323 RHODE ISLAND AVE., N.W.

(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

1    Q    You did.   And were you able to

2    review any of his previous testing?

3    A    Yes, I did.

4    Q    Okay.    And you did in your

5    evaluation, did you not, compare his test to

6    decide whether the testing was consistent

7    with his previous testing or not, right?

8    A    Right.   You're talking about my

9    evaluation?

10    A    Your evaluation, correct.

11    Q    Yes, yes.   I did a summary of all

12    the testing that he has had since he was six

13    and a half years-old and then compared that

14    to -- the testing that I highlighted and that

15    summary    was    primarily    intellectual

16    functioning.

17    Q    Um-hum.

18    A    So I highlighted all of those.

19    Q    Right.

20    A    And then compared them to what we

21    saw.

22    MS. WULKAN:   And I would refer the

1    Hearing Officer, just so we don't have to

2    have all of that very specific evaluation, to

3    page -- it's actually the second page of the

4    neuropsychological evaluation.

5          It's      entitled      "Previous

6    Evaluations" and there is a whole section on

7    that, which will give you a summary of all

8    the previous evaluations, except to the

9    extent that I would ask if I ask you any

10   specific questions about it.   Other than

11   that, we'll leave that as a foundation.

12   Okay?

13          THE WITNESS:  Sure, yes.

14          BY MS. WULKAN:

15     Q    Now, can you describe the results

16   of D██████████ cognitive testing?

17     A    Sure.  We did a screening of his

18   intellectual functioning for a subtest

19   screener.  And so overall what we found was

20   there is some consistency between his verbal-

21   - over his verbal score and his nonverbal.

22          So, basically, his visual

1    reasoning, how he handles nonverbal, visual

2    information and his verbal functioning and

3    his nonverbal functioning are, approximately,

4    in the low average range for age.

5         Although, I want to make sure that

6    we clarify that this is a screener, and so a

7    typical full -- the reason we did a screener

8    was because he had been evaluated in 2005,

9    and so what we wanted was to get an estimate

10   of his cognitive functioning because it has

11   been evaluated before, and our estimates were

12   fairly close, so there is a lot of -- there

13   is a lot more variability that doesn't get

14   covered in a screener.

15        Q    Uh-huh.  So how can you compare

16   the results of your testing with his 2005, I

17   guess it was just a year ago, cognitive

18   testing?  How do you compare your results

19   with those?  Consistent?

20        A    They are very similar in that --

21   well, and I want to make sure that we also --

22   and I wrote this in the report, that the

1    testing that was done in 2005 was felt to be

2    somewhat of an underestimate of D███████

3    skills just because there was some trouble in

4    establishing a rapport with the tester and

5    some problems with his energy level.

6              But I would say overall I can

7    comment on the testing that has been done in

8    previous years and ours. What it shows is a

9    child with, approximately, low average

10   intellectual functioning with a lot of

11   variability in scores, which is very, very

12   characteristic of a child with learning

13   disability.

14        Q    And is it correct that his IQ

15   scores, a full-scale IQ came out on this

16   screening as an 80, verbal IQ 84, performance

17   IQ 81, and that's what you would characterize

18   as low average, right?

19        A    Right, yes, that's low average.

20        Q    Okay.

21        A    But this is very, very different

22   from a child who -- and his past testing is -

1      - the past testing, there were different

2      tests used, so it's difficult to compare them

3      directly.

4              But I think when you look at

5      across the board, all of the testing,

6      intellectual testing that has been done, it

7      shows a pattern of quite a bit of variability

8      with scores averaging.  A lot of these are

9      composites, which are average.

10         Q    Um-hum.

11         A    So with sort of low average kinds

12     of scores and very different from a pattern

13     of a child who would be functioning in the

14     mentally retarded range, for example, who

15     would be very similar.  You would find a lot

16     of similarity across scores and all very low.

17      He has a lot of variability.

18         Q    Okay.  And what -- as a result of

19     that particular part of the testing, what

20     were D███████████ educational diagnoses?

21         A    The educational diagnoses are

22     based on taking a look at all of the

1    different domains of functioning, including

2    his general intellectual functioning.    So

3    there is a separate section on academic

4    functioning.

5        Q    Okay.

6        A    And so we take a look at that and

7    compare it to the general intellectual skills

8    and some of his other skills.

9            And overall we felt that his, and

10   there is an educational diagnoses,

11   performance is consistent with a child with

12   ADHD, Attention Deficit Hyperactivity

13   Disorder, predominantly inattentive subtype,

14   and we also gave three academic disorder

15   diagnoses, reading disorder, mathematics

16   disorder and the disorder of written

17   expression.

18           The disorder of written expression

19   is by history.    We didn't directly test

20   written expression in this evaluation.

21           HEARING OFFICER BUTLER-TRUESDALE:

22   Let me just interrupt you for one second.

1          MS. WULKAN:  Sure.

2          HEARING  OFFICER  BUTLER-TRUESDALE:

3  For purposes of my notes, I want to get some

4  clarification before you go any further.

5          Now, were you saying that the --

6  which part of your evaluation was just a

7  screener?  Was it the entire test?

8          THE  WITNESS:    Just  the  general

9  intellectual functioning.

10          HEARING  OFFICER  BUTLER-TRUESDALE:

11  The general intellectual functioning.

12          THE  WITNESS:    Right,  so  just

13  looking  at  his  --  how  does  he  think  and

14  reason, some examples of that would be asking

15  about vocabulary skills, his ability to take

16  a  look  at  visual  patterns  from  the  visual

17  side and complete those patterns, so just his

18  -- when faced with new information, how does

19  he problem solve, how does he reason.

20          That is what we use.  That was the

21  Wechsler  Abbreviated  Scale  of  Intelligence.

22  We  used  that  screener  because  he  has  been

1    tested many times in the past and results are

2    less -- you know, they -- when you use a full

3    intellectual scale when a child has been

4    tested more recently within the past year,

5    you can come -- you have -- can have practice

6    effects of the child being familiar with the

7    test.

8                HEARING OFFICER BUTLER-TRUESDALE:

9    Right.

10               THE WITNESS:  We use a different

11   test and we use a shorter test.

12               HEARING OFFICER BUTLER-TRUESDALE:

13   Okay.

14               THE WITNESS:  But it's an estimate

15   that correlates very highly with other kinds

16   of full-length intellectual tests.

17               HEARING OFFICER BUTLER-TRUESDALE:

18   Okay.

19               THE WITNESS:  But that was the

20   only thing that was a screener.

21               HEARING OFFICER BUTLER-TRUESDALE:

22   Okay.  Thank you.  I had a clue about that.

1    Now, can you give me -- are you able to tell

2    me or give me a statement with respect to the

3    reliability of the screener versus this?

4              THE WITNESS:  Yes.  Off the top of

5    my head, it's probably in the order of a 90,

6    91, 92 percent correlation.

7              HEARING  OFFICER  BUTLER-TRUESDALE:

8    You said 90 to 92 correlation?

9              THE WITNESS:  Between 90 and 92.

10             HEARING  OFFICER  BUTLER-TRUESDALE:

11   Okay.  That's all I wanted to know.  Thank

12   you.

13             THE WITNESS:  Yes.

14             HEARING  OFFICER  BUTLER-TRUESDALE:

15   Ms. Wulkan?

16             MS.  WULKAN:   I  would  just  refer

17   the  Hearing  Officer  or  I  can  ask  you  to

18   actually if you have --

19             BY MS. WULKAN:

20        Q    Do  you  have  your  report  in  front

21   of you, Dr. James?

22        A    I do.

1          Q     If you would just read out on the
2     bottom of page 1 all the tests that you gave
3     him.
4          A     Sure, bottom of page 1, yes.
5          Q     Rather than just sort of set it at
6     the bottom line, what you're talking about.
7          A     We  --  so  there  were  several
8     measures which were parent reports.  Do you
9     want me to mention those as well or just the
10    actual tests that were administered?
11         Q     Well, let's start with the actual
12    tests administered and then we'll talk about
13    the self-report and parent reports.
14         A     Okay.
15         Q     So the Wechsler Abbreviated Scale
16    of  Intelligence,  which  is  the  WASI,  the
17    verbal fluency test.  It's a subtest of the
18    Delis-Kaplan  Executive  Functioning  system,
19    the  DKEF,  the  California  Verbal  Learning
20    Test,  the  children's  version  of  that,  the
21    CVLTC, and we took several subtests from the
22    Wide Range Assessment of Memory and Learning,

1    2nd   Edition, WRAML-2, the Beery Visual Motor

2    Integration, VMI, the gross tech board, the

3    Rey Osterrieth Complex Figure, RCS.

4            The selected subtests, we took

5    several of the Tests of Everyday Attention

6    for Children, that's the TEA-Ch, the Auditory

7    Consonant Trigram, the Tower of London, a

8    Comprehensive Test of Phonological

9    Processing, which is often called a CTOPP and

10   several subtests of the Wechsler Individual

11   Achievement test, 2nd Edition, the WIAT-II,

12   and the Gray Oral Reading Test, 4th Edition,

13   GORT-4.

14       Q    And in terms of the sort of more

15   standardized information for reporting from

16   the parent, can you just briefly summarize

17   those?

18       A    Sure.   The Achenbach Child

19   Behavior Checklist or the CBCL is a measure,

20   a report measure checklist of emotional and

21   behavioral functioning, and it covers a

22   number of domains like anxiety, depression,

1    rule breaking behavior, aggression, social

2    problems.

3            The analog for teachers is the

4    Achenbach Teacher Report Form or TRF. It's a

5    very similarly structured form, but the

6    teacher fills it out and it comes up with

7    similar scales related to aggression or

8    anxiety and a lot of different other kinds of

9    emotional-behavioral issues.

10           And then we also had both parent

11   and teacher complete the BRIEF, the Behavior

12   Rating Inventory of Executive Function.

13   Executive functioning is a set of problem

14   solving skills that include things like your

15   working memory, your ability to inhibit your

16   impulses, your ability to attend information

17   over longer periods of time, your

18   flexibility, those kinds of skills that are

19   all encompassed in executive function, and

20   both parent and teacher fill that out.

21           And then we have the ADHD IV

22   reading scale, which the parents fills out,

1  just a number of -- it's basically taken from

2  the   list   of   symptoms   related   to

3  hyperactivity, impulsivity and attention.

4      Q    And was there anything filled out

5  by D▓▓▓▓▓ himself?

6      A    Yes, and Dominique also completed

7  the Achenbach Youth Self-Report, which is the

8  self-report version of the Achenbach scale

9  that   looks   at   behavioral   and   emotional

10 functioning.  And then he also filled out a

11 measure, the self-report measure of the BRIEF

12 looking at executive skills.

13     Q    Very well.  Now, Dr. James, can

14 you describe the results of his academic

15 achievement testing?  That would be the WIAT

16 and the Gray and some of the others.

17     A    The Gray Oral Reading Test?

18     Q    Um-hum.

19     A    And the CTOPP.  So what we did was

20 we looked at his fundamental reading skills

21 through   the   CTOPP,   so   his   phonological

22 awareness, so that is his ability to be able

1     to take sounds and put them together and

2     manipulate sounds, because research documents

3     have documented fairly clearly over the past

4     20 years that sound and your ability to

5     manipulate sound is very -- is a fundamental

6     reading skill.

7           Q     Um-hum.

8           A     So kids that have difficulty doing

9     that are more likely to have reading

10    disorders. So what an example of that would

11    be would to take the word toothbrush and ask

12    him to -- you know, if we said take away

13    tooth, what are you left with? So we did

14    that and then the second part of the CTOPP,

15    which is the rapid naming piece, is very much

16    linked to fluency.

17           So not only is it important that

18    you decode accurately and look at a letter

19    and be able to -- like a K and be able to say

20    that's the kuh sound, that's your phonologic

21    awareness. It's also important to be able to

22    read fluently. So sometimes children are

1    able to accurately decode, but they are very,

2    very slow readers and that is also going to

3    impact upon their reading skills.

4         So if you have deficits in both,

5    as D███████, D████████ shows deficits in

6    both naming and in phonological awareness,

7    and that makes him -- that puts him -- that

8    makes him have a reading disorder, basically.

9         And we also look at his ability to

10   read single words and paragraphs.  So single

11   word reading we did through the WIAT word

12   reading and then we also looked at his

13   ability to look at sentences and paragraphs,

14   to read those out loud and how quickly,

15   again, was he able to do that.  So that goes

16   to his fluency.  How accurately does he do

17   that?  Does he make a lot of errors?

18        And then we looked at his

19   comprehension.  So, overall, looking at

20   reading from those three points of view, his

21   basic phonological skills, his ability to

22   then take those and read single words and

1 then the next level, which is to be able to

2 read quickly and understand well sentences

3 and paragraphs, are all well below average

4 for age and well below what we would expect,

5 given his cognitive skills.

6   And just to give you a sense of

7 how low, I mean, when we see scores in the

8 60s -- unfortunately, I don't have here -- I

9 meant to put in grade equivalence, but scores

10 in the 60s are -- would be --

11   Q You actually did put those in.

12   A You know, a score in the 60s that

13 you would see for a child with mental

14 retardation, cognitively, a cognitive score

15 in the 60s, that would be about the

16 equivalence. So what we're saying is

17 academically, he is falling in almost like a

18 mental retardation range, so that tells you

19 how far behind he is. It's not one or two

20 years behind. It's more like four.

21   And, similarly for arithmetic and

22 mathematical reasoning is really his ability

1    to go beyond simple calculations and reason

2    through word problems and those are both

3    similarly very, very impaired.

4        Q    You actually, if you look on page

5    -- on the academic functioning section of

6    your report on page 1, 2, 3, 4, 5, it does

7    have that he is -- his reading is at a

8    standard score of 67 and it says early third

9    grade level.

10       A    Oh, you have it.  Okay.  Good.  I

11   guess, you know what?

12       Q    That's --

13       A    I must have an older version of

14   the report.

15       Q    That's fine.  Excuse me one

16   second, Dr. James.

17            HEARING OFFICER BUTLER-TRUESDALE:

18    Page 6.

19            MS. WULKAN:  Page 6.  And here it

20   says academic functioning and here it has

21   those scores right here.

22            HEARING OFFICER BUTLER-TRUESDALE:

1    Okay.

2              MS. WULKAN:  You see there?

3              HEARING  OFFICER  BUTLER-TRUESDALE:

4    Thank you.

5              MS. WULKAN:  Thanks.

6              HEARING  OFFICER  BUTLER-TRUESDALE:

7    I'm sorry.

8              MS. WULKAN:  I was helping locate

9    this.

10             BY MS. WULKAN:

11       Q    So it says here that reading is

12   early third grade level.  Spelling is a

13   standard score of 63 or 68.

14       A    68.

15       Q    68, a mid second grade level.

16       A    Right.

17       Q    Arithmetic is a standard score of

18   64, mid third grade level, and mathematic

19   reasoning, 70, early fourth grade level.

20       A    That's right.

21       Q    And then I guess when you get down

22   to the Gray Oral Reading Component, you said

1    he was at the first percentile for age or 61.

2         A     Right.

3         Q     And so you were just saying that

4    those were more than four years behind and

5    that that is -- is that an expected level

6    with the child, the disabilities that you

7    have just outlined?  Is that an expected

8    level of performance for that child?

9         A    It's quite a bit lower than what

10    you would expect.  You know, there is always-

11    - for a child with a learning disability,

12    there will always be a gap between his

13    cognitive skills and his performance on

14    academic tasks, but, you know, a gap of now,

15    I mean, he was in seventh grade when I saw

16    him, of four plus years is much more than we

17    would expect, this particularly given that he

18    has been in an environment where he has

19    received services for a child with learning

20    disabilities.

21         Q     Can you describe the results or

22    can you tell us what Dominique's

1  neuropsychological strengths and weaknesses

2  are?

3         A    Sure.   Let me just actually -- I

4  would   say   that   his   neuropsychological

5  strengths are in many of his actual cognitive

6  skills.   So, for example, his vocabulary

7  skills, just his ability to define words is

8  in the low -- it's actually in the high end

9  of the low average range for age.

10         He was able to do, when he was

11  asked to do some verbal -- so his verbal

12  reasoning, I think one thing that is

13  important to note, I think that I have said

14  already, is that there is a lot of

15  variability in his skills, so that there are

16  certain aspects of his verbal reasoning that

17  are below average, but then there are some

18  that are actually within the average range

19  for age and a good example would be his

20  ability to generate words according to

21  certain categories.   So, again, that relates

22  to verbal knowledge and vocabulary.

1            And then, you know, I think
2    overall, as we're looking at overall, that
3    his cognitive skills are in the low average
4    range, which with some being a little bit
5    higher than that.
6            His relative weaknesses are in his
7    academic performance, as I explained, and
8    then also associated with that, the
9    difficulties that make up the diagnosis that
10    he receives for ADHD, which is deficits in
11    attention and, more specifically, executive
12    function kinds of skills, so organization,
13    being able to hold information on mind and
14    being able to do something with that
15    information, his ability to take a look at a
16    task and find a systematic approach of
17    attacking it and his abilities to sort of
18    self-monitor his behavior and self-monitor
19    his work.
20            And all of those things are
21    executive function skills that are very often
22    impaired in a child with ADHD.    And then

there is even more.  When you take the
weaknesses in the separate areas,
academically and then executive function
skills, that puts him at even a greater risk
academically.

     Q    And what about in the -- are there
weaknesses in the verbal domain as well?

     A    Yes.  I mean, there are definitely
-- there are weaknesses in the verbal domain.
 There are strengths in the verbal domain.
There is a lot of variability there and in
his visual-spacial skills.

     So weaknesses verbally for him are
when information is complex, when he has a
lot to handle, when he is required to really
elaborate upon his ideas and to give more
than a brief response.  He has a really hard
time doing that and being precise in his
verbal responses, also in his ability to
conceptualize.

     And this goes, again, to where
executive function impacts him and that

1    impacts his verbal ability.  So he has a hard

2    time taking verbal information and being able

3    to apply it, being able to handle complexity,

4    being  able  to  really  use  words  to  form

5    connections that are more abstract and less

6    concrete.

7            Q    Okay.  And you mentioned that he

8    has some problems with attention and he has

9    an ADHD diagnosis.  How, if at all, does that

10   attention issue affect his ability to perform

11   in the classroom?

12           A    Well, it would affect his ability

13   to  really  sustain  effort  to  activities  and

14   so, you know, already you have a child with

15   learning  difficulties,  but  then,  you  know,

16   having problems with attention make it more

17   likely  that  he  is  going  to  misinterpret

18   information,  that  he  is  going  to  hear

19   instructions from a teacher and get the first

20   or  second  instruction,  but  maybe  miss  the

21   third  and  the  fourth  and  then  apply  that

22   incorrectly.

1          So that, I think, is the biggest

2     at this age where we see the most difficulty

3     with attention is really to sustain effort

4     and to follow through on instruction in that.

5          Q     And doesn't he have any problem

6     with retention of information?

7          A     That's much more related to

8     working memory and attention and working

9     memory kind of go hand-in-hand, so it's a

10    little bit like he has -- you know, his

11    ability to take in information and hold it

12    there and be able to use it when he needs to

13    is also impacted.  So he may have trouble.

14          With his attention, he may have

15    trouble bringing in information, attending to

16    it and being able to absorb it and then being

17    able to hold on to it.  It's not a memory

18    problem at all, but more of a -- just a

19    short-term memory kind of issue.  A little

20    bit like having a bucket with holes.  So you

21    put information in and it leaks out.

22          HEARING  OFFICER  BUTLER-TRUESDALE:

1      Can I interrupt just one second?  Excuse me,

2      I'm sorry.  I think I have a fair assessment

3      of who D███████ is at this time, but what

4      I'm trying to ascertain is if this witness is

5      going to provide me with information related

6      to who he is and what, if any, deficiencies

7      there were in the IEP, with respect to the

8      count set that you have here, I'm not certain

9      where she is falling into where would be the

10     findings of fact.

11              MS. WULKAN:  Well, I was going to

12     ask her about what she knows about, you know,

13     his experiences at SAIL, what kind of program

14     he has gotten and whether he -- etcetera.  I

15     was going to go to what her recommendations

16     were, but I can go first to that area and

17     discuss that with her.

18              HEARING  OFFICER  BUTLER-TRUESDALE:

19      Yes.

20              MS. WULKAN:  Yes, I was going to

21     go there.

22              HEARING  OFFICER  BUTLER-TRUESDALE:

 1    Okay.

 2              MS. WULKAN:  I was trying to lay a

 3    foundation, so you could know what the issues

 4    were.

 5              HEARING  OFFICER  BUTLER-TRUESDALE:

 6    Okay.  Okay.

 7              MS. WULKAN:  And what the sort of

 8    nature  of  the  severity  of  his  disability

 9    were.

10              HEARING  OFFICER  BUTLER-TRUESDALE:

11    Okay.

12              BY MS. WULKAN:

13         Q    And so, Dr. James?

14         A    Right.

15         Q    Did    you    discuss    D███████

16    experiences  at  SAIL  with  either  D███████  or

17    his parents?

18         A    I  did  with  his  mom.   So  the

19    information I have is through her, yes.

20         Q    And what did you learn about that?

21         A    Well,  one  of  the  things  that  she

22    was  concerned  about  was  his  rate  of  progress,

1    that he had not made as much progress in her

2    mind as, you know, he should have in the

3    years that he has spent there, because he was

4    apparently receiving services related to his

5    learning disabilities.

6              So she was concerned (A) about

7    rate of progress.  Also the kind of classroom

8    environment.  She, for example, told me that

9    he was in an open classroom and for a child

10   with -- you know, a learning disability would

11   also, particularly with ADHD and trouble

12   focusing and paying attention, to be in an

13   open classroom where there is a lot more

14   going on, many more things to be distracted

15   by and a lot more activity, that that would -

16   - that ended up being unsuccessful for him.

17       Q    And based on your -- you obviously

18   looked at his past testing.  You looked at

19   his level of progress and you testified that

20   he was not making progress commensurate with

21   what he was expected to make given his

22   cognitive abilities and given his -- given

1    the interventions.    So what could you

2    conclude about the program about his ability

3    to make progress in this particular program

4    that he was in from the time he was in first

5    grade getting special education until seventh

6    grade?

7              MR. DALTON:    Objection.    Excuse

8    me, Dr. James, please, wait until the Hearing

9    Officer rules on that objection before you

10   answer this question.

11             THE WITNESS:    Yes, sir.

12             MR. DALTON:    There is no

13   indication that this witness has any basis,

14   other than the mother's opinion about the

15   program to evaluate to serve as a basis for

16   an opinion by this expert.    Certainly hearsay

17   of hte parent would not be substituted for,

18   i.e., examination of the program, examination

19   of the testing or protocols that were given

20   to the chlid and the examination, the

21   teaching techniques.

22             Apparently, the witness has no

1    idea -- never spoke with the teacher.  You

2    never reviewed the program at the school.  So

3    how she can specifically give an opinion on

4    the program at SAIL, I don't know.

5        MS. WULKAN:  I believe that I have

6    laid the foundation and I asked her based on

7    her analysis of his progress over the period,

8    his academic progress, and knowing all that

9    she knows about it is that he was getting

10    special education services, does she feel

11    that he has made adequate progress.  And

12    that's the basis.

13        She can look at the testing and

14    she can say whether or not she thinks that

15    the program has provided the appropriate

16    interventions for him.  Not specifically what

17    interventions, but she can look at his

18    progress and say based on what I know it is

19    or isn't adequate progress.

20        MR. DALTON:  No, not with regard

21    to the program.  She might be able to testify

22    in her professional opinion, given what she

1  feels is the child's IQ, that he should be

2  further along based on that.  But not based

3  on the program, because she has no knowledge

4  of the program.

5          HEARING OFFICER BUTLER-TRUESDALE:

6  May I ask her a question?

7          MS. WULKAN:  Sure.

8          HEARING OFFICER BUTLER-TRUESDALE:

9  And I don't know how close it is to your

10  question, but --

11          MS. WULKAN:  That's fine.

12          HEARING OFFICER BUTLER-TRUESDALE:

13  Here is at least what I'm curious about.

14  Dr. James?

15          THE WITNESS:  Yes?

16          HEARING OFFICER BUTLER-TRUESDALE:

17  Given the evaluations, the extensive

18  evaluations that you have performed on

19  D███████ and the conclusions that you

20  ascertained from those evaluations, well, let

21  me step back.  Did you review petitioner's

22  IEP?

1          THE WITNESS:  Did I?  Yes, I did.

2          HEARING  OFFICER  BUTLER-TRUESDALE:

3  Reviewed, okay.  Given those evaluations and

4  results and your reviews of the IEPs, what,

5  if any, opinion did you form as a result of

6  the program that was described in the IEPs,

7  it's suitability for the petitioner and the

8  progress that he made, if he assumingly made,

9  if those IEPs were actually implemented?

10  That's the question that I have.  Now, I'm

11  not certain how close that is to what

12  Attorney Wulkan was asking you.

13          MS. WULKAN:  Fine.

14          HEARING  OFFICER  BUTLER-TRUESDALE:

15  But that is at least the question that I

16  have related to defining the fact that I need

17  to make.  Are you able to answer that

18  question?

19          THE WITNESS:  I will be able to

20  answer it.  And, I mean, I did review his IEP

21  and the IEP indicated that he was receiving

22  special ed classroom instruction.

1          HEARING OFFICER BUTLER-TRUESDALE:

2     Okay.  Now, let me ask you this.  I'm sorry.

3     And  I  apologize  for  keeping  interrupting

4     you, but I know I asked you actually a series

5     of  compound  questions.   So,  one,  how  many

6     IEPs did you review?

7          THE WITNESS:  One.

8          HEARING OFFICER BUTLER-TRUESDALE:

9     Okay.  All right.  So go ahead, finish your

10    question.  I'm sorry, finish your answer.

11         THE WITNESS:  So I did review his

12    most recent IEP and it indicated that he was

13    receiving  special  ed  classroom  instruction

14    and occupational therapy for an hour, speech

15    and  language  therapy  for  an  hour  and

16    accomodations  such  as  a  multi-sensory

17    approach, frequent breaks, oral response and

18    extended time.

19         And I would -- you know, in my

20    experience in working with children with this

21    type  of  learning  disability  and  with  the

22    cognitive potential that he shows as a child

1    with low average, a low average IQ.  As I

2    said, I would expect there to continue to be

3    a gap between his learning -- his academic

4    performance and his IQ, which is fairly

5    characteristic of kids with learning

6    disabilities.

7              But to be four years behind, three

8    to four years behind would be more than I

9    would expect given his neuropsychological

10   profile.

11             HEARING OFFICER BUTLER-TRUESDALE:

12   Just one second.  And how much -- from the

13   evaluations that you completed, how much of

14   that gap would you attribute to the

15   sufficiency of the IEP?

16             MR. DALTON:  Objection to the

17   Hearing Officer's question, just for the

18   record.

19             HEARING OFFICER BUTLER-TRUESDALE:

20   Okay.  Let me hear your objection, so I can

21   rule on it.

22             MR. DALTON:  Well, I mean, it goes

1    back to the fact that she admits that the

2    only thing that she knows about the program

3    is the IEP.

4                    HEARING OFFICER BUTLER-TRUESDALE:

5     Um-hum.

6                    MR. DALTON:  The IEP -- there has

7    been no demonstration that the IEP was even

8    intended to be implemented as written.  First

9    of all, it's our contention that it was

10   written at that level to accomodate the

11   parent.

12                   MS. WULKAN:  Objection.

13                   MR. DALTON:  So that private

14   placement could be accomplished.

15                   MS. WULKAN:  I object to any of

16   that argument.

17                   MR. DALTON:  No, I mean, it's very

18   critical.

19                   MS. WULKAN:  It's the IEP for the

20   child in the record.

21                   MR. DALTON:  Well, I mean, counsel

22   is going to make those comments until 5:00,

1    it doesn't change the fact that --

2              HEARING  OFFICER  BUTLER-TRUESDALE:

3    So you --

4              MR. DALTON:   -- it's written as a

5    prelude to transferring the child to a full-

6    time program.

7              MS. WULKAN:   Mr. Dalton is making

8    arguments.  I don't think -- see there is --

9              HEARING  OFFICER  BUTLER-TRUESDALE:

10   So wait a minute.  Let me.  Was this an

11   interim IEP?  No?

12             MS. WULKAN:   The thing with that

13   IEP is it's from '05.

14             HEARING  OFFICER  BUTLER-TRUESDALE:

15   Okay.

16             MS. WULKAN:   It's in the record,

17   '05 and '06.  Same as --

18             MR. DALTON:   Well, first of all,

19   they are not both in the record.  Only the

20   cover sheet is for '05.

21             HEARING  OFFICER  BUTLER-TRUESDALE:

22   Only the cover sheet for '05?

1        MR. DALTON:  Right.

2        HEARING  OFFICER  BUTLER-TRUESDALE:

3    '04/05?

4        MS. WULKAN:  It doesn't matter.  I

5    don't know where I left it.  I think to

6    answer your question or the problem, that's

7    the IEP that's in the record.  That's the

8    official IEP.  If Mr. Dalton is conceding

9    that they didn't implement that IEP, that's

10   fine.  He can say that.  Then we can ask her

11   questions about why the IEP is not

12   implemented.

13       HEARING  OFFICER  BUTLER-TRUESDALE:

14    Is that what you're conceding?

15       MS. WULKAN:  Did they implement

16   the IEP as written?

17       MR. DALTON:  What -- it's not

18   relevant for the purpose -- it has relevancy,

19   but in a different context not within the

20   context of this expert answering the

21   question, because it still goes back to the

22   program.

1          HEARING OFFICER BUTLER-TRUESDALE:

2     Um-hum.

3          MR. DALTON:  Okay.  And what I'm

4     saying is she doesn't have a sufficient

5     basis.

6          HEARING OFFICER BUTLER-TRUESDALE:

7     Oh, okay.  Knowledge of the program?

8          MR. DALTON:  Program.

9          HEARING OFFICER BUTLER-TRUESDALE:

10    Okay.

11         MR. DALTON:  She is making certain

12    assumptions based on the IEP written, based

13    on a full-time IEP that was written.  She is

14    assuming that given his intelligence as she

15    has measured it, that he should have made

16    more progress.  And what I am saying is I'm

17    objecting to that conclusion based on the

18    fact that it's based on the program.

19         HEARING OFFICER BUTLER-TRUESDALE:

20    Oh.

21         MS. WULKAN:  That is --

22         MR. DALTON:  Because it is not.

1          HEARING OFFICER BUTLER-TRUESDALE:

2    Okay.

3          MR. DALTON:  It is based --

4          MS. WULKAN:  It's argument.

5          HEARING OFFICER BUTLER-TRUESDALE:

6    What if I --

7          MS. WULKAN:  This isn't an

8    objection to a question that you asked.  This

9    is argument.

10          HEARING OFFICER BUTLER-TRUESDALE:

11    Okay.

12          MS. WULKAN:  He can save this for

13    his closing argument.

14          HEARING OFFICER BUTLER-TRUESDALE:

15    Okay.  Well, let me see if I can make you

16    both more comfortable, not that that is the

17    goal of this hearing, but let -- because I

18    think maybe my question was overly broad.

19    Maybe my question to her should have been

20    specifically related to the IEP plan and not

21    the program, but the plan.

22          MS. WULKAN:  You're talking about

1    the goals and objectives here?

2              HEARING OFFICER BUTLER-TRUESDALE:

3     Uh-huh.

4              MS. WULKAN:  Are you talking about

5    the outline?

6              HEARING OFFICER BUTLER-TRUESDALE:

7     Were the goals and objectives sufficient

8    based on her evaluation of the petitioner.

9              Dr. James?

10             THE WITNESS:  Yes.

11             HEARING OFFICER BUTLER-TRUESDALE:

12    Are you following us?

13             THE WITNESS:  I am.  I mean, I am

14   at a disadvantage, because I don't have the -

15   - an IEP in front of me.  I have my summary

16   of-- you know, it's not typical for me to

17   write in detail what is in the IEP.

18             HEARING OFFICER BUTLER-TRUESDALE:

19    Oh, I understand.

20             THE WITNESS:  So I'm sitting here

21   in front of my report.

22             HEARING OFFICER BUTLER-TRUESDALE:

1    I see.

2            THE  WITNESS:    But,  yes,  I  am

3    following.

4            HEARING  OFFICER  BUTLER-TRUESDALE:

5    Okay.   All  right.   So  you  are  actually

6    unable  to  answer  my  question  with  respect  to

7    --

8            THE  WITNESS:   Yes,  I  mean,  I  can't

9    answer  that  based  on  the  --  I  would  have  to

10   have  the  IEP  in  front  of  me.

11           HEARING  OFFICER  BUTLER-TRUESDALE:

12   Okay.   Okay.   No  problem.   No  problem.   I'm

13   going  to  return  you  to  Ms.  Wulkan.

14           Do  you  remember  where  you  where?

15           MS.  WULKAN:   Sort  of.

16           HEARING  OFFICER  BUTLER-TRUESDALE:

17   Okay.

18           BY  MS.  WULKAN:

19      Q    We  were  discussing  given  --  I'm

20   going  to  give  you  a  few  facts.   I'm  going  to

21   say  that  D████████  IEP  calls  for  full-time

22   special  education,  30  hours  a  week,  and  full-

1    time  special  education.    And  as  you  have

2    already    indicated    in    small    classes,

3    apparently, and he is -- he was to be getting

4    all the accomodations that you listed as well

5    as  the  occupational  therapy  that  you  had

6    talked about, the speech and language therapy

7    you talked about, and he was supposed to be -

8    - and they were supposed to be accomodating.

9              They      have      disability

10   classification  on  the  IEP  is  multiple

11   disability,  speech  and  language  impaired  and

12   learning  disability.    Those  are  the  facts

13   that you have before you.  If there is an IEP

14   that  was  developed  to  be  commensurate  with

15   that, if those services were actually being

16   delivered,  let's  assume  that  those  services

17   were  actually  being  delivered,  what  I  just

18   described  to  you  for  the  diagnosis  that  I

19   just described to you, would you assess that

20   his  progress  was  adequate  in  that  program

21   that  he  was  being  served  appropriately  in

22   that program?

1          If the outlines of the program

2     were as I gave you and the IEP as it was, was

3     being implemented, was the progress adequate?

4          A     No.

5               MR. DALTON:  Objection.

6               HEARING OFFICER BUTLER-TRUESDALE:

7      Okay.

8               MR. DALTON:  I mean, first of all,

9     there is no indication that this is the

10    facts.  She keeps saying it's the facts and

11    she wants to present it as a hypothetical

12    question, because it's an expert.  The rules

13    do provide for --

14               HEARING OFFICER BUTLER-TRUESDALE:

15     I thought you said --

16               MS. WULKAN:  Maybe I --

17               HEARING OFFICER BUTLER-TRUESDALE:

18     But I thought you were saying, let me finish

19     here, if in assuming?  I thought I heard if

20     and assuming in her question.

21               MR. DALTON:  I'm confused.  Is it

22     a hypothetical question?

212

1          MS.   WULKAN:        It's   not   a

2    hypothetical.   Those  are  the  facts.   That's

3    what's in the --

4          MR. DALTON:   Okay.   Well, she is

5    saying that's facts.

6          MS.  WULKAN:      --  IEP.   It's  in

7    evidence.

8          HEARING  OFFICER  BUTLER-TRUESDALE:

9     Okay.

10          MS.  WULKAN:    That's  what  is  in

11   evidence.   He has three hours of special ed.

12          HEARING  OFFICER  BUTLER-TRUESDALE:

13    Um-hum.

14          MS.    WULKAN:     This    is    his

15   disability classification.   This is what his

16   IEP  calls  for.    This  is  it.    It's  in

17   evidence.   This is what she reviewed.   This

18   is  what  she  just  testified  about.   And this

19   is  in  evidence.    If  you  look  at  the  IEP,

20   which is P-12.

21          HEARING  OFFICER  BUTLER-TRUESDALE:

22    Okay.

1          MS. WULKAN:    That's the one that

2    he has.

3          HEARING  OFFICER  BUTLER-TRUESDALE:

4     Okay.   And your objection is because, Mr.

5    Dalton?

6          MR.  DALTON:    She asked her to

7    assume that it was fully implemented and that

8    is not a fact.   That's an assumption.

9          MS. WULKAN:  Well, then I'm --

10         MR.  DALTON:    So  it  is  a

11   hypothetical.   It's not a fact.   I just want

12   to make sure --

13         MS. WULKAN:  Okay.

14         MR. DALTON:   -- along the basis of

15   my cross examination of this expert, I want

16   to  make  sure  that  the  expert,  first  of  all,

17   understands the question.

18         HEARING  OFFICER  BUTLER-TRUESDALE:

19    Um-hum.

20         MR.  DALTON:    That  it's  not  a

21   factual  question,  it's  a  hypothetical

22   question and that based on that hypothetical

1    question she gives an answer.  Fine.  Then I

2    have a basis to cross examine her.  Right

3    now, I have no such basis, because I don't

4    know what questions she is answering.

5            MS. WULKAN:  Well, then let's say

6    this.  If Mr. Dalton is going to stipulate

7    that it wasn't fully implemented, then I

8    don't think I really have to ask the

9    question, because we now know that it wasn't

10   fully implemented, therefore, he wasn't

11   getting an appropriate program.

12           If Mr. Dalton says it is fully

13   implemented, I'm giving him the benefit of

14   the doubt and I'm saying it was fully

15   implemented.  So do you think he has made

16   adequate progress.

17           HEARING OFFICER BUTLER-TRUESDALE:

18   Well, let's have her answer it both ways.

19           MS. WULKAN:  Okay.  Whichever --

20           HEARING OFFICER BUTLER-TRUESDALE:

21   Assuming that it was fully implemented and

22   assuming that it was not.

1          MS. WULKAN:  Okay.  Okay.  That's

2     fine.

3          HEARING  OFFICER  BUTLER-TRUESDALE:

4     In whatever degrees.

5          MS. WULKAN:  That's fine.

6          HEARING  OFFICER  BUTLER-TRUESDALE:

7     Okay.

8          BY MS. WULKAN:

9     Q     Okay.  Dr. James?

10         HEARING  OFFICER  BUTLER-TRUESDALE:

11    Dr. James, I'm sorry.  Okay.  Will you be

12    able  to  answer  the  question  under  both

13    scenarios?  Number one being assuming the IEP

14    --

15         THE  WITNESS:    I  can't  answer  a

16    question  related  to  whether  or  not  it  was

17    fully implemented.

18         HEARING  OFFICER  BUTLER-TRUESDALE:

19    I'm sorry, say that again.

20         THE  WITNESS:    I  can't  answer  a

21    question  as  to  --  because  I  don't  have

22    familiarity  with  the  program,  I  can't.    I

1    have no way of saying whether or not the

2    program was fully implemented, if you are

3    asking me that.

4                HEARING OFFICER BUTLER-TRUESDALE:

5    Oh, no.

6                THE WITNESS:  And the results.

7                HEARING OFFICER BUTLER-TRUESDALE:

8    I don't think Ms. Wulkan's question was

9    whether or not the program was fully

10   implemented.

11               THE WITNESS:  Okay.

12               HEARING OFFICER BUTLER-TRUESDALE:

13   But assuming that it was, what would have

14   been your expectations of the testing and

15   assuming that it wasn't fully implemented, it

16   being the IEP, what would have been your

17   expectations of the evaluations that you

18   performed?

19               THE WITNESS:  I think I can answer

20   the first question.  I don't think I can

21   answer the second.

22               HEARING OFFICER BUTLER-TRUESDALE:

1    Okay.  Okay.

2            THE WITNESS:  So if it was fully

3    implemented, then --

4            MR. DALTON:  Excuse me, Doctor,

5    Dr. James?  I'm sorry to interrupt you, but

6    that goes back to my objection.

7            HEARING OFFICER BUTLER-TRUESDALE:

8    Um-hum.

9            MR. DALTON:  Now that she has

10   confirmed what I thought, that she cannot

11   answer the question --

12           HEARING OFFICER BUTLER-TRUESDALE:

13   If the program --

14           MR. DALTON:  It's not --

15           HEARING OFFICER BUTLER-TRUESDALE:

16   -- has not been fully implemented.

17           MR. DALTON:  Right.

18           HEARING OFFICER BUTLER-TRUESDALE:

19   Um-hum.

20           MR. DALTON:  That this ends up

21   being a hypothetical question.  And as long

22   as we have an understanding that's a

1  hypothetical  question,  then  I  have  no

2  objection.    If  it's  not  a  hypothetical

3  question, then my objection remains the same.

4         MS. WULKAN:  If you don't mind my

5  poking  around,  let's  ask  --  let  her  do  the

6  first  one  and  then  I'll  poke  around  a  little

7  bit on the second one.

8         HEARING  OFFICER  BUTLER-TRUESDALE:

9  Okay.

10        MS.  WULKAN:    Because  I  think  we

11 can get an answer.

12        HEARING  OFFICER  BUTLER-TRUESDALE:

13 Okay.  All right.  Okay.

14        MS. WULKAN:  Okay.

15        HEARING  OFFICER  BUTLER-TRUESDALE:

16 Well, let me --

17        BY MS. WULKAN:

18    Q    Dr.  James,  can  you  answer  the

19 first one?  We're assuming that it is --

20        HEARING  OFFICER  BUTLER-TRUESDALE:

21 Well, let me just rule on his objection.

22        MS. WULKAN:  Fine.

1          HEARING OFFICER BUTLER-TRUESDALE:

2   I'm sustaining the objection, but I'm

3   expecting her to reword the second part of

4   the question.  Are we on the same page about

5   what the second part of the question is?  I

6   want to make sure we're --

7          MS. WULKAN:  Um-hum.

8          HEARING OFFICER BUTLER-TRUESDALE:

9   Okay.  All right.

10          MS. WULKAN:  Okay.

11          BY MS. WULKAN:

12      Q    So as to the --

13          MS. WULKAN:  Do we want her to

14   answer the first one?

15          HEARING OFFICER BUTLER-TRUESDALE:

16   Yes.

17          MS. WULKAN:  Okay.

18          HEARING OFFICER BUTLER-TRUESDALE:

19   I would like her to answer the first one.

20          BY MS. WULKAN:

21      Q    So, Dr. James, assuming that the

22   program that we just outlined was fully

1    implemented, has D~~ominique~~ made progress that

2    you would expect given the testing?

3         A    If   the   program   was   fully

4    implemented as outlined in the IEP, I would

5    have expected him to make more progress than

6    he has made.

7         Q    Okay.  Now, I'm just going to try

8    to rephrase that.  So assuming that if it was

9    fully  implemented,  he  would  have  made  more

10   progress.  If it wasn't fully implemented and

11   he   didn't   get   those   services   that   were

12   outlined, can't you conclude -- could you not

13   conclude that he clearly wouldn't make -- he

14   would  make  even  less  progress,  if  it  was

15   fully implemented?

16              MR. DALTON:  Objection.

17              MS.  WULKAN:    I  mean,  not  fully

18   implemented.

19              MR.  DALTON:   The  witness  already

20   stated she couldn't answer this question.

21              MS. WULKAN:  Well, I'm rephrasing.

22              HEARING  OFFICER  BUTLER-TRUESDALE:

1       I think she -- I think that was a different

2   question than the first one.

3              MR. DALTON:  Well, clearly, to the

4   extent that I don't believe it was, I mean,

5   she was --

6              HEARING  OFFICER  BUTLER-TRUESDALE:

7   I mean, I think that that was different than

8   the second prong of the question before.  Can

9   you repeat it for me, please?

10             THE WITNESS:   Could you, please,

11  repeat that question?

12             BY MS. WULKAN:

13      Q     Yes.  Presuming that you have this

14  IEP and the outline that we talked about, the

15  full-time  special  ed,  you  know,  the  60

16  minutes of OT, the 60 minutes of speech and

17  language, presuming that that actually didn't

18  get delivered at SAIL, just presuming for a

19  minute that that --

20             HEARING  OFFICER  BUTLER-TRUESDALE:

21  Right.  The opposite of the hypothetical.

22             BY MS. WULKAN:

1      Q      The opposite of the hypothetical.

2    It didn't get delivered at SAIL.  Would you

3    expect him to make more or less progress than

4    he made?

5      A      I can't answer that question.

6      Q      Okay.  Okay.  So, Doctor, how, if

7    at all, do you think this lack of progress

8    has affected D████████ from both an emotional

9    and an academic standpoint?

10     A      Well, I mean, right now, he is

11   rising.  I mean, he's a rising eighth grader

12   now and he -- with skills that are between a

13   second and fourth grade level.  So, I mean,

14   he is at a very significant disadvantage in

15   comparison to his age peers.  As he gets

16   older, this is a very critical time for him

17   academically, as he is moving on and the

18   information that he is going to be receiving

19   is much more demanding, much more complex.

20         So he is going to struggle much

21   more academically, because there is lost --

22   there has been sort of lost learning and lost

1    time there for him.  And there -- we feel

2    it's important to intervene as early as

3    possible.  And now, we're getting to a point

4    for him where that's very difficult, because,

5    you know, he is now getting quite a bit

6    older.

7                And I think emotionally it falls

8    around -- the same kinds of consequences are

9    happening and he is experiencing this gap

10   between, you know, we're seeing his ability

11   and what he is actually accomplishing and

12   what he is able to do.  It's extraordinarily

13   frustrating.

14               It's always more frustrating the

15   more cognitive awareness you have of that and

16   that, I think, is manifested clearly in the

17   report of -- that we see parent and teacher

18   and self-report of the kinds of anxiety

19   symptoms he is experiencing.  And talking

20   about somatic kind of complaints, headaches,

21   stomach aches, the kind of things that don't

22   have any medical basis, that are often an

224

1    indicator that that child is anxious and

2    feeling overwhelmed.

3        Q    Doctor, did you make any

4    recommendations?

5        A    Yes, I did.

6        Q    Can you discuss those, please?

7        A    What would you like me to talk

8    about?  Would you like me to talk about them?

9        Q    Yes.  I could ask you more pointed

10    questions.

11        A    Okay.

12        Q    I know that there are three or

13    four pages of them.

14        A    Yes.

15        Q    So I'll try to summarize it a

16    little bit.  The recommendations in terms of

17    his academic programming, what kind of a

18    program do you think he needs?  What kind of

19    a school setting do you think he needs?

20        A    Right.  So in order to address the

21    overall kind of issues around his attention

22    and his executive functioning, so his

1    organizational skills, working memory,

2    etcetera, he needs to be in a setting that's

3    highly structured, small, low student to

4    teacher ratio and with -- addressing all

5    aspects of his executive skills.

6           So for example, a very organized

7    approach to teaching where he is being

8    presented with a framework before he actually

9    is addressing the material. So there is a

10   way for him to make sense of it, a way for

11   him to understand it and routines around

12   problem solving and really helping him to do

13   some planning and goal setting within the

14   classroom setting.

15          So he needs that kind of

16   environment that is structured and small,

17   because that allows for more individualized

18   attention and makes it easier for a child

19   with problems with sustaining and focusing

20   his attention to really be able to grasp all

21   of the information and instructions he needs

22   to be successful.

1          I think secondly, given the extent

2     of the learning disabilities that he has that

3     he needs a very systematized and specialized

4     instruction in those areas, in reading, in

5     math, in written expression.   And there is

6     quite a bit of research to support a daily

7     systematized reading instruction, phonics-

8     based, that focuses on reading fluency and

9     oral reading and also addresses written

10    language and written expression and

11    organizing that.

12          Mathematics would be similar in

13    terms of really specialized instructions,

14    special teachers who have knowledge and

15    experience in working with children with

16    Dominique's profile and using special

17    techniques of teaching math.   And helping him

18    to organize for higher level kinds of

19    mathematical problems, like word problems,

20    which are going to be more difficult for him.

21         Q    And with regard to his executive

22    functioning problems, what would need to be

1    done with regard to remediating those?

2         A    That is really in the -- what I

3    outlined initially.

4         Q    The academic programming part of

5    it?

6         A    Yes, the kind of program that is,

7    you know, smaller, that is highly structured,

8    that really focuses on setting up a framework

9    for him, so really increasing organization.

10   I'm sure if the information is presented to

11   him systematically in smaller more manageable

12   chunks, particularly when it is new

13   information, that there is made --

14   connections are explicitly made between, you

15   know, what is he learning today and what he

16   was learning last week.

17        He is likely to have difficulty

18   with integrating information and that's what

19   we see in higher level academic skills.

20   That's what's an important part of higher

21   academics, like reading comprehension, like

22   mathematical reasoning where you are not --

1    where you really need to know what is

2    important, what's not important, can I see

3    the big picture.  That's what's going to be

4    more difficult for him, because of his

5    executive functioning weakness in

6    organization and working memory like I

7    outlined it.

8        Q    Okay.  Dr. James, would a school

9    where there would be children with a primary

10   diagnosis of emotional disturbance and

11   behavior problems be appropriate for

12   D̶e̶m̶i̶n̶i̶g̶u̶s̶

13       A    No.  I would say that would not be

14   appropriate for him, because his primary

15   issue is one of learning and academics.  And,

16   you know, the secondary issue or considered

17   in tandem would be the attention

18   organizational executive issues, not

19   emotional or behavioral.  I think any kinds

20   of emotional kinds of things that he would be

21   experiencing are really more internal kinds

22   of things.

1          Like I described anxiety and I

2  think secondary and come out of frustration

3  about his learning.    In a classroom for

4  children with emotional and behavioral

5  disturbance, that's their primary issue.    And

6  you really see more acting out behaviors as

7  opposed to the types of behavior that we see

8  and D████████ behavior is in any -- over

9  these areas that I am describing are actually

10 quite mild.

11         So the primary concern is

12 learning, not behavior.

13     Q    Did you make any recommendations

14 with regard to any interventions, medical or

15 otherwise, for his ADHD?

16     A    Yes.    I recommended that, I'm just

17 going back to -- I did recommend that he --

18 that psychopharmacological management be

19 considered for him through medication such as

20 a stimulant to help manage his attention and

21 help him have greater focus.

22     Q    Are you aware whether -- I'm

230

1  sorry.   Are you aware of whether the parent

2  has D████████ --

3        A    Yes, I'm saying I'm aware that I

4  believe that he has been started on a

5  stimulant.

6        Q    And, Doctor, what do you think the

7  effect would have been on D███████ if school

8  would have started a couple of days ago and

9  he had no place to go to school?  What do you

10  think that would have done to him in terms of

11  his emotional status that you were talking

12  about, his anxieties, his vulnerabilities?

13        A    I mean, I think that that would

14  have had a detrimental effect on him

15  emotionally, behaviorally, not knowing where

16  he was going to be and what kind of setting.

17  I mean, for him, especially when you have a

18  child with any kind of attention problem and

19  some of these executive issues, as I have

20  been describing, structured environments are

21  much better for them.

22        And so to be in a limbo where, you

1    know, there really is no -- there is nothing

2    to definitive for him would be detrimental

3    and he would be, you know, missing out.

4    Everyone else would be going to school and he

5    is not.  I think for a child of his age that

6    has to have a negative impact upon his self-

7    esteem.

8           MS. WULKAN:   I don't have any

9    further questions.  Thank you.

10          HEARING OFFICER BUTLER-TRUESDALE:

11   Um-hum.  Cross, Mr. Dalton?

12          MR. DALTON:  Yes.

13          THE WITNESS:   I do actually have

14    to go.  You are aware that at 1:00 I have to

15    go to another meeting?

16          MR. DALTON:   We'll have to

17    continue the hearing.  I have to have an

18    opportunity to cross.

19          THE WITNESS:  Okay.

20          HEARING OFFICER BUTLER-TRUESDALE:

21   Okay.

22          MS. WULKAN:   How long are you

1    going to be, Mr. Dalton?

2           THE WITNESS:    Can you give me a

3    sense of that, please, because that was the

4    reason that I was available between 11:00 and

5    12:00.

6           MR. DALTON:    Counsel was aware of

7    the time that this witness was available and

8    chose to have her direct last until -- the

9    entire time, thus effectively robbing me of

10   the opportunity to cross.

11          MS. WULKAN:    I'm more than happy.

12    If you could just give us an estimate, Mr.

13   Dalton, we'll see if we could work it out.

14          MR. DALTON:    Well, 15 minutes to

15   half an hour.

16          HEARING OFFICER BUTLER-TRUESDALE:

17    Do you want to talk with your witness to see

18   how long she can be available or what, if any

19   time, we can call her back?

20          MS. WULKAN:    Or if she is

21   available later on, too.

22          HEARING OFFICER BUTLER-TRUESDALE:

1   Um-hum.

2          MS. WULKAN:   Dr. James, I'm going

3   to pick up the phone and talk to you.

4          THE WITNESS:  Okay.

5          MS.  WULKAN:   Hi.   Mr.  Dalton

6   thinks he is going to have 15 to 30 minutes.

7   Is it possible that we could do that now or

8   would it be better later?  You're in a lot of

9   trouble, because -- okay.

10         What time can I call you back that

11  you would be on a break this afternoon?   At

12  4:00?  Okay.   We'll call you back.  On that

13  same  number,  that  (301)  number  or  on  your

14  pager?  We'll page you.  Okay.  Okay.  Okay.

15  Gotcha.   Gotcha.   Okay.   Thank you very

16  much.   We'll call you back at 4:00.   Thank

17  you.  Um-hum.  Bye, bye.

18         HEARING  OFFICER  BUTLER-TRUESDALE:

19  Okay.  Who is your next witness?

20         MR. DALTON:   I  would  like  to

21  object to the unavailability of the witness.

22  I realize --

1          HEARING  OFFICER  BUTLER-TRUESDALE:

2     And we learned after direct.

3          MR.  DALTON:   Yes,  because  now  it

4     will  be  three  hours.   My  recall  of  the

5     testimony will have been diminished and --

6          MS.  WULKAN:   I  went  to  this  with

7     the  stricture  that  we  started  at  12:00.   We

8     probably  didn't  start  until  about  12:20,  by

9     the  time  we  got  on  the  phone.   We  were  eating

10    lunch,  etcetera.   And  I  did  my  cross

11    examination.   I  said  right  before  hand  that

12    she  was  --  needed  to  be  out  or  finished  at

13    1:00, before we even started then.

14          MR.  DALTON:   Right.   And  she  went

15    right up --

16          MS.  WULKAN:   I  would  object  on  --

17          MR.  DALTON:    --  to  that  time  on

18    her  direct  not  leaving  me  any  time  at  all.   I

19    think  that  is  highly  prejudicial  to  my  client

20    and  for  me  to  request  15  to  20  minutes  for

21    cross  is  not  out  of  line  at  all.

22          MS.  WULKAN:   It's  not  out  of  line.

1    I agree with you, but what's the problem

2    with her doing it at 4:00?

3              MR. DALTON:  Well, turn the table

4    on counsel if she had to wait three hours, it

5    would be prejudicial to her client.  This is

6    her expert.

7              HEARING OFFICER BUTLER-TRUESDALE:

8    You know, I understand your motion.  I don't

9    know what my alternatives are.  What

10   alternatives are you asking me to consider?

11             MR. DALTON:  I think my client is

12   prejudiced.  I don't know that there is

13   anything you can do that -- to eradicate the

14   prejudice, other than striking the testimony.

15             MS. WULKAN:  Mr. Dalton doesn't

16   have an opportunity to cross examine, we can

17   argue about this for the next 15 minutes and

18   get ourselves into a position where we won't

19   even be ready to cross examine at 4:00.  This

20   is basically a couple of hour delay between

21   her direct and her cross.  I don't think that

22   there is much prejudice involved.

1          MR. DALTON:    The last time I

2     checked 1:00 to 4:00 was three hours not a

3     couple of hours.

4          MS. WULKAN:  Okay.

5          HEARING OFFICER BUTLER-TRUESDALE:

6     Well, what I can do is if we are all

7     amenable to that, I can give counsel the

8     opportunity.  We can stop at 3:00 and give

9     counsel the opportunity to listen to the

10    testimony over again, just immediately before

11    the cross, but we would then lose an hour,

12    because I would be giving him from 3:00 to

13    4:00 to --

14         MR. DALTON:    I just need to put

15    the Hearing Officer on notice that if this

16    goes over today, I am not available the rest

17    of this week.   It will have to be sometime

18    next week.  I can't help my schedule, but my

19    schedule is completely blocked for this week.

20         HEARING OFFICER BUTLER-TRUESDALE:

21    Well, let me ask you this.  How many other

22    witnesses do you have?

1          MS. WULKAN:   Two other witnesses.

2    Someone   from   Katherine   Thomas   and   the

3    parent.

4          HEARING   OFFICER   BUTLER-TRUESDALE:

5    Okay.

6          MS. WULKAN:   If we --

7          HEARING   OFFICER   BUTLER-TRUESDALE:

8    Are  we  able  to  --  I'm  wondering  if  we  are

9    able  to  get  through  those  two  witnesses

10   before 3:00?

11         MS. WULKAN:   Sure.

12         HEARING   OFFICER   BUTLER-TRUESDALE:

13   So  that  Mr.  Dalton  has  the  opportunity  to

14   listen to the direct.

15         MS.  WULKAN:    I  will  try.    If

16   that's  what  Mr.  Dalton  needs  to  do,  if  he

17   didn't  take  good  enough  notes,  then  he  needs

18   to  listen  to  it  again,  then  we'll  be  happy  to

19   have  him  listen  to  it  again  if  he  can't  hold

20   it for the next three hours.

21         HEARING   OFFICER   BUTLER-TRUESDALE:

22   Okay.  All right.

1          MS. WULKAN:  I'm happy to do that.

2          HEARING  OFFICER  BUTLER-TRUESDALE:

3   All right.  Let's try that.

4          MS. WULKAN:  I'll try.  I don't

5   know whether I'll do that, but I'll see how

6   long his cross examination is and my direct

7   examination is not that long.

8          HEARING  OFFICER  BUTLER-TRUESDALE:

9   Okay.

10         MS. WULKAN:  I'm assuming he is

11  not cross examining Katherine Thomas, since

12  he stipulated that Katerine Thomas could

13  provide educational benefits, I'm assuming he

14  is not going to cross examine there.  So that

15  witness should be relatively short.

16         HEARING  OFFICER  BUTLER-TRUESDALE:

17  And I think I can facilitate us reaching

18  that goal if we don't take the 1:15 and the

19  3:15 or 2:15 break.  If we don't take those

20  breaks.  But I am going to have to stop to go

21  get my glasses.  I can barely read this.  And

22  I was really too vain to do this.

1          MR. DALTON:    I need a two minute

2     break.

3          HEARING  OFFICER  BUTLER-TRUESDALE:

4     You need a break anyway.  Okay.  So let me

5     go get my glasses.  I'll come back in and

6     we'll start over.  Okay.  All right.

7          (Whereupon,  off  the  record  for  a

8     recess.)

9          MS.  WULKAN:    Okay.    So  we're

10    calling Debbie Lourie from Katherine Thomas.

11         HEARING  OFFICER  BUTLER-TRUESDALE:

12     Okay.

13         MS.  WULKAN:    Telephone  number

14    (301)   738-9691   and,   apparently,   it's

15    extension 100.

16         HEARING  OFFICER  BUTLER-TRUESDALE:

17     Okay.

18         MS.  WULKAN:    And  ask  the  front

19    desk to get them for you.

20         OPERATOR:    Thank you for calling

21    The   Treatment   and   Learning   Centers,   the

22    Katherine Thomas School and the Early --

1          MS. WULKAN:  100.

2          HEARING  OFFICER  BUTLER-TRUESDALE:

3   Oh, I hit zero for the receptionist.

4          OPERATOR:  One moment, please.

5          OPERATOR:        Katherine    Thomas

6   School.  How may I help you?

7          HEARING  OFFICER  BUTLER-TRUESDALE:

8   Yes.  Good afternoon.  Could I get extension

9   100?

10         OPERATOR:  Okay.

11         MS.  WULKAN:    I  think  we're  just

12  going to ask for Debbie Lourie.

13         HEARING  OFFICER  BUTLER-TRUESDALE:

14   Oh, Debbie Lourie.

15         OPERATOR:  Yes.

16         OPERATOR:  Front  desk.  May  I  help

17  you?

18         HEARING  OFFICER  BUTLER-TRUESDALE:

19   Yes, I'm trying to reach Debbie Lourie.

20         OPERATOR:    Okay.    One  moment,

21  please.

22         MS.  WULKAN:   Do  they  still  have  a

1    program where they train students on their

2    own phones?

3            MR. DALTON:  Yes.

4            MS. LOURIE:   Hello.   This is

5    Debbie.

6            HEARING OFFICER BUTLER-TRUESDALE:

7    Hi.  Ms. Lourie?

8            MS. LOURIE:  Yes.

9            HEARING OFFICER BUTLER-TRUESDALE:

10   This is Tonya Butler-Truesdale and I am the

11   Hearing Officer in the case for Dominique

12   Hawkins.  Are you ready to participate in the

13   hearing?

14           MS. LOURIE:  Absolutely.

15           HEARING OFFICER BUTLER-TRUESDALE:

16   Great.  I'm going to swear you in and then

17   you're going to spell your full name for the

18   record and then Ms. Wulkan will ask you a

19   couple questions.  Okay?

20           MS. LOURIE:  Okay.  Thank you.

21           HEARING OFFICER BUTLER-TRUESDALE:

22   Okay.  Would you raise your right hand,

1    please?

2            MS. LOURIE:  Okay.

3    Whereupon,

4            DEBORAH LOURIE

5    a  witness,  was  called  by  Counsel  for  the

6    Petitioner,  and having  been  first  duly  sworn,

7    was  examined  and  testified  as  follows:

8            HEARING  OFFICER  BUTLER-TRUESDALE:

9    And  I'm  assuming  you're  in  an  isolated  room,

10   right?

11           THE  WITNESS:  I am.

12           HEARING  OFFICER  BUTLER-TRUESDALE:

13   Okay.    And  would  you  spell  your  full  name

14   for  the  record,  please?

15           THE  WITNESS:  Deborah,  D-E-B-O-R-

16   A-H.   Last  name  is  Lourie,  L-O-U-R-I-E.

17           HEARING  OFFICER  BUTLER-TRUESDALE:

18   Your  witness.

19           MS.  WULKAN:   I'm  going  to  refer

20   the  Hearing  Officer.   If  you'll  just  hang  on

21   one  second,  Ms.  Lourie.

22           THE  WITNESS:  Of  course.

1      MS. WULKAN:   I'm going to refer

2  the Hearing Officer to the -- I believe it's

3  the letter of acceptance to Dr. Piegler, sent

4  to Dr. Piegler, it was cc'ed to Mr. Dalton on

5  August 1, 2006.  That's P-5.

6      HEARING  OFFICER  BUTLER-TRUESDALE:

7  Um-hum.

8      MS.  WULKAN:    And  then  the

9  Katherine Thomas program information we have

10  submitted at P-14 and the acceptance letter

11  to Katherine Thomas is P -- from Katherine

12  Thomas is P-15.  I believe those are the

13  appropriate documents.

14      HEARING  OFFICER  BUTLER-TRUESDALE:

15  5, 14, 15?

16      MS. WULKAN:  Correct.

17      HEARING  OFFICER  BUTLER-TRUESDALE:

18  Okay.

19      MS.  WULKAN:   Okay.  Thank  you.

20  Thank you.

21          DIRECT EXAMINATION

22      BY MS. WULKAN:

1      Q    Sorry, Ms. Lourie.

2      A    No problem.

3      Q    You're not going to let it offend

4  you.  Ms. Lourie, what is your occupation?

5      A    I am the admissions coordinator at

6  the Katherine Thomas School.

7      Q    And what is your background?

8      A    I'm a social worker.  I was -- I

9  have been a social worker for 13 years and

10  worked with kids in a variety of capacities

11  for -- in schools for learning and language-

12  based disabilities, emotional disabilities, a

13  variety of different things.

14      Q    And how long have you been

15  employed by Katherine Thomas?

16      A    Almost two and a half years.

17      Q    Um-hum.  And can you describe what

18  your position as director of admissions?

19  What do you do as director of admissions for

20  Katherine Thomas?

21      A    Of course.  Basically, my

22  responsibilities include I review records for

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    www.nealrgross.com

1    all the students coming in to determine

2    whether a student is appropriate for our

3    school.  So I'm reviewing to make sure that

4    students have learning and language-based

5    disabilities that are moderate to severe,

6    that they are not coded as emotionally

7    disabled and they are not coded as mentally

8    retarded.

9           I review the records for clinical

10   information, as well as any of the learning

11   and language-based disabilities and once I do

12   that, I set them up for a visit to the

13   school.

14          Q    Okay.  And did you do that in

15   D███████ H██████' case?

16          A    Yes, I did.

17          Q    Okay.  And what information did

18   you receive and review with regard to

19   D████████?

20          A    Sure.      I reviewed a

21   neuropsychological evaluation from March of

22   2006, a speech and language report from '05,

1    an IEP from '05 and an OT assessment from

2    '05.

3            Q    Okay.  And based on that review of

4    those records, did you decide to give

5    D███████ an admissions interview?

6            A    Yes, absolutely.  He had a lot of

7    the qualities that would make him a good

8    candidate for our school.  You know, clearly,

9    he has difficulty with reading, executive

10   functioning, things such as that, so we did

11   set up a visit for July 24th and July 25th of

12   the summer.

13           Q    And during the summer, do you have

14   an extended school year program going on?

15           A    We do.  It's called the Learning

16   Enrichment Program.  We have our students

17   that are funded, typically, have their ESY

18   here, but it's also a camp for outside

19   students, so they do academics in the morning

20   and we can assess them during that time

21   period.

22           Q    Okay.  And so when D███████ came

1    in, did you meet with D████████?

2    A    I did.  I met with D███████ and

3    his mother.  I greet -- you know, I typically

4    greet  the  kids  and  bring  them  into  their

5    classrooms,  show  them  around  so  that  they

6    feel  comfortable  in  the  school,  and  then

7    check in through various parts of the day.

8    Q    Um-hum.  Okay.  Now, I want to go

9    back  to  a  little  bit  of  a  description  of

10   Katherine Thomas.  What sort of program would

11   he  be  going  in?   Is  there  a  lower  school,

12   middle  school,  upper  school?   What  --  he is

13   going into eight grade.

14   A    He is in eighth grade.  He is in

15   the middle school program.

16   Q    Okay.

17   A    To  sort  of  tell  you  a  typical  day

18   in the middle school, you know, we follow the

19   typical,  the  Maryland  State  Voluntary

20   Curriculum.  We have English language, arts,

21   math, science, technology.

22   Throughout  the  day  we  do  mix  in  a

1    lot of different things, because all of our

2    kids have those moderate to severe learning

3    and language-based disabilities, so once a

4    week they get pragmatics.  Some students this

5    semester will be getting technology, that's

6    where D████████ would be, and then reading

7    for a whole semester as a class.

8         The technology works on different

9    programs for reading and software.  He gets

10   PE, social studies and also a class on study

11   skills specifically, which will really help

12   him because of his executive functioning

13   difficulties and organizational difficulties.

14        Q    And --

15        A    They also get arts, music, drama

16   mixed in their day.  So they get also the

17   arts component of the school, which I think

18   since I reviewed the IEP from SAIL, you know,

19   arts is also something that he excels in.

20        Q    Okay.  What are the size of the

21   classrooms, the classes that he would be in?

22        A    Absolutely.  The small classes are

1   really good for D▬▬▬▬.    He is in a

2   classroom of 10 with a teacher and teacher

3   assistant, but on top of that we have all of

4   our related service staff on-site.

5            So we have six full-time speech

6   and language pathologists and two part-time,

7   four occupational, full-time occupational

8   therapists and two part-time.    And we also

9   have social workers, three of those, and

10  part-time counselors.    So sometimes you can

11  have even more in a class, because they

12  integrate in and out of the class.

13           They do pull-out and they

14  integrate in.    So at a minimum you're going

15  to have 10 students with a teacher and

16  teacher assistant, but it can also be much

17  higher than that in a classroom.

18       Q    Can you explain what you mean by

19  the related service staff integrate into the

20  classroom?

21       A    Absolutely.    It varies for every

22  single student.    We individualize.    We follow

1    the current IEP definitely for the first 45

2    to -- you know, 45 days just to assess where

3    students are at.

4              But when we talk about integrating

5    in, it can vary.  If a child needs something,

6    let's say it's a pragmatics issue, they may

7    pull out and do that in a small group, a diad

8    or a triad, and then they may practice that

9    skill inside of a class or at lunchtime.  It

10   sort of depends on the varying needs.

11             If it's OT, a fine motor skill

12   issue, instead of pulling them to our

13   occupational therapy rooms, they will go into

14   the classroom and help them during a writing

15   exercise or a typing exercise to help them

16   fine tune those skills in an area that will

17   be useful for them.

18        Q    Okay.

19        A    Does that answer?

20        Q    Yes, it does.  Are teachers

21   certified in special education, qualified?

22        A    Yes.  They are either certified in

1    special education or they are working their

2    provisional license, so they have either/or.

3         Q    And are they all specialists in

4    either speech and language impairment or

5    learning disabilities?

6         A    Well, the teachers are getting

7    certified in special education.

8         Q    Right.

9         A    So they should all know the area

10   of special education, but the speech and

11   language pathologist would be for the speech

12   and language or the occupational therapist

13   for the occupational therapy, etcetera.

14        Q    You said that you have reviewed

15   D█████████ IEP and these evaluations.    Are

16   D█████████ demonstrated deficits in speech

17   and language impairment, learning

18   disabilities, attention issues and executive

19   functioning issues, are they consistent with

20   the other kids that would be in his class?

21        A    Absolutely.    You know, in our

22   school, it's a small school environment and I

1    don't want to repeat myself too much, but

2    it's moderate to severe learning and

3    language-based difficulties, so they can be

4    varying, but many of them have very similar

5    difficulties that D███████ has that is the

6    strength of our programs.

7         So, you know, as I said, for

8    attention and executive functioning, you

9    know, we have classes sort of organized to

10   help deal with that at the end of the day and

11   for poor auditory attention, having a small

12   class ratio so that he can focus more.

13        And I think that's really

14   important for him, and just teaching a very

15   hands-on multi-sensory approach because he is

16   a kid that has strength in some visual-

17   perception skills. If he doesn't get taught

18   in, you know, a multi-sensory way or it's

19   hands-on auditory visual, all different

20   types, he could lose pieces of information,

21   so we definitely -- a lot of our kids have

22   those difficulties.

253

1        Q    Can    your    school    implement

2  D███████ school time special education IEP

3  that  he  has  currently  there,  that  he

4  currently has now?

5        A    Yes, he can.

6        Q    Okay.

7        A    I mean, we can, I should say.

8        Q    Yes.  And can you describe what

9  your  or  the  teachers'  impressions  were  of

10  D███████ when he came on for that visit?

11        A    Absolutely.  Well, when I met with

12  him and he came in and I -- I think when he

13  came  in  the  door,  he  appeared  very  shy  and

14  somewhat  reserved.  We  felt  that  when  he

15  entered the program, he seemed really eager

16  to be in the classroom, to learn and try to,

17  you  know,  adjust  to  the  routine  in  the

18  classrooms and interacting.

19        I think just the things that we

20  noted, you know, he requires help with some

21  social cues, verbal and nonverbal languages.

22  I  think  that,  you  know,  because  of  his

1  language-based disability, he has some

2  difficulty following some of the social

3  interactions, so we felt like this was, you

4  know, a good place because people could help

5  him with sort of directing him with that.

6         So those are some of the basics, I

7  think, of what we saw when he came here and

8  he also was benefitting from that very multi-

9  sensory approach.

10    Q    And did he have any problems with

11 any of the other students or did he seem to

12 fit into the population emotionally in that

13 way?

14    A    He seemed to fit into the

15 population very well. You know, a couple of

16 other things, he has difficulty sort of

17 staying on task, so sort of helping him with

18 that.    I think that what people probably

19 recognized is he visually looks around to

20 figure out what the social cues are in -- I

21 think because he misses some of the nuances

22 of things.

1          So I think at our school we have a

2    population, I would say, the best way for me

3    to describe it is slightly -- a little --

4    slightly naive, a little behind maybe and a

5    very gentle group.  And so I think, you know,

6    it's good for him because he has social peers

7    that I think will be able to work with him,

8    because one of the things -- and I apologize.

9          We did get a teacher evaluation

10   form.  I apologize.  I think you had asked

11   what forms I had gotten, but part of our

12   admissions process is the teacher evaluation

13   form.

14        Q    Um-hum.

15        A    And one of the things they said --

16        Q    From SAIL?

17        A    -- was an idea that he gets very

18   sensitive.  He sort of stands out and he

19   doesn't quite know what to do in social

20   situations, and so this is good for him

21   because he has peers that he can interact

22   with and he won't get targeted or --

1    Q    When you say that you got a
2    teacher evaluation form that said that he
3    stands out, doesn't know what to do, was that
4    from SAIL?
5    A    Yes.
6    Q    Okay.  And based on his interview
7    and your observation of him over the time
8    that he was visiting and your review of the
9    records, was D████████ admitted to your
10    program?
11    A    Yes, he was.
12    Q    And you sent a letter of
13    acceptance?
14    A    Yes, we did.
15    Q    Okay.
16    MS. WULKAN:  I would refer you to
17    that for the record.
18    HEARING OFFICER BUTLER-TRUESDALE:
19    Um-hum.
20    BY MS. WULKAN:
21    Q    And did D████████ actually -- has
22    D████████ actually started at Katherine

1    Thomas?

2          A      He did, he started.    He has been

3    here since the 20th, since Monday.

4          Q      Okay.    And can you tell us over

5    the, approximately, two days that he has been

6    there what, if anything, you or the teachers

7    have noticed with regard to his adjustment to

8    the program?

9          A      I think that they think -- you

10   know, as I was saying, I think he fits in

11   very well.    I think they had noted some

12   attentional issues, trying to keep him sort

13   of focused and redirected and on task.

14              And I think that picking up again,

15   I mean, not to keep repeating, but some of

16   the social awareness, trying to sort of

17   navigate the social awareness system, picking

18   up on verbal and nonverbal, sort of needs

19   some help within those areas, but seems to be

20   doing really well within the academic portion

21   of the program, understanding the work and

22   following along.

258

1        Q    Now,  D████████,  most  of  his

2  academic  grade  levels  tested  out  somewhere

3  between  the  --  around  the  second,  third  grade

4  level,  maybe  slightly  up  to  the  fourth  grade

5  level  in  math.

6              Is  that  sort  of  commensurate  with

7  the  other  students  in  your  program?

8        A    Yes.  He  is  grouped  accordingly  to

9  where  his  levels  are.  I  mean,  we  have  kids

10  with  varying  levels,  but  we  definitely  have

11  kids  on  levels  where  he's  at.

12       Q    Okay.  And  do  you  feel  that  you

13  can  meet  his  educational  needs?  You  said

14  that  you  read  the  neuropsychological,

15  correct,  Dr.  James'  neuropsychological?

16       A    Yes.

17       Q    And  do  you  believe  that  you  can

18  meet  his  educational  needs  that  are  outlined

19  in  the  neuropsychological?

20       A    I  really  do,  I  think  for  various

21  reasons.  You  know,  he  needs  daily  reading

22  and  we  can  provide  that.  We  have  two  reading

1    specialists on staff, you know, staff trained

2    in Orton-Gillingham and Wilsons, some of the

3    sort of recommendations that she put on books

4    on tape.

5          We    have    a    lot    of    those

6    accommodations, AlphaSmart and neighbor kids

7    have those.  We have them at the school, just

8    the small, individualized attention again.

9    So if he needs, you know, stuff like exams

10   read to him orally, those are some of the

11   recommendations, those are things that we can

12   do for him.  So I definitely think so and,

13   again, a hands-on approach is what he needs.

14        Q    So do you --

15        A    A multi-sensory hands-on approach.

16        Q    Do you think that D███████ could

17   benefit from -- can benefit from a placement

18   at Katherine Thomas?

19        A    Absolutely.  I think it's an ideal

20   spot for him.

21        Q    Okay.

22        MS.   WULKAN:    I   have   nothing

1    further.

2              HEARING OFFICER BUTLER-TRUESDALE:

3    Cross, Mr. Dalton?

4              MR.    DALTON:      (No    audible

5    response).

6              HEARING OFFICER BUTLER-TRUESDALE:

7    Thank you so much for your time, Ms. Lourie.

8              THE WITNESS:  Oh.

9              HEARING OFFICER BUTLER-TRUESDALE:

10   We appreciate it.

11             THE WITNESS:  Thank you so much.

12             MS. WULKAN:  Thanks.

13             THE WITNESS:  Take care.

14             MS. WULKAN:  Bye-bye.

15             THE WITNESS:  Bye.

16             HEARING OFFICER BUTLER-TRUESDALE:

17   Who is your next witness?

18             MS. WULKAN:  Ms. Hawkins.

19             HEARING OFFICER BUTLER-TRUESDALE:

20   Would  you  raise  your  right  hand,  Ms.

21   Hawkins?

22   Whereupon,

1        MICHELLE HAWKINS

2    was called as a witness by Counsel for the

3    Petitioner, and having been first duly sworn,

4    assumed the witness stand and was examined

5    and testified as follows:

6                HEARING OFFICER BUTLER-TRUESDALE:

7    Okay.  Thank you.

8                MS. WULKAN:    One second to get

9    this up for the board.

10               HEARING OFFICER BUTLER-TRUESDALE:

11   Um-hum.

12               MS. WULKAN:   Okay.  These are the

13   documents that you are doing.

14               HEARING OFFICER BUTLER-TRUESDALE:

15   No problem.

16               MS. WULKAN:   Okay.  I just wanted

17   to see whether there was any particular

18   documents that I had on IEP.   We have,

19   obviously, referred to the IEP at P-12, which

20   is March 15, 2006 IEP.

21               HEARING OFFICER BUTLER-TRUESDALE:

22   Okay.

262

1          MS. WULKAN:    And  the  IEP  cover

2     page that we did submit for March 21, 2005.

3          HEARING  OFFICER  BUTLER-TRUESDALE:

4      Okay.   That was 12?

5          MS. WULKAN:    That's 12, P-12 and

6     P-13.

7          HEARING  OFFICER  BUTLER-TRUESDALE:

8      Okay.

9          MS. WULKAN:    And then I may ask

10    about  some  correspondence  and  other  things,

11    but  that's  --  those  are  primarily  the

12    documents.

13         HEARING  OFFICER  BUTLER-TRUESDALE:

14     Okay.

15              DIRECT EXAMINATION

16         BY MS. WULKAN:

17         Q    Now, can you state your name for

18    the record and spell your first name?

19         A    Michelle Hawkins, M-I-C-H-E-L-L-E.

20         Q    Okay.    And  how  do  you  know

21    D████████?

22         A    D████████ is my son.

263

Q    He is your son.  And can you just describe a little bit about your family, who is in your family besides D███████?

A    I also have an 11 year-old son who has autism.

Q    His name is?

A    Deon (phonetic) Hawkins.

Q    Okay.  And are you -- can you give us an educational history of D███████ like when he first started in school?  When did he first go to school?  Where did he first go first go to school?

A    Well, let me see.  The first school he went to was Cook, John Cook.

Q    That's a D.C. public school?

A    D.C. public school, yes.

Q    Um-hum.

A    And --

Q    And how long did he go there, for what year?

A    One year, kindergarten.

Q    Kindergarten?  Okay.  And after

264

1    that, what happened?

2        A    Then I put him in a Edison

3    Friendship Charter School.

4        Q    Um-hum.

5        A    But that school, the setting was

6    too large and, at that time, I did not know

7    that he had a disability.

8        Q    Um-hum.

9        A    And he wasn't learning anything.

10        Q    And this was in the first grade,

11    right?

12        A    Yes.

13        Q    Okay.  So how long did you leave

14    him at Edison Charter?

15        A    I guess from September to March.

16        Q    Okay.

17        A    And then in April he started SAIL.

18        Q    Okay.  So you moved him from

19    Edison straight to SAIL.  And has he gone

20    anyplace else, but SAIL, since that time,

21    since the first grade?

22        A    No, he hasn't.

265

1    Q    Okay.  Until now.

2    A    Right.

3    Q    Until two days ago.

4    A    Yeah.

5    Q    And why did you choose to place

6    him at SAIL in the first grade?

7    A    SAIL had multi-sensory styles for

8    his learning, had small classrooms.  It was

9    arts-based and the psychologist that tested

10   him came to the school and observed him and

11   he thought it was a good placement.

12   Q    And this was -- where was he

13   evaluated when he was in first grade?

14   A    Georgetown.

15   Q    And they recommended a program for

16   students with learning disabilities at that

17   time?

18   A    Let me see.  I'm trying to

19   remember if he was diagnosed with a learning

20   disability.  Yes.

21   Q    Okay.  Now, when he entered SAIL

22   in the first grade, did there come a time

1    when D.C. public schools or not D.C. public -

2    - sorry.

3             MS. WULKAN:  Strike that.

4             BY MS. WULKAN:

5        Q    Did there come a time -- sorry.

6    That's another fabulous thing sentence,

7    really good.  All right.

8             Did there come a time when SAIL

9    identified him as a student with a

10   disability?  Did they give him an IEP?

11       A    Yes.

12       Q    And was that pretty much right

13   after, in the second grade?

14       A    Right, yes.

15       Q    Okay.  Right after he had been

16   there a little bit?

17       A    Yes.

18       Q    So did SAIL evaluate him at that

19   time or did you have independent evaluations

20   upon which they based their recommendation

21   that he have an IEP?

22       A    It was independent evaluation.

Q    Okay.   So then they had an IEP and, as far as you know, did he have an IEP every year from the end, the beginning of second grade all the way through seventh grade?

A    Yes.

Q    He did?

A    Um-hum.

Q    And to your knowledge, did he have the same level of services, what we call a full-time special ed IEP, i.e., all of his classes were in special ed?  Was that IEP the same from second grade all the way to seventh grade?   I don't mean the same goals and objectives.   I just mean the same level of services.   Was he always getting a full-time special ed IEP at SAIL?

A    Yes, yes.

Q    Okay.   And what were D█████████ grades like at SAIL?

A    They didn't give letter grades. They gave progressing, needs help, mastered,

1  so he was usually progressing.

2          Q     So he was usually progressing?

3          A     Or making progress.

4          HEARING OFFICER BUTLER-TRUESDALE:

5  Can you repeat for me again?  What were the

6  three categories, progressing?

7          THE WITNESS:  He needs help.

8          HEARING OFFICER BUTLER-TRUESDALE:

9  Needs help.  Progressing?

10         THE WITNESS:  Progressing.

11         HEARING OFFICER BUTLER-TRUESDALE:

12 Mastered?

13         THE WITNESS:  Yes.

14         HEARING OFFICER BUTLER-TRUESDALE:

15 Okay.  Go ahead.

16         MS. WULKAN:  Okay.

17         BY MS. WULKAN:

18         Q     And most of his grades or up until

19 the -- did there come a time when they

20 started giving him letter grades?

21         A     Yes, that was last year, middle

22 school.

1     Q    Last year, so that would be

2    seventh grade?

3     A    Yes.

4     Q    Okay.  Now, did there come a time

5    when D███████ -- there was talk about

6    retaining D████████ in grade six?

7     A    No, I requested that he be

8    retained.

9     Q    You requested?  You requested to

10   SAIL that he be retained in grade six?  And

11   why did you do that?

12    A    Because I didn't feel he was ready

13   to move to the seventh grade.

14    Q    In terms of what, lack of academic

15   progress, emotionally, what?

16    A    Academic progress.

17    Q    And would he have moved from a

18   different SAIL School, from the lower school

19   to the junior high school or something at

20   that time?  Is that when he would have

21   logically moved?

22    A    Yes.

1     Q    At the end of the sixth grade

2    year?

3     A    Yes.

4     Q    And so he stayed in the lower

5    school for an extra sixth grade, correct?

6     A    Yes.

7     Q    So he was there first, second,

8    third, fourth, fifth, sixth, sixth?

9     A    Yes.

10     Q    So for seven years then?

11     A    Yes.

12     Q    Well, eight years, because then he

13    was there for seventh grade as well.

14     A    Right.

15     Q    So he was there for a total of

16    eight years, right?

17     A    Yes.

18     Q    Okay.  Now, can you describe the--

19    when they moved him to the -- is it junior

20    high school, is that what they're calling it,

21    or is it a middle school?

22     A    Middle, middle.

1      Q    Upper school program?    What do

2    they call that, the sixth grade?

3      A    Middle.

4      Q    Seventh grade?

5      A    Middle.

6      Q    Middle school.  Okay.  So did they

7    move him to a different building when he

8    moved into the seventh grade?

9      A    Yes, they moved to a different

10    building.

11      Q    Okay.  And can you describe the

12    physical setting at SAIL in the new building

13    that he moved into in September of '05?

14      A    It was open space.  The classrooms

15    were very small.  In one of his classrooms,

16    the teacher had used sheets to muffle the

17    sounds and the activity that was going on,

18    because they were under the steps.

19      Q    Was it a school building, an

20    office building?  What was it?

21      A    No, it was an office building.

22      Q    Okay.  How many rooms did they

272

1   have in this office building for how many

2   grades or how many, approximately, children?

3       A    I'm not sure.

4       Q    Did they have more than one

5   classroom?

6       A    Yes.

7       Q    Or one big classroom divided up?

8       A    More than one classroom.

9       Q    Was   D████████   classroom   one

10  classroom divided up into differences spaces

11  or --

12      A    Yes, some petitions were used to

13  divide the classrooms.

14      Q    Would the petitions go all the way

15  to the ceiling?

16      A    No, they were short petitions.

17      Q    And how many students were in his

18  classes at SAIL?

19      A    14 to 16.

20      Q    Okay.  Was there more than one

21  teacher in the class?

22      A    Not all of them.

1      Q    All    right.    Sometimes    yes,

2    sometimes no?

3      A    Yes.

4      Q    Okay.    Would there be a teacher

5    and an aide if there was an extra personnel

6    there?

7      A    Yes.

8           HEARING    OFFICER    BUTLER-TRUESDALE:

9    I missed out on that.    So he was changing

10   classes once he got to the middle school?

11          THE WITNESS:    Yes.

12          HEARING    OFFICER    BUTLER-TRUESDALE:

13   Okay.    And you said 14 to 16 students and

14   not all the classes had a teacher's aide.    Is

15   that -- am I repeating?    Am I getting that

16   right?

17          MS.    WULKAN:        That's    correct.

18   That's exactly right.

19          HEARING    OFFICER    BUTLER-TRUESDALE:

20   Okay.    Go ahead.

21          BY MS. WULKAN:

22     Q    Now, let me go backwards a little

1    bit.  Did you attend all of the IEP meetings

2    for D████████ every  single  year  in  those

3    eight years that he went to SAIL?  Did you

4    attend every IEP meeting?

5        A    Yes, I did.

6        Q    Was  there  ever  a  time  that  you

7    attended  --  that  you  didn't  attend  an  IEP

8    meeting?

9        A    No.

10       Q    And who would participate in those

11   IEP meetings at SAIL?

12       A    The    teacher,    the    occupational

13   therapist,  the  speech  therapist,  special  ed

14   coordinator.

15       Q    Okay.  Was  there  ever  anyone  from

16   D.C. Public Schools --

17       A    No.

18       Q    -- at those meetings?

19       A    No.

20       Q    Not  from  the  first  grade  all  the

21   way to the eighth grade?

22       A    No  one  from  D.C.  Public  Schools

275

1  participated.

2      Q    Okay.    Did  you  ever  have  any

3  contact with anyone from D.C. Public Schools?

4      A    No.

5      Q    Now, did -- what was the -- going

6  back to this seventh grade year, the '05/06

7  year, what was the atmosphere like in the

8  classrooms?  Did you observe D█████ in the

9  classrooms?

10     A    Yes.  It was disruptive.  There

11 was a lot of noise.  Some of the teachers

12 were not able to handle the children, their

13 behaviors.

14     Q    And how all -- how was D█████

15 responding to that?  Was he saying anything

16 about going to school?  Was he --

17     A    Yes, sometimes he wanted to stay

18 home.  He told me he hated the school.  The

19 children teased him.  He wasn't learning

20 anything.

21     Q    Was that something he was saying

22 or something you were saying?

1        A        That's something he said.

2        Q        Okay.    And    when    did    he    start

3    saying  these  things  and  start  having  anxiety

4    about    going    to    school    and    saying    that    he

5    wasn't  learning  anything  and  whatever  else?

6        A        This    was    when    he    started    middle

7    school.

8        Q        It    wasn't    until    he    started    this

9    new    school,    right,    the    new    building,    not    new

10    school,  new  building,  right?

11        A        Yes.

12        Q        Okay.    And  prior  to  the  time  of

13    this    '05/06    school    year    that    we're    now

14    talking    about,    prior    to    the    time,    did    you

15    ever  discuss  with  the  IEP  teams  that  you  met

16    with,    the    IEP    teams    that    you    met    with    at

17    SAIL,    did    you    ever    discuss    that    you    didn't

18    think    SAIL    was    an    appropriate    school    for

19    Dominique  or  that  you  were  dissatisfied  with

20    SAIL  in  any  way?

21        A        Yes.    This    was    after    we    had    the

22    IEP  meeting.

Q    I'm talking about prior to this
school year, before 2005.

A    Oh, before.

Q    Before he went to the middle
school.

A    Um-hum.

Q    I'm not talking about this year at
all.  I'm talking about before 2005.  Any of
the first seven years, did you ever discuss
with the IEP team people that you didn't like
SAIL or you thought it was inappropriate or
anything else?

A    No.

Q    Did they ever say to you at any of
these IEP meetings, I'm not talking about
this year again, I'm talking about the seven
years prior, did they ever say to you that
they didn't think he was a good fit or that
he should be -- shouldn't be at SAIL?

A    No.

Q    Did they ever -- did anyone ever
discuss with you that D█████████ had a full-

1  time special ed IEP and that other children

2  may not have had full-time special ed IEPs?

3  Did anyone ever say anything to you about

4  that?

      A    No.

6        Q    Did you know that there were

7  children at SAIL that didn't have full-time

8  special ed IEPs?

9        A    No, I didn't.

10       Q    When did you become aware that

11 there were children at SAIL that didn't have

12 full-time special ed IEPs?

13       A    It was at the -- not August 8th,

14 there was a meeting we had before.

15       Q    August 1st, the resolution meeting?

16       A    Yes, yes.

17       Q    On August 1st.  And that was the

18 first -- how did you become aware on August

19 1, 2006 that there were children without

20 IEPs, without full-time special ed IEPs at

21 SAIL?

22       A    You asked Ms. Umansky and she told

1    you.

2         Q    But that was the first time you

3    ever knew that, right?

4         A    Yes.

5         Q    Now, did there come a time in

6    '05/06 when you went to an IEP meeting

7    regarding D███████? A regular IEP meeting.

8         A    Yes, um-hum.

9         Q    Was that -- when was that?    In

10   around March?

11        A    March, I think, it was.

12        Q    March of '06.  And that was the

13   one that created this IEP, which is in

14   evidence at P-12.  I'm just going to show you

15   the cover sheet to that and see if this is

16   the IEP meeting notes.  This is 3/15/06.

17   Okay.

18        A    Um-hum.

19        Q    And then there were some meeting

20   notes about what was going on at this.

21             HEARING  OFFICER  BUTLER-TRUESDALE:

22    And you said that's P-12?

1          MS. WULKAN:  That's P-12.

2          HEARING  OFFICER  BUTLER-TRUESDALE:

3    Okay.

4          MS. WULKAN:  Those are the meeting

5    notes and then you see that she signed in an

6    and it was 3/15/06.  It was the IEP meeting.

7          HEARING  OFFICER  BUTLER-TRUESDALE:

8    Okay.

9          BY MS. WULKAN:

10         Q    Now, looking at these notes, there

11   were some introductory things and then who is

12   Katie that spoke?

13         A    That's  the  speech  and  language

14   pathologist.

15         Q    And she indicated in these notes

16   that "D███████████ decoding has improved as

17   well as his overall comprehension when in a

18   small group setting.  In class his attention

19   still seems to be an issue and they talked

20   about  comprehension  fluency.     It  was

21   recommended  to  continue  with  speech  and

22   language service for 60 minutes a week in a

1    small group consult setting."

2                Did you agree with that?  With her

3    observations about that?

4         A    Not at home.

5         Q    Not at home?   You didn't agree

6    with what?

7         A    His progress.

8         Q    That he had made progress?

9         A    Yes.

10        Q    Yes.  Okay.  And then it says that

11   he improved greatly in OT and that he should

12   continue with his OT, pretty much the same

13   thing in the notes, right?

14        A    Yes.

15        Q    And did you agree with that, that

16   he had improved greatly in OT?

17        A    His handwriting had improved.

18        Q    Um-hum.  And then there was Ms.

19   Umansky and Mr. -- Ms. Tayback (phonetic)?

20        A    His handwriting had improved, but

21   he still was not able to write in cursive.

22        Q    Okay.  And then they talked about

1    when he was focused, he was progressing in

2    language arts and continued to work on

3    editing sentence structure and punctuation

4    and decoding and the team agreed with the

5    goals and that he would continue to work on

6    organizational goals, etcetera. That's

7    pretty much the substance of this, of this

8    IEP, is that they were talking about his

9    essentially making some progress and that he

10   continued to work on his goals.

11           So what was your understanding of

12   what SAIL's position was, at this time, about

13   whether or not D██████ was either

14   benefitting from the program or should

15   continue in the program?

16       A    He should continue the program.

17       Q    Okay. Then mom says here, you

18   started saying that you had some concerns.

19   You said you were concerned about the open

20   space in the building, requested that his

21   classes not be in open space, over spring

22   break the ceilings are being added, so open

1    space won't be an issue after that they said.

2              And then you said something about

3    him being Type 1 Doe (phonetic) in classes,

4    etcetera.  Now, faith was discussed in order

5    to show -- ensure faith.  D█████████ requires

6    transportation, level 4 accomodations for

7    state  district  testing,  32  hours  of

8    specialized instruction, full-time special ed

9    IEP and ES we'll obviously discuss.

10              Now, so is it your understanding

11    from this IEP meeting that they were -- was

12    anybody at SAIL telling you that it was an

13    inappropriate placement for him?

14        A    Not during the IEP meeting.

15        Q    Um-hum.  And you expressed some

16    concerns  at  that  IEP  meeting,  but  you

17    basically signed off on the IEP.  Is that

18    right?

19        A    Yes.

20        Q    And had you other than talking

21    about the open space that you talked about

22    and the other problems that you talked about

1   at the IEP meeting that are in the notes, had

2   you expressed to anyone at SAIL that you

3   thought that the setting -- that you didn't

4   think the program -- that he was progressing

5   enough or that you didn't think the program

6   was appropriate?

7        A    Not during the IEP meeting.

8        Q    Not during the IEP meeting.  Did

9   there come a time when you did express that

10  to SAIL later on?

11       A    Yes, it was later, because he was

12  complaining, you know, about being disruptive

13  and he hated going to school and he wasn't

14  learning anything and some days he wanted to

15  stay home.

16       Q    Um-hum.

17       A    So then I became concerned and

18  started looking at other placements.

19       Q    Okay.  And what, if anything, did

20  you communicate to SAIL about that?

21       A    I talked with Ms. Umansky about

22  teacher evaluations.

1    Q    Teacher evaluations or observation

2    forms?

3    A    Yes.

4    Q    Um-hum

5    A    It was for his testing at

6    Children's, Chelsea and Katherine Thomas.

7    Q    Um-hum.  And there were some forms

8    that SAIL needed to fill out?

9    A    Yes.

10    Q    And so you gave them to Ms.

11    Umansky?

12    A    Yes.

13    Q    Um-hum.  And did Ms. Umansky ask

14    you anything, at that time, about why you

15    were looking for another placement or whether

16    you should be looking for another placement

17    or anything?  Did any discussion take place

18    then?

19    A    Well, she felt that I should be

20    looking for another placement, because he was

21    having a lot of difficulty.

22    Q    Did she talk about what difficulty

1    that was?

2         A    Behavior, that it just wasn't

3    appropriate.

4         Q    Okay.  Did she say we don't think

5    that SAIL is appropriate, at this time?

6         A    No.

7         Q    She didn't say that?

8         A    No.

9         Q    She didn't say that.  But she

10   agreed to fill out these observation forms.

11   Now, did you ever -- why did she agree to

12   fill out the observation forms?

13        A    Um-hum.

14        Q    And about when?  It was after the

15   IEP meeting, about when did you, do you know

16   what month you may have given these forms to

17   Ms. Umansky?

18        A    Um, April, May, maybe June.

19        Q    So somewhere between April and

20   June of '06, just a few months ago, right?

21        A    Yes.

22        Q    Okay.  And prior to that time, I

1    know I have asked you this question again,

2    but just to be 100 percent clear, prior to

3    that time, did you have any discussions with

4    anyone at SAIL, any lawyers for SAIL, any

5    administrators at SAIL, any teachers at SAIL,

6    any specialists at SAIL that you thought that

7    SAIL was inappropriate for Dominique?

8        A    Yes, I did.

9        Q    And who did you have those

10   conversations with?

11       A    His English teacher, Ms. Tayback,

12   his speech and language pathologist.

13       Q    And when did you have those

14   conversations with them?

15       A    It was between April and when I

16   started getting the evaluations when I went

17   to the PTA meeting and was talking to the

18   teachers and they were talking about the

19   difficulties he was having.

20       Q    Okay.  So prior to to that period,

21   March, there was the IEP meeting and then all

22   of the observations occurred between April

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433      WASHINGTON, D.C.  20005-3701      www.nealrgross.com

1   and June.  Prior to March or April of '06,

2   you didn't talk to anybody at the school

3   about the fact that you thought it was

4   inappropriate and they never said to you,

5   conversely, they never said to you that they

6   thought it was inappropriate?

7        A    No.

8        Q    Now, you started to look -- what

9   was the -- do you know whether D████████ was

10  getting individualized instruction at SAIL?

11       A    He might have been getting some.

12       Q    Okay.  Was that an exception or

13  was that the rule or do you know?  Do you

14  know?

15       A    I'm not sure.

16       Q    Okay.  Did you feel -- do you feel

17  that D███████ has made adequate progress

18  based on the IEP that he has?

19       A    No.  No, he hasn't.

20       Q    And what would you say or to what

21  do you attribute his lack of progress?

22       A    I think the expertise of the

289

1   teachers not being able to accomodate his

2   multiple disability.

3        Q    Okay.

4        A    Expert level of the teachers.

5        Q    Um-hum.  Now, did there come a

6   time when you attended a resolution meeting

7   at SAIL?

8        A    The first one?

9        Q    That meeting that we had -- the

10  one.  The first one.

11       A    Okay.

12       Q    The August 1st meeting.

13       A    I'm sorry.

14       Q    Sorry.  That's the resolution

15  meeting.

16       A    Yes.

17       Q    Did you know before you went to --

18  when you -- who did you think was going to be

19  at that meeting?  I'm having a hard time.

20       A    SAIL and me and my attorney.

21       Q    Okay.  And when you came into the

22  meeting that was as a result of our due

290

1    process hearing request, was there anybody

2    else physically present at the meeting

3    besides the SAIL people and you and me?

4         A    No.

5         Q    Was there anybody else

6    participating by telephone?

7         A    Yes, Dr. Piegler.

8         Q    Okay.  And did you know who Dr.

9    Piegler was?

10        A    No, I didn't.

11        Q    Or why she was participating?

12        A    No.

13        Q    And at that time, did you -- was

14   that the meeting to which you were referring

15   when you said the first time I heard that.

16        MS. WULKAN:  Strike that.

17        BY MS. WULKAN:

18        Q    Was there a discussion about

19   D█████████ having a full-time IEP?  Having a

20   30 hour IEP at that resolution meeting?

21        A    I don't remember.

22        Q    You don't remember?

291

1      A      No.

2      Q      Okay.

3              HEARING  OFFICER  BUTLER-TRUESDALE:

4      This is at the resolution meeting?

5              MS. WULKAN:    Yes, this is at the

6      resolution meeting.

7              BY MS. WULKAN:

8      Q      Do you remember we were discussing

9      the fact that D████████ had a full-time IEP

10     and I believe it was either Ms. Umansky or

11     Mr. Dalton, one of the two, saying they were

12     surprised.  Do you remember that?

13     A      I think it was Ms. Umansky.

14     Q      It was Ms. Umansky.    And so we

15     then pulled out the IEP, right?

16     A      Yes.

17     Q      And we looked at it and said it

18     was a full-time IEP, right?

19     A      Yes.

20     Q      Okay.  And did SAIL, Mr. Dalton on

21     behalf of SAIL, or anyone say at that meeting

22     that  they  agreed  that  they  were  an

1    inappropriate placement for D██████?

2         A    Yes.

3         Q    And did we resolve that resolution

4    meeting at that time?   Did we come to an

5    agreement about how to settle the due process

6    hearing, at that time?

7         A    No, we did not, because the woman

8    from DCPS didn't have D████████ records.

9         Q    Okay.   So we filled out or she

10   filled out a form.   I can show you this form,

11   which has been admitted.   This was the

12   resolution meeting form, I described to you.

13             HEARING OFFICER BUTLER-TRUESDALE:

14    She -- who filled out this form?

15             MS. WULKAN:   Dr. Piegler did this.

16    Dr. Piegler is on the phone.

17             HEARING OFFICER BUTLER-TRUESDALE:

18    Okay.

19             MS. WULKAN:   She filled out this.

20    We didn't see her filling this out.

21             HEARING OFFICER BUTLER-TRUESDALE:

22    Okay.   That's what I was trying to

1   establish.

2                   MS. WULKAN:  She was there filling

3   it out.

4                   HEARING  OFFICER  BUTLER-TRUESDALE:

5    That's what I was trying to clarify.

6                   MS. WULKAN:  Apparently, she did,

7   because she filled it out and then she sent

8   it in to --

9                   HEARING  OFFICER  BUTLER-TRUESDALE:

10   She makes reference to filling out this form

11  during the phone conversation?

12                  MS. WULKAN:  Apparently.

13                  HEARING  OFFICER  BUTLER-TRUESDALE:

14   Okay.

15                  MS.  WULKAN:    I   mean,  we,

16  obviously, couldn't see her, because she was

17  on the phone.

18                  HEARING  OFFICER  BUTLER-TRUESDALE:

19   Okay.

20                  MS. WULKAN:  And we were  in  the

21  room.

22                  HEARING  OFFICER  BUTLER-TRUESDALE:

1          Okay.

2                    MS. WULKAN:  So I couldn't see her

3          doing what she did.  And I actually -- I'm

4          not sure if I even knew that she was -- maybe

5          I did know that she was taking notes.  But

6          she then filled out the resolution form and

7          sent it to wherever in the world is that you

8          send it.  I don't know where you send it.

9          But you send it to somebody, the Student

10         Hearing Office or somebody and say we did or

11         didn't resolve this.

12                   She sent it on, because then I

13         sent her the letter correcting some of the

14         things that she sent it, because we,

15         obviously, didn't see it at the resolution

16         meeting, because she wasn't there.  So we

17         couldn't review it.  So I think I

18         subsequently sent her a letter saying there

19         were some misstatements in this resolution

20         meeting notes and I asked her to correct them

21         and then I never heard back from her.

22                   So that letter and there are

1    several letters to Dr. Piegler here and I'm

2    going to just go through these things.

3            BY MS. WULKAN:

4        Q    So the resolution meeting notes

5    are P-10 and that is the one that we have

6    already read into the record, where it says

7    in here "SAIL PCS stated their school is not

8    an appropriate setting for this student."

9    Right?

10       A    Yes.

11       Q    That's what this says.  And then

12   it says parent and attorney are requesting

13   school placement at Katherine Thomas or

14   Chelsea for the '06/07 school year.  Right?

15   And do you remember that we said that we

16   would send her acceptance letters at SAIL,

17   acceptance letters when we got them, right?

18       A    Um-hum.

19       Q    And now I'm going to refer you to

20   P-11 and this is a letter that we wrote to

21   Dr. Piegler asking her to clarify two

22   statements, including DCPS' July 14th

resolution meeting notes.  First, it says the note states that a copy of the parent manual was provided to the parents' attorney and I think that's just the standard language DCPS puts in their resolution meeting notes.  But it wasn't, in fact, you didn't get any manuals about the meeting, did you?

A   No.

Q   So I said I didn't receive a copy of that manual or -- at or prior to the meeting, so I corrected that.  That's in the record in that document.  And second, the notes indicate that DCPS received via fax today a cover letter from parent attorney outlining complaint against SAIL PCS and a copy of the due process complaint notice.

In order to clarify that it was SAIL and not my office that sent documents to DCPS, the note should read "DCPS received via fax today from SAIL's attorney a copy of the parents' due process complaint notice and hearing request letter.

1           In other words, we didn't sent,

2    you didn't send anything to Dr. Piegler, did

3    you about our due process hearing complaint?

4         A    (No audible response).

5         Q    And you didn't authorize me to

6    send anything, did you?

7         A    No.

8         Q    So we were trying to straighten

9    out that -- the day that Dr. Piegler got

10   involved on the day, that I understood it,

11   that Mr. Dalton sent -- the day of the

12   resolution meeting, Mr. Dalton faxed her a

13   copy of the resolution meeting notes -- I

14   mean, of the due process hearing complaint.

15        A    Um-hum.

16        Q    That was it.  That's how she came

17   to be participating.  Now, have you ever

18   received from DCPS, ever in this case,

19   including in the last month, have you ever

20   received any notices of placement from DCPS?

21        A    No.

22        Q    You placed --

1          MS. WULKAN: Strike that.

2          BY MS. WULKAN:

3     Q   When you were examining schools

4 for D&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;, what kind of schools were you

5 looking for?

6     A   A school that focused on -- well,

7 a school that has small classrooms, focused

8 on some of his executive functioning skills.

9 He was very, very disorganized. He never

10 had his homework. You know, I didn't know

11 what he was doing in class, because he never

12 brought his materials home. Study skills, he

13 was interested in physical activity,

14 computers. He enjoyed art. He is very

15 creative. Assistance with his writing,

16 something that focused on reading, on his

17 reading, his math difficulty, writing

18 difficulty. So he needed something that --

19 an intensive program that focused on those

20 things.

21     Q   And did you think that Katherine

22 Thomas fit that profile?

1       A       Yes.

2       Q       And what did you do to -- did you

3   visit Katherine Thomas when Dominique visited

4   it in July?

5       A       Yes.

6       Q       Did you visit it before that?

7       A       Yes, I did.

8       Q       Okay.    And what did you learn

9   about Katherine Thomas on the visit that

10  maybe -- well, whether or not you thought

11  that it could do the things that you have

12  just outlined?

13      A       I thought they could and Monday

14  when he started school, they had a parent

15  meeting and they talked.    They had the two

16  reading specialists come in and talk about

17  the reading programs they had.    They have

18  maybe 10 reading programs they work with and

19  they matched the program with the child.

20          The reading specialist meets with

21  children at least four times a week.    They

22  talked about the study skills and how they

1   help them with their planner and organizing a

2   notebook and their school work.  The teachers

3   have a lot of contact with parents.  They

4   have a website where you can go in and if the

5   child doesn't have the homework assignment,

6   you can look on the website, look on the

7   teacher's name and find out what the homework

8   assignments are.

9           One of his teachers actually has a

10  Yahoo group and he sends us information after

11  he has been every day to let us know how the

12  school day went, what the expectations of the

13  class are, homework assignments, if you have

14  any difficulties or questions or problems,

15  you can -- and they even have a parent Yahoo

16  group, so that parents can interact with each

17  other.

18          There was one parent there who had

19  success with her child's homework and she

20  used technology, so they share those things.

21  There's a lot of information for parents.

22          Q    Is    that    different    than    what

1    happened at SAIL?

2         A     Yes.      I     tried    to    contact

3    D████████ teachers only one, Ms. Tayback

4    was   the   one   who   ever   gave   me   a   lot   of

5    feedback.    It   was   hard   to   get   them   by   phone

6    and they did not respond to email.

7         Q     And  you're  a  big  email  person,

8    aren't you?

9         A     Um-hum.

10        Q     I  get  reams  of  emails  from  this

11   client.   Now, so why did you decide to place,

12   to start D████████ at Katherine Thomas on the

13   20th?

14        A     Because  we  hadn't  had  a  hearing

15   and no determination was made where he was

16   going to go to school.

17        Q     Okay.

18             HEARING   OFFICER   BUTLER-TRUESDALE:

19    What was that questions again, I'm sorry?   I

20   was writing down.

21             MS. WULKAN:  Why did she decide to

22   place him --

1                HEARING OFFICER BUTLER-TRUESDALE:

2       Okay.

3                MS. WULKAN:  -- on the 20th.

4                HEARING OFFICER BUTLER-TRUESDALE:

5       Okay.

6                THE WITNESS:    And I had an

7       acceptance letter from them.

8                BY MS. WULKAN:

9       Q     And have you been to this -- well,

10      I think you answered the question previously,

11      but have you been satisfied with the

12      placement so far?

13      A     Yes.

14      Q     Do you believe that Dominique

15      would benefit from -- will benefit from this

16      placement at Katherine Thomas?

17      A     Yes, very much so.

18               HEARING OFFICER BUTLER-TRUESDALE:

19      I guess we want to, excuse me, remind the

20      petitioner of the time.

21               MS. WULKAN:  Okay.

22               HEARING OFFICER BUTLER-TRUESDALE:

1    And that we promised Mr. Dalton --

2          MS. WULKAN:  I'm done.

3          HEARING  OFFICER  BUTLER-TRUESDALE:

4    -- we would stop and let him listen to the

5    record.

6          MS.  WULKAN:   This  is  my  last

7    question.

8          HEARING  OFFICER  BUTLER-TRUESDALE:

9    Okay.  Cross?

10          MR. DALTON:  Yes.

11          HEARING  OFFICER  BUTLER-TRUESDALE:

12    Um-hum.

13                CROSS EXAMINATION

14          BY MR. DALTON:

15    Q      There are several things that I am

16    needing some clarification on.  And I don't

17    understand your testimony.  On one hand, my

18    understanding of your direct testimony is

19    that D████████, did not make progress at SAIL.

20    On the other hand, until this year you

21    seemed to have been testifying that both he

22    and you were very satisfied with the program

1    at SAIL, that he made progress there and that

2    it was only when he was moved to a new

3    setting that the problems began.

4                Can you clear that up for me?

5                MS. WULKAN:  Yes, I just want to

6    object a little bit, because I think there

7    was one misstatement in that.

8                HEARING  OFFICER  BUTLER-TRUESDALE:

9     Okay.

10                MR.  DALTON:  Well, even if there

11    was, counsel, you are not entitled to object

12    to that misstatement.  What the witness will

13    do is correct my statement or misstatement

14    and then on redirect you will point out the

15    error, not coach your witness about her

16    answer prior to her testimony.

17                MS. WULKAN:  No, I think that your

18    premise of your question there is a

19    misstatement.

20                MR.  DALTON:  If there was, you're

21    not entitled to point that out as a method of

22    coaching your witness in her answer.

1          MS. WULKAN:  I wasn't trying to

2    coach my witness.  All right.  Go ahead.  I

3    wasn't trying to coach the witness.

4          HEARING OFFICER BUTLER-TRUESDALE:

5     Okay.

6          MS. WULKAN:  That wasn't what I

7    was doing.

8          HEARING OFFICER BUTLER-TRUESDALE:

9     Okay.

10          MR. DALTON:  I'll repeat it now.

11          HEARING OFFICER BUTLER-TRUESDALE:

12     Repeat the question.

13          MR. DALTON:  Mission accomplished.

14          BY MR. DALTON:

15     Q    My purpose in cross examination is

16    for me to make sure that I understand your

17    testimony.  All right.  So if, in fact, and

18    I'm hoping that we don't have another

19    interruption between my question and your

20    ability to answer, so that's my preference

21    here to my question.

22          If there is something that I say

306

1    that you feel is a misstatement of your

2    testimony --

3        A    Um-hum.

4        Q    -- then it is by all means your

5    opportunity to correct me.

6        A    Right.

7        Q    Okay.  All right.  So hopefully we

8    won't have any more interruptions.

9            Now, my understanding is of your

10   direct testimony that on the one hand you say

11   that D██████ did not make progress while he

12   was at SAIL.  On the other hand, it is my

13   understanding that until he was moved to the

14   new building, D██████ had a positive

15   experience at the school.  You had positive

16   experiences at the school.  His IEPs were all

17   signed and agreed to by you and he was making

18   progress.

19           So help me understand the

20   discrepancy between those two --

21       A    He wasn't making --

22       Q    -- forms --

307

1       A    He wasn't making enough progress.

2       Q    Okay.  So even though you did not

3   raise any objection at all, if that's what I

4   understand your testimony to be, until this

5   school year that's just proceeding, it was

6   your long-held belief that he was not making

7   adequate progress.  Is that correct?

8       A    Yes.

9       Q    All right.  Now, can you, please,

10  explain to me why the difference in treatment

11  between how you reacted to Edison and how you

12  reacted to SAIL?

13      A    Edison was brand new.  There were

14  26 children in the class.  The reading

15  specialist that was there, they had a couple

16  of reading teachers at Edison.  One of them

17  was on maternity -- I mean, she had to go on

18  maternity leave, so there were 26 children in

19  his reading class.  So it was inappropriate.

20          HEARING  OFFICER  BUTLER-TRUESDALE:

21   At Edison?

22          THE WITNESS:  Yes.

1          HEARING  OFFICER  BUTLER-TRUESDALE:

2     Okay.

3          BY MR. DALTON:

4     Q    So you wait eight years to raise

5     an objection at SAIL, because SAIL's program

6     looked a little better?

7     A    Well, he was making -- well, I had

8     tutors also.  He was making some progress,

9     but it just wasn't enough.  And then when he

10    complained and he was just unhappy.

11    Q    Well, but I thought that -- and

12    I'll  direct  the  Hearing  Officer  to  the

13    questions that were propounded by counsel to

14    her client, but my recall was that there was

15    not  a  complaint  from  your  son  until  this

16    school year.

17    A    Right.

18    Q    Is that true?

19    A    Right.

20    Q    So where is this long history over

21    eight  years  of  complaints?  It's  only  the

22    last  year  when  they  moved  the  physical

1    setting.

2          A      Because I had tutors.

3          Q      So now you're saying that because

4    you  have  tutors,  it  masked  the  lack  of

5    performance that he should have had at SAIL?

6          A      I feel like I should not have had

7    to have tutors.  He should be getting what he

8    needs in the placement he is in.

9          Q      Is   this   belief   long-held   or

10   recently acquired?

11         A      Long-held.

12         Q      And yet, even though it's a long-

13   held  belief,  you  raised  not  a  finger  until

14   this year.

15         MS. WULKAN:  Objection.  Asked and

16   answered.  It has been in the same form.

17         MR. DALTON:  No, no.  Now we're

18   talking about the fact that she had tutors in

19   place  and  that  she  didn't  feel  that  she

20   should have tutors.  In addition to the lack

21   of  progress,  now  we  have  another  factor,

22   which in my mind also raises the issue of an

1    objection that should have been made and yet

2    was not made for eight years.

        HEARING OFFICER BUTLER-TRUESDALE:

4     Overruled.    I'm going to give him the

5    latitude.

        BY MR. DALTON:

7        Q    So is it fair to say that not only

8    were you not satisfied with the progress,

9    but, in addition to that, you thought it was

10   unnecessary to have tutors and yet you still

11   did not complain about SAIL for eight years?

12       A    I did in sixth grade.

13       Q    Oh, so now you are changing your

14   testimony?    Because before, as I understood

15   both in your direct and on your cross

16   examination, it wasn't until this year that

17   you had a complaint.    So which is it?

18       A    Well, when he was in the sixth

19   grade we had an MDT meeting.

20       Q    Um-hum.

21       A    That was when I found out that the

22   teacher and the service providers did not

1   talk to each other.

2        Q    So actually your complaints about

3   the school started as long as three years

4   ago?

5        A    Not three years.

6        Q    Wasn't he in sixth grade twice?

7        A    The latter.

8        Q    Oh, it was the latter year?

9        A    Yes.

10       Q    Let's reexamine this issue about

11  the sixth grade, because I have a little bit

12  of a misunderstanding.  Would you, please,

13  give me the answer to the question as to why

14  you asked the school to hold your son back to

15  sixth grade, in sixth grade?

16       A    Because he wasn't ready to move

17  on.

18       Q    Okay.  Now, move on to where?

19       A    The seventh grade.

20       Q    Aren't you leaving something out?

21       MS.  WULKAN:    Is that a question

22  that she's supposed to answer?

312

1            MR. DALTON:  Um-hum.

2            MS. WULKAN:  Well, I don't think

3    she can.  I'm objecting to the form of the

4    question.  Aren't you leaving something out?

5     What's in his mind, I don't know what.

6            MR. DALTON:  Well, I'm trying to

7    give the --

8            MS. WULKAN:  Objection.

9            MR.  DALTON:       --  witness  the

10    opportunity to --

11            HEARING  OFFICER  BUTLER-TRUESDALE:

12    I'll --

13            MR.  DALTON:      --  rehabilitate

14    herself, but if counsel doesn't want to give

15    the witness that, I'll withdraw the question

16    and ask her this question.

17            HEARING  OFFICER  BUTLER-TRUESDALE:

18    Okay.

19            BY MR. DALTON:

20        Q    Isn't it true that at that time

21    SAIL did not have a seventh grade and you

22    would have had to move your child to a

313

1    different school?

2           A    Yes.

3           Q    Okay.  And why is it that that was

4    now just coming out under cross examination?

5           A    I'm not understanding your point.

6           Q    Well, isn't it true that when you

7    answered that question about him want -- you

8    wanting to hold him back, that you didn't

9    want to move on.  It's really a statement of

10   not that you didn't want him to move on, it's

11   really a statement that you were so satisfied

12   with the school that you were willing to keep

13   your son back another year just to keep him

14   at SAIL.

15          A    I just don't have anything in mind

16   -- another placement in mind at the time.

17          Q    Well, let's go back to that issue,

18   too, because you seem to be in both my

19   experience and your counsel's experience to

20   be a pretty sophisticated parent.  You have

21   another child named Deon who has autism and

22   that   child   is   also   placed   in   a   private

314

1    school.   Is that not correct?

2           A     No, it isn't.

3           Q     Where is that child placed?

4           A     Saint Coletta.

5           Q     Okay.   And isn't Saint Coletta up

6    until last year been a private school?

7           A     It's a charter school this year.

8           Q     Yes, but prior to that, it has

9    always been a private school, correct?

10          A     Yes.

11          Q     Okay.   And --

12                MS. WULKAN:   Wait.   I got an --

13                THE WITNESS:   Oh, oh, oh, okay.

14   My son was in D.C. public schools.   We just

15   moved him to a charter school, if that's what

16   you were asking me.

17                MR. DALTON:   Um-hum.

18                THE WITNESS:   Right.

19                BY MR. DALTON:

20          Q     So you just moved him?

21          A     Yes.

22          Q     And in that process that took some

1    time, did it not?

2          A    Not really.

3          Q    Okay.

4          A    Saint Coletta is a charter school.

5    You don't have to sue for charter.

6          Q    I understand that, but you made

7    the determination that he wanted to go to a

8    school without any time frame involved at

9    all.

10          MS. WULKAN:  Objection.

11          BY MR. DALTON:

12          Q    Is my understanding of your --

13          MS. WULKAN:   This isn't a case

14    about Deon.   I don't know why we're going

15    around this way.

16          MR. DALTON:  Well, it's --

17          MS. WULKAN:  What is the point?

18          MR. DALTON:   I'm going to get to

19    the point if I have just a minimum amount of

20    latitude here.

21          BY MR. DALTON:

22          Q    You didn't have any trouble making

1    the decision.    You didn't review any other

2    schools.    You didn't go through any time

3    frame knowing that public schools was

4    inappropriate to knowing that he needed a

5    change of setting.    Is that what my

6    understanding is?

7         A    I don't understand what you are

8    asking me and why.

9         Q    Well --

10        A    You need to get to the point what

11   you are asking me, because I don't understand

12   what you are asking me and why you are asking

13   me about Deon.

14        Q    With all due respect I don't think

15   the why --

16        A    We're talking about Dominique.

17        Q    -- part -- I don't think the why

18   part is of your concern.

19             MS. WULKAN:   I'm going to object.

20             BY MR. DALTON:

21        Q    I'm doing the questions.

22        A    Okay.

Q    If  you  don't  understand  the
question, that's a different position.

HEARING  OFFICER  BUTLER-TRUESDALE:
All  right.    Let  me  hear  Ms.  Wulkan's
objection.  What are you objecting to now?

MS. WULKAN:   I don't know whether
Mr. Dalton  is  asking  her  about  moving
D███████  or  asking  her  about  moving Deon.
If  he  is  asking  her  about  moving Deon,  she
has  already  explained  that  the  child  was  in
the  D.C.  public  school  for  six  years,  however
many  years  up  until  one  minute  ago  and  then
he  was  moved  in  the  late  spring  or  whatever
it  was  to  Saint  Coletta,  which  is  a  charter
school.

Why  we're  talking  about  this  in
this  hearing  is  completely  and  totally
irrelevant.  If  he  is  asking  her  about  moving
D███████,  that's  a  different  issue.  But  why
we're  exploring  what  she  did  with  him  being
in  a  D.C.  public  school  and  then  moving  him
to  a  charter  school  when  he  aged  out  of  D.C.

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

1    public schools, I don't have any idea and I
2    am objecting to this and I don't think my
3    client has any idea why we're going down this
4    road.
5            THE WITNESS:  I know.  I thought
6    the hearing was about D██████.
7            HEARING OFFICER BUTLER-TRUESDALE:
8    Mr. Dalton, can you explain to me the
9    relevance or give me an idea of where we're
10   going, so I can rule on the objection?
11           MR. DALTON:   Well, it would
12   compromise the integrity of my cross
13   examination if I did that, because it would
14   tell the client where I'm -- the witness
15   where I'm going with these questions.
16           HEARING OFFICER BUTLER-TRUESDALE:
17   Do you mind stepping outside the door just
18   to the glass there where you can see me wave
19   you back in?  Thank you.  Okay.
20           MR. DALTON:   All right.  The
21   client has testified that the student always
22   had full-time IEPs.  That's not the case.  We

1    will present evidence in rebuttal.  We will

2    be requesting the record remain open a week

3    for us to do that.

4                    She knew that SAIL was not a full-

5    time special ed school.

6                    HEARING OFFICER BUTLER-TRUESDALE:

7    Um-hum.

8                    MR. DALTON:   Okay.   And that

9    virtually all the students there are on part-

10   time IEPs.

11                   HEARING OFFICER BUTLER-TRUESDALE:

12   Um-hum.

13                   MR. DALTON:   That approximately

14   three years ago --

15                   HEARING OFFICER BUTLER-TRUESDALE:

16   Now, virtually or all of them?

17                   MR. DALTON:  All of them.

18                   HEARING OFFICER BUTLER-TRUESDALE:

19   All?

20                   MR. DALTON:  All of them are part-

21   time.  None of them are full-time.

22                   HEARING OFFICER BUTLER-TRUESDALE:

1    Okay.

2          MR.  DALTON:    Okay.    And  that

3    approximately three years ago, she was having

4    trouble  with  Deon  and  trying  to  figure  out

5    where  to  place  him.    And  so  trying  to  place

6    him  and  D██████  at  the  same  time  was  just

7    not  going  to  work.

8          HEARING   OFFICER  BUTLER-TRUESDALE:

9    Um-hum.

10          MR.  DALTON:    So  that's  why  the

11   school  went  to  full-time  placement,  gave  her

12   time  to  work  on  placing  her  other  son  and

13   placing  this  son  and  that  this  is  the  reason

14   I'm  asking  her  this,  because  what  we're  --

15   she  seems  to  be  going  is  it  didn't  take  any

16   time  at  all  to  place  him.

17          HEARING   OFFICER  BUTLER-TRUESDALE:

18   Deon?

19          MR.  DALTON:    Deon.    And  that  goes

20   to  the  credibility  issue  of  we  know  that  it

21   takes  time  to  place  a  student.    You  just

22   don't  have  a  student  placed  overnight.    And  I

1   want to go into further when she started this

2   process with D▮▮▮▮▮▮, because I want to

3   explore the credibility of her saying that

4   she knew that -- you know, she is a

5   sophisticated parent.

6        She knew that the student did not

7   have full-time IEPs for six years or eight

8   years.  That that's just preposterous to even

9   go along with that and believe that and not

10  know that there was a change between the

11  hours and that that -- that the reason for

12  that change was to help accomodate her.

13       Again, the only thing we are

14  guilty of is not informing DCPS three years

15  ago.

16       MS. WULKAN:  I'm going to have to

17  respond to that.  First of all, Mr. Dalton is

18  absolutely incorrect factually.  The first

19  thing, as to Deon, which is completely

20  irrelevant and I proffer that it's still

21  completely irrelevant.  Deon was in a D.C.

22  public school.  It was fine and dandy.  She

1  never wanted to move him, until he aged out

2  this year in June of '06.  And she had to

3  look for a new placement for him, because he

4  had aged out of his Autism D.C. Public School

5  Program.  And then she moved him to Saint

6  Coletta, which is a charter school now.

7           So she wasn't looking for a

8  placement for him three years ago.  I don't

9  know where you are time frame came from.  You

10  can scream and yell all you want, but it's

11  not true.  So she never talked to anybody

12  about moving Deon three years ago nor indeed

13  did she talk about anyone moving Dominique.

14          HEARING OFFICER BUTLER-TRUESDALE:

15  Well, let me say this.  She appears to me to

16  be taking so much time in some of the

17  responses that she could give a flat out

18  denial to, that I feel confident that if that

19  question is directly posed to her, that I can

20  give some weight to or understanding of her

21  own response.  Credibility set aside for the

22  whole hearing.

1          MS. WULKAN:  Um-hum.

2          HEARING  OFFICER  BUTLER-TRUESDALE:

3   So I think we can ask her very directly --

4          MR.  DALTON:   I  mean,  I  don't

5   understand counsel's --

6          HEARING  OFFICER  BUTLER-TRUESDALE:

7   -- what type of cooperation.

8          MR.  DALTON:   -- objection.   All

9   this is true.

10          HEARING  OFFICER  BUTLER-TRUESDALE:

11  But what type of cooperation she was seeking

12  from  the  school,  if  any  at  all,  during  her

13  attempts  to  place  the  other  child.   That  I

14  will entertain.

15          MR. DALTON:  Okay.

16          HEARING  OFFICER  BUTLER-TRUESDALE:

17   And I think --

18          MR.  DALTON:   I'll  rephrase  my

19  question.

20          HEARING  OFFICER  BUTLER-TRUESDALE:

21   -- that she can --

22          MS. WULKAN:  And to the contrary--

1              HEARING  OFFICER  BUTLER-TRUESDALE:

2      Yes, sure, okay.

3              MS. WULKAN:    He says it's three

4      years ago.  She says it was --

5              HEARING  OFFICER  BUTLER-TRUESDALE:

6      Okay.  I'm bringing her back in now.

7              MS. WULKAN:  Bring her.

8              HEARING  OFFICER  BUTLER-TRUESDALE:

9      Okay.  Come on.  Thank you so much for your

10     cooperation.

11             MR. DALTON:  Okay.

12             HEARING  OFFICER  BUTLER-TRUESDALE:

13     We've got a half -- you know, we're at 2:30

14     now.  Just so everybody is on board with

15     time.  Okay.  The question is going to be

16     rephrased  to  the  satisfaction  of  both

17     counsel.  Okay.  So kind of, I don't want to

18     say blank out, but it's going to be rephrased

19     a little bit.  Okay.

20             BY MR. DALTON:

21        Q    Isn't  it  true  that  part  of  the

22     reason  that  SAIL  moved  your  child  from  a

1    part-time to a full-time placement was to --

2                MS.  WULKAN:    That's   not   the

3    question.  Objection.  That's not at all the

4    question that we were just talking about.

5                MR.  DALTON:    It's  --  I  haven't

6    even finished the question.  Let me at least

7    get the question out.

8                HEARING   OFFICER   BUTLER-TRUESDALE:

9     I can rule on that objection after he has

10   completed whatever the question is.

11               MR.  DALTON:    All  right.    Let  me

12   back up again.

13               BY MR. DALTON:

14        Q    Isn't  it  true  that  one  of  the

15   reasons SAIL moved D████████ IEP from part-

16   time  to  full-time  was  to  give  you  some  time

17   with regard to placement of Deon?

18        A    That was never my understanding.

19        Q    Okay.

20        A    And I'm still trying to figure out

21   what does Deon have to do with D██████ and

22   his placement.

1     Q     All right.  Is it still your

2  testimony that for the last six years

3  D███████ has had a full-time IEP?

4     A     Yes.

5     Q     Okay.  And if I were to show you

6  IEPs from the years '04, '05 and '06 that

7  were not full-time, how would you account for

8  that?

9     A     It just was not my understanding

10  that it changed.

11     Q     You attended every IEP?

12     A     It wasn't my understanding it had

13  changed.

14     Q     So you're telling me that with two

15  children that you have IEPs that you

16  attended, that you don't know the difference

17  between a full-time and a part-time IEP?

18     A     You do better and you know better.

19     Q     Well, if -- how many hours are

20  there in a week?

21     A     I have two children with special

22  needs and it is very, very stressful.  You

1    have no idea.  It's hard trying to keep up

2    with all of that stuff.  I do the best that I

3    can.

4         Q    I don't mean to upset you.

5         A    I know, but you are.

6         Q    Well, let's take a break then,

7    because I do have more questions.

8              HEARING OFFICER BUTLER-TRUESDALE:

9    Okay.  I can give you -- let's take a five

10   minute break.  I hope that will be helpful,

11   because we still want to be able to call the

12   other witness at 4:00.

13             MS. WULKAN:  I'm sorry.

14             (Whereupon, off the record for a

15   recess.)

16             HEARING OFFICER BUTLER-TRUESDALE:

17   Okay.  We're back on the record.

18             BY MR. DALTON:

19        Q    Ms. Hawkins, I want to redirect

20   your attention to the meeting that has been

21   described as the resolution meeting of August

22   the 1st.  Do you recall that meeting?

1       A       Yes.

2       Q       All right.  And do you recall that

3  I requested a break of Dr. Piegler so that I

4  could ask -- have a private conversation with

5  you and your attorney?

6       A       Yes.

7       Q       All right.  And do you recall what

8  happened during that meeting?

9               MS. WULKAN:  I'm going to object

10  to anything about conversations that you had

11  at a resolution meeting with us.  That's not

12  admissible at this hearing.

13              MR. DALTON:  Well, actually, it is

14  and I think this Hearing Officer would agree

15  me with regard to that.

16              MS. WULKAN:  I doubt that.  Those

17  were resolution meetings or mediations?

18              MR. DALTON:  No, no, they are not

19  mediations.  That's the difference and that's

20  the whole point, counsel.  Mediations are

21  confidential and --

22              HEARING OFFICER BUTLER-TRUESDALE:

329

1    Let me save both of you some time.  I have

2    as a course so far been overruling objections

3    to the admittance of resolution meeting

4    notes.

5                MS. WULKAN:  Okay.

6                HEARING OFFICER BUTLER-TRUESDALE:

7    And the reason that I have done that and I

8    have been asking parents if they have any

9    relevant cases that would provide direction

10   otherwise to, please, give it to me.

11               But I have stated that I think

12   that the reliance that some people were

13   putting on the bar of settlement negotiations

14   from litigation proceedings did not

15   necessarily apply to an administrative due

16   process hearing in that this is not

17   litigation, and that this is an adjudicative

18   procedure which has a different purpose than

19   litigation.

20               And so while the notes are

21   admissible before me at this time, but I

22   haven't received despite pleadings any case

330

1    law helping me to make another determination,

2    it is possible that I would make that a

3    different ruling with respect to

4    conversations, if you can distinguish the

5    difference between the notes and any

6    conversations had at the resolution meeting.

7            MS. WULKAN:  Okay.

8            HEARING OFFICER BUTLER-TRUESDALE:

9    But I have held that the notes are

10   admissible.  So can you all argue this motion

11   on --

12           MS. WULKAN:  I think the notes --

13           HEARING OFFICER BUTLER-TRUESDALE:

14   That basis?

15           MS. WULKAN:  Yes.  I don't even

16   know where Mr. Dalton is going with this, but

17   if he had -- if he pulled us out, it was

18   clearly off the record, so to speak.  There

19   wasn't -- DCPS wasn't involved in it.  Nobody

20   else was involved in it.  He had a private

21   conversation with us.

22           I don't remember what it was

1    about, but I don't know what -- at this point

2    why   it   would   be   admissible   in   this

3    proceeding,  because  it  was  basically  a

4    private conversation.

5                HEARING  OFFICER  BUTLER-TRUESDALE:

6    So you're saying this wasn't even a part of

7    the resolution meeting?

8                MS. WULKAN:  Yes, correct.

9                HEARING  OFFICER  BUTLER-TRUESDALE:

10    Okay.  Mr. Dalton?

11                MS. WULKAN:  He pulled us into the

12    other  room  and  said  I  want  to  talk  to  you

13    privately.  Let's go off the record.

14                HEARING  OFFICER  BUTLER-TRUESDALE:

15    Okay.  Mr. Dalton?

16                MR.   DALTON:   Could  I,  please,

17    request  that  Ms.  Hawkins  leave  the  room,

18    please?

19                HEARING  OFFICER  BUTLER-TRUESDALE:

20    Okay.   Ms.  Hawkins,  do  you  mind?   Okay.

21    Keep  your  eye  on  me.   Okay?   I  mean,  you

22    don't have to stare at me, but okay.  Okay.

332

1          (Whereupon, the witness leaves the

2     room.)

3          MR.  DALTON:   Okay.   The reason

4     that I requested that I be able to speak to

5     Ms. Hawkins out of the presence of the team

6     and  Dr.  Piegler  was  because  I  wanted  to

7     confirm  this  whole  business  of  the  tacit

8     agreement  between  the  school  and  her  about

9     waiting until she found an attorney.

10          HEARING  OFFICER  BUTLER-TRUESDALE:

11      Um-hum.

12          MR.   DALTON:     And   a   private

13     placement.

14          MS.  WULKAN:    Mr.  Dalton,  I'm

15     sorry.   I was there at that meeting.   That

16     was  never  even  raised.    That  issue  wasn't

17     raised.

18          MR.  DALTON:   Okay.   Counsel,  it

19     was.   It was the whole purpose of it.

20          MS. WULKAN:   It was not.

21          MR.  DALTON:   Okay.   Well,  I'm

22     going to proffer my --

1          MS. WULKAN:   Okay.   You can

2  proffer all you want to.   I will tell you

3  that was not even raised.

4          MR. DALTON:   -- my record, because

5  I'm entitled to do that for appeal purposes

6  and it goes to the entire credibility of your

7  case.

8          MS. WULKAN:   Well, it really goes

9  -- and this is, first of all, a private

10  conversation.   Second of all, I was there.

11  It was never even raised.   The first time I

12  heard his theory about her asking for

13  something was last night when he spoke to a

14  friend of the family.   This is the first time

15  I ever heard of it.

16          MR. DALTON:   Okay.

17          MS. WULKAN:   And it was not raised

18  there.   You can ask her if you want, but I'm

19  telling you that I was there and that was

20  never -- that was not the purpose.   The side

21  conversation was about what I did wrong and

22  why I should have come to him around the

1    Katherine Thomas.

2           MR. DALTON:  No.

3           MS. WULKAN:  Totally wrong.  That

4    was what the side conversation was about.

5           MR. DALTON:  No, that was not.

6    That was part of it.  Okay?

7           MS. WULKAN:  Well, it wasn't on

8    the record and we're not going to get

9    anywhere on this.

10          MR. DALTON:  Okay.

11          MS. WULKAN:  And I think --

12          MR. DALTON:  All I'm going to do

13   is proffer my -- I got about one or two

14   minutes of proffering the record, and then I

15   want to ask the client about it.  If the

16   client denies it, that's fine.  We have

17   rebuttable testimony other than that

18   conversation, the supplement.  You can give

19   it whatever weight you want.

20          HEARING OFFICER BUTLER-TRUESDALE:

21    Well, let her come in.  You ask the

22   question.  I'll give the answer proper

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

1   weight.

2           MR. DALTON:  Okay.

3           MS. WULKAN:    And I'm noting my

4   objection for the record.

5           (Whereupon,  the  witness  reenters

6   the room.)

7           BY MR. DALTON:

8       Q    All right.   To kind of reset the

9   stage  again,  we  were  having  a  resolution

10  meeting.   Dr.  Piegler  was  participating  by

11  phone.   There  was  a  question  about  the

12  appropriateness of the placement at SAIL.

13          She indicated that before we could

14  go to that, I mean, before we could go to the

15  issue of placement, that she had to have that

16  answer  and  before  I  wanted  to  ask  --  ah,

17  before I wanted to give that answer, I wanted

18  a  break  so  I  could  talk  to  you  and  your

19  lawyer.

20          We went out into that little side

21  office that is directly in front of the room

22  where  we  were  having  the  resolution  meeting

1     with the speakerphone.  Do you recall that?

2          A    Yes, I remember going in the room.

3          Q    Okay.  And  do  you  recall  what

4     happened in that room?  Can you give me your

5     version of what we talked about?

6          A    I don't remember.

7          Q    You don't remember anything?

8          A    No.

9          Q    You don't remember me?  You were

10    sitting and I was standing and your counsel

11    was standing and I looked you directly in the

12    eye.

13          MS.  WULKAN:  Objection.  She

14    answered it.

15          BY MR. DALTON:

16          Q    And I asked you whether or not --

17          HEARING  OFFICER  BUTLER-TRUESDALE:

18    Sustained.  Sustained.  She answered, she

19    answered.

20          MS. WULKAN:  Objection.  Asked --

21          HEARING  OFFICER  BUTLER-TRUESDALE:

22    She answered the question of whether or not

1    she remembered.    Now, are you asking her

2    another question?

3                MR. DALTON:  Um-hum.

4                HEARING OFFICER BUTLER-TRUESDALE:

5     Okay.

6                MS. WULKAN:  No, he is just going

7    to try to proffer his answer.    She doesn't

8    remember.

9                BY MR. DALTON:

10        Q    Do you recall me stating that my

11   investigation was that --

12               MS. WULKAN:  Objection.

13               HEARING OFFICER BUTLER-TRUESDALE:

14    Sustained.

15               MS. WULKAN:  Objection.

16               HEARING OFFICER BUTLER-TRUESDALE:

17    She said she didn't remember.

18               MS. WULKAN:  Asked and answered.

19   She said she doesn't remember anything.

20               MR. DALTON:  She is not letting me

21   proffer the record or ask the question.

22               MS. WULKAN:  You asked her.

1          MR. DALTON:   And I have to do one

2     or the other.

3          MS. WULKAN:   You asked her if she

4     remembered what happened at that meeting.

5          MR. DALTON:   And she is saying she

6     doesn't remember anything.

7          MS. WULKAN:   She said she doesn't

8     remember.  Therefore, that is the end of the

9     questions.   She said she doesn't remember.

10    So you're going to ask her again do you

11    remember my saying this, and she is going to

12    say again no.  So we don't need to make more

13    of a record.   You asked her whether you

14    remember what happened at that meeting.

15    That's the end of it as far as I'm concerned.

16         HEARING  OFFICER  BUTLER-TRUESDALE:

17     Absolutely.

18         MR. DALTON:   I don't understand

19    the vehement objection if the client is

20    simply going to answer no.

21         HEARING  OFFICER  BUTLER-TRUESDALE:

22    Well, she already answered no, so let's go

1   to the next question.

2           MR. DALTON:   It seems to me this

3   is the very crux of the whole case and we're

4   not being allowed to get to it, and that

5   bothers me.  It's one thing for the client to

6   deny it and it's another for it not to even

7   be asked.

8           HEARING  OFFICER  BUTLER-TRUESDALE:

9   Okay.   Wait a minute.   Are you asking

10  something different than do you remember what

11  happened?

12          MR. DALTON:  Um-hum.   I want to

13  ask a specific question and counsel is doing

14  everything on her power to make sure that

15  that question doesn't get asked.

16          MS. WULKAN:  He wants to ask her

17  don't you remember that I said this the once?

18   That's what he wants to know.  She said she

19  doesn't remember what he said.  Now, he is

20  going to say I'm telling you what I asked,

21  don't you remember that I asked that?  He is

22  saying --

1          MR. DALTON:   And all she has to

2     say is no.

3          MS. WULKAN:   Well, but already

4     asked and answered.   She doesn't remember.

5     So why does he get to then proffer?   Does he

6     think that by asking the question, it becomes

7     part of the record?   I think that's legally

8     insufficient.

9          MR. DALTON:  No, I could --

10          MS. WULKAN:   You have already gone

11     there.

12          MR. DALTON:   I either get to

13     proffer the record as to what I believe the

14     witness' answer would have been or I get to

15     ask the question.  She doesn't get her way on

16     both of those.   It's an automatically

17     appealable issue if you don't want to proffer

18     the record.

19          MS. WULKAN:  Okay.

20          HEARING OFFICER BUTLER-TRUESDALE:

21     Yes.  I wish that the more narrow question

22     had been asked first, but it's too late now

1  and I have already ruled on the objection.

2  Let's go on to the next question.    It's

3  narrow.

4              MR. DALTON:   Well, I would like

5  her excused, so I can proffer what the

6  question and what I believe the answer would

7  be.

8              HEARING OFFICER BUTLER-TRUESDALE:

9  Okay.   I'll allow that.   I'm sorry, Ms.

10 Hawkins.

11             (Whereupon, the witness leaves the

12 room.)

13             MS. WULKAN:   I mean, how does he

14 get to proffer what he thinks the answer --

15 what his theory is?   That's your closing

16 argument.

17             MR. DALTON:   Because -- no,

18 because the Federal Court on more than one

19 case --

20             MS. WULKAN:   Cite the case.

21             MR. DALTON:   I don't have to.

22             MS. WULKAN:   Okay.

1          MR. DALTON:    Has stated that if

2    you do not put it on the record, they can't

3    rule on it, which makes perfect common sense.

4    If it's not on the record, they can't rule

5    on it.   Okay.   Here is the question.

6          I said to Ms. Hawkins I could not

7    understand why there was an IEP for three

8    years with full-time placement from such a

9    competent person as Amy Muldoon (phonetic),

10   the predecessor.   Okay.   Amy had been, and I

11   said this, one of the most competent people

12   we have.   Okay?   I could not understand that.

13         So I asked for an investigation

14   and the investigation turned up that there

15   was this tacit agreement between the mother

16   and the school that the school would give the

17   mom as much time as she needed to find a

18   lawyer and a placement and then we would

19   contact DCPS, and that the only reason this

20   all broke down was because of the physical

21   change of the school and that's when things,

22   this little tacit agreement, fell apart.

1          MS. WULKAN:       Well,    that's

2   interesting,   because   I   never   heard   that

3   argument.   I  was  in  that  meeting.   I  never

4   heard anything about Amy Muldoon.

5          MR. DALTON:  Oh, okay.   Well, you

6   can --

7          MS. WULKAN:   In  fact,  you  didn't

8   know  when  you  came  into  that  meeting,  Mr.

9   Dalton, that he had a full-time IEP.

10          MR. DALTON:  Oh, please.

11          MS. WULKAN:   I will absolutely --

12   Ms. Umansky was there.   You said he doesn't

13   have an IEP.   We don't have anybody here at

14   SAIL with a full-time IEP.

15          MR. DALTON:  That's --

16          MS. WULKAN:   That's exactly what

17   you said at that meeting.

18          MR. DALTON:  Okay.

19          MS. WULKAN:   You didn't even know

20   that he had an IEP, so he can -- if he wants

21   to go through this whole scenario and ask her

22   about whether or not --

344

1          MR. DALTON:   You're confusing the

2     two meetings.

3          HEARING  OFFICER  BUTLER-TRUESDALE:

4     Okay.  Let me make sure.

5          MS. WULKAN:  No, I'm not.

6          HEARING  OFFICER  BUTLER-TRUESDALE:

7     Because it's 2:50, I want to make sure that

8     we have on the record off the record you

9     stated to me that you would prefer to proceed

10    with the --

11         MR. DALTON:  Cross exam.

12         HEARING  OFFICER  BUTLER-TRUESDALE:

13    -- cross as opposed to reviewing the tapes.

14    I want to make sure that that's clear on the

15    record.

16         MR. DALTON:  Right.

17         HEARING  OFFICER  BUTLER-TRUESDALE:

18    That that was your elected option.  Okay.

19         MR. DALTON:  And then I wanted Ms.

20    Umansky's  rebuttal  evidence  put  on,  too,

21    before --

22         HEARING  OFFICER  BUTLER-TRUESDALE:

1    Okay.

2              MS. WULKAN:   I'm going to object

3    to any -- to Ms. Umansky.   She is not

4    disclosed.

5              MR. DALTON:   Rebuttal witnesses

6    are not --

7              HEARING OFFICER BUTLER-TRUESDALE:

8    Are we ready to bring to Ms. Hawkins back

9    in?

10             MR. DALTON:   -- required to be

11   disclosed.

12             MS. WULKAN:   Um-hum.

13             HEARING OFFICER BUTLER-TRUESDALE:

14   Okay.  Where did she go?  Oh, she must be --

15             MS. WULKAN:   Okay.

16             HEARING OFFICER BUTLER-TRUESDALE:

17   She must be on the phone.   She's probably

18   trying to make a phone call.

19             (Whereupon, the witness reenters

20   the room.)

21             MR. DALTON:   Oh, no, that's

22   ridiculous.

1          HEARING OFFICER BUTLER-TRUESDALE:

2    Okay.  Next question?

3          BY MR. DALTON:

4     Q     Your son has one or two pairs of

5    glasses?

6     A     Two, same prescription.

7     Q     Why is that?

8     A     Same prescription.

9     Q     Why?  Why two?

10    A     In case he loses one.

11    Q     Or another way of saying it is one

12   for school, one for home?

13    A     Yes.

14    Q     Okay.  And isn't it a fact that on

15   most occasions, he did not wear his glasses

16   at school?

17    A     I could not say.   I'm not at

18   school.

19    Q     And would you be surprised that a

20   witness from the school testified that he did

21   not wear his glasses at school?

22    A     No, because I'm not at school and

347

1    I don't -- I wouldn't know whether he wears

2    his glasses at school.

3        Q    The question, ma'am, is would you

4    be surprised at that testimony that he did

5    not wear his glasses at school?

6        A    No.

7        Q    You wouldn't be surprised?

8        A    No.

9        Q    Okay.  And isn't it a fact that

10   because he does have prescription glasses

11   that his ability to attend and read would be

12   affected by the failure to wear those

13   glasses?

14       A    Yes, but somebody needs to let me

15   know that.

16       Q    And why is it that Dr. James is

17   making a recommendation for medication to

18   address the ADHD issue when, in fact, he was

19   already on medication for ADHD?

20       A    He wasn't taking it at the end of

21   the year.

22       Q    When was he taking it?

1       A    Earlier.

2       Q    What does earlier mean?

3       A    January/February.

4       Q    And why did he stop?

5       A    He said it irritated his stomach.

6       Q    Okay.  Did you see any difference

7  while he was on medication?

8       A    The teachers did not report any

9  difference.

10      Q    Did you see any difference?

11      A    No,    not    on    that    particular

12  medication, no.

13      Q    Did he try other medications?

14      A    He is trying something now.

15      Q    What is that medication?

16      A    Concerta.

17      Q    Is it helping?

18      A    I'm not sure yet.

19           MR.    DALTON:    Just    a    minute,

20  please.

21           HEARING  OFFICER  BUTLER-TRUESDALE:

22    Um-hum.

1         BY MR. DALTON:

2         Q    Okay.  Now, as a result of the

3  August 1st meeting, the parties decided to

4  have a conference call so that the issue of

5  placement could be decided.  Is that not

6  correct?

7         MS. WULKAN:  Objection for the

8  record.  It's -- nothing has come in on

9  evidence past the August 1st resolution

10  meeting notes, so that's it as far as I'm

11  concerned.

12         HEARING OFFICER BUTLER-TRUESDALE:

13  Let me rule.  Just give me a second.  I'll

14  think this one out.  I didn't really

15  adequately discuss where we were going to go

16  with this issue before.

17         MS. WULKAN:  It certainly doesn't

18  go to the complaint that's before you nor has

19  DCPS been made a party to this and nor has

20  DCPS -- nor has Mr. Dalton produced any

21  evidence, documents or witnesses that have

22  anything to do with that.

            HEARING OFFICER BUTLER-TRUESDALE:

I think I have to sustain that motion in consistency with the fact that I have excused DCPS from the proceedings, but let me hear from you, Mr. Dalton.

            MR. DALTON: It goes to the whole issue of what this case is about. The case is not about SAIL. The case is about placement of D███████ at an appropriate school and there is no disagreement.

            MS. WULKAN: Pardon me?

            MR. DALTON: There is no disagreement about that.

            MS. WULKAN: Oh, there is vast disagreement about that. That is not what the Hearing Officer said this case is about and I certainly disagree. This case is about what we complained about.

            MR. DALTON: All right.

            MS. WULKAN: It's what the complaint is about and that is what you have been limited to testimony about.

1        MR. DALTON:  Okay.

2        MS. WULKAN:  This, what we have

3    complained about.

4        MR. DALTON:  All right.  Aside

5    from counsel's comments, the questions are

6    directed to showing our view of the case.

7        HEARING OFFICER BUTLER-TRUESDALE:

8     Um-hum.

9        MR. DALTON:  Now, it is true that

10   counsel for the parent is entitled to present

11   her view, but it is equally true that counsel

12   for the school is entitled to present the

13   school's view of the case, and we have been

14   completely prevented from doing that over my

15   continuous objections.

16       HEARING OFFICER BUTLER-TRUESDALE:

17    Okay.

18       MR. DALTON:  Okay?  I have sat

19   here and I think been extremely civil about

20   my inability to present a case on behalf of

21   my client.  I will continue to remain civil

22   with that regard, by the way, but I am very

352

1    troubled by the fact that the Hearing Officer

2    has used her discretion to prevent this

3    counsel from adequately presenting a defense

4    in this case and I need to say that for the

5    record.

6                    HEARING OFFICER BUTLER-TRUESDALE:

7    Yes.

8                    MR. DALTON:  I mean, this --

9                    HEARING OFFICER BUTLER-TRUESDALE:

10   And I can appreciate that comment.  I am

11   only going to interrupt to say that I think

12   that there is one controlling factor that

13   supersedes how either party may present their

14   case and that is the written hearing

15   complaint and, specifically, the date that

16   the complaint is signed and filed.

17                    I think the reason that we're

18   chasing our tail over this issue is because

19   there are critical events that happened after

20   the filing of the complaint, and that those

21   critical events which happened after the

22   filing of the complaint, how much they weigh

into my job, which is to make a ruling based on the complaint as defined, written and offered by the petitioner, unfortunately also shapes your affirmative defenses.

MR. DALTON:  Well --

HEARING  OFFICER  BUTLER-TRUESDALE: But  I'm  looking  very  strictly  at  the chronology of events.

MR. DALTON:  I understand.

HEARING  OFFICER  BUTLER-TRUESDALE: And what happened prior to the filing of the complaint  that  makes  the  allegations relevant.

MR. DALTON:  Okay.  But here is my problem with that.  Okay?

HEARING  OFFICER  BUTLER-TRUESDALE: Um-hum.

MR.  DALTON:  It  seems  that everyone is forgetting all the experience we have had.  Let's say that this complaint was about our failure to provide evaluations and hold an MDT meeting.

1          HEARING  OFFICER  BUTLER-TRUESDALE:

2     Um-hum.

3          MR.  DALTON:    And  then  after  the

4     complaint    is    filed,    we    complete    the

5     evaluations  and  hold  the  MDT  meeting.    Are

6     you  trying  to  say  that  we're  not  entitled  to

7     introduce  that  evidence  and  request  that  the

8     case  be  dismissed  because  of  mootness?    I

9     have  done  that  100  times.

10          HEARING  OFFICER  BUTLER-TRUESDALE:

11     Well,  I  think  that  it  would  depend  on  what

12     the  counts  of  the  complaint  were.

13          MR.  DALTON:    No,  the  count  is  we

14     didn't  do  the  evaluations,  we  didn't  hold  an

15     MDT  meeting.

16          MS.  WULKAN:    No,  that's  not  the

17     count.

18          MR.  DALTON:    No,  no,  I'm  trying  to

19     put  it  in  a  different  context.    To  use  your

20     logic,  you  would  have  to  prove  --

21          HEARING  OFFICER  BUTLER-TRUESDALE:

22     I'm  trying  to  make  sure  I  understand  your

1    analogy.

2              MR. DALTON:  You would have to --

3              HEARING  OFFICER  BUTLER-TRUESDALE:

4    I'm trying to make sure I understand your

5    analogy, but I'm not sure how closely your

6    analogy is related to this complaint, given

7    that she has incorporated the denial of faith

8    not just being the failure to do a procedural

9    issue or complete a procedural issue, but she

10   has incorporated the concept of the child

11   suffering some harm over an extended period

12   of time.

13             MR. DALTON:  Okay.

14             HEARING  OFFICER  BUTLER-TRUESDALE:

15   Which would -- which means that an issue of

16   mootness is a little harder to achieve.

17             MR. DALTON:  Okay.  But look --

18   all right.  So let's change the analogy.

19             HEARING  OFFICER  BUTLER-TRUESDALE:

20   Okay.

21             MR. DALTON:  Let's say that the

22   analogy is you didn't provide evaluations,

1    okay, you didn't hold an MDT meeting and

2    because of the time difference, there is comp

3    ed.

4                    HEARING OFFICER BUTLER-TRUESDALE:

5    Okay.

6                    MR. DALTON: Okay? So now, you're

7    telling me you don't allow anything in

8    because you can't do the comp ed part? No.

9    You let in the fact that you had the

10   evaluations. You let in the fact that you

11   had the MDT and then you go on that other

12   issue, was the failure to give that in a

13   timely fashion -- constitute an award of comp

14   ed?

15                    MS. WULKAN: You know, Mr. --

16                    MR. DALTON: The same thing goes

17   for here. You let in the fact that there was

18   a subsequent placement meeting. You let in

19   evidence about the fact that there was a

20   notice of prior placement, and then you go --

21   you come to the issue of whether or not there

22   is authority for you to hold the school

1    responsible for that or whether you have to

2    look at the -- and take evidence on whether

3    Prospect is appropriate.

4         MS. WULKAN:  No.

5         MR. DALTON:  And that's what I

6    asked you to do and you didn't do it and that

7    -- so that has completely compromised my

8    ability to represent my client.

9         MS. WULKAN:  First of all, I

10   believe that the Hearing Officer --

11        HEARING OFFICER BUTLER-TRUESDALE:

12    I wish I agreed with you.

13        MS. WULKAN:  I believe that the

14   Hearing Officer has ruled on your same

15   arguments that you have made from the

16   beginning of the hearing and you continue to

17   make, and there are several problems with

18   your arguments.

19        Number one, that the Hearing

20   Officer is working with the complaint, as she

21   should, and you are the only defendant to the

22   complaint and there has not been any

1    disclosure by you.  Even in your not allowed

2    disclosures, there is no disclosure from you

3    about anything having to do with any meetings

4    or anything that happened subsequent to the

5    resolution meeting.

6              There is nothing.  There is

7    nothing in the record.  There is no

8    disclosure.  There is no notice.  There is

9    nothing.  You're trying to bring that in.

10             MR. DALTON:  What is the relevance

11   of that?

12             MS. WULKAN:  Well, I think we're

13   only allowed to put hearings in -- evidence

14   into hearings.

15             MR.    DALTON:    That's    where

16   witnesses' testimony comes in.

17             MS. WULKAN:  No.  I believe that

18   we're only allowed to have disclosure.

19   You're only allowed to have evidence about

20   what is disclosed to you and this is --

21             MR. DALTON:  Not rebuttal.

22             MS. WULKAN:  Look, she has already

359

1   ruled on this.

2          MR. DALTON:  Let's move on.

3          MS. WULKAN:  You just want to just

4   move the time line.

5          MR. DALTON:  Is the witness going

6   to be able to testify as to the October 8th

7   or, I'm sorry, August 8th meeting and her

8   participation in that meeting?

9          HEARING OFFICER BUTLER-TRUESDALE:

10   No, this is the meeting that I already

11   entertained a question on with her, what she

12   remembered.

13          MS. WULKAN:  No.

14          MR. DALTON:  No, no, that was the

15   August 1st.

16          THE WITNESS:  That was the August

17   1st meeting.  That was the resolution meeting.

18          HEARING OFFICER BUTLER-TRUESDALE:

19   Oh, this was the pull-out from the --

20          MS. WULKAN:  This is the one he --

21          MR. DALTON:  Right.

22          MS. WULKAN:  Yes.  This is the one

1    you have already ruled and said you're not

2    taking any evidence with regard to this.

3           HEARING OFFICER BUTLER-TRUESDALE:

4    Just a moment ago when I said, well, I have

5    excused DCPS.

6           MS. WULKAN:  That's correct.

7           HEARING OFFICER BUTLER-TRUESDALE:

8    And to remain consistent with the earlier

9    decision, too.

10          MS. WULKAN:   That's  correct.

11   That's correct.

12          HEARING OFFICER BUTLER-TRUESDALE:

13   Well, I'm sticking with it, because I'm

14   afraid to backpedal with you all.

15          MR. DALTON:  Okay.  Well, that's

16   fine.  Then I don't need to have the witness

17   excused.  I just want to proffer for the

18   record that both counsel and her witness

19   agreed to participate by phone.  We didn't

20   need to have all the parties there, because

21   the only issue was placement.

22          It was my opinion that DCPS would

361

1    offer what they always do, a public

2    placement, and that counsel would have to

3    defend her private placement and that that

4    issue would be decided by the Hearing

5    Officer.

6            We met.  They rejected the

7    placement on the basis that D███████ had

8    aged out and that is the relevant information

9    that should be considered by the Hearing

10   Officer even contrary to the rulings that

11   have been made and the arguments made by

12   parents' counsel.

13           Let me think.  I may not have any

14   more questions, because I'm not able to ask

15   any more questions, I don't think.  No, I

16   think the rest of my questions will be

17   rebuttal, to my rebuttal witness.

18           HEARING OFFICER BUTLER-TRUESDALE:

19    Okay.  Redirect?

20           MS. WULKAN:    I have very, very

21   brief redirect.

22               REDIRECT EXAMINATION

1      BY MS. WULKAN:

2          Q    Ms. Hawkins, did you ever, three

3    years ago, ask SAIL to keep D███████ because

4    you --

5          HEARING OFFICER BUTLER-TRUESDALE:

6    We got something -- let's switch those

7    mikes.  That mike right in front of you isn't

8    picking up at all.  Your voice wasn't

9    registered at all.  I'm sorry.

10         MS. WULKAN:   Should I just turn

11   that one on?

12         HEARING OFFICER BUTLER-TRUESDALE:

13    I don't know, but it's --

14         MS. WULKAN:   Maybe it's turned

15   off.  It needs turned on.  All right.  Let's

16   try this one.

17         BY MS. WULKAN:

18         Q    Did you ever have a discussion

19   with SAIL three years ago that you thought

20   that you wanted to move D███████, but that

21   you wanted them to hold on to D███████,

22   because you were too busy moving Deon three

1    years ago?

2        A    No,   Deon   was   in   a   D.C.   public

3    school   three   years   ago.    I   moved   Deon   this

4    year.

5        Q    Were   you   dissatisfied   with   Deon's

6    placement   three   years   ago   when   he   was   in   D.C.

7    Public   Schools?

8        A    No.

9        Q    When   did   you   start   deciding   you

10   were going to move Deon?

11       A    He   was   in   the   sixth   grade,   so   it

12   was time for him to move to middle school.

13       Q    Okay.   So that was just this year?

14       A    Yes.

15       Q    At the end of this year?

16       A    Um-hum.

17       Q    And   when   did   you   decide   that   you

18   wanted to move D███████?

19       A    When   he   came   to   the   new   school,   I

20   visited.   He -- there   were   no   walls.    It   was

21   dirty.    It   was   crowded   classrooms   and   he

22   didn't   want   to   go   to   school.   He   was   always

1    upset, so --

2          Q    So that was after March of '06?

3          A    Yes.

4          Q    Okay.

5                MS. WULKAN:    I have nothing

6    further.

7                HEARING OFFICER BUTLER-TRUESDALE:

8    Recross?  Amazing.  Who is next?

9                MS. WULKAN:    I don't have any

10   further witnesses.

11               HEARING OFFICER BUTLER-TRUESDALE:

12   Okay.

13               MS. WULKAN:  Just Dr. James.

14               HEARING OFFICER BUTLER-TRUESDALE:

15   All right.

16               MR. DALTON:  All right.  Could we

17   have a little bit of time?  So, at this time,

18   I would like to call Ms. Umansky as rebuttal

19   to the testimony offered by parents' counsel.

20               HEARING OFFICER BUTLER-TRUESDALE:

21   Any objection?

22               MS. WULKAN:    I'm going to object

1    because Mr. Dalton was not supposed to be

2    calling any witnesses because you did not

3    allow his disclosure, which included

4    witnesses and testimony, and so I don't see

5    why he gets to now put on a case when he

6    didn't have any disclosure.

7                HEARING OFFICER BUTLER-TRUESDALE:

8    Tell me a little bit more about the

9    rebuttal.

10               MR. DALTON:  It's a fundamental

11   principle.  You can't know that you're going

12   to have a rebuttal witness until you hear the

13   testimony.

14               HEARING OFFICER BUTLER-TRUESDALE:

15   Okay.

16               MR. DALTON:  Because you don't

17   know what -- if there is going to be anything

18   to rebut.

19               HEARING OFFICER BUTLER-TRUESDALE:

20   Um-hum.

21               MR. DALTON:  You can't assume that

22   witnesses are going to testify, that you're

1    going to need rebuttal testimony.

2            HEARING OFFICER BUTLER-TRUESDALE:

3    Okay.

4            MS. WULKAN:  But that --

5            MR. DALTON:    Therefore, there is

6    no need to disclose that testimony.

7            MS. WULKAN:  But that --

8            MR. DALTON:  And I have --

9            MS. WULKAN:   It allows you not to

10   put on a case is what the thing is.

11           MR. DALTON:  Oh.

12           MS.  WULKAN:    When  you  have  a

13   disclosure  and  you  don't  disclose  any

14   witnesses,  you  can't  put  on  witnesses  in  the

15   case.

16           MR. DALTON:  No, I can.

17           MS. WULKAN:  Whether it's case in

18   chief or rebuttal.

19           MR.  DALTON:    Contrary  to  the

20   ruling, I can call the party and I can always

21   produce rebuttal evidence.

22           HEARING  OFFICER  BUTLER-TRUESDALE:

1    Okay.

2              MS. WULKAN:  I don't agree.

3              MR. DALTON:  And if you choose to

4    side with the -- if you choose to side on

5    this issue, I will make a proffer, rest and I

6    will not cross examine Ms. Jones because I am

7    simply going to --

8              HEARING  OFFICER  BUTLER-TRUESDALE:

9    Ms. James.

10             MS. WULKAN:  Dr. James.

11             MR. DALTON:  Or Dr. Jones.  I am

12   simply going to address the position --

13             MS. WULKAN:  James.

14             HEARING  OFFICER  BUTLER-TRUESDALE:

15   Here is what I want to do, because I want to

16   at  any  cost  create  a  full  record  for  the

17   court.   I  think  that's  a  courtesy  I  can  do

18   for  them.   I  will  regain  my  very  liberal

19   tradition  regarding  evidentiary  evidence  in

20   these  due  process  hearings.   I  will  allow  her

21   as a rebuttal witness.

22             MR. DALTON:  Okay.

1              HEARING OFFICER BUTLER-TRUESDALE:

2    And give her testimony proper weight and I

3    note your objection.  I definitely understand

4    your objection and I understand how it can be

5    perceived as a way to circumvent the Five Day

6    Disclosure Rule.

7              MS. WULKAN:  I thought so.

8              HEARING OFFICER BUTLER-TRUESDALE:

9    I agree with you, but I have -- I am trapped

10   by my past patterns, which is that I am very

11   liberal about the inclusion of evidence,

12   trying to acquire as much evidence as

13   possible, and I have said constantly ad

14   nauseam that the rules of evidence do not

15   apply in the administrative due process

16   hearing.

17             And I'm distinguishing between the

18   two rulings in that I do not have discretion

19   with the Five Day Disclosure Rule.  I think I

20   do have some discretion with the concept of

21   the rebuttal witnesses, so I'm going to allow

22   the testimony.

1        MS. WULKAN:  Okay.

2        HEARING  OFFICER  BUTLER-TRUESDALE:

3   Okay?   All  right.   Would  you  raise  your

4   right hand, please?

5   Whereupon,

6        JENNA UMANSKY

7   was  called  as  a  witness  by  Counsel  for  the

8   Plaintiff,  and  having  been  first  duly  sworn,

9   assumed  the  witness  stand  and  was  examined

10  and testified as follows:

11       HEARING  OFFICER  BUTLER-TRUESDALE:

12   All  right.   Now,  spell  your  full  name  for

13  the record, please.

14       THE  WITNESS:   J-E-N-N-A  U-M-A-N-S-

15  K-Y.

16       HEARING  OFFICER  BUTLER-TRUESDALE:

17   Do  you  solemnly  --  did  I?   Did  I  swear  you

18  in already?

19       MR. DALTON:  Um-hum.

20       HEARING  OFFICER  BUTLER-TRUESDALE:

21   I did?  Okay.  Your witness, Mr. Dalton.

22       DIRECT EXAMINATION

1        BY MR. DALTON:

2        Q      Would you, please, state your

3    current occupation?

4        A      I am a special education

5    coordinator for SAIL Upper and High School.

6        Q      And your past employment?

7        A      I -- last year I was the special

8    education teacher for SAIL Upper and High

9    School.

10        Q      And before that?

11        A      I spent five years as a teacher at

12    the Ivy Mountain School and before that, two

13    years as a teacher at Saint Coletta.

14        Q      All right.  And what are your

15    duties in your current position?

16        A      I oversee the Special Education

17    Department.  I make sure that we are in

18    compliance with our IEPs and testing.  I

19    ensure that all students' accommodations and

20    modifications are being met, as well as their

21    instructional needs.

22                I also supervise the special

education teachers and work with our non-
special education teachers to ensure that
they are teaching to the best of their
ability to meet our special education student
needs.

Q     And are you familiar with the
student, D██████ H██████?

A     Yes, I am.

Q     And how are you familiar with him?

A     I was his special education
teacher last year.

Q     All right.   And who was the
special ed coordinator at that time?

A     Amy Muldoon.

Q     With regard to this issue of there
being a full-time placement --

        MR. DALTON:   I'm sorry.   Strike
that.

        BY MR. DALTON:

Q     A full-time IEP for this student,
do you have any explanations?

A     It was explained to me that Ms.

1   Hawkins was working with Ms. Muldoon and the

2   rest of the SAIL staff to find a different

3   placement for D███████, and in the meantime

4   had created an IEP that would help her do so.

5        Q    And what are the procedures for

6   having DCPS assist the charter school in the

7   placement of a student who requires a full-

8   time placement?

9        A    When a student needs to have their

10  placement changed, excuse me, from SAIL into

11  a full-time placement, we create what is

12  called a placement packet.  It includes, but

13  is not limited to, current and past IEPs, MDT

14  notes, all the evaluations, including the

15  most recent triannial and speech and OT, if

16  appropriate, as well as the site review form.

17       Q    And was this transmitted to DCPS?

18       A    To the best of my knowledge, yes,

19  after the August 1st meeting.

20       Q    All right.  And do you have any

21  explanation as to why it wasn't done before

22  that?

 1      A     No.  It was my understanding that

 2   they were waiting to hear further from Ms.

 3   Hawkins.

 4      Q     What is your opinion as to the --

 5            MR. DALTON:  Well, strike that.

 6            BY MR. DALTON:

 7      Q     Do you have any explanation other

 8   than the explanation that you have come to

 9   understand about why SAIL did not transmit

10   that placement package to DCPS?

11      A     No.

12      Q     Okay.

13      A     Other than they were waiting to

14   hear from Ms. Hawkins.

15      Q     Okay.

16      A     Traditionally, we work with the

17   parent to -- when the placement process is

18   started.

19            MR. DALTON:  And we need some

20   guidance from the Hearing Officer.  I intend

21   to ask her a series of questions concerning

22   the August 8th meeting, which has already been

1  ruled on, that you don't want to have -- take

2  evidence on, but I simply want to get her

3  testimony in for the purposes of, basically,

4  proffering my record.

5          MS.  WULKAN:      No,  objection.

6  Number one, you have already ruled on it and

7  you wouldn't let him ask Ms. Hawkins about

8  it.    Number  two,  this  is  rebuttal  and

9  rebuttal  is  only  for  the  purposes  of

10  rebutting what was said on direct.   I mean,

11  there is a limitation to rebuttal.   Rebuttal

12  was said.

13          MR. DALTON:  This --

14          MS. WULKAN:  And so this is not a

15  free will in his deciding to get around your

16  ruling for the third time.

17          MR. DALTON:  No.

18          MS. WULKAN:  So I object to that.

19          MR. DALTON:  It's not a matter of

20  your taking in testimony.   You're not going

21  to consider this testimony.   It's a matter of

22  proffering the record for appeal purposes.   I

1   need to ask this witness questions so that

2   the court knows what her answers would be, so

3   they can then rule on the correctness of your

4   decisions.

5          HEARING OFFICER BUTLER-TRUESDALE:

6   Well, you know, I think this is resolved by

7   the fact that on appeal these cases can be

8   presented darn near de novo.  You get to

9   present evidence that you did not put before

10   me and that is the reason why on appeal de

11   novo issues can be presented.

12          So I don't think that I have to

13   entertain her answers to those questions

14   simply so that there is a record for appeal,

15   because they can be presented during the

16   appeal case.  Am I wrong on that?

17          MR. DALTON:   It has been my

18   experience --

19          MS. WULKAN:  No, you're not wrong.

20          MR. DALTON:   -- that that issue is

21   not always as clear cut as you have made it

22   out to be.

1          HEARING  OFFICER  BUTLER-TRUESDALE:

2     Why?

3          MR. DALTON:  Again, I think --

4          HEARING  OFFICER  BUTLER-TRUESDALE:

5     Do you know why?

6          MS. WULKAN:  We can make --

7          HEARING  OFFICER  BUTLER-TRUESDALE:

8     I mean, why?  Is the practice different than

9     the rule?

10          MS. WULKAN:    No, they  can  do  it

11     whatever -- they can do whatever they want in

12     terms of the de novo request.  I mean, this

13     is -- the only consistent thing is that you

14     have ruled on this and Mr. Dalton has argued

15     about it for the last two hours.

16          You have ruled on it three or four

17     times and now, he is trying to get it in a

18     fourth time with Ms. Umansky on rebuttal when

19     it was not raised clearly on any -- in any of

20     the direct case.  So I don't know why you

21     would now allow it for the fifth time when

22     you have already just said he can't do it.

1   He has made his proffer and now he wants to

2   bolster it and I don't understand what we're

3   doing here around this.  You know, just --

4                HEARING OFFICER BUTLER-TRUESDALE:

5   Explain to me.   I'm sorry.   Were you

6   finished?  I didn't mean to cut you off.

7                MS. WULKAN:   No.   I just -- you

8   know, I mean, I just -- I can't -- I don't

9   understand how many more times we have to

10  argue this and you have to rule on it that

11  many more times.

12               MR. DALTON:   I'm not asking for a

13  ruling.  You have already ruled.  I'm simply

14  asking that --

15               HEARING OFFICER BUTLER-TRUESDALE:

16  Well, now, I'm asking.  You indicated that

17  it's not as clear cut as I had stated, so

18  what am I missing, the difference between the

19  rule and practice?

20               MR. DALTON:   It should be.  I have

21  had objections by the Government by --

22               HEARING OFFICER BUTLER-TRUESDALE:

1   Successful objections?

2              MR. DALTON:    Not to date, but

3   there have been objections and I have had to

4   brief the issue and only -- and, you know, it

5   is a simple matter to simply establish on the

6   tape what the witness' answers would be, but

7   it's your judgment.

8              HEARING OFFICER BUTLER-TRUESDALE:

9   I'm trying to stay consistent, Mr. Dalton.

10  Objection sustained.

11             MS. WULKAN:    Okay.    Anything?

12  Anything more, Mr. Dalton?

13             MR. DALTON:  I'm sorry?

14             HEARING OFFICER BUTLER-TRUESDALE:

15  I said objection sustained.

16             MR. DALTON:    Okay.    One moment,

17  please.

18             HEARING OFFICER BUTLER-TRUESDALE:

19  Okay.    Cover your mike.    You want me to go

20  off the record?

21             MS. WULKAN:    I'm not sure he can

22  talk to his witness in the middle of

379

1    testimony.   Mr. Dalton, I don't think you can

2    really talk to your witness in the middle of

3    testimony.   I'm just going to have to put an

4    objection on the record.

5            MR.  DALTON:    Please,  I  have  no

6    further questions of this witness.

7            HEARING  OFFICER  BUTLER-TRUESDALE:

8    All right.

9            MR.  DALTON:   I rest.   I waive my

10   cross examination of Dr. Jones.   I waive my

11   closing and I respectfully request that we be

12   excused.

13           HEARING  OFFICER  BUTLER-TRUESDALE:

14   Okay.   Now --

15           MS.  WULKAN:    I  think  I  have  an

16   opportunity to --

17           MR. DALTON:  You do.

18           HEARING  OFFICER  BUTLER-TRUESDALE:

19   I'm going to get there.

20           MR. DALTON:   But you can do it on

21   the record without my presence.

22           HEARING  OFFICER  BUTLER-TRUESDALE:

1    I'm going to get to that.  Just let me make

2    sure.   You had indicated earlier that you

3    wanted me to leave the record open for some

4    documents.

5              MR. DALTON:  Um-hum.

6              HEARING  OFFICER  BUTLER-TRUESDALE:

7    Are you still making that request?

8              MR. DALTON:   Yes, I renew that

9    request.

10              HEARING  OFFICER  BUTLER-TRUESDALE:

11    Okay.  Do you have any objection to that?

12              MS. WULKAN:  Yes.

13              HEARING  OFFICER  BUTLER-TRUESDALE:

14    Okay.

15              MS. WULKAN:   I don't know what

16    documents would be coming in, but if he

17    wasn't able to disclose them to begin with,

18    then why would he be able to add them now?

19              MR.  DALTON:   They are rebuttal

20    because of the testimony of her client.

21              HEARING  OFFICER  BUTLER-TRUESDALE:

22    I'm not trying to frustrate you all.   I

1  really am not trying to feed the two lions,

2  you know, to keep this thing going.  I just

3  have to tie up all the loose ends and I'm,

4  you know, talking to the non-attorneys in the

5  room.

6              I don't want you to think I'm

7  spurring them on.  That was brought up

8  earlier and I know I needed to tie that issue

9  up before he left.

10             Do you know exactly what it is

11 that you wanted the record left open for?

12             MR. DALTON:  Yes, the prior three

13 IEPs that --

14             THE WITNESS:  IEPs before the --

15             MR. DALTON:  Before the last three

16 IEPs.

17             HEARING OFFICER BUTLER-TRUESDALE:

18  Okay.

19             MS. WULKAN:  My understanding is

20 the complaints only go back two years.

21             MR. DALTON:  It goes --

22             MS. WULKAN:  We did not make the

1  complaint about what happened six years ago.

2  We made a complaint about what has happened

3  in the last year at SAIL, and my

4  understanding is that you cannot make a

5  complaint and do anything.  That's what the

6  IDEIA says, not back further than two years.

7  So what relevance do these documents have?

8        MR. DALTON:  They go to the

9  credibility of the witness.  They go to the

10  understanding of the witness' testimony.

11  They go to the context of that testimony.

12  They go to our theory of the case.

13        HEARING OFFICER BUTLER-TRUESDALE:

14  Okay.

15        MR. DALTON:  All of those things.

16        HEARING OFFICER BUTLER-TRUESDALE:

17  Let me reserve a decision on that.  Are you

18  cross examining this witness?

19        MS. WULKAN:  I was going to.

20        HEARING OFFICER BUTLER-TRUESDALE:

21  Okay.  Okay.  I'm ready for your cross.

22        CROSS EXAMINATION

1        BY MS. WULKAN:

2        Q    Ms. Umansky, you testified that

3    you -- when you do -- when you ask DCPS to

4    take over a case, I think is the way you said

5    it, when you ask them to make another

6    placement, that you put together a placement

7    packet?

8        A    Uh-huh.

9        Q    You said, right?  And then you

10   said there were five or six things in this

11   placement packet.

12       A    Uh-huh.

13       Q    And it's true, isn't it, that

14   nobody asked, no one at SAIL, none of the

15   lawyers or none of the administrators, asked

16   you to do that packet for D████████ until

17   August 1st?

18       A    Yes, but it was not in my duties

19   before the end of June to do so.

20       Q    Okay.  But you personally were not

21   asked whether or not anybody -- are you aware

22   of whether there was a packet that was

1    prepared and somebody handed it to you and

2    said, oh, this was asked for six months ago

3    and we're going to give it to you to give it

4    to them?  So you weren't asked and you didn't

5    see any in the record?

6         A    Right.

7         Q    Right?

8              HEARING  OFFICER  BUTLER-TRUESDALE:

9    This is the request to prepare the packet

10   that we're talking about?

11             MS. WULKAN:  Yes, or the package.

12             HEARING  OFFICER  BUTLER-TRUESDALE:

13   Okay.

14             BY MS. WULKAN:

15        Q    And did you eventually do the

16   whole package after the August 1st meeting?

17        A    Yes,  at  the  request  of  Dr.

18   Piegler.

19        Q    And what was that package that you

20   sent?

21        A    It was -- included his most recent

22   IEP, all of the recent evaluations or current

385

1    evaluations that we had on file, as well as

2    MDT notes, his report card and the site

3    review form.

4         Q    Okay.  And you also testified that

5    you -- did you participate in -- you

6    participated in an IEP in March of '06,

7    right?

8         A    Yes, ma'am.

9         Q    Before with -- Ms. Hawkins was

10   there.

11        A    Yes, ma'am.

12        Q    And that was the one that's in the

13   record.

14        A    Um-hum.

15        Q    Did you also participate in the

16   '05 IEP?

17        A    No, ma'am.  I was not employed.

18        Q    You weren't there then?

19        A    Yes.

20        Q    Okay.  So you participated in the

21   '06 IEP.

22        A    Um-hum.

386

Q    And you saw -- have you reviewed the notes from the '06 IEP?

A    Um-hum.

Q    You have?  And is that a pretty accurate reflection of what was discussed there?

A    On the record, yes.

Q    On the record, yes.  Okay.  And so at that time, there was no discussion about Ms. Hawkins wanting to move D███████ or D████████ -- you know, or the school saying we can't program for him because he has a full-time IEP, right?

A    Not on the record.

Q    Not on the record.  And, also, there was nothing -- and he -- you had reviewed -- at that IEP meeting, you reviewed the '05 IEP, right?

A    Correct.

Q    And that was a full-time special ed IEP, was it not?

A    Correct.

1 Q And so there was really not a

2 significant change between the '05 and the

3 '06 IEP at least in terms of services or

4 amount of hours?

5 A That is correct.

6 Q That's correct.

7 A Um-hum.

8 Q And have you reviewed his IEPs

9 past that back to '04, with an '04 IEP?

10 A No.

11 Q You haven't?

12 A I have now.  At that time, I had

13 not.

14 Q You had not.  So at that time,

15 what you knew was that he had a full-time

16 special education IEP for the year '05?

17 A Um-hum.

18 Q And for the year '06?

19 A Um-hum.

20 Q And there was no one at SAIL that

21 was saying he shouldn't have that, right, at

22 that meeting?

388

1       A       It's possible, yes.  No.

2       Q       Okay.    And   you   never   had   a

3    discussion with Ms. Hawkins prior to the time

4    of  the  IEP  meeting  about  her  looking  for

5    another placement for D████████, did you?

6       A       I   did   not,   but   it   was   my

7    understanding that other members of the MDT

8    did.

9       Q       Well, but you didn't have any?

10      A       Personally, no.

11      Q       No.   And you don't know.   I mean,

12   that's  whatever  it  is  is  clearly  hearsay,

13   right?

14      A       Yes.

15      Q       You don't --

16      A       Our   --   her   main   correspondence

17   regarding D████████ progress was not with

18   me.

19      Q       Right.   So all you know about is

20   that  eventually  after  the  IEP  meeting,  you

21   did have a conversation with Ms. Hawkins when

22   she   brought   you   the   teacher   observation

389

1    forms, right?

2         A    Yes.

3         Q    And you agreed with her at that

4    time, which was sometime between April and

5    June, right?

6         A    Yes.

7         Q    And you agreed with her that you

8    would get those things filled out, so that

9    she could look for another placement and that

10   would be appropriate?

11        A    I agreed that we would fill out

12   the form.  We did not discuss whether or not

13   SAIL was an appropriate placement.

14        Q    You didn't?

15        A    No.

16        Q    And at the August 1st meeting, you

17   did -- there was a statement, was there not,

18   that SAIL was not an appropriate placement

19   for him?

20        A    I believe so.

21        Q    At the August 1st meeting?

22        A    I believe so.

1     Q     You were there.

2     A     According to our notes, yes.

3     Q     Yes.  Okay.

4           MS.  WULKAN:     I   have   nothing

5     further.

6           HEARING  OFFICER  BUTLER-TRUESDALE:

7     Redirect?

8           MR. DALTON:  No redirect.

9           HEARING  OFFICER  BUTLER-TRUESDALE:

10    Let me just -- I'll be quick.

11          MS. WULKAN:  Okay.

12          HEARING  OFFICER  BUTLER-TRUESDALE:

13    Okay.  You got to SAIL when?

14          THE WITNESS:  I began at SAIL this

15    time last year for the '05/06 school year.

16          HEARING  OFFICER  BUTLER-TRUESDALE:

17    So the special education --

18          THE   WITNESS:     As   the   special

19    education -- yes, special education teacher.

20          HEARING  OFFICER  BUTLER-TRUESDALE:

21    I mean, September '05.

22          THE WITNESS:  '05, yes.

1          HEARING OFFICER BUTLER-TRUESDALE:

2    And I think I heard you say you did not have

3    a discussion with petitioner's mother with

4    respect to the appropriateness of SAIL.

5          THE WITNESS:  Correct.

6          HEARING OFFICER BUTLER-TRUESDALE:

7    Okay.  Okay.  I think the remaining issue is

8    the comp ed discussion, the comp ed count.

9    Do you have any witnesses for me with respect

10   to substantiating the mode and quantity of

11   comp ed?

12          MS. WULKAN:  No.  What I -- I was

13   going to argue Dr. James' testimony about

14   what harm he has suffered and what detriment

15   he has suffered, and I was going to leave the

16   form and amount to you to determine.

17          HEARING OFFICER BUTLER-TRUESDALE:

18   Okay.  If you --

19          MR. DALTON:  Objection.

20          HEARING OFFICER BUTLER-TRUESDALE:

21   Okay.  Let me get it out.  If you leave form

22   and amount to me, I have got to hear some

1    testimony.    I  have  got  to  get  it  from

2    somewhere --

3              MS. WULKAN:  Okay.

4              HEARING  OFFICER  BUTLER-TRUESDALE:

5    -- if I leave the record open for him.

6              MS. WULKAN:  Okay.

7              HEARING  OFFICER  BUTLER-TRUESDALE:

8    Which is why I brought that up.

9              MR. DALTON:  She doesn't meet the

10   Reed (phonetic) standard.

11             HEARING  OFFICER  BUTLER-TRUESDALE:

12   Do you want the record left open for your --

13             MS. WULKAN:  I just wanted to get

14   a finding -- I just wanted --

15             MR. DALTON:  You can rule any way

16   you want, Madam Hearing Officer.  I am not

17   going to waive my objection to her lack of

18   compliance with the Reed decision.

19             HEARING  OFFICER  BUTLER-TRUESDALE:

20   I --

21             MS. WULKAN:  I believe that you

22   can make a determination that comp ed is

1    warranted and that what Reed says is it's an

2    IEP team decision about the form and the

3    amount.

4         MR. DALTON:  Nope.

5         HEARING OFFICER BUTLER-TRUESDALE:

6    They didn't turn around and tell me you

7    shouldn't be delegating that to the team so,

8    you know, that ruling, I mean, that case I

9    think is going to be reworked a little bit,

10   because there is some ambiguity in it to me.

11        MS. WULKAN:  I think there is some

12   ambiguity in it, but I don't believe that --

13   I mean, I will just leave it to you.

14        HEARING OFFICER BUTLER-TRUESDALE:

15   I'm --

16        MS. WULKAN:  If you don't think

17   you have enough evidence, then you can deny

18   the comp ed claim.

19        HEARING OFFICER BUTLER-TRUESDALE:

20   I'm leaving the record open for you to give

21   me some direction on the comp ed, the

22   modality and the quantity, leaving the record

394

1    open for the IEPs.

2            MR. DALTON:    Note our objection

3    for the record.    I don't think there is any

4    entitlement whatsoever.

5            HEARING OFFICER BUTLER-TRUESDALE:

6    It has been an objection day.    I assume

7    neither of you want to make closings?

8            MS. WULKAN:    I do.

9            HEARING OFFICER BUTLER-TRUESDALE:

10    All right.

11            MR. DALTON:    Can we be excused?

12            HEARING OFFICER BUTLER-TRUESDALE:

13    If you choose to leave, there's nothing I

14    can do about that.

15            MR. DALTON:    No, I'm not -- I'm

16    asking permission.

17            HEARING OFFICER BUTLER-TRUESDALE:

18    Permission?    I never want the Daltons to

19    leave, I mean, but I'm not going to hold you

20    here.

21            MR. DALTON:    You have given your

22    rulings.

1           HEARING OFFICER BUTLER-TRUESDALE:

2    I'm not going to hold you here, but I never

3    want you all to leave.  I don't want anyone

4    to leave.

5           MR. DALTON:  I don't see any

6    purpose of us being here.

7           HEARING OFFICER BUTLER-TRUESDALE:

8    I know that you know how to represent your

9    client and if you feel that it's appropriate

10   to leave, I have nothing to say about it.

11          MR. DALTON:  Okay.  Thank you.

12   Good night, everyone.

13          HEARING OFFICER BUTLER-TRUESDALE:

14   Okay.  Are you reading for your closing?

15          MS. WULKAN:  Yes.  I have never

16   had anybody walk out on me in my closing

17   argument.  I'm insulted, man.  I have never

18   had that happen before to me, but I guess

19   there's a first time for everything.  Oh,

20   well.

21          There has been a lot of argument

22   in this case and I don't really want to spend

1     a huge amount of time and energy arguing, but

2     I just wanted to give you some legal

3     argument, basically, and some case law for

4     you to look at, and I think that is primarily

5     it.   In terms of the other arguments, I think

6     they have been pretty well set out.

7                 I think we have shown that SAIL

8     has denied D████████ the faith both through

9     testimony and through documents and through

10    extensive documentation, extensive testimony.

11    And, in fact, SAIL admitted it in the

12    resolution meeting notes, so I don't think

13    there is really much that we have to do since

14    they said we do not have an appropriate

15    placement.   We do not (inaudible) an

16    appropriate placement to SAIL, to D███████.

17                So, you know, I think we're sort

18    of at the -- I think that part of the case,

19    which I want you to make a finding about,

20    seems appropriate to me.   I mean, we have

21    clearly established that SAIL is their own

22    LEA.

1          And what I was going to do was to

2     give you the charter regulations that are

3     relevant to this particular matter, all about

4     what LEAs responsibilities are and aren't in

5     due process hearings, all about what they can

6     and can't do with regard to placement.

7          I would ask you also to look at

8     the -- there are two pleadings in there from

9     us, but particularly the first one which is

10    our response to the first motion to dismiss,

11    so to speak, and DCPS' and SAIL's and we cite

12    to a bunch of law about what you can -- you

13    know, what we think the Hearing Officer can

14    and can't do with regard to that, and that is

15    at P-3.  And so I'm not going to reiterate

16    all those arguments because it's laid out

17    fairly clearly there.

18          I have several things for you.  I

19    have a copy of the charter school

20    regulations.  I also have a copy of the six

21    cases to which I referred.  Those are <u>IDEA</u>

22    <u>PCS v. Belton Hyde Leadership</u> (phonetic), <u>PCS</u>

1    v. Clark, Friendship Edison PCS v. William

2    Morrow, Friendship Edison PCS v. Ebony Smith

3    and Parker v. D.C..

4                    HEARING OFFICER BUTLER-TRUESDALE:

5     Let me state for the record that, and this

6     is just my public bulletin announcement,

7     despite the consent decree, the Hearing

8     Officers do not have access to Lexis or

9     Westlaw.  So I would appreciate it, since I'm

10    leaving the record open, if those cases would

11    be forwarded with whatever information.

12                    MS. WULKAN:   I have them right

13    here for you.

14                    HEARING OFFICER BUTLER-TRUESDALE:

15     All right.  Excellent.

16                    MS. WULKAN:  They are here.

17                    HEARING OFFICER BUTLER-TRUESDALE:

18     Okay.

19                    MS. WULKAN:  They are Xeroxed and

20    they are ready to go.

21                    HEARING OFFICER BUTLER-TRUESDALE:

22     Thank you.

1          MS. WULKAN:   The other thing I

2     have, and you either can or can't take this,

3     and I will just tell you what I have, I sort

4     of briefed them in very short terms with the

5     procedural posture of the issue, the outcome

6     and the reasoning.

7          Now, of course, that is our

8     office's interpretation of them.   If you

9     don't want to look at that, I mean, it's just

10    a simple chart that says what the ruling was.

11    I don't think that we did anything

12    interpreting, but of course it is -- I think

13    it's accurate.   I can offer this to you and

14    you can either use it or not or you don't

15    have to.   You can just read them yourself,

16    but if you -- we did do a little chart which

17    says what the ruling is and we didn't decide

18    to apply --

19          HEARING OFFICER BUTLER-TRUESDALE:

20    I have no problems with receiving that

21    synopsis, matrix as long as it is also

22    forwarded to respondent's counsel.

1          MS. WULKAN:    Okay.    I'm happy to

2    do that.    So here is the matrix.    Here are

3    the cases and here are the charter school

4    regulations.

5          HEARING OFFICER BUTLER-TRUESDALE:

6    Let the record reflect that I asked the

7    petitioner for the cases and in light of

8    leaving the record open for both parties, I

9    am accepting this synopsis, matrix and,

10   unfortunately, respondent chose to leave and

11   so is not here to make any objections to the

12   receipt of that document.    Okay.

13         MS. WULKAN:    Okay.    And you are

14   leaving the record open.    If I can just

15   clarify what you're leaving the record open

16   for and for how long, and then I can --

17         HEARING OFFICER BUTLER-TRUESDALE:

18   Yes, that's the issue.    I didn't get to tell

19   him how long I'm leaving the record open for.

20         MS. WULKAN:    Yes.

21         HEARING OFFICER BUTLER-TRUESDALE:

22   But the receipt of the IEPs that he wanted

1     to forward for rebuttal purposes and you

2     wanted--

3             MS. WULKAN:  I was going to submit

4     to you a comp ed plan.

5             HEARING OFFICER BUTLER-TRUESDALE:

6      Oh, the -- phew, thank you.  Any relevant

7     materials that you want to turn in with

8     respect to the findings of fact that I need

9     to make an on the comp ed.

10            MS. WULKAN:  Comp ed plan.  Okay.

11     I will make those.

12            HEARING OFFICER BUTLER-TRUESDALE:

13     Thank you.

14            MS. WULKAN:  I will make those.  I

15    will make that available to you.  And do you

16    have a time frame?

17            HEARING OFFICER BUTLER-TRUESDALE:

18     Let's see.  Today is the 30th.  Look in the

19    calendar, please.  How long do you think that

20    you would need for the -- to gather the

21    information to help me be in compliance with

22    Reed?

1              MS. WULKAN:  A week?  Excuse me

2      one second.  Can I just confirm with my

3      associate?

4              HEARING OFFICER BUTLER-TRUESDALE:

5       Um-hum.

6              MS. WULKAN:  Yes, I'm just stuck

7      in a three day due process hearing next week,

8      which is really difficult for us, but I don't

9      want to let this hang out.  So what I would

10     like to do is try to get it to you by a week

11     from today.

12             HEARING OFFICER BUTLER-TRUESDALE:

13      A week from today.

14             MS. WULKAN:  Which is --

15             HEARING OFFICER BUTLER-TRUESDALE:

16      So that's --

17             MS. WULKAN:  -- the 5th?

18             HEARING OFFICER BUTLER-TRUESDALE:

19      That's the 5th?

20             MS. BECK:  6th.

21             MS. WULKAN:  6th, 6th.

22             HEARING OFFICER BUTLER-TRUESDALE:

403

1    No, it's the -- oh, right, because it's

2    Wednesday.

3                MS. WULKAN:  That's the 6th.

4                HEARING OFFICER BUTLER-TRUESDALE:

5    Today is Wednesday, so that's the 6th.

6                MS. WULKAN:  Yes.

7                HEARING OFFICER BUTLER-TRUESDALE:

8    And he is already unilaterally placed, so

9    there is no undue harm for the HOD that's on

10    the 16th.  Are you waiving your right to the

11    HOD in 10 days?

12                MS. WULKAN:  As long as it

13    actually comes out in 10 days from the time

14    that I submit the evidence to you.  I mean,

15    not --

16                HEARING OFFICER BUTLER-TRUESDALE:

17    Yes.

18                MS. WULKAN:  We're not waiving it

19    forever, but yes, sure.

20                HEARING OFFICER BUTLER-TRUESDALE:

21    Okay.  So let's do this.  Let's do the --

22    you said the 6th?

1          MS. WULKAN:    We have a very

2     limited amount of funding for this unilateral

3     placement, very, very, very limited.    So we

4     can't string this out too long and if it

5     really is -- I mean, do you want to just give

6     them a copy?

7          MS. BECK:  Well, I mean, if she is

8     going to keep the record open for Mr. Dalton-

9     -

10          MS. WULKAN:    Dalton anyway.

11          MS. BECK:    Unless he only needs a

12     couple of days.

13          MS. WULKAN:    I'm sure he doesn't

14     need very long to get those IEPs here.

15          MS. BECK:      He said he was

16     unavailable for the rest of the week.

17          MS. WULKAN:    Why don't we do this?

18      Why don't we take the week, you know, until

19     next Wednesday if that's okay with you.

20     We'll submit everything by next Wednesday.

21     I'm assuming Mr. Dalton can get you the IEPs

22     by next Wednesday.    I would like a copy of

405

1    them as well.

2              We'll forward to Mr. Dalton the

3    things that we submitted, the charter school

4    regulations, the cases and the grid thing,

5    and we will get to you something by the 6th,

6    and then if we could get a ruling by the 16th

7    or so, that would really be helpful, right?

8              HEARING OFFICER BUTLER-TRUESDALE:

9    I'm normally not that far outside of the 10

10   days when I'm not in compliance with the 10

11   days.  It is the law that the HODs be issued

12   within the 10 days.

13             It is because of long hearings

14   like this and posthearing conferences and

15   prehearing conferences that there is an

16   occasion when the HODs don't come out within

17   the 10 days, in addition to the fact that

18   sometimes the issuance date, the issuance

19   deadline, falls on a weekend or holiday, and

20   this working mom takes advantage of that when

21   they do.

22             Okay.  So you definitely will not

1    be forgotten and I will make a note.  I will

2    note on my records that there are funding

3    concerns behind this, so that there isn't an

4    issue.

5              MS. WULKAN:    That is true.    I

6    mean, it's --

7              HEARING  OFFICER  BUTLER-TRUESDALE:

8     Now, I do ask that if for any reason you do

9    not receive an HOD, at least within three

10   days of the 10 day deadline, that you email

11   me on my Blackberry pager, because I just

12   wanted to explain to you, just because we

13   have not adjudicated together before, that I

14   typically write my opinions very late at

15   night or actually early in the morning, 3:00

16   in the morning.

17             MS. WULKAN:  Woo.

18             HEARING  OFFICER  BUTLER-TRUESDALE:

19    And almost all of them are faxed in and when

20   I come in here, I run right to the hearing

21   room to do my hearings.  I do not know that

22   they are appropriately placed in the HOD box

1   where they are issued out.  There are

2   occasions where I have faxed something in,

3   opinions have -- you know, a group of

4   opinions together and they feed into the fax

5   and I think they got it and issued it and

6   they have not.

7          So don't assume that just because

8   I'm late that I'm just late.  I may think

9   that I have issued it.  So I always -- both

10  counsel who adjudicate before me have my

11  Blackberry, so that they are not leaving

12  messages in there for me that I may or may

13  not get, and my Blackberry address, which I

14  check throughout the hearings, throughout the

15  day,       is       tonyas,       T-O-N-Y-A-S,

16  tonyasblackberry@nextel.black  berry.net.

17         And I ask that since I give this

18  direct email and access to all parties that

19  you, please, forgive me when you see me

20  checking the Blackberry during your own

21  hearings, because I give this to people so

22  that they can contact me about emergencies

408

1    directly, as opposed to leaving messages in

2    the Student Hearing Office.

3            MS. WULKAN:    So if I'm going to

4    give you this information by the 6th, then if

5    I don't hear from you by the 19th?

6            HEARING OFFICER BUTLER-TRUESDALE:

7    By the 19th.

8            MS. WULKAN:    Then I will email

9    you.

10           HEARING OFFICER BUTLER-TRUESDALE:

11   Please, email me, and I ask that you use

12   that email address only for short messages,

13   requests to call, things like that.    If you

14   are going to email any other documents to me,

15   I ask that you send them to another address

16   and I will give you that, and also send a

17   copy to the Student Hearing Office.

18           I give you my personal email

19   address, so that if there is information that

20   you wish to get to me over the weekend or on

21   my reading day, which I'm not here, that you

22   can do that.    Okay?    And, unfortunately,

1    again, you have got to then let me know on

2    this address that it's there.

3              MS. WULKAN:  That it's there.

4              HEARING  OFFICER  BUTLER-TRUESDALE:

5    Right.   My email address is -- for longer

6    emails  and  all  that  type  of  pleadings  and

7    stuff  like  that  is  A  as  in  apple,  T  as  in

8    Tom,  T  as  in  Tom,  Y  as  in  yours,  T  as  in  Tom,

9    M  as  in  Mary,  B  as  in  boy,  T  as  in  Tom.

10   That's  basically  atty  Tonya  M.  Butler-

11   Truesdale, initials.  Okay?

12             MS. WULKAN:  Okay.

13             HEARING  OFFICER  BUTLER-TRUESDALE:

14    @aol.com.

15             MS.  WULKAN:   Okay.   We  have  got

16   it.  Have you got all the directions down?

17             HEARING  OFFICER  BUTLER-TRUESDALE:

18    All right.  Okay.

19             MS. WULKAN:  Good.

20             HEARING  OFFICER  BUTLER-TRUESDALE:

21    Okay.

22             MS. WULKAN:  Thank you very much.

410

1              HEARING OFFICER BUTLER-TRUESDALE:

2     You're welcome.

3              MS. WULKAN:  Thank you so much for

4     your patience.

5              HEARING OFFICER BUTLER-TRUESDALE:

6     Oh, no problem.

7              MS. WULKAN:  We did --

8              HEARING OFFICER BUTLER-TRUESDALE:

9     This is part and package of the deal.

10             MS. WULKAN:  Yes, is it?

11             HEARING OFFICER BUTLER-TRUESDALE:

12    I mean, I --

13             MS. WULKAN:  I haven't been in one

14    like this in awhile, I'll say, you know.

15             HEARING OFFICER BUTLER-TRUESDALE:

16    You're lucky.

17             MS. WULKAN:  Yes, you probably see

18    a lot more like this, but I don't get -- I

19    haven't had one in a long time, years and

20    years ago when Donovan Anderson used to be --

21             HEARING OFFICER BUTLER-TRUESDALE:

22    Let me go off the record.

1              MS. WULKAN:  Oh, sure.

2              HEARING  OFFICER  BUTLER-TRUESDALE:

3    Wait.  There was something else I was trying

4    to tell you.  Oh, that I will be sending a

5    short order out explaining to Mr. Dalton the

6    terms of the extension --

7              MS. WULKAN:  Okay.

8              HEARING  OFFICER  BUTLER-TRUESDALE:

9    -- on getting things in the record.

10              MS. WULKAN:  Okay.

11              HEARING  OFFICER  BUTLER-TRUESDALE:

12    I'm off the record.

13              (Whereupon,    the    hearing    was

14    concluded.)

15

16

17