UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAIL PUBLIC CHARTER SCHOOL,⁣ )
⁣ )
⁣⁣⁣⁣⁣Plaintiff, )
⁣ )
v. )⁣⁣⁣⁣⁣Civil Case No. 06-1821(TFH)
⁣ )
MICHELLE HAWKINS, *et al.,* )
⁣ )
⁣⁣⁣⁣⁣Defendants. )
_____ )

## **NOTICE OF FILING**

Attached is a supplement to the administrative record filed herein July 25, 2007, with index.  Documents noted in the July 25 filing as missing have been provided by counsel for the student, and are transmitted herewith.  To avoid confusion, pagination of these supplemental materials for record reference purposes begins with page 600.  It also now appears that, in light of rulings in the challenged HOD, record pages 81-88 filed on July 25 should not be included in the record.

We are advised that a copy of these materials was provided to Plaintiff's counsel by Defendants' counsel on August 20, 2007.

Respectfully submitted,

LINDA SINGER
Attorney General of the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

**/s/ Edward P. Taptich**
EDWARD P. TAPTICH [#012914]
Chief,  Equity Section 2

**/s/ Cary D. Pollak**
CARY D. POLLAK [#055400]
Senior Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-6604
(202) 727-0431 (fax)
email: cary.pollak@dc.gov

August 21, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAIL PUBLIC CHARTER SCHOOL,           )
                                      )
                    Plaintiff,        )
                                      )
v.                                    )          Civil Case No. 06-1821(TFH)
                                      )
MICHELLE HAWKINS, *et al.,*            )
                                      )
                    Defendants.       )
_____)

## INDEX OF SUPPLEMENT TO RECORD

Parents' 5-day Disclosure letter w/att. dated 8/23/06          -          600

SAIL Praecipe w/att. dated 9/1/06                              -          725

Parents' Opposition dated 8/6/06                              -          739

Parents' proposed Compensatory Education Plan dated 9/6/06    -          742

Law Office Of
**DONNA L. WULKAN**
1765 N Street, N.W.
Carriage House
Washington, D.C. 20036

———

(202) 682-3909
telecopier (202) 955-1015

August 23, 2006

Paul Dalton, Esq.
Counsel for SAIL Public Charter School
1008 Pendelton Street
Alexandria, VA 22314

BY HAND

                                RE:   Dominique Hawkins
                                  DOB:  8/28/92

Dear Mr. Dalton:

     As the educational attorney for Mr. and Mrs. Hawkins, parents of Dominique Hawkins, I am writing to you pursuant to the 5-day disclosure rule under the IDEIA and DCMR, I am hereby disclosing witnesses and documents to be presented at the August 30, 2006 hearing in this case.

     The following witnesses[1] may be presented in this case:

1.    Ms. Michelle Hawkins, mother;
2.    Mr. Carlton Hawkins, father;
3.    Dr. Joette James, licensed psychologist;
4.    Dr. Lauren Krivitzky, pediatric neuropsychologist;
5.    Ms. Debbie Louric, Admissions Coordinator, or designee, Katherine Thomas School.

     The following documents, copies of which are enclosed herein, may be introduced as evidence at the hearing:

---

[1]Some witnesses may testify via telephone.

| | |
|---|---|
| P-1 | Hearing Request, dated June 23, 2006; |
| P-2 | Order, dated July 13, 2006; |
| P-3 | Plaintiffs' Opposition to the Motions to Dismiss submitted by both SAIL and DCPS and Response to SAIL's Motion to Join a Necessary Party, dated July 13, 2006; |
| P-4 | Plaintiffs' Response to Defendants' Motion to Join a Necessary Party, dated August 4, 2006; |
| P-5 | Letter to Dr. Peagler, dated August 1, 2006; |
| P-6 | Neuropsychological Evaluation, Dr. Joette James; |
| P-7 | Speech and Language Evaluation, dated June 20, 2005; |
| P-8 | Occupational Therapy Evaluation, dated February and March, 2005; |
| P-9 | Psychological Evaluation, Dr. Scott, dated March 29, 2005; |
| P-10 | Meeting Notes, dated July 14, 2006; |
| P-11 | Letter to Dr. Peagler, dated July 14, 2006; |
| P-12 | IEP, dated March 15, 2006; |
| P-13 | IEP cover page, dated March 21, 2005; |
| P-14 | Katherine Thomas program information; |
| P-15 | Acceptance letter, Katherine Thomas School; |
| P-16 | Dr. Joette James' resume; |
| P-17 | Dr. Lauren Krivitzky's resume. |

We may also rely on any and all documents and/or witnesses disclosed in a timely manner by SAIL for this hearing.

Sincerely,

Donna L. Wulkan

Enclosures:    As stated

CC:    Sheila Hall (by HAND)

Law Office Of
**DONNA L. WULKAN**
1765 N Street, N.W.
Carriage House
Washington, D.C. 20036

(202) 682-3909
telecopier (202) 955-1015

June 23, 2006

Sheila Hall
State Enforcement and Investigation Division
For Special Education Programs
Student Hearing Office
825 N. Capitol St., N.E., 8th floor
Washington, D.C. 20002

BY FAX AND MAIL

RE:    Dominique Hawkins
DOB:   8/28/92

Dear Ms. Hall:

As the educational attorney for Mr. Carlton and Mrs. Michelle Hawkins, parents of Dominique Hawkins, I am writing pursuant to the IDEIA, DCMR and local DCPS rules and regulations to request that you schedule a special education administrative due process hearing regarding Dominique. This case requires a sit-down denial and appropriateness hearing.

Dominique is a 13-year-old student who is currently in the 7th grade at the School for Arts in Learning (hereinafter "SAIL") Public Charter School's Middle School program. Dominique has been diagnosed with Attention Deficit Hyperactivity Disorder, Predominantly Inattentive Type; Reading Disorder; Mathematics Disorder; Disorder of Written Expression; a moderate to severe speech and language impairment in both receptive and expressive language; and a severe impairment in language processing and language memory. Recent testing indicates that he is reading and writing at the second-grade level and his cognitive functioning is in the borderline range for his age. Dominique has been found eligible as a student in need of special education with disability classifications of speech/language impaired and learning disabled and his IEP calls for a full-time special education program.

Dominique has attended SAIL PCS since entering the 1st grade. However, his current middle school program at SAIL is inappropriate. Dominique is not making adequate academic progress and he is not receiving all of his required related services. Dominique's classes are too large and unstructured and do not offer an adequate amount of individualized instruction or redirection. He is easily distracted and his placement in a classroom environment with disruptive classmates (and a previously "open classroom" setting) is inappropriate.

Instead, Dominique requires a highly structured, full-time special education program that



focuses on teaching students with severe learning disabilities and speech and language impairments. Dominique also requires small classes with a low student-to-teacher ratio. In addition, Dominique requires a placement with well-matched peers who do not present with behavior problems or cause distractions for Dominique in the classroom.

Therefore, Mr. and Mrs. Hawkins raise the following complaints:

1. In violation of the IDEIA and DCMR, SAIL has failed to develop an appropriate IEP, including, but not limited to, developing appropriate goals and an appropriate disability classification.

2. In violation of the IDEIA and DCMR, SAIL has failed to issue an appropriate notice of placement.

3. In violation of the IDEIA and DCMR, SAIL has failed to provide for and deliver appropriate instructional and related services.

4. In violation of the IDEIA and DCMR, SAIL has failed to evaluate the student in all areas of his disability.

5. In violation of the IDEIA and DCMR, SAIL has failed to ensure Dominique makes adequate progress in his academic program.

6. In violation of the IDEIA and DCMR, SAIL has failed to provide appropriate special education instruction and therefore has failed to provide an appropriate placement.

These failures constitute a denial of Free Appropriate Public Education (FAPE). As relief, the parents request that the hearing officer order SAIL to place and fund Dominique, including transportation, at an appropriate full-time private special education program that can address his significant academic, language, organizational and attentional disabilities, such as the Chelsea School. The parents also request an IEP meeting, to be convened at Dominique's new placement, to revise his IEP as needed. In addition, the parents request compensatory education.

Sincerely,

Donna Wulkan

CC:    Mr. and Mrs. Hawkins

George Gaudette
Principal, School for Arts in Learning
1705 H. Street, NW
Washington, DC 20006

603

10/11/2005  12:40   202442556    ST JDE PR 202435    PAGE  06/09

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**



# Due Process Complaint Notice

- The form is used to give notice of a due process complaint to the District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA) and/or parents with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).**

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office of the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556..

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting (called a "Resolution Session") with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. The Student Hearing Office does NOT schedule resolution meetings.

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

**A.    INFORMATION ABOUT THE STUDENT:**

Student Name: *Dominique Hawkins*    Birth Date: *8/28/1992*

Address: *3001 20th Street, NE    WDC 20018*

Home School: *B*

Present School of Attendance: *SAIL*

Is this a charter school? *Yes*    (If yes, you must also provide a copy of this notice to the charter school principal or director)

Parent/Guardian of the Student: *Michelle Hawkins*

Address (if different from the student's above): *3001 20th Street, NE, WDC 20018*

Phone/Contact Number: _____ Fax Number (if applicable): _____

SEID DPCN Rev'd. 9/30/05

1

**B.**    <u>**Individual Making the Complaint/Request for Due Process Hearing:**</u>

Name: Michelle Hawkins

Complete Address: 3001 20th Street, NE
Washington, DC 20018

Phone: (h) 202-832-7843 (w) _____ (Fax) _____ (e-mail) _____

Relationship to the Student:

☒ Parent      ☐ Legal Guardian      ☐ Parent Surrogate

☐ Self/Student      ☐ Local Education Agency (LEA)      ☐ Parent Advocate

**C.**    <u>**Legal Representative/Attorney (if applicable):**</u>

Name: Donna L Wulkan

Address: 1765 N Street, N.W. Carriage House
Washington, DC 20036

Phone: (w) 202-682-3909 (Fax) 202-955-1015 (e-mail) donnawulkan@hotmail.com

Will attorney / legal representative attend the resolution session?    ☐ Yes      ☐ No

**D.**    <u>**Complaint Made Against (check all that apply):**</u>

☐ DCPS school (name of the school if different from page one) _____

☒ Charter school (name of the charter school if different from page one) _____

☐ Non-public school or residential treatment facility (name) _____

☐ Parent

**E.**    <u>**Resolution Session Between Parent and LEA:**</u>

I understand that it is my right to have a resolution session to resolve this complaint. I also understand that I may voluntarily waive this right if I choose. (Note: All parties must agree to waive the resolution session to avoid having this meeting.)

☐ I wish to waive the Resolution Session.

**F.**    <u>**Mediation Process:**</u>

IDEA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent. Both parties can request mediation as an alternative to the Resolution Session. Mediation is also available prior to a due process hearing, but mediation may not be used to deny or delay a parent's right to a hearing on parent's due process complaint. Please check all that apply:

☐ I am requesting mediation as an alternative to the resolution session meeting.

☐ I am requesting mediation services <u>only</u>.

☒ I do not wish to use a mediator at this time.

2

SEID DPCN Rev'd. 9/30/05

**G.**   **Facts and Reasons for the Complaint:**

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions. Provide complete details about all the facts supporting your claims. (You may attach additional pages if needed):

1.   What is the nature of the problem, including the facts relating to the problem, that will need to be addressed at a Resolution Session meeting, a Mediation Conference, and/or a Due Process Hearing?

*See Attached letter.*

2.   To the extent known to you at this time, how can this problem be resolved?

*See Attached letter*

3.   Issues presented:

*See Attached letter*

**H.**   **Estimated amount of time needed for the hearing:**   *full day*

Note:   In the absence of a specified amount of time, the SHO schedules hearings in two hour blocks of time and will allocate two hours to conduct the hearing. Please indicate if you believe more than two hours will be needed.

**I.**   **Accommodations and Assistance Needed:**

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type)_____
- Special Communication (please describe the type)_____
- Special Accommodations for Disability (please be specific) _____
- Other_____

3

SED DPCN Rev'd. 9/30/05

**J.    Waiver of Procedural Safeguards:**

☐ I (parent/guardian) waive receiving a copy of the procedural safeguards at this time.

**K.    Parent Signature and Affirmation:**

I affirm that the information provided on this form is true and correct.

_____        _____
Signature of Parent or Guardian                                    Date

**L.    Signature of Attorney/ Legal Representative:**

_Donna Wicker/gb_ _____  _01/23/06_____
Legal Representative / Advocate                              Date

**M.    Signature of LEA Representative (if hearing requested by LEA):**

_____        _____
Representative of LEA                                                   Date

Mail, fax or deliver this complaint notice to:
State Enforcement and Investigation Division
For Special Education Programs (SEID)
Student Hearing Office (SHO)
825 North Capitol Street, NE, 8th Floor
Washington, DC 20002
Fax number: 202/442-5556

SEID DPCN Rev'd. 9/3005

4

607



## Message Confirmation Report

**JUN-23-2006 04:04 PM FRI**

Fax Number  :  2029551015
Name        :  LAW OFFICE


Name/Number    :  2024425669
Page           :  7
Start Time     :  JUN-23-2006 04:03PM FRI
Elapsed Time   :  01'04"
Mode           :  STD ECM
Results        :     [O.K]

608

**Message Confirmation Report**                    JUN-23-2006 04:02 PM FRI

Fax Number    :  2029551015
Name          :  LAW OFFICE

Name/Number    :  2022934685
Page           :  7
Start Time     :  JUN-23-2006 04:00PM FRI
Elapsed Time   :  02'18"
Mode           :  STD ECM
Results        :      [O.K]

# FAX TRANSMISSION

Law office of

### DONNA L. WULKAN
1765 N Street, N.W.
Carriage House
Washington, D.C.  20036

———

(202) 682-3909
telecopier (202) 955-1015

**To:**   Sheila Hall
State Enforcement and Investigation
For Special Education Programs
(202) 442-5669

**Date:**   June 23, 2006

**CC:**

**Pages:**   7, including this cover sheet.

**From:**   Stefan Black
Law Clerk
Law Office of Donna Wulkan

**Subject:**   Dominique Hawkins

Please see attached letter...

The information contained in this telefacsimile message is transmitted by an attorney. It is privileged and confidential, intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If this communication has been received in error, please notify us immediately by telephone, collect if necessary, and return the original message to us at the above address via first class mail (we will reimburse postage). Thank you.

610

# FAX TRANSMISSION

### Law office of
### DONNA L. WULKAN
**1765 N Street, N.W.**
**Carriage House**
**Washington, D.C. 20036**

**(202) 682-3909**
**telecopier (202) 955-1015**

| | | | |
|---|---|---|---|
| **To:** | George Gaudette<br>(202) 293-4685 | **Date:** | June 23, 2006 |
| **CC:** | | **Pages:** | 7, including this cover sheet. |
| **From:** | Stefan Black<br>Law Clerk<br>Law Office of Donna Wulkan | | |
| **Subject:** | Dominique Hawkins | | |

Please see attached letter...

The information contained in this telefacsimile message is transmitted by an attorney. It is privileged and confidential, intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If this communication has been received in error, please notify us immediately by telephone, collect if necessary, and return the original message to us at the above address via first class mail (we will reimburse postage). Thank you.

611

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

In the Matter of:                    )        BEFORE A SPECIAL EDUCATION
                                     )
Dominique Hawkins (8-28-92)          )        INDEPENDENT HEARING OFFICER
                   *Petitioner*      )
              Vs.                    )
SAIL PCS                             )        STATE EDUCATION AGENCY
                   *Respondent*

ON THIS DAY came on to be heard Respondent SAIL's "Motion to Dismiss or in the Alternative Motion to Join a Necessary Party," DCPS' "Motion to Dismiss" and Petitioner's Opposition to both Motions in the above styled cause.

## ORDER

After reviewing the evidence, the Motion of SAIL is **DENIED** and the Motion of DCPS **GRANTED**.

The allegations in the Complaint concerning a denial of FAPE are against SAIL. Furthermore, the Complaint does not state facts alleging that DCPS has denied the student FAPE, notwithstanding the parent's requested remedy of a placement. Additionally, based on the allegations in the Complaint, SAIL, as its own LEA, may be able to provide the relief requested should it be determined that there was a denial of FAPE. Accordingly, Respondent SAIL's "Motion to Dismiss or in the Alternative Motion to Join a Necessary Party," is Denied. DCPS' "Motion to Dismiss" concerning it being a party is Granted.

SIGNED: this date   7-13-06

_____
Impartial Special Education Hearing Officer

Issue Date: 7/14/06

Original to SHO – Student's File
Copy To:   Parent' - C/O:
           DCPS - C/O:
           Charter School - C/O:

Donna Wulkan, Esq.
Quinne Harris-Lindsey, Esq.
Laura Duos, Esq.

2007 JUL 13 PM 2:39
DC PUBLIC
SCHOOL SYSTEM



EXHIBIT
P-2
612

STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA
STATE ENFORCEMENT AND INVESTIGATION DIVISION
SPECIAL EDUCATION PROGRAMS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| DOMINIQUE HAWKINS | ) | |
| | ) | |
| v. | ) | July 13, 2006 |
| | ) | |
| SAIL PCS | ) | |

## PLAINTIFF'S OPPOSITION TO THE MOTIONS TO DISMISS SUBMITTED BY BOTH SAIL AND DCPS AND RESPONSE TO SAIL'S MOTION TO JOIN A NECESSARY PARTY

## I. Introduction

COMES NOW, Carlton and Michelle Hawkins (Plaintiffs), parents of Dominique

Hawkins, and request the Motions to Dismiss filed by School for Arts in Learning (SAIL) and

District of Columbia Public Schools (DCPS) be denied.  First, because all substantive claims

concerning the denial of FAPE are directed against SAIL and because SAIL would be

responsible for paying both compensatory education and attorneys' fees in the event that

Plaintiffs prevailed at the upcoming due process hearing, SAIL is a necessary party to the current

action. Furthermore, because all factual disputes must be resolved in favor of the nonmoving

party in summary judgment actions and because Plaintiffs have alleged sufficient facts to

establish a prima facie case of denial of free appropriate public education (FAPE), SAIL's factual

arguments are inapposite at this stage of the proceedings and as a result, their Motion to Dismiss

should be denied.  Second, because SAIL is likely authorized to provide Plaintiffs with complete

1

EXHIBIT
P-3
613

relief. DCPS may not in fact be a necessary party to the instant action at this stage of the proceedings. However, if the Hearing Officer should find that SAIL is not authorized to place Dominique at another school or is otherwise unable to provide Plaintiffs with complete relief, Plaintiffs move that DCPS be joined in the instant action and their Motion to Dismiss be denied.

## II. Background

In their Due Process Hearing Request dated June 23, 2006, Plaintiffs alleged that SAIL had denied Dominique FAPE on the following grounds: (1) that SAIL has failed to develop an appropriate IEP for Dominique, (2) that SAIL has failed to deliver appropriate instructional and related services to Dominique, and (3) that SAIL has failed to provide Dominique with an appropriate special education placement. As relief for these denials of FAPE, Plaintiffs requested placement and funding for Dominique at a full-time non-public special education program, a compensatory education award, and attorneys' fees.

On July 6, 2006, SAIL filed a Motion to Dismiss requesting that Plaintiffs' Hearing Request be dismissed or, in the alternative, that DCPS be joined as a necessary party. On July 7, 2006, DCPS filed a separate Motion to Dismiss requesting only that they be dismissed as a party. Plaintiffs now enter their opposition to both motions.

## III. Argument

**A. Because SAIL is solely responsible for the actions constituting the alleged denial of FAPE and because SAIL would be responsible for paying both the compensatory education award and Plaintiffs' attorneys' fees in the event that Plaintiffs prevail at the hearing, SAIL is a necessary party to the current action.**

Under the District of Columbia Municipal Regulations Section 5-3019.2, LEA Charters

2

614

such as SAIL are responsible for implementing the terms of the IDEIA with regard to children enrolled in their schools. Plaintiffs thus directed the allegations set forth in their Hearing Request against SAIL. Specifically, Plaintiffs alleged that SAIL failed to provide Dominique with an appropriate placement, denied him his required related services, and was unable to develop and implement an appropriate IEP to suit his unique academic needs. In addition, Plaintiffs alleged that the above-listed failures resulted in Dominique's failure to progress. Because the responsibility for the provision of FAPE belonged to SAIL and because the decisions that led to the alleged denial of FAPE were made exclusively by SAIL officials, it is SAIL's responsibility to defend their actions at the hearing.

Furthermore, if the hearing officer should decide that SAIL did indeed deny Dominique FAPE, they alone would be responsible for providing Dominique with the compensatory education award and the attorneys' fees requested in Plaintiffs' hearing request. Despite SAIL's allegations that the only substantive relief requested by the parents was the placement at a private special education program, Plaintiffs explicitly requested compensatory education.[1] Furthermore, under 20 U.S.C. § 1415(i)(3), a prevailing party at a due process hearing is entitled to reasonable attorneys fees. A recent decision from the U.S. District Court for the District of Columbia stands for the proposition that so long as an LEA Charter school is capable of providing the services ordered by a hearing officer, the responsibility of providing both the ordered services themselves and the attorneys' fees incurred in preparation falls solely on the LEA charter school and not on DCPS. *See IDEA Public Charter School v. Belton*, 2006 U.S. Dist. LEXIS 13321, 45 IDELR 719 (D.D.C. March 15, 2006).

---

[1] "In Addition the parents request compensatory education." Hearing Request at 2.

3

In *Belton*, a hearing officer ordered a public charter school to provide one of its students with an occupational therapy evaluation. *Belton*, 2006 U.S. Dist. LEXIS 13321, 10. The school objected and sued both the students' parents and DCPS, arguing that DCPS - not the school - should be responsible for funding the evaluation. *Id.* at 10-11. The District Court disagreed, holding that because the school was an LEA charter school and thus "stands on its own under the IDEA," and because there was no indication that the school was unable to fund the occupational therapy evaluation, the school was solely responsible for providing the evaluation and to pay the student's attorneys' fees. *Id.* at 17.

Here, like the school in *Belton*, SAIL is an LEA Charter school and is thus solely responsible for ensuring that the terms of the IDEIA are met with respect to Dominique. As such, should the hearing officer determine that SAIL denied Dominique FAPE, the responsibility for implementing the ordered relief would also fall solely upon SAIL unless they were able to demonstrate that they were incapable of doing so. As of the filing of this opposition, no such indication has been made. Thus, just as the school in *Belton* was responsible for paying for the evaluation and the parents' attorneys' fees, SAIL - not DCPS - should be required to pay Dominique's compensatory education and Plaintiffs' attorneys' fees.

Therefore, even if one accepts SAIL's argument that they are not authorized to place their students in other schools, they are still a necessary party to this action because they are the party responsible for denying Dominique FAPE and they are at the very least responsible for paying for Dominique's compensatory education award and Plaintiffs' attorneys' fees. The sole remaining issue raised in SAIL's Motion to Dismiss is whether summary judgment should be granted because the factual allegations raised in Plaintiffs' Hearing Request are untrue.

4

616

Under Federal Rule of Civil Procedure 56(c), a motion to dismiss should not be granted unless it is shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2]   A Court considering such a motion shall resolve all factual disputes in favor of the non-moving party and draw all logical inferences therefrom. *See Arnett v. Kennedy*, 416 U.S. 134, 139 (1973).  Because the Hearing Officer must assume the facts alleged in Plaintiffs' Hearing Request to be true when considering the merits of SAIL's Motion to Dismiss and because these allegations raise genuine issues regarding material facts, Plaintiffs respectfully request the hearing officer deny SAIL's Motion to Dismiss.  Defendant's contentions that Dominique's IEP is current or that he has been comprehensively evaluated are factual arguments that are simply not pertinent in summary judgment proceedings.

### B.  Because SAIL is likely authorized to provide Plaintiffs with all the relief requested in the hearing request, DCPS may not be a necessary party to the instant action.

District of Columbia Municipal Regulation Section 5-3019.13 defines the responsibilities of LEA Charter Schools as follows:

> LEA Charters shall provide their own representation at, *and be responsible for implementation of all agreements or decisions resulting from,* mediation and due process hearings involving children in their school, unless implementation of the agreement or decision is the responsibility of DCPS as a result of any actions or inactions of DCPS while a child had been enrolled at an LEA Charter school or pursuant to federal law or local law or regulation. (emphasis added)

However, if an LEA lacks the funds to properly implement a hearing officer's decision, it

---

[2] Under Rule 12(c), a 12(b)(6) motion is to be treated in all respects as a motion for summary judgment and disposed of as provided in Rule 56.  The same is true for any motion to dismiss.

617

shall appeal to the State Education Agency (SEA) for assistance.[3]  Thus, the language of DCMR § 5-3019.13 and DCMR § 5-3019.9 suggests that DCPS is not a necessary party in disputes between LEA Charter schools and their students unless (1) some action or inaction on the part of DCPS indicates that it has taken responsibility for the child, or (2) the LEA can demonstrate that it is financially incapable of serving the child and appeals to the SEA for assistance.[4]

DCPS has not given SAIL any indication that it is willing to assume responsibility for Dominique's education.   The District of Columbia established the institution of public charter schools to provide public schools with "an option for more autonomy over their administration, operations and expenditures."  D.C. Code § 38-1701.2(7).  The District ceded greater autonomy to charter schools with the understanding such schools would be independently liable for the legal consequences of their policies.  Specifically, D.C. Mun. Reg. § 5-3019.2 provides that LEA Charter schools are to be independently "responsible for ensuring that the requirements of [the IDEIA] ... are met in regard to children enrolled in their schools."  Here, the educational decisions that deprived Dominique of FAPE were made solely by SAIL.  DCPS had no knowledge of the programs and instruction strategies SAIL employed to teach Dominique, nor did it play any role in the development of Dominique's IEP.  DCPS was not responsible for

---

[3] "When an LEA concludes that it cannot serve a child with a disability enrolled in its facility using the funds available to it, it shall appeal to DCPS, in its role as designee for the State Education Agency, for assistance." D.C. Mun. Reg. 5-3019.9.  DCPS functions as the SEA for SAIL. *See IDEA Public Charter School v. Belton*, 2006 U.S. Dist. LEXIS 13321 (D.D.C. March 15, 2006).

[4] Contrary to SAIL's contention that it "does not have the authority" to place Dominique in another school, *see* SAIL's Motion to Dismiss at 1, District of Columbia Municipal Regulation Section 5-3019.3 provides that "Except as provided in §§ 3019.4 and 3019.5 below, LEA Charters are responsible for special education evaluations, and if necessary, IEPs and *placements for children with disabilities enrolled in their facilities*" (emphasis added).  District regulations therefore indicate that public charter schools likely possess the authority to place and fund their students at different schools.

6

evaluating the extent of Dominique's impairment or for ensuring that the learning environment at SAIL was appropriate given Dominique's needs. As such, it is simply counterfactual that DCPS did anything to indicate that it had assumed responsibility for Dominique's education.

Furthermore, SAIL has not yet demonstrated that it is financially incapable of providing Dominique with the funding necessary to attend a full-time special education program or that it has appealed to DCPS as its SEA for assistance. DCPS confirmed as much in its Motion to Dismiss. DCPS Motion to Dismiss at 2. Thus, because DCPS has not assumed responsibility for Dominique's education and because SAIL has not demonstrated that it is incapable of implementing the hearing officer's eventual decision or appealed to DCPS in its role as SEA for assistance, it appears that at this time SAIL would be responsible for implementing the hearing officer's order should the Plaintiffs prevail. Because Plaintiffs can likely obtain complete relief from SAIL, they may not be required to join DCPS as a party to the current action.

In the event that SAIL is able to demonstrate that it cannot appropriate sufficient funds to cover the costs of a non-public placement for Dominique or if the hearing officer should find that SAIL is not authorized to place Dominique at another school, DCPS would then become a necessary party because Plaintiffs would no longer be able to receive complete relief from SAIL. In that situation, Plaintiffs would request that DCPS be joined as a necessary party and that DCPS's Motion to Dismiss be denied.

To ensure that Dominique receives the relief due to him in a timely manner, Plaintiffs respectfully request that the determination of whether it is SAIL or DCPS that is required to fund Dominique's placement at a private school (should one be ordered by the hearing officer at the hearing) be made prior to the requested due process hearing. Equity demands that Dominique

7

619

not be denied his due relief while DCPS and SAIL engage in a legal battle regarding who is

responsible for paying for this relief.


## IV. Conclusion

For the reasons stated above, Plaintiffs respectfully request that the Hearing Officer deny

both Motions to Dismiss.


Respectfully submitted,


DONNA L. WULKAN, ESQ.
Unified D.C. Bar No. 370961
1765 N. Street, NW
Carriage House
Washington, DC 20036
202.682.3909


8

620

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing Opposition was served upon the following parties via first-class mail and via fax (if available) on the 13th day of July, 2006.

Quinne Harris-Lindsey
Office of the General Counsel
825 N. Capitol St., NE
Room 90009
Washington, DC 20002

Laura Duos, Esq.
Dalton, Dalton, & Houston, P.C.
1008 Pendleton Street
Alexandria, VA 22314

George Gaudette
Principal, SAIL
1705 H. Street, NW
Washington, DC 20006

Mr. and Mrs. Hawkins.
3001 20th Street, NE
Washington, DC 20018

*Donna Wulkan /gmb*
Donna L. Wulkan, Esq.

621

## Multi Communication Report

### JUL-13-2006 10:15 AM THU

| Fax Number | : | 2029551015 |
|---|---|---|
| Name | : | LAW OFFICE |

| Ref. Name | : | |
|---|---|---|
| Pages | : | 10 |

### 1. Successful

| Fax Number | Name |
|---|---|
| 2024425556 | |
| 2024425097 | |
| 7037392323 | |
| 2022934685 | |

### 2. Unsuccessful

| Fax Number | Name |
|---|---|

### 3. Multi Communication Journal

| No. | Name/Number | Start Time | Time | Mode | Page | Results |
|---|---|---|---|---|---|---|
| 990 | 2024425556 | 07-13 10:07AM | 01'14" | ECM BC | 010/010 | [O.K] |
| 990 | 2024425097 | 07-13 10:08AM | 01'20" | ECM BC | 010/010 | [O.K] |
| 990 | 7037392323 | 07-13 10:10AM | 01'22" | ECM BC | 010/010 | [O.K] |
| 990 | 2022934685 | 07-13 10:12AM | 02'56" | ECM BC | 010/010 | [O.K] |

# FAX TRANSMISSION

### Law office of
### DONNA L. WULKAN
**1765 N Street, N.W.**
**Carriage House**
**Washington, D.C.  20036**

———

**(202) 682-3909**
**telecopier (202) 955-1015**

| | | | |
|---|---|---|---|
| **To:** | Student Hearing Office<br>202-442-5556 | **Date:** | July 13, 2006 |
| **CC:** | Quinne Harris-Lindsey<br>DCPS OGC<br>202-442-5097 | **Pages:** | 10, including this cover sheet. |

Laura Duos
Dalton, Dalton, & Houston, P.C.
703-739-2323

George Gaudette
SAIL
202-293-4685

**From:**    Donna Wulkan

**Subject:**    Dominique Hawkins

Attached is Plaintiff's Opposition to the Motions to Dismiss Submitted by Both SAIL and DCPS and Response to SAIL's Motion to Join a Necessary Party.

The information contained in this telefacsimile message is transmitted by an attorney.  It is privileged and confidential, intended for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited.  If this communication has been received in error, please notify us immediately by telephone, collect if necessary, and return the original message to us at the above address

623

**STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA**
**STATE ENFORCEMENT AND INVESTIGATION DIVISION**
**SPECIAL EDUCATION PROGRAM**

| | |
|---|---|
| IN RE: | ) |
| | ) |
| DOMINIQUE HAWKINS | ) |
| | ) |
| v. | )      **August 4, 2006** |
| | ) |
| SAIL PCS | ) |

<u>**Plaintiff's Response to Defendant's Motion to Join a Necessary Party**</u>

COMES NOW, Carlton and Michelle Hawkins (Plaintiffs), parents of Dominique

Hawkins, and respectfully submit their response to Defendant's Motion to Join a Necessary

Party.


**I. Background**

On July 6, 2006, SAIL submitted its Motion to Dismiss or In the Alternative Motion to

Join a Necessary Party, arguing that because they were not statutorily authorized to place their

students at another school,[1] the Hearing Officer should either dismiss them from the case or join

DCPS as a necessary party. <u>See</u> Attachment 1. The next day, DCPS filed a preemptive Motion

to Dismiss, arguing that pursuant to D.C. Municipal Regulation Sections 5-3019.2, 5-3019.9, and

5-3019.11, DCPS only assumes an active role in a particular school's education after the charter

school cannot service a student. <u>See</u> Attachment 2. Because SAIL never notified DCPS that it

---

[1] Defendants did not cite any law in support of the proposition that they were not authorized by statute to place their students in other local education agencies.

1

EXHIBIT
**P-4**
624

could no longer serve Dominique, DCPS requested that it be dismissed from the case. Plaintiffs filed a response on July 13, 2006, arguing that (1) SAIL is a necessary party because Plaintiffs allegations are directed solely at SAIL, and (2) that SAIL may be statutorily authorized to place their students at other schools.

On July 14, 2006, Hearing Officer David Smith denied both SAIL's Motion to Dismiss and their Motion to Join a Necessary Party, finding that "based on the allegations in the Complaint, SAIL, as its own LEA, may be able to provide the relief requested should it be determined that there was a denial of FAPE." See Attachment 4. Hearing Officer Smith also dismissed DCPS as a party because "the Complaint does not state facts alleging that DCPS has denied the student FAPE, notwithstanding the parent's requested remedy of a placement." Id.

The same day Hearing Officer Smith issued his ruling, Plaintiffs, SAIL, and DCPS convened a resolution meeting. At the meeting, representatives from SAIL conceded that their school was an inappropriate placement for Dominique, and the parties agreed that the remaining issue was relief. See Attachment 5. The meeting concluded without a settlement, and the parties agreed to meet again via teleconference on August 8, 2006 to discuss placement of Dominique. Id. Defense counsel wrongly characterizes this meeting as a continuation of the July 14th resolution meeting. As is clearly indicated by Dr. Peagler's resolution meeting notes, the July 14th meeting concluded "unresolved." Id.

On August 1, 2006, SAIL again moved to join DCPS as a necessary party, and Plaintiffs now enter their response.

## II. Argument

2

625

Pursuant to D.C. Municipal Regulation Section 5-3019.13,

> LEA Charters shall provide their own representation at, and *be responsible for implementation of all agreements or decisions resulting from, mediation and due process hearings involving children enrolled in their school,* unless implementation of the agreement or decision is the responsibility of DCPS as a result of any actions or inactions of DCPS while a child had been enrolled at an LEA Charter school or pursuant to federal or local law or regulation. (emphasis added)

DCPS is therefore only a necessary party to the instant action if they have assumed responsibility for the education of Dominique. Because Hearing Officer Smith implicitly held that DCPS had not assumed that responsibility when he dismissed them as a party and denied SAIL's July 6, 2006 Motion to Join a Necessary Party, the instant motion must also be denied unless events subsequent to the July 14th Order indicate that DCPS is now accountable for Dominique's education. The only circumstances that have changed since Hearing Officer Smith issued the July 14th Order are the following: (1) SAIL's representatives have now admitted that they cannot serve Dominique and that SAIL is not an appropriate setting for him, and (2) DCPS has agreed to participate in a meeting to discuss placement of Dominique on August 8, 2006. Plaintiffs take no position as to whether these facts are sufficient to indicate that DCPS is now responsible for Dominique's education.

If the Hearing Officer should decide that DCPS is now responsible for Dominique's placement, then Plaintiffs respectfully request that they be joined as a necessary party to the action. If the Hearing Officer concludes in spite of these new developments that SAIL would be responsible for implementing a new placement for Dominique should it be determined that there was a denial of FAPE, then Plaintiffs respectfully request that the Hearing Officer deny SAIL's Motion to Join a Necessary Party.

In its Motion to Join a Necessary Party, SAIL argues that at the agreed-upon August 8 meeting, one of two things will happen: either DCPS will approve one of the parents' recommended placements or it will offer a public placement. In the event of the former, SAIL wrongly concludes that the matter is resolved and that a hearing would be unnecessary. Even if Plaintiffs receive their requested placement at the meeting, the issue of compensatory education will still be unresolved and thus, a hearing will be required to settle that dispute. As to that issue, SAIL is the proper defendant. Furthermore, if DCPS offers a public placement, SAIL assumes that DCPS would need to be a party to defend their choice of placement. However, any new placement proposed by DCPS would not be the subject matter of the hearing already currently scheduled for August 30, 2006 as a result of Plaintiffs' Complaint. Any actions taken by DCPS at the August 8th meeting are irrelevant to the question of whether SAIL has denied the student a FAPE.

Currently, DCPS has set the hearing for the sixty-fifth day from the request on August 30, 2006. Plaintiffs and SAIL are the only two parties to this matter and are in absolute agreement, that the hearing must be held as soon as possible. Plaintiffs' preferred placement for Dominique, the Katherine Thomas School in Rockville, Maryland, has conditioned their acceptance of Dominique upon funding being provided to them by August 30, 2006. However, orientation for the school begins on August 25th, and classes begin August 28th. Thus, in order for Dominique to have a chance to take advantage of the opportunities offered by this program, it is necessary that the due process hearing in this case be set no later than August 23. Because of prior obligations, Plaintiffs' counsel requests that the hearing be set anytime between August 18th and August

4

627

23rd.[2]

## III. Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the due process

hearing be set between August 18th and August 23nd.

Respectfully  submitted,

DONNA L. WULKAN, ESQ.
Unified D.C. Bar No. 370961
1765 N. Street, NW
Carriage House
Washington, DC 20036
202.682.3909

---

[2] Because DCPS was dismissed as a party to this action, they currently do not have standing to delay the date of the hearing.

5

628




### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Response to Defendant's Motion to Join a Necessary Party was served upon the following parties via first-class mail and via fax (if available) on the 4th day of August, 2006.

Quinne Harris-Lindsey
Office of the General Counsel
825 N. Capitol St., NE
Washington, DC 20002

Paul Dalton, Esq.
Dalton, Dalton, & Houston, P.C.
1008 Pendleton Street
Alexandria, VA 22314

Esteban Morales
Principal, SAIL
1705 H. Street, NW
Washington, DC 20006

Mr. and Mrs. Hawkins.
3001 20th Street, NE
Washington, DC 20018

Donna L. Wulkan, Esq.

6

629

# FAX TRANSMISSION

**Law office of**
**DONNA L. WULKAN**
**1765 N Street, N.W.**
**Carriage House**
**Washington, D.C. 20036**

**(202) 682-3909**
**telecopier (202) 955-1015**

| | | | |
|---|---|---|---|
| **To:** | Sheila Hall<br>Student Hearing Office | **Date:** | August 4, 2006 |
| **Fax #:** | (202) 442-5556 | **Pages:** | 23, including this cover sheet |

CC:        739
Paul Dalton, Esq. (703)-642-2323
Quinne Harris-Lindsey, Esq. (202) 442-5098

**From:**    Donna Wulkan

**Subject:**    Plaintiff's Response to Defendant's Motion to Join a Necessary Party

The information contained in this telefacsimile message is transmitted by an attorney. It is privileged and confidential, intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If this communication has been received in error, please notify us immediately by telephone, collect if necessary, and return the original message to us at the above address via first class mail (we will reimburse postage). Thank you.

## Multi Communication Report

**AUG-04-2006 03:28 PM FRI**

```
Fax Number    :  2029551015
Name          :  LAW OFFICE


Ref. Name     :
Pages         :  23
```

### 1. Successful

| Fax Number | Name |
|---|---|
| 4425556 | |
| 4425098 | |

### 2. Unsuccessful

| Fax Number | Name |
|---|---|
| 17036422323 | |

### 3. Multi Communication Journal

| No. | Name/Number | Start Time | Time | Mode | Page | Results |
|---|---|---|---|---|---|---|
| 1052 | 4425556 | 08-04 03:16PM | 02'46" | ECM BC | 023/023 | [O.K] |
| 1052 | 17036422323 | 08-04 03:21PM | 00'00" | G3 BC | 000/023 | [No Answer] |
| 1052 | 17036422323 | 08-04 03:22PM | 00'00" | G3 BC | 000/023 | [No Answer] |
| 1052 | 4425098 | 08-04 03:24PM | 02'56" | ECM BC | 023/023 | [O.K] |
| 1052 | 17036422323 | 08-04 03:27PM | 00'00" | G3 BC | 000/023 | [No Answer] |

631

**Message Confirmation Report**                          AUG-04-2006 03:36 PM FRI

Fax Number    :  2029551015
Name          :  LAW OFFICE

Name/Number   :  17037392323
Page          :  8
Start Time    :  AUG-04-2006 03:35PM FRI
Elapsed Time  :  01'06"
Mode          :  STD ECM
Results       :     [O.K]

Law Office of
**DONNA L. WULKAN**
1765 N Street, NW
Carriage House
Washington, DC 20036

_____

(202) 682-3909
telecopier (202) 986-4670

August 1, 2006

Peggy Peagler
825 N. Capitol Street, NE
Sixth Floor
Washington, DC 20002

BY MAIL AND FAX                                    Re:    Dominique Hawkins
                                                   DOB:  3/20/90

Dear Dr. Peagler:

        At the July 14, 2006 resolution meeting regarding the matter of Dominique Hawkins, you requested the parents' attorney to submit an acceptance letter from their preferred placement. I am writing to you to submit such a letter from the Katherine Thomas School in Rockville, Maryland. The parents are therefore seeking funding and placement for Dominique at the Katherine Thomas School for the 2006-2007 school year.

        Thank you very much for your time, and if you wish to speak with me prior to the August 8th teleconference, please do not hesitate to contact me at my office.

                                                   Thank you,

                                                   _Donna L. Wulkan_

                                                   Donna L. Wulkan, Esq.

CC:          Paul Dalton
             Dalton, Dalton, & Houston
             1008 Pendleton St.
             Alexandria, VA 22314

Enclosure:   Katherine Thomas acceptance letter



EXHIBIT
P-5
633

# FAX TRANSMISSION

Law office of

**DONNA L. WULKAN**
1765 N Street, N.W.
Carriage House
Washington, D.C. 20036

———

(202) 682-3909
telecopier (202) 955-1015

| | | | |
|---|---|---|---|
| **To:** | Dr. Peagler<br>202.442.5517 | **Date:** | August 1, 2006 |
| **CC:** | Paul Dalton<br>703.739.2323 | **Pages:** | 3, including this cover sheet. |
| **From:** | Donna Wulkan | | |
| **Subject:** | Dominique Hawkins | | |

Please see attached letter

The information contained in this telefacsimile message is transmitted by an attorney. It is privileged and confidential, intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If this communication has been received in error, please notify us immediately by telephone, collect if necessary, and return the original message to us at the above address via first class mail (we will reimburse postage). Thank you.

634

## Multi Communication Report

AUG-01-2006 04:00 PM TUE

| | | |
|---|---|---|
| Fax Number | : | 2029551015 |
| Name | : | LAW OFFICE |
| | | |
| Ref. Name | : | |
| Pages | : | 3 |

### 1. Successful

| Fax Number | Name |
|---|---|
| 4425517 | |
| 17037392323 | |

### 2. Unsuccessful

| Fax Number | Name |
|---|---|

### 3. Multi Communication Journal

| No. | Name/Number | Start Time | Time | Mode | Page | Results |
|---|---|---|---|---|---|---|
| 1038 | 4425517 :. | 08-01 03:59PM | 00'24" | ECM BC | 003/003 | [O.K] |
| 1038 | 17037392323 | 08-01 03:59PM | 00'26" | ECM BC | 003/003 | [O.K] |

635



## Children's
### National Medical Center

| | |
|---|---|
| **Name:** | Dominique Hawkins |
| **CNMC#:** | 020035223 |
| **Date of Birth:** | 08/28/92 |
| **Evaluation Dates:** | 03/27/06 |
| **Age:** | 13-08 |
| **Referred by:** | Parents |
| **Examined by:** | Joette James, Ph.D.; Lauren Krivitzky, Ph.D. |

### REPORT OF NEUROPSYCHOLOGICAL EVALUATION

#### REASON FOR REFERRAL

Dominique Hawkins is a 13-year, 8-month-old boy who presents with a history of Attention Deficit Hyperactivity Disorder (ADHD), and a longstanding history of difficulties with receptive and expressive language, fine motor skills and academic performance. Dominique was initially evaluated in our clinic in August/September 2002. He was referred for a follow-up neuropsychological evaluation by his parents for an updated assessment of his profile of cognitive strengths and weaknesses and to assist with educational/treatment planning.

#### SOURCES OF RELEVANT DATA

Relevant information was obtained through an interview with Dominique's mother. Mrs. Hawkins completed the Achenbach Child Behavior Checklist (CBCL), the ADHD-IV Rating Scale, and the Behavior Rating Inventory of Executive Function (BRIEF), parent form. Dominique's speech/language pathologist and his math teacher each completed the BRIEF and the Teacher Report Form (TRF) of the Achenbach Scales. Dominique completed the Achenbach Youth Self-Report (YSR) and the self-report version of the BRIEF. This information was supplemented by a review of records, detailed observation of Dominique's behavioral repertoire and of his performance on a variety of psychological tests, which included the following:

> Wechsler Abbreviated Scale of Intelligence (WASI); Verbal Fluency Test, Delis-Kaplan Executive Functioning System (D-KEFS); California Verbal Learning Test- Children's Edition (CVLT-C); selected subtests, Wide Range Assessment of Memory and Learning-Second Edition (WRAML-2); Beery Visual Motor Integration (VMI); Grooved Pegboard; Rey-Osterrieth Complex Figure (ROCF); selected subtests, Test of Everyday Attention for Children (TEA-Ch); Auditory Consonant Trigrams; Tower of London DX; Comprehensive Test of Phonological Processing (CTOPP); selected subtests, Wechsler Individual Achievement Test- Second Edition (WIAT-II); Gray Oral Reading Test- Fourth Edition (GORT-4).



**EXHIBIT**
**P-6**
636

Hawkins, Dominique
MR# 020035223

## RELEVANT HISTORY

Dominique's medical, developmental, social, and educational history have been presented in detail in the reports of previous evaluations (i.e. Gilotty and Stein: 8/02; Scott: 3/05), and will, therefore, not be restated here. The reader is referred to those reports for the details of Dominique's early history. In the interim, there have been no changes in Dominique's medical status; he remains in good general health, with no significant illnesses or hospitalizations. In 2006, Dominique briefly underwent a trial of Ritalin (dose unknown) for attention control; however, it was discontinued because Dominique's parents felt that they could not see a therapeutic benefit and Dominique was reluctant to take it.

Currently, Dominique continues to attend the School for Art and Learning (SAIL), a special education placement for children with learning disabilities. He is in the 7th grade. Dominique's IEP indicates that in addition to specialized classroom instruction he receives weekly occupational therapy (1 hour) and speech/language therapy (1 hour), and accommodations such as a multi-sensory approach, frequent breaks, oral response and extended time. According to his mother and educators, Dominique is currently performing significantly below grade level in all academic subjects. While he has shown some improvement, his parents are concerned that his rate of academic progress remains slow. Further, according to Dominique's mother, since Dominique does not demonstrate significant behavior problems at school, the extent to which he is impaired by his learning difficulties has not been recognized and adequately addressed in his current educational setting. Primary concerns continue to be related to slow and laborious reading decoding, which impacts his performance on reading-related tasks across the curriculum. Additionally, while Dominique shows good comprehension of what is read to him, he struggles to comprehend what he reads on his own. In terms of writing, Dominique has significant difficulty putting his thoughts into writing; he is currently using a graphic organizer. More generally, Dominique struggles to understand and retain concepts and has the most difficulty with higher-order thinking and problem-solving skills, such as abstraction and inferencing. He performs best when information is simplified and "chunked" and becomes quickly overwhelmed on tasks with multiple verbal instructions or steps. There are also ongoing concerns about Dominique's attention and focus. He has a hard time sustaining his attention and effort, resisting distractions and staying on task. This has been particularly problematic in the past year, when reportedly Dominique was in an open classroom environment. Despite these difficulties, Dominique's educators describe him as a polite, cheerful, helpful and respectful young man who desires to please others and do well.

In terms of emotional/behavioral functioning, Dominique's parents expressed concerns about the effects of his academic difficulties on his self-esteem and motivation. Socially, Dominique reports having some difficulty managing teasing from peers. His mother observes that Dominique has a strong need to "fit in" with his peers which sometimes causes him to engage in behaviors he later regrets. Nonetheless, he is an outgoing child and has several school friends with whom he associates regularly

## PREVIOUS EVALUATIONS

Dominique has undergone several assessments over the years, a few of which will be highlighted here. An initial neuropsychological evaluation (Georgetown University Medical Center) was conducted when Dominique was 6 years, 4 months, using the Stanford-Binet IV. The results of intellectual testing revealed an overall Stanford-Binet Test Composite of 70 (Borderline), a Verbal Reasoning SAS of 70, an Abstract/Visual Reasoning SAS of 70, and a Short-Term Memory SAS of 64. A relative strength was noted in Dominique's quantitative reasoning skills (counting and matching), which were in the Average range (Quantitative Reasoning SAS=96). Assessment of Dominique's early academic skills using the WJ-R placed him at the Kindergarten level for reading and mathematics. Weaknesses in attention, memory and fine-motor skills were also noted.

Dominique subsequently underwent a psychological evaluation through CNMC in August/September 2002. He was 9 years, 11 months at the time and about to begin the 4th grade. On the WISC-III,



Hawkins, Dominique
MR# 020035223

Dominique obtained a Full Scale IQ of 90 (Average). However, a significant discrepancy was obtained between his verbal reasoning abilities (Verbal IQ= 81- Low Average), and his nonverbal/visual processing skills (Performance IQ= 102 Average). There was also significant variability among subtests. Overall, Dominique cognitive profile and behavioral presentation were felt to be consistent with ADHD and substantial impairments in speech and language abilities.

Dominique most recently underwent a psychological evaluation (3/05) at Mount Washington Pediatric Hospital at the age of 12 years, 7 months. The evaluator encouraged caution in interpretation of the test results given Dominique's reduced energy level and tendency to impulsively rush through tasks. In addition, Dominique's mother reported that only a minimal rapport with the examiner was established, and as such the results of the evaluation were not fully reflective of Dominique's abilities at the time. On the Stanford-Binet- Fifth Edition, Dominique obtained a Full Scale IQ of 78 (Borderline), a Verbal IQ of 81 (Low Average) and a Nonverbal IQ of 77 (Borderline). Intra-subtest scatter was again noted, particularly in the verbal domain. Academic skills were assessed using the Wechsler Individual Achievement Test- Second Edition. His skills ranged from significantly below average to low average, with a particular weakness in reading and written language (Reading Composite SS=55- Below Average; Mathematics Composite SS=77- Borderline; Written Language Composite SS=61-Below Average).

## OBSERVATIONS AND FINDINGS

*For the following scores: SS= Standard Score (Mean=100, Standard Deviation=15); ss= scaled score (M=10, SD=3); T= T score (M=50, SD=10); z= z score (M= 0; SD= 1)*

**General Appearance/ Presentation:** Dominique presented as quiet and reserved, with a somewhat restricted range of affect. He was, however, polite and cooperative and attempted all tasks presented to him.

**General Cognitive Ability:** Dominique's cognitive skills were screened with the *WASI.* Given Dominique's history of significant variability among subtests on full-length intellectual measures, these scores should be considered only as an estimate of Dominique's current intellectual ability. Dominique obtained a Full Scale IQ of 80, a Verbal IQ of 84, and a Performance IQ of 81, all of which fall in the Low Average range. He received the following subtest T-scores:

| | | | |
|---|---|---|---|
| Vocabulary | 42 | Block Design | 34 |
| Similarities | 36 | Matrix Reasoning | 41 |

**Verbal Skills:** In general, Dominique preferred to answer to direct questions; he tended to give brief responses and spontaneous conversation was difficult to elicit. Dominique's informal language comprehension seemed within normal limits. Language pragmatics were globally intact, and Dominique demonstrated an adequate appreciation of paralinguistic features, such as intonation, gesture, and facial expression.

Language-based processing was generally in the low average range for age. On the verbal subtests of the *WASI,* Dominique's performance was low average on a task of vocabulary knowledge (*Vocabulary*) involving the definition of words. His responses tended to be somewhat impoverished in terms of detail and precision and he had trouble elaborating upon his ideas. Dominique struggled on a task of verbal concept formation *(Similarities)*, which required him to form increasingly abstract connections between words. Rapid word generation was solidly average for semantic cues, but low average for phonemic cues; the latter task placed a heavier demand on Dominique's ability to perform an organized search of his lexicon (*D-KEFS Verbal Fluency: Letter Fluency* ss= 7, *Category Fluency* ss=11). Dominique also had trouble on a task, which required him to alternate between naming items from different semantic



Hawkins, Dominique
MR# 020035223

categories (*D-KEFS Category Switching* ss=6, *Switching Accuracy* ss=5). Dominique's difficulties on this task were likely due to difficulties in attending to the task and keeping the rules in working memory.

Verbal memory was also generally low average. Dominique's recall of paragraph-length stories was low average on *WRAML2 Story Memory* immediately and after a delay (*Immediate* ss= 6; *Delay* ss= 6). His free recall of the stories was fragmented and disorganized. Dominique's performance improved to average (ss=9), when he was asked multiple-choice questions about the stories, providing further evidence of organizational difficulties in that he retained more than he was able to freely recall. On the *CVLT-C*, a verbal list-learning task, Dominique's overall recall across five trials was below average (T= 35), and he demonstrated a flat learning slope (*Learning Slope* SS=63). Immediate (SS= 70) and delayed recall (SS=63) were both significantly below age-expectations. Dominique showed evidence of poor attention and monitoring of his responses in that he frequently "recalled" words that were not on the original list (*Total Intrusions* SS=130), and tended towards a "yes" response bias when presented with the words in recognition format (*Response Bias* SS=115). In sum, Dominique's difficulties with attention and executive functioning negatively impacted upon his ability to learn and remember new, verbally-presented information.

**Visual/Spatial Skills:** There were no observed difficulties with basic visual-perceptual processes such as the appreciation of visual fields, gaze patterns, face/object recognition, or the basic navigation in topographical space.

Visually-based processing and visual-motor skills were also below age-expectations. On the *WASI*, Dominique's performance was below average on a visual construction task (*Block Design*), and low average on a measure of nonverbal problem-solving (*Matrix Reasoning*). Basic constructional skills were also below average range on the *VMI* (SS= 70). On a more complex drawing task, the *Rey-Osterrieth Complex Figure*, Dominique's copy was notable for significant weaknesses in planning and organization. He approached the task in a piecemeal, part-oriented manner, which lacked an appreciation of the framework of the figure. In addition appeared loosely and quickly drawn without a careful eye to accuracy. Nonetheless, Dominique was able to retain most of what he initially encoded of the figure after a 20-minute delay.

**Attention/Executive Functions:** Dominique's attention and concentration was adequate in the 1:1 structured setting. His activity level was well-modulated with no significant verbal or motor impulsivity. Dominique worked persistently though his approach to tasks was somewhat haphazard.

Attention was variable on formal, individually administered measures. Dominique's performance was average in terms of accuracy and speed on a measure of focused visual attention (*TEA-Ch Sky Search Targets* ss= 10, *Time per Target* ss=8, *Attention Score* ss=10). Sustained auditory attention was significantly below age-expectations, however (*Score!* ss=2). Divided attention (auditory and visual) was low average (*TEA-Ch Sky Search DT* ss=7), and Dominique's regulation of motor impulses was age-appropriate (*TEA-Ch Walk/Don't Walk* ss=11). On questionnaire measures (*CBCL, ADHD-IV Rating Scale*), Dominique's mother indicated borderline to clinically significant concerns about attention (*CBCL Attention Problems*- T=65; *ADHD-IV Rating Scale*- 8 of 9 symptoms of inattention, 2 of 9 symptoms of hyperactivity/impulsivity). Similarly, on the *TRF* both Dominique's speech/language pathologist and his math teacher reported moderate attention difficulties on the classroom setting (*Attention Problems*-Speech T=64, Math T=66). Dominique's self-report on the *YSR* was not overall indicative of significant concerns with attention and hyperactive/impulsive behavior (*Attention Problems* T=63), although he did identify that he "often" has trouble with concentration, finishing tasks within expected time frame and sitting still.

Vulnerabilities were also noted in aspects of broader executive function skills. Dominique struggled with tasks of working memory, which require holding and manipulating information "on-line." He scored in



Hawkins, Dominique
MR# 020035223

the below average range in terms on a task which involved rapidly alternate between counting forwards and backwards (*TEA-Ch Creature Counting Total Correct* ss=3). Variability in Dominique's performance was also noted on a more complex working memory task involving interference (*Auditory Consonant Trigrams- 3"* SS=70, *9"* SS=105, *18"* SS=86, *Total* SS=88). Planning speed was adequate but efficiency was variable on the *Tower of London DX*, a multi-step planning task (*Total Moves* SS= 94; *Total Correct* SS=78, *Total Time Violations* SS=108; *Execution Time* SS=92). However, on this task, Dominique impulsively violated the rules on several occasion (*Total Rule Violations* SS≤60). The results of formal testing are consistent with the report of Dominique's mother, speech/language pathologist and math teacher on the *BRIEF*. All three reporters indicated clinically significant difficulties with independent task initiation (Parent T=65, Teacher T=75, Speech T=78), working memory (Parent T=71; Teacher T=88, Speech T=83), planning/organization (Parent T=67, Teacher T=79, Speech T=70), organization of belongings (Parent T=66, Teacher T=80, Speech T=83). Poor self-monitoring of tasks and behavior was also noted in the school context (Teacher T=71, Speech T=88). In addition, the report of Dominique's teacher and speech/language pathologist on the *BRIEF* indicated significant concerns about aspects of Dominique's behavioral regulation, including inhibitory control (Teacher T=66, Speech T=89), flexibility (Teacher T=66, Speech T=79), and emotional control (Teacher T=64, Speech T=97). Dominique's self-report on the *BRIEF* was not indicative of significant concerns in any executive domain, though he endorsed a number of symptoms related to poor flexibility in problem-solving and difficulties with change and transitions (Shift T=63).

**Motor Functioning:** Gait and balance were generally intact. Dominique is right-handed and uses a thumb- wrapped grip. Fine motor speed and dexterity were significantly below average bilaterally (Dominant, Right hand: SS≤60, Left Hand SS≤60) on *Grooved Pegboard*.

**Academic Functioning:** Assessment of Dominique's basic academic skills was completed with the *WIAT-II*, *CTOPP*, and the *GORT-4*. Basic academic skills, in terms of single word reading (SS=67; early 3rd grade level), spelling (SS=68; mid 2nd grade level), arithmetic (Numerical Operations SS=64; mid 3rd grade level) and mathematical reasoning (SS=70; early 4th grade level) were all significantly below expectations for age, and also stand in contrast to Dominique's generally low average cognitive abilities. In addition, Dominique's phonological processing, which research shows to be a foundational component in reading, was significantly below age-expectations (*CTOPP Phonological Awareness Composite* SS=76), as was his automaticity in naming was (*CTOPP Rapid Naming Composite* SS=73). Further, on the *GORT-4*, which examines reading proficiency at the paragraph level, Dominique's performance was well below average, with overall performance below the 1st percentile for age (*Oral Reading Quotient* SS=61). His reading rate (ss=2) and accuracy (ss=4) were significantly impaired, with comprehension in the low average range (ss=6).

**Behavioral Adjustment:** Parent report on the *CBCL* did not indicate significant emotional/behavioral concerns at this time, though mild medical concerns (i.e. eye problems, skin problems) resulted in an elevated score on the Somatic Complaints scale (T=67). The reports of Dominique's math teacher and speech/language pathologist suggest some concerns related to anxiety/ self-consciousness (*Anxious/Depressed* T=66- Speech) and argumentativeness (*Aggressive Behavior-* T=67- Teacher). Dominique's self-report showed a pattern similar to his teachers with mild problems identified with respect to arguing, losing his temper, self-consciousness, and difficulty getting along with adolescents his own age (*Social Problems* T=66; *Aggressive Behavior* T=67). Dominique also endorsed some physical complaints, such as rashes and occasional headaches and stomachaches (*Somatic Complaints* T=67). Though he made several positive statements about himself in the narrative portion of the *YSR* (" I am charming," "I am nice," "I am smart"), overall, Dominique's emotional presentation suggests that he is experiencing some decrements in his self-confidence in large part attributable to his academic weaknesses, which at times interferes with his relationships with others.



Hawkins, Dominique
MR# 020035223

## IMPRESSIONS

Dominique Hawkins is an appealing, likable 13½-year-old boy with a history of ADHD, impairments in language and fine motor skills and longstanding academic difficulties who was referred for a updated neuropsychological evaluation due to ongoing concerns regarding academic progress.

The current evaluation documents Low Average verbal reasoning and nonverbal/visual processing skills, and is broadly consistent with the results of previous evaluations. In the context of Dominique's cognitive ability, the neuropsychological profile reveals significant relative weaknesses in academic performance, which include deficits in phonological processing, reading fluency, and mathematical reasoning. As such, we feel that Dominique meets the criteria for a diagnosis of <u>Reading Disorder</u> (which is essentially synonymous with dyslexia) and <u>Mathematics Disorder</u>. Although Dominique's writing skills were not formally assessed in this evaluation, by history he also meets criteria for a diagnosis of <u>Disorder of Written Expression</u>. In addition, Dominique demonstrates significant weaknesses in attention, as well as aspects of executive functioning including flexibility, working memory, self-monitoring, and systematic organizational skills. As such, he also continues to meet criteria for <u>Attention Deficit Hyperactivity Disorder (ADHD), Predominantly Inattentive Type</u>. Evidence of ongoing vulnerabilities in fine motor speed and dexterity was also observed.

These weaknesses place Dominique at risk for difficulties in academics. Since Dominique reads more slowly and less accurately than his peers, he is likely to become overwhelmed by large quantities of written material, which in turn affects his comprehension and ability to complete assignments in a timely manner. As Dominique advances in school, these difficulties are likely to increasingly affect his performance across the curriculum, impacting not only subjects such as spelling and written expression, but also reading intensive subjects such as social studies as well as aspects of mathematics, such as word problems.

Dominique's academic performance is also likely to be compromised by vulnerabilities in executive functions and attention. Executive function is a cognitive domain that encompasses skills related to self-regulation (e.g., problem-solving, planning skills, organization, and impulse control). Planning skills are necessary to generate the steps needed to accomplish a goal, and flexible problem-solving is required to select appropriate strategies and inhibit inappropriate ones. When presented with complex problem-solving tasks, Dominique often had difficulty planning a systematic and organized approach. In addition, as a result of working memory problems, Dominique may have difficulty keeping directions or all steps needed for a task "in mind" while he completes it. As such, he may have difficulty working in an organized manner, and consistently demonstrating his knowledge. Likewise, vulnerabilities in attention are related to executive function difficulties, reducing Dominique's capacity to sustain effort to academic tasks and complete work in a timely manner. Fine motor weaknesses will also impact Dominique's efficient output of information.

Because of these difficulties, Dominique will be sensitive to the load of work he must complete. "Load" consists not only of the amount of work that he must complete, but also the complexity of the work. As such, he is at ongoing risk for academic problems as he advances though higher grades and there are greater demands. One's organizational skills become essential as the curriculum becomes more complex, and Dominique will have to derive information from more complex text, reproduce information in appropriately organized written form, and do so in an increasingly independent manner. Thus, Dominique may have difficulty with tasks that are long-term (requiring planning of time), require organization of lots of detailed information (e.g., a specific multi-step task) and must be completed in a certain time frame. Executive weaknesses in flexibility also place Dominique at risk in the social-emotional domain, such that he may have trouble with interpersonal problem-solving and become overwhelmed in busy social environments. Further, due to his learning difficulties, Dominique is already experiencing damage to his self-esteem and a high level of frustration. School struggles, particularly an expanding gap between his



Hawkins, Dominique
MR# 020035223

good capabilities and his actual "output," frequently cause distress and discouragement in students such as Dominique.

Dominique's neuropsychological vulnerabilities should continue to be seen in the context of his areas of strength. Among his many assets are his endearing nature, resilience and motivation to succeed. He possesses good basic cognitive skills, and with the appropriate supports he will continue to make progress, albeit at a slower rate than his peers. His psychological and behavioral adjustment will continue to be fostered by his parents' active support and their investment in his well-being.

## RECOMMENDATIONS

**Academic Programming:** Given his current academic impairments in the area of reading/writing, ADHD and associated executive dysfunction, Dominique should continue to qualify for special education intervention under the Learning Disability/ Other Health Impaired (given ADHD) rubrics. He will be most successful in a highly structured classroom with a low student-to-teacher ratio with instruction by educators with expertise in working with children with Dominique's profile. The focus of the cognitive/academic support for Dominique lies in systematic remediation of reading and related skills (i.e. comprehension, written expression) as well as assisting his executive control systems. He will require intensive reading instruction as outlined below. He also needs to develop consistent systematic problem-solving routines for task set-up (working memory, planning, organization) and completion (including monitoring). He will benefit from the development of task-specific routines and strategies including explicit goal-setting to support his executive vulnerabilities. These supports are necessary on an overt level, provided by his teachers and parents explicitly to start. Once the task routines become familiar, the external supports can be faded, and Dominique's own use of the routines become the focus of the reinforcement. Ultimately, teaching him to become strategic in developing his own problem-solving routines and supports is the end goal.

Specific recommendations include:

- *Reading Instruction:* Dominique continues to need individualized, systematic, daily reading instruction by a reading specialist. Research supports a phonics-based approach (the ability to associate word-sounds with printed letters or letter-groups). Reading specialists use a variety of phonics-based methods such as the Lindamood, Orton-Gillingham, or Wilson programs. Software for home and school use includes Earobics (earobics.com), SoundReading (soundreading.com), Great Leaps (greatleaps.com), and Reading SOS (lexialearning.com). We recommend that Dominique's parents and teachers seek out the recommendations of the National Reading Panel (www.nationalreadingpanel.org/), which recommends a comprehensive approach to reading instruction, including an emphasis on phonics-based strategies, reading fluency, reading comprehension and spelling/writing.

- *Reading Comprehension:* Some strategies for reinforcing reading comprehension are suggested in: Katherine Maria, Reading Comprehension Instruction: Issues and Strategies (York, 1990), & Lynn Rhodes & Nancy Shanklin, Windows into Literacy (Heinemann Press, 1993). As regards spelling, consult L. Moats' (1987) Spelling: Development, Disabilities, and Instruction. Susan Setley's book, Taming the Dragons: Real Help for Real School Problems, has lots of great spelling tricks (Hawthorne Educational Services, 1-800-542-1673).

- Dominique will also continue to benefit from the following accommodations addressing his reading difficulties being formally addressed in his IEP. It will be important for these accommodations to be available to Dominique in all of his classes:



Hawkins, Dominique
MR# 020035223

  a. Dominique should be allowed to tape record lectures so that he can study by listening rather than by reading.
  b. Dominique should be given photocopied notes of lectures or material presented by overhead or on the chalkboard. This should be provided either by the teacher or by a peer known for taking good notes.
  c. Dominique's assignments should be modified when possible so that he can complete projects that demonstrate his understanding, rather than written work. These projects must not rely on written captions.
  d. Dominique should be provided with a personal word processor by the school, such as an Alpha Smart. He may require an assistive technology evaluation to obtain this equipment. Because his spelling of words is inconsistent, he will still require help from a teacher or special education teacher in going over his written responses to determine correct spellings.
  e. Whenever possible, Dominique should be allowed to complete exams orally so that he is not penalized for his reading difficulties and writing disability in subject areas such as science, social studies, and other academic areas.
  f. Books on tape should be provided for all of Dominique's textbooks and any novels he is required to read.

- Dominique will benefit from being provided with the opportunity to dictate his responses to a special education teacher when completing written assignments and written tests.

- *Additional reading resources:* The National Library System Talking Books (books on tape) may be helpful (http://www.loc.gov/nls/reference/factsheets/readingdisabilities.html). Recording for the Blind and Dyslexic records books including textbooks (http://www.rfbd.org). Both of these resources are free to qualified applicants. For parents and teachers, excellent information about reading disability is available on the web at LD Association of Minnesota http://www.fln.vcu.edu/ld/ld.html and International Dyslexia Association http://interdys.org and in two recommended books, Overcoming Dyslexia, by Sally Shaywitz, M.D., and Starting Out Right: A guide to promoting children's reading success, by the National Reading Council (1998, National Academy Press).

- *Written expression:* Teach Dominique a very specific routine for producing written work. Such a routine might include: 1. Brainstorming in which Dominique comes up with several ideas related to the topic of assignment; 2. Identification of the appropriate number of ideas to express in a written assignment of the assigned length; 3. Outline development; 4. Writing specific topic sentences; 5. Completing paragraphs; 6. Checking organization of paragraphs and document as a whole; 7. Running spell check; and 8. Proofreading. Whatever approach to structuring written material is identified, it should be repeatedly practiced with a tutor and written out as a checklist.

- *Mathematics:* In teaching math concepts, instruction should be explicit, concrete, and step-by-step. Dominique is likely to learn math best when he is taught specific routines that he can apply to certain kinds of problems. Math instruction should be supplemented with manipulatives, concrete examples, demonstration, modeling, and verbal descriptions. When teaching a new concept, a highly structured and sequential approach that moves from the concrete to the abstract will work best. Dominique may have difficulty applying previously leaned concepts and his teachers may need to point out similarities between problems to foster generalization.



Hawkins, Dominique
MR# 020035223

The following classroom-based accommodations are also recommended:

- *Increasing organization and structure:* Dominique will benefit from increased structure and organization when learning new information or when he is expected to complete work independently. When presenting new information, teachers should attempt to present it in smaller, more manageable chunks. New information should be taught in a well-organized format with overall frameworks made clear at the outset and reviewed at the end of each lesson. Dominique may benefit from 'pre-teaching' by previewing lessons beforehand on a daily basis for brief periods of time. This can set Dominique's expectations for the day, giving him a frame of reference, which will allow for more efficient encoding when he is presented with the material in class. Such preteaching and review methods will help provide an organizational framework for capturing novel information more efficiently.

  Dominique is likely to learn individual rules and facts but may miss the organizing principles (or "big picture") that allow for generalization of that information. Therefore, Dominique may need assistance in attending to the core concepts of new information presented to him. He may need assistance in learning strategies to quickly perceive the "big picture" and main points of the material he is learning. Utilizing cue questions that will direct him to the main concepts can be beneficial ("What is the goal here?" "What is the teacher looking for?").

  Dominique's difficulties will be most apparent when tasks are new and when less structure is provided by the environment. Structuring tasks will help facilitate completion. Clear statements about what is expected for each task, as well as strategies to limit open-endedness should help to structure more ambiguous tasks. Jointly analyzing and then writing down the individual steps that will be needed to complete multi-step tasks can also be of some benefit. Using checklists to prompt the steps in a procedure is extremely valuable, not only to organize materials and one's approach to them, but also to support the effort required for independent and persistent output. For example, a version of a "First I do this; Second I do this; Third I do this" strategy serve to structure an assignment, keep one on track, and reduce the open-endedness of tasks that can prove so daunting for children like Dominique. Creating these lists should not only help to teach Dominique how to break tasks down on his own, but they will also provide an opportunity for teachers to quickly prompt Dominique to keep him organized and on track (e.g., Where are you on your list? How many steps have you checked off?). Allowing him to see all of the steps at once should also keep him from becoming overly focused on one aspect of the task and from losing sight of the overall goal of the assignment.

- *Working Memory:* The following may be helpful in supporting Dominique's working memory:

  a. Establishing eye contact with Dominique prior to giving essential instructions or new material will help ensure that he is ready to listen carefully. Individuals like Dominique with working memory difficulties often need to be alerted when essential material or instructions are being presented.

  b. It will be important for complex verbal (oral) information to be simplified, repeated and presented in manageable chunks for Dominique to facilitate his comprehension. In addition, he would benefit from occasional checks on his understanding by asking him to explain task instructions "in his own words."

  c. Changing tasks more frequently can alleviate some of the drain on sustained working memory for children like Dominique. Dominique's focus is likely to fade more quickly than his peers. Changing from one task to the next sooner can help restore his focus for a



Hawkins, Dominique
MR# 020035223

brief period of time. Tasks can be rotated, such that he might work for ten minutes on math problems, ten minutes on reading, and then return to another ten minutes of math.

d.  Individuals with difficulties sustaining working memory often need frequent brief breaks. Breaks typically need only be one or two minutes in duration. Observing when Dominique's ability to focus begins to wane will help determine the optimal time for a break.

e.  Often people with working memory deficits also exhibit word and information retrieval difficulties. They frequently experience the "tip of the tongue" phenomenon, or may produce the wrong details within the correct concept. Dominique may need additional time to retrieve details when answering a question. Cues may be necessary to help him focus on the correct bit of information or word. It is often helpful to avoid open-ended questions and to rely more on recognition testing which does not require retrieval.

f.  Children with working memory difficulties often benefit from multimodal presentation of information. Verbal instruction can be accompanied by visual cues, demonstration and guidance to increase the likelihood that new material will be learned.

- *Decreasing demands for speed*: Given his fine motor and executive control weaknesses, Dominique would benefit from a reduction in time constraints either by shortening assignments or allowing him more time to complete them. Tests should be administered in an untimed fashion. Make accommodations regarding the quantity of home and class work assignments to the number of problems Dominique can finish in a given time period. If the teacher wishes him to spend 30 minutes on an assignment, assign only the amount of work that can be completed in that time. Communication between home and school is essential to calibrate assignments to challenge Dominique without overwhelming him. Dominique may also be a good candidate for being taught keyboarding skills.

- *Homework completion*: Strategies for organization, planning, self-monitoring and self-evaluating performance should also be utilized on homework activities. These strategies can provide a systematic set of steps for the completion of tasks, which can help Dominique get started and follow through with a minimum of supervision. These "recipe"-like set of steps often have a beginning, middle and end which helps to reduce the open-endedness of homework assignments.

- *Home/ school communication*: Close communication between home and school is critical to ensure Dominique's development of appropriate task behaviors and organizational skills as well as to ensure that assignments are appropriately understood and recorded. Also, in developing executive skills, it is important to elicit Dominique's input throughout the process. Although he will need guidance in determining strategies, it will also be important to obtain his opinions on which strategies he finds most helpful.

### Other Interventions

- *Continued speech/language therapy* is recommended to address expressive and receptive language skills. It is also recommended that pragmatic language and social skills be addressed in a structured, small group environment.
- *Continued occupational therapy* is recommended to address Dominique's fine motor weaknesses, especially inasmuch as they impede with functional skills such as handwriting.



Hawkins, Dominique
MR# 020035223

- Although he did not experience a therapeutic benefit with Ritalin, Dominique's parents may wish to consider *psychopharmacological management* of Dominique's difficulties with attention and impulse control with another agent. He is referred back to his pediatrician in this regard.

- *Explicit emphasis on self-esteem* is essential to counteract Dominique's negative self-view by helping him to experience greater success in the academic domain. Concrete charts of progress, verbal reinforcement, segmenting assignments in small, manageable pieces, and identifying opportunities in the curriculum to allow Dominique to express particular areas of expertise is recommended. This is more generally associated with flexible curriculum development that encourages Dominique to develop areas of interest with projects. In addition, it will be important to continue to engage Dominique in extracurricular activities in which he can experience a sense of mastery and self-efficacy.

If there are further questions or the need for consultation regarding the findings of this evaluation, please do not hesitate to call me (Dr. James) at 301-738-8933.

*Joette James*

Joette James, Ph.D.
Licensed Psychologist
Pediatric Neuropsychology Fellow
Children's National Medical Center

*Lauren Krivitzky, Ph.D.*

Lauren Krivitzky, Ph.D., Supervisor
Licensed Psychologist
Pediatric Neuropsychologist
Children's National Medical Center

646

Hawkins, Dominique
MR# 020035223

This score sheet is provided for the convenience of other professionals. It accompanies a written report and should not be interpreted without reference to the report. Scores reported as standard scores (mean = 100; standard deviation = 15); scaled scores (mean = 10; standard deviation = 3); or t-scores (mean = 50; standard deviation = 10). "WNL" means within normal limits; and "Low" and "High" means a standard deviation or more below and above age expectations, respectively.

## General Intellectual Functioning:

Wechsler Abbreviated Scale
of Intelligence (WASI)

| Verbal Scale (t-score) | | Performance Scale (t-score) | | Index Scores (standard) | |
|---|---|---|---|---|---|
| Vocabulary | 36 | Block Design | 34 | Verbal IQ | 84 |
| Similarities | 42 | Matrix Reasoning | 41 | Performance IQ | 81 |
| | | | | Full Scale IQ | 80 |

## Language:

| D-KEFS Verbal Fluency Test | Scaled |
|---|---|
| Letter Fluency | 7 |
| Category Fluency | 11 |
| Category Switching | 6 |
| Switching Accuracy | 5 |

## Visual/Visual-Motor Integration:

| Beery Developmental Test of Visual Motor Integration (standard) | 70 |
|---|---|

## Attention/Impulsivity:

TEA-Ch (scaled)

| Sky Search | |
|---|---|
| Correct targets | 10 |
| Time per Target | 8 |
| Attention | 10 |
| Score! | 2 |
| Sky Search DT | 7 |
| Creature Count | |
| Total Correct | 3 |
| Timing score | n/a |
| Walk/Don't Walk | 11 |



647

**Executive Functioning:**

The Behavior Rating Inventory of Executive Function (BRIEF)

| Subscale/Index | Parent t-score | Teacher t-score | Subscale/Index | Parent t-score | Teacher t-score |
|---|---|---|---|---|---|
| Inhibit | 60 | 64 | Initiate | 65 | 75 |
| Shift | 41 | 66 | Working Memory | 71 | 88 |
| Emotional Control | 48 | 66 | Plan/ Organize | 67 | 79 |
|  |  |  | Organization of Materials | 66 | 80 |
|  |  |  | Monitor | 60 | 71 |
| Behavior Regulation Index | 51 | 67 | Metacognition Index | 68 | 81 |
| Global Executive Composite | 64 | 78 |  |  |  |

The Behavior Rating Inventory of Executive Function- Self-Report (BRIEF-SR) (t-score)

| Subscale/Index | Self-Report Score | Subscale/Index | Self-Report Score |
|---|---|---|---|
| Inhibit | 58 | Working Memory | 60 |
| Shift | 63 | Plan/Organize | 57 |
| Emotional Control | 57 | Org. Materials | 59 |
| Monitor | 58 | Task Completion | 60 |
| Behavioral Regulation Index | 61 | Metacognition Index | 60 |
| Behavioral Shift | 60 | Global Comp | 61 |
| Cognitive Shift | 62 |  |  |

Tower of London Dx

|  | Standard Score |
|---|---|
| Move | 94 |
| Correct | 78 |
| Rule Violations | ≤60 |
| Time Violations | 108 |
| Initiation Time | 90 |
| Execution Time | 92 |

CVLT-C (standard)

| Semantic Cluster | 85 |
|---|---|
| % Recall Primacy | 85 |
| % Recall Recency | 93 |
| Perseveration | 93 |
| Intrusions | 130 |

Auditory Consonant Trigrams (standard)

| 0" Delay | 103 |
|---|---|
| 3" Delay | 70 |
| 9" Delay | 105 |
| 18" Delay | 86 |
| Total | 88 |

Neuropsychological Evaluation

648

Hawkins, Dominique
MR# 020035223

~ ~ - 14

**Learning/Memory:**

| WRAML (scaled) | | CVLT (standard) | |
|---|---|---|---|
| Story Memory | | Total (scaled) | 35 |
|   Immediate Recall | 6 | Trial 1 | 100 |
|   Delayed Recall | 6 | Trial 5 | 70 |
|   Delayed Recognition | 9 | Learning slope | 63 |
| | | Short Delay | 70 |
| | | | |
| | | Short Delay – cued | 63 |
| | | Long Delay | 63 |
| | | Long Delay – cued | 70 |
| | | Recall Consistency | 93 |
| | | Discriminability | 78 |
| | | Correct Recognition | 93 |
| | | Response Bias | 115 |

**Fine Motor/Sensory:**

Grooved Pegboard (standard)     RH: ≤60 (Dom Hand)          LH: ≤60

**Achievement:**

CTOPP

| Subtest | Scaled Score |
|---|---|
| Elision | 4 |
| Blending Words | 8 |
| **Phonological Awareness (standard)** | **76** |
| Rapid Digit Naming | 5 |
| Rapid Letter Naming | 6 |
| **Rapid Naming (standard)** | **73** |

GORT-4 (scaled)

| Rate | 2 |
|---|---|
| Accuracy | 4 |
| Fluency | 1 |
| Comprehension | 6 |
| **Oral Reading Quotient (standard)** | **61** |

WIAT-II

| | Standard | Grade Equivalent |
|---|---|---|
| Word Reading | 67 | Early 3rd |
| Spelling | 68 | Mid 2nd |
| Numerical Operations | 64 | Mid 3rd |
| Math Reasoning | 70 | Early 4th |

Neuropsychological Evaluation

Hawkins, Dominique
MR# 020035223

15

## Social/Emotional:

### Achenbach Scales (CBCL, TRF)

| Scale | Parent t-score | Teacher t-score (Speech) | Teacher t-score (Math) |
|---|---|---|---|
| Anxious/Depressed | 51 | 66 | 59 |
| Withdrawn/Depressed | 53 | 61 | 50 |
| Somatic Complaints | 67 | 58 | 50 |
| Social Problems | 58 | 59 | 64 |
| Thought Problems | 51 | 50 | 50 |
| Attention Problems | 65 | 64 | 66 |
| Rule-Breaking Behavior | 54 | 56 | 58 |
| Aggressive Behavior | 51 | 63 | 67 |
| Internalizing Problems | 57 | 64 | 54 |
| Externalizing Problems | 51 | 61 | 66 |
| Total Problems | 57 | 64 | 64 |

| Scale | Parent t-score | Teacher t-score (Speech) | Teacher t-score (Math) |
|---|---|---|---|
| Affective Problems | 55 | 64 | 52 |
| Anxiety Problems | 50 | 62 | 56 |
| Somatic Problems | 68 | 60 | 50 |
| Attention Deficit/Hyperactivity Problems | 68 | 62 | 66 |
| Oppositional Defiant Problems | 51 | 63 | 69 |
| Conduct Problems | 56 | 56 | 61 |

### Achenbach Scales (YSR)

| Scale | Self-Report t-score |
|---|---|
| Anxious/Depressed | 64 |
| Withdrawn/Depressed | 51 |
| Somatic Complaints | 67 |
| Social Problems | 66 |
| Thought Problems | 51 |
| Attention Problems | 63 |
| Rule-Breaking Behavior | 60 |
| Aggressive Behavior | 67 |
| Internalizing Problems | 63 |
| Externalizing Problems | 65 |
| Total Problems | 65 |

| Scale | Self-Report t-score |
|---|---|
| Affective Problems | 58 |
| Anxiety Problems | 70 |
| Somatic Problems | 68 |
| Attention Deficit/Hyperactivity Problems | 63 |
| Oppositional Defiant Problems | 56 |
| Conduct Problems | 70 |

*Neuropsychological Evaluation*

**Evaluation Report**
**Speech-Language Pathology**

**Student:** Dominique Hawkins          **Report Date:** 6/20/05
**D.O.B.:** 8/28/92                      **Grade:** 6th
**C.A.:** 12 years, 8 months             **Homeroom Teacher:** Ms. Jen

**Reason for Evaluation:** Triennial IEP Review

Background
Dominique Hawkins is a 12 year, 8 month old male, enrolled as a 6th grader at the School for
Arts in Learning (SAIL). Dominique currently receives 60 minutes of speech-language therapy
per week in individual or small-group pullout session formats. This speech-language assessment
was ordered as part of the triennial review of Dominique's Individualized Education Plan (IEP).
The results herein will be used by the IEP team to evaluate strengths and needs within the
educational setting and to make recommendations regarding Dominique's needs for continuing
speech-language intervention (if any).

Assessments
Clinical/Behavioral observations
Oral-motor screening
Voice, Articulation, Fluency screening
Language evaluation: *Clinical Evaluation of Language Fundamentals (CELF-4)*

Clinical/Behavioral Observations
The formal language evaluation, CELF-4, was administered across 3 sessions of 45-60 minutes
apiece, about the length of time Dominique could maintain appropriate focus and attention to
task. Dominique was friendly and cooperative, willingly following directions and redirections to
complete each of 8 subtests. He took a short break after every 2 subtests in the same testing
period and maintained a strong effort throughout. Given prior clinical experiences with
Dominique, the following assessment can be taken as a valid representation of Dominique's true
speech-language strengths and weaknesses.

Current therapy goals address reading decoding, encoding and comprehension as well as abstract
verbal reasoning. Results of the present evaluation suggest that these goal areas remain pertinent
to Dominique's speech-language therapy plan.

Oral-Motor Screening
An informal screening suggests that oral-motor structures and functions are within normal limits
to support intelligible, conversational speech.

Voice, Articulation and Fluency Screening
Voice, articulation and fluency all present as within functional limits for age- and gender-
appropriate intelligible speech.

Language Evaluation
The *CELF-4* is a standardized instrument normed for use on children aged 5-21. *CELF*
are reported as scaled (standardized) scores ("SS"), first by subtest. The average subtes



EXHIBIT
P-7
651

10, with a standard deviation (SD) of 3. Any subtest score below 7 may indicate a need for therapeutic intervention. Percentile rank refers to the percent of the normative sample that scored at or below Dominique in a given subtest.

| Subtest | Subtest assesses... | SS | Percentile Rank |
|---|---|---|---|
| Concepts & Following Directions (C&FD) | Knowledge of linguistic concepts (e.g. under, instead, except, both, etc.) and ability to follow directions in temporal order | 4 | 2 |
| Recalling Sentences (RS) | Ability to recall exactly sentences of increasing linguistic load | 3 | 1 |
| Formulated Sentences (FS) | Ability to relate increasingly abstract vocabulary to a given picture | 5 | 5 |
| Word Classes – Receptive (WC-R) | Ability to recognize and group vocabulary by function and/or attributes | 6 | 9 |
| Word Classes – Expressive (WC-E) | Ability to define words by function and/or attributes | 5 | 5 |
| Word Classes – Total (WC-T) | Scaled score of WC-R and WC-E results | 5 | 5 |
| Word Definitions | Knowledge of curricular vocabulary | 7 | 16 |
| Understanding Spoken Paragraphs (USP) | Ability to recall details and main ideas from orally presented paragraphs | 7 | 16 |
| Number Repetition – Forward (NR-F) | Ability to recall sequenced information of reduced linguistic load | 6 | 9 |
| Number Repetition – Backward (NR-B) | Ability to hold and manipulate sequenced information with reduced linguistic load | 14 | 91 |
| Number Repetition – Total (NR-T) | Scaled score for combined NR-F and NR-B scores | 10 | 50 |
| Familiar Sequences (FSq) | Ability to recall and repeat linguistic and non-linguistic sequences as quickly and accurately as possible. | 10 | 50 |

The CELF-4 combines certain subtest scores to allow comparison between broader, underlying speech-language skill sets. These Index Scores are reported below. The average score is 100, SD=15. Any Index Score that falls below 85 may indicate a need for therapeutic intervention. Deviation of score from the mean is reported for ease of comparison in ±SD format.

| Index | Includes Subtests... | Scaled Index Score | Percentile Rank |
|-------|---------------------|--------------------|-----------------| 
| Core Language | C&FD, RS, FS, WC-T | 66 | 3 |
| Receptive Language | C&FD, WC-R | 73 | 4 |
| Expressive Language | RS, FS, WC-E | 65 | 3 |
| Language Content | WC-T, WD, USP | 78 | 5 |
| Language Memory | C&FD, RS, FS | 62 | 2 |
| Working Memory | NR-T, FSq | 100 | 50 |

Finally, the CELF-4 allows for comparison between certain index scores. A statistically significant discrepancy may aid in diagnosis of a speech-language disorder and/or suggest the direction for intervention.

| Indices compared | SS of Higher Index | SS of Lower Index | Difference | Critical Value for Statistical Signficance | Significant at p<.05 level? |
|------------------|--------------------|--------------------|------------|----------------------------------------------|------------------------------|
| RLI, ELI | 73 (RLI) | 65 (ELI) | 8 | 12 | No |
| LCI, LMI | 78 (LCI) | 62 (LMI) | 16 | 12 | Yes |

<u>Interpretation and Discussion of Results</u>

Dominique presents with language abilities from the Very Low/Severe range (index scores <70) to the Moderately Low range (index scores 70-84), with one score, the Working Memory Index (SS=100) falling into the solidly Average range. While his RLI score (SS=73) places him in the Moderately Low range, and the ELI (SS=65) falls into the Very Low range, the difference between them is not statistically significant and therefore his language abilities appear to be equally well developed across both receptive and expressive modalities. A statistically significant difference does exist between the LCI (SS=78) and the LMI (SS=62). The LCI suggests how well a student is able to get the "gist" of language. The subtest measures that comprise the LCI (the Word Classes-Total, Expressive Vocabulary, and Word Definitions, SS=5, 7, and 7 respectively) are measures of vocabulary knowledge, definitions and semantic class properties. These tests carry reduced language processing load. That is, the stimuli, while verbal, are short, usually single words. Likewise, the responses do not require elaborate syntactic constructions, just pointing to or mentioning key words or phrases. Dominique's sense of word meanings and semantic relationships represents his highest index score on the CELF-4, second only to his WMI (SS=100).

The LMI, on the other hand, represents Dominique's facility with more complex language, or increased "linguistic load". The subtests for this index (Concepts & Following Directions, SS=4; Recalling Sentences, SS=3; and Formulated Sentences, SS=5) all involve holding sentences, sequences of information and/or concepts, and manipulating or synthesizing them with other cognitive-linguistic processes or information to formulate a correct response. The WMI score of 100 (Average) tends to rule out insufficient linguistic memory as an underlying cause of Dominique's apparent language processing deficit. Item analysis of the C&FD suggests that confusion of directionality (left, right) contributed heavily to his low score there. His RS performance declined as syntactic complexity, not necessarily sentence length, increased. His FS item scores followed no particular pattern. He was able to create sentences using fairly sophisticated syntactic forms, whereas some of his sentences involving simpler syntax scored

zero. Overall, then, Dominique's low LMI is most likely a factor of the complexity of the language processing task, rather than the sheer amount of linguistic information.

<u>Summary/Recommendations</u>

Dominique is a 12-year-old African-American male student who presents with a statistically significant difference in his Language Content Index (SS=78) and Language Memory Index (SS=62). This reflects Dominique's difficulty with syntactically complex language, as well as complex processing tasks that involve holding and synthesizing different types and amounts of language to accomplish a variety of tasks. Recommendations are as follows:

- Continued speech-language intervention services of 60 minutes per week with a certified speech-language pathologist, to include a minimum of 15 minutes per week of direct consultation with the classroom teachers to modify curriculum and assessments to compensate for Dominique's language processing difficulties.
- Assessment tools such as multiple choice, matching, and fill-in-the-blank rather than short-answer or essay-type questions.
- Pullout therapy goals to address abstract, complex verbal processing and reasoning concerns.
- Continued intervention to address reading decoding, encoding and comprehension development.

Respectfully submitted,

Katy N. Rizvi, MA, CCC-SLP
Speech-Language Pathologist
School for Arts in Learning

# OCCUPATIONAL THERAPY ASSESSMENT

NAME: Dominique Hawkins

DATE: February and March 2005

Birthday: August 28, 1992

Age: 12 years 6 months to 12 years 7 months

SCHOOL: Dominique is a sixth grader at the School for Arts in Learning, a District of Columbia Public Charter School.

Dominique has a long history of difficulties in multiple areas of learning and sensorimotor development. In particular, he demonstrates a serious learning disability in reading and language processing. As part of Dominique's special education curriculum, he has received a high intensity of Occupational Therapy treatment since entering SAIL in the first grade.

Dominique's Occupational Therapy is rendered in both group and individual sessions. It encompasses techniques taken from sensory integration therapy, Neurodevelopmental treatment, functional skills training and perceptual/motor intervention. Through Dominique's O.T. he has participated in the Brain Gym



EXHIBIT
P-8

655

series of brain/body exercises, the Alert Program for Self Regulation (uses an engine vocabulary and sensorimotor strategies – "tune ups" to help children identify and maintain their levels of alertness), the Callirobics system of tracing exercises to music and the Handwriting without Tears manuscript and cursive handwriting programs.

In past years Dominique's cooperation and motivation in O.T. has varied, and of late he has become so frustrated by how hard some things are for him as opposed to his peers that he seems often to be at the point of giving up.

THERAPIST: Michael Smith, OTR/L, MSOT and Linda Nolan, OTR/L, SIPT CERTIFIED

RESPONSE TO RECENT ASSESSMENT: Dominique is a big boy with a great smile and generally jovial disposition. He is always polite and friendly to this examiner but on the occasions pertaining to his assessment, he appeared frustrated and sometimes even grumpy during some subtests, while reacting with tremendous silliness during others.

SUMMARY OF FINDINGS:

ASSESSMENTS ADMINISTERED:

CLINICAL OSERVATIONS OF MUSCLE TONE, POSTURE, SENSORY REACTIONS AND OTHER ASPECTS OF NEURODEVELOOPMENT. ALSO INCLUDES SUBTESTS TAKEN FROM THE BRUININKS OSERETSKY TESTS OF MOTOR DEVELOPMENT.

THE QUICK NEUROLOGICAL SCREENING TEST II:  Evaluates underlying Neurologic skills related to learning, behavior and daily living.

THE BEERY BUKTENICA TEST OF VISUAL PERCEPTION: Evaluates several parameters of non motor visual problem solving.

THE BEERY BUKTENICA TEST OF MOTOR COORDINATION: A standardized design copying test.

THE BEERY BUKTENICA TEST OF VISUAL-MOTOR INTEGRATION: A design copying test.

SUMMARY OF TEST RESULTS:  Results of tests and observations suggest steady improvements in Dominique's sensory integration, motor planning, coordination and perceptual/fine motor/visual motor (particularly handwriting) skills which attest to the hard work he has done in O.T. over the years. On the other hand, deficits in sensorimotor integration, sensory



processing, postural movement skills (especially muscle tone and endurance), and visual motor development remain and are of sufficient intensity to notably impact Dominique's potential to learn in the classroom and function efficiently in other life situations.

Dominique's profile will be discussed in the following paragraphs:

SENSORY AND NEURODEVELOPMENT: Dominique's overall score of 48 points on the QNST 11 fell just below the cut off (of 50 points) which delineates a "severe discrepancy" from normal Neurologic functioning and well into the realm of being "moderately discrepant". This means that there remain so many areas of immature or atypical skill development as to significantly impact his daily functioning and make it hard for him to keep up with his peers.

On the other hand, readers should be aware that Dominique's score has "come down" at least 10 points since the assessment was last administered. This lowering of his score indicates a maturation of certain neural foundational skills which should make it at least somewhat easier for him to perform class work and daily skills.

Among the subtests, Dominique's skills were "significantly discrepant" from what would typically be expected in areas of sustained posture and joint stability/postural energy, directionality awareness, eye movements and self regulation during the testing.

Dominique's skills were "moderately discrepant" in areas related to touch perception, static balance, isolating and coordinating arm and finger movements, and copying designs.

Dominique demonstrated adequate skills but with qualitative concerns on tests related to multisensory integration, dynamic balance, kinesthetic awareness, and repeating sound patterns.

SENSORY PROCESSING: Results of tests and observations suggest significant disorganization related to processing foundational vestibular -- (movement/gravity), proprioceptive (body) and tactile (skin edge) information. Difficulties with aspects of auditory and visual processing were also noted.

Dominique does not appear to register vestibular/proprioceptive inputs with sufficient efficiency to maintain body tone and endurance, exhibit sophisticated balance skills, be aware of his own relationship to space, and maintain a balanced "active

659

but alert" level of arousal. Frequently "under alerted" (and slouchy), Dominique requires additional external stimulation to remain alert and motivated to work on his skills and process information more effectively. He is thus often distracted and frustrated by his fatigue and lack of general arousal but does not have necessary strategies to alert himself effectively.

At the same time, Dominique can still get over stimulated by competing sounds, visual clutter and movement around him, light touch and the closeness of other children who may inadvertently touch, bump into or breathe on him.

Due to factors previously described, there are occasions when Dominique is so preoccupied with how he feels that he fails to register more important information presented to him.

Unfortunately, Dominique still has significant trouble modulating his responses to sensory inputs appropriately thus some activities which would be appropriately alerting and organizing may become too stimulating without much in the way of warning. In other words, Dominique's levels of arousal can go from "0 to 100" without warning! For example, he often comes into therapy and immediately flops down into a chair or reclines on the floor. When not directly engaged and

660

appropriately stimulated, he may move himself around in the rolling swivel chair or wander about and fidget and is generally not sufficiently alerted for learning. When over stimulated, he often becomes so silly that he is similarly not available for learning! Silly behaviors may go so far as to include rolling around on the floor, tossing balls around the room and playing with toys designed for much younger children.

On the other hand, Dominique exhibits emerging skills in some very important sensorimotor foundations.

For example, Dominique continues to work on integrating multiple stimuli into concepts. His performance on palm/form recognition tasks (which ask him to identify numbers, letters and shapes traced onto the skin of his palm when he isn't looking) have steadily gotten better. As Dominique improves his skills in this area he should become better at visualizing shapes and symbols without having to look at them. In particular, this should help him with visual form constancy concepts related to reading as well as number constancy concepts for math. It is therefore vital that educators incorporate hands on materials when teaching reading, math and other concepts.

Also, in the context of testing, Dominique now performs better on subtests which ask him to attend to several

661

tactile stimuli at once. For example, he is more aware of both stimuli when he is touched on the hand and cheek at the same time.

In terms of kinesthesia, Dominique is better able to control his body in space when he is not watching it. His performance was more accurate on the "finger to nose" subtest during which he was asked to reproduce the distance between his own nose and a target in space after closing his eyes. He also did better on the moving balance activity during the portion where he was asked to tandem walk backwards. It is generally easier for Dominique to keep his eyes closed upon request, although during tasks when he is asked to maintain his body position, he still needs to open his eyes in order to orient himself better in space and check his position. Also, Dominique continues to lack the feedback he needs to modulate and grade the amount of force and speed he uses to initiate and complete activities and to make subtle adjustments that would improve overall movement accuracy. His speed tends to be at one end of the continuum or the other, (without much in the middle) either very slow and labored or very fast without regard for possible injury to others.

In terms of small muscle awareness, Dominique still relies on watching and thinking about what his fingers are doing more than he should have to and recently made

4

662

mistakes on a finger sequencing activity when using his left hand.

In an altogether different area, Dominique continues to demonstrate inconsistencies with aspects of the "Sound Patterns" subtest, with his performance suggesting that the addition of motor challenges can interfere with abilities to process and respond to auditory information. On the other hand, readers should be aware that his performance on this particular subtest has improved significantly over the years.

Dominique performed almost perfectly when repeating vocalized sound patterns, but made some mistakes when reproducing the same sound patterns using audible hand to knee taps.

Dominique demonstrated some improvement when presented with a rhythmic sound pattern, "shave and a haircut, six bits". This suggests that the addition of singing, music, rap, rhythm, marching or rhyme might be helpful when presenting lessons to him.

This information also suggests how important it will be for adults to wait until Dominique has finished one activity before instructing him in another. It also suggests the need for multisensory instruction as well as multimodal clarification, i.e. accompanying verbal

instructions with demonstrations, pictures and/or hands on input.

In terms of processing visual inputs, Dominique has improved general strength of small eye muscles, sighting efficiency, general tracking skills and freedom from visual defensiveness demonstrably. However, he continues to be significantly hindered by his weak eye movement skills and resolving but still apparent visual defensiveness which make it difficult to even access his visual attention much less sustain it. Results of standard visual perceptual tests describe non motor visual problem solving in the lowest ranges of average.

NEUROMOTOR DEVELOPMENT: Dominique demonstrates residual inefficiencies in muscle tone and postural control consistent with sensorimotor integration dysfunction and Neurodevelopmental delay.

Most obviously, Dominique demonstrates low resting muscle tone, weaknesses through the core musculature of his trunk and notable difficulties stabilizing his extremities in space. Dominique's low muscle tone also affects his tongue, eye muscles, and palm/finger muscles.

Young people Dominique's age should be able to achieve counter gravity positions like "supine flexion"

664

(cannonball) and "prone extension" (superman) and hold them for at least 30 seconds.

However, Dominique complained that it was "too hard" to flex his body into the cannonball position and his performance has not improved much over the past year. At first, he was unable to hold himself in flexion even when the examiner placed his body into the correct position and he started to cough as though unable to catch his breath. This was most likely because he tried to "fix" himself into position by stiffening his diaphragm and holding his breath. After a fairly prolonged rest he tucked his knees rocked back and forth a few times for momentum and let out an unbelievably loud "roar" and groan as he pulled his head from the floor and tucked it against his chest. Again he tried to fix by holding his breath, and then began to giggle and cry at the same time, kicking his legs to ease his discomfort and complaining that his stomach was cramped and his neck was killing him. He went on that way, somewhat holding on to his supine flexion position for 6 to 11 seconds.

Dominique was very upset with requests to perform sit-ups. After several "false starts" he was able to demonstrate very small upper abdominal crunches, requiring numerous cues as to how he should breathe and suggestions to tap on his abdominals to keep them active.

Dominique also required cues to pull on his head while activating his crunch. Given numerous rests, he was eventually able to complete about 33 sit-ups, many of them rather poor in quality.

Dominique struggled just as hard to try to assume a prone extension or "superman" position but did demonstrate about 70 percent improvement in this skill over the past year. Even given many practice trials along with demonstrations and physical cues, Dominique struggled to clear his hips and legs away from the floor surface. Attempting to fight the effects of a primitive reflex which helps toddlers flex their limbs in preparation for crawling, Dominique tried to rely on another primitive reflex pattern in which extension of the head and neck facilitates hyperextension of the upper body. He maintained tension throughout his upper body by squeezing his hands into fists for 30 seconds.

Dominique was not amenable to trying to do push-ups.

Dominique still struggles a lot with the "Arm and Leg Extension" subtest on the QNST where he has trouble keeping his trunk fully erect while also holding his arms, legs and tongue extended in front of him while his eyes are closed. Firstly, he constantly opens his eyes to orient his head in space and check on his body position. He attempts to keep his arms up by leaning back,

"fixing" his shoulder and neck stiffly and "locking" his elbows in place and required several cues to keep his legs up. Dominique tries to ease his discomfort by kicking his legs and wiggling. The stress of his efforts was illustrated by the elicitation of "overflow" movements and stiff posturing in his mouth, tongue, hands and fingers.

Dominique's low tone is also such that he had trouble keeping his tongue extended for the full count of 35 seconds. Low tone in Dominique's tongue will certainly impact his articulation and diction skills.

In another area, Dominique continues to demonstrate remnants of primitive reflexes more commonly seen in much younger children. When evident in children Dominique's age, their presence is indicative of neurological immaturity or irregularity. These immature reflex patterns were elicited in the all four's position when Dominique's head was moved away from his midline in any direction – side to side, up or down. An exaggerated reflex causes changes in the tone and stability of the trunk and extremities. Extension components of the symmetric tonic neck reflex were mild and evidenced by tendencies to arch his trunk and stiffen his arms when his head was extended back. The flexion components of the symmetric tonic neck reflex were much stronger and evidenced by total collapse of both arms as his head was flexed forward. The

asymmetric tonic reflexes were mild to moderate and noted by some collapse of skull side elbows as his head was turned side to side.

Dominique was also asked to assumer gross motor positions and play games in the clinic where he had to position his body "counter" to the reflex pattern, From an all four's position he was asked to lift one leg, bend his opposite elbow and place his hands on his hips, and turn his head toward his bent elbow. Doing this was essentially impossible for Dominique who nearly burst into tears trying. He was basically unable to go from a crawling position into a "three point" position by lifting one leg or the other and demonstrated such poor endurance through his hips and legs that he had to rest the lifted leg on the resting leg.

Overactive reflexes can interfere with development of the midline as well as performance of higher level movement challenges and eye/hand skills and balancing.

Despite Dominique's many issues, his abilities to sustain both still and moving balance are developing steadily, although he continues to have issues balancing on one foot with his eyes closed, a position in which he gets very little additional feedback.

668

Dominique was able to stand on either foot ten or more seconds with eyes open, but struggled to keep his balance when his eyes were closed. He also tends to contort his body to try to stay balanced.

Dominique demonstrates more notably improved skills with moving balance and specifically with tandem walking during which he gets additional input through his joint and movement receptors. Dominique was able to tandem walk forwards and backwards with his eyes open and forward with his eyes closed with little difficulty, but occasionally relied on waving his arms to remain stable.

COORDINATION AND MOTOR PLANNING: Abilities to rotate the trunk, reach across the body midline and coordinate different movements between the two body sides and the upper and lower body halves are important precursors to skilled gross and fine motor skills. Theoretically, smooth body coordination is though to reflect maturation of the cerebral hemispheres of the brain to some extent. Along this line, improving body coordination around its midline or center of gravity could improve important connections between the two halves of the brain.

Over the year, Dominique has demonstrated improvements in his abilities to imitate a variety of

669

movement patterns which require crossing his midline more automatically. Many of the movement activities he has mastered come from the "Brain Gym" program, a series of movements designed to promote "brain/body" integration. These include many forms of the "cross crawl" (which we often refer to analogously as "driving") where the right hand touches the left knee alternately with the left hand touching the right knee.

Dominique is also able to hop on both his right and left feet and skip with more smoothness than before. On the other hand, he still has difficulties performing oppositional movement patterns and other higher level bilaterality skills as well as directionality concepts. Continued work in this area should benefit Dominique's motor coordination as well as inter-hemispheric efficiency.

In regard to upper extremity skills Dominique's skills are still more coordinated when both arms and hands are moving at the same time and in the same manner, than when one arm is moving independently of the other. Also, while Dominique is performing a skill with one hand, "overflow" movements are elicited in his other hand. This suggests that abilities to isolate refined movement of one extremity independently of others has not yet been fully integrated. This can impact comfort

and efficiency of two handed skills including writing, fastening and the like.

Dominique demonstrates improved abilities to isolate and coordinate movements of his lower arm interpedently of his upper arm. He executed forearm rotations (diadochokinetic movements) well but still demonstrates some floppiness through his wrists, hands and fingers.

EYE TRACKING SKILLS: Dominique's abilities with regard to tolerating certain visual stimuli as well as sighting and isolating small eye movements have improved notably, although significant problems with general tracking skills remain.

Dominique now demonstrates sufficiently adequate small eye muscle skills to wink both eyes independently. He chose his left eye for sighting and now automatically closes his right eye to improve focusing.

On the other hand, Dominique had tremendous trouble maintaining sufficient head control as a basis for stable eye movements. Often propping his head with his hand, it took numerous trials for Dominique to hold his head still and attempt to track the moving targets in space. His general abilities to follow targets was frail (especially side to side)  and he demonstrated lapses in focus where his eyes would "jump" in the opposite

671

direction suggesting difficulties with ocular motor planning as well as residual "visual defensiveness". Abilities to switch from one target to another appear to be developing with diagonal and vertical tracking skills poor to fair. As he continued his eyes reddened and he began to giggle to the point where he had to be reoriented.

Difficulties with eye tracking often impact academic skills to a considerable degree. Dominique's problematic eye tracking will hinder him from remaining visually focused in the classroom. Also, he may have trouble reading along the printed line left to right, may skip letters or words or backtrack and/or have difficulty keeping his place in the paragraph.

VISUAL PERCEPTUAL SKILLS: Dominique's performance on the Beery Test of Visual Perception was likened to that of a child 8 years 11 months of age. His standard score of 86 fell within the lower realms of "low-average". Dominique appeared to tire by the last page of the test, at which point he began to make errors related to size consistency and other visual details including one missing piece.

FINE MOTOR COORDINATION SKILLS: In terms of factors which may affect Dominique's fine motor skills, therapists have noted questions about his basic hand and finger awareness, the development of palm and finger

muscles (still rather floppy and "flat"), hyperextension of his thumbs secondary to low muscle tone, and overflow movements from one extremity to the other, suggesting that abilities to isolate refined movement of one extremity independently of the other has not become fully integrated.

Dominique's skills for tracing on the Beery Test of Motor Coordination fall at the lowest ranges of "low average" with a standard score of 85 (85 to 115 being average). His performance corresponded to a fine motor coordination age of 8 years 6 months.

VISUAL MOTOR SKILLS: Dominique is right handed. He grasps his pencil in a developing open web space tripod and begins working with his left hand utilized as a stabilizer and assist. He is able to maintain an active upright desk posture for short periods of time during testing but does not have sufficient endurance to remain active and alert during the school day.

Dominique approaches his work in a much more automatic manner. He was able to label and copy basic geometric shapes including circle, square, rectangle, triangle and vertical diamond quickly and automatically. Occasional issues with closure and angle execution are still noted during basic drawing activities.

On the Beery Test of Visual Motor Integration, Dominique's raw score earned him a visual motor age equivalency of 7 years old. His standard score of 74 is considered "below average".

Regardless of scoring, an analysis of Dominique's productions noted marked improvements in his abilities to integrated more sophisticated designs such as a basic star shape. Dominique appeared to lose points for lack of attention to detail (overlapping circles were sloppy), poor spatial planning and alignment, difficulties with consistent angle formation and distortion of his cube design.

HANDWRITING SKILLS: Dominique has worked industriously on the Handwriting without Tears manuscript and cursive programs. His pencil pressure is more consistent with less smearing and his work is more neatly aligned and spaced. Dominique was able to write his upper and lower case manuscript letters correctly and in order. During testing, he was not comfortable writing his cursive letters without a model.

RECOMMENDATIONS: At this time, continuation of Occupational Therapy as part of Dominique's educational program is advised. Occupational Therapy treatment is indicated to address numerous sensory processing and postural movement issues that impact his

abilities to learn and be successful in school as well as social situations and daily life. In order for treatment to be effective, Dominique should receive a combination of individualized and small group therapy as well as in class consultation, twice weekly. In addition to Dominique's direct treatment, he will require a great many special strategies and accommodations including the administration of a "sensory diet", frequent movement breaks, an air seat cushion, a water bottle with straw, and fidget objects.

In addition to therapy, Dominique needs a healthful nutritional program and must exercise on a daily basis. He should participate in an intense physical development program with an adult who understands the nature of his Neuromotor and sensorimotor issues and would benefit from intramural/less competitive sports activities at the Boys Club or similar organization.

Appropriate extra curricular activities would include swimming, biking, skating, hiking, rowing, therapeutic horseback riding, Yoga, low key martial arts.

Dominique should not exercise using heavy weights. He must do supervised exercises to support his lower back. He must increase his endurance through walking and performing calisthenics with proper form.

✓ It is also suggested that Dominique be re-evaluated by a developmental vision specialist to determine whether developmental lenses might be helpful for him.

Dominique is a terrific kid. We wish him the very best and look forward to his progress. Questions to the O.T. department are welcome.

SIGNED:


Linda Nolan, OTR/L, SIPT Certified, Consulting SAIL therapist


Michael Smith, OTR/L, MSOT, SAIL staff therapist

676





**Mt. Washington
Pediatric Hospital, Inc.**
*an affiliate of North Arundel
Health System, Inc.*

3001 Hospital Drive - 4th Floor
Cheverly, Maryland 20785
301-618-6974

## PSYCHOLOGICAL EVALUATION

| | |
|---|---|
| Name: | Dominique Hawkins |
| Medical Record #: | M044947 |
| Date of Birth: | 08/28/1992 |
| Date of Evaluation: | 03/29/2005 |
| Age: | 12 years 7 months |
| | |
| School: | School for the Arts in Learning (SAIL) |
| Grade: | 6 |
| Teacher: | Jennifer Clark |
| Pediatrician: | Janet Adams, MD |
| Evaluator: | Erik Scott, Ph.D. |

Reason for referral:  Dominique was referred for a psychological evaluation by his mother, Ms. Michelle Hawkins, who requested an assessment of his current level of cognitive, achievement, attentional, and behavioral functioning.

Background information:  Background information was provided by Ms. Hawkins. She stated that she has the following concerns: academic, speech, and attentional issues. Dominique lives with his parents and younger brother in Washington, DC.  The younger brother has a diagnosis of Autism.

Birth history was obtained from Ms. Hawkins.  She stated that Dominique was born full term and weighed 5 lbs 7 oz.  No complications during pregnancy or birth except that the mother had a lot of "water weight".  Developmental milestones within normal limits.  No early medical problems.  Vision and hearing are "fine.  Dominique has allergies to dust, pollen and animal dander.  He also has seasonal asthma.  Medications: none except when he has asthma issues (singulair and albuterol).  Pediatrician is Dr. Adams.  He also sees a neuro-developmental pediatrician (Dr. Charles Conlon).

Dominique currently attends the School for the Arts in Learning in Washington, DC.  He is in the sixth grade.  He currently has an Individualized Education Plan.  He is entitled to 30 hours of special education instruction, 1 hour of speech and language, and 30 minutes of occupational therapy weekly.  His handicapping condition is "Multiple Disability".

A Rehabilitation and Specialty Hospital
Accredited by Joint Commission on Accreditation of Healthcare Organizations and by
Commission on Accreditation of Rehabilitation Facilities (infant and early childhood development, comprehensive
inpatient rehabilitation, respite) Member agency of National Association of Children's Hospitals and Related Institutions



EXHIBIT
P-9    677

According to the mother, he is doing "ok" in school for his academic level. SAIL does not give grades.

Extracurricular activities: basketball. Dominique has friends and is popular. Strengths: art, putting things together without instructions. He is always a good helper and knows what to do in "emergencies".

Tests Administered:

Stanford-Binet Intelligence Scale – Fifth Edition
Wechsler Individual Achievement Test – Second Edition
Behavior Rating Inventory of Executive Functions – Parent and Teacher Forms
Behavior Assessment System for Children – Parent and Teacher Forms
Reynolds Adolescent Depression Scale – Second Edition
Revised Children's Manifest Anxiety Scale

Behavioral Observations: Dominique presented as a slightly overweight preteen appearing his stated age. He easily accompanied the examiner to the testing area. In the room, and with a lot of 1:1 support, he was cooperative and generally attempted most items to the best of his ability. When he encountered items that were difficult for him in a setting with support, he would attempt them after some gentle reinforcement. His mood was overall quite good and he was appeared to forth good effort, although he admitted to being "tired".

When he had to do tests independently however (for example filling in self report forms), his attention span waned and he would "rush" through items without reading the instructions or understanding what was expected from him. The Minnesota Multiphasic Personality Inventory had to be abandoned as he was not able to handle the amount of items and he also had haphazardly filled in items. When he was made aware of this, he would giggle, and he stated that he "knew" that he had rushed.

Overall, however, Dominique appeared to enjoy the 1:1 interaction with this examiner. Results from this evaluation should be viewed with caution, however, as the may reflect an underestimation of his skills given that he was tired and he would "rush".

Test Results

Cognitive functioning: Cognitive functioning was measured with the Stanford-Binet Intelligence Scale – Fifth Edition. This is a scale that measures Dominique's thinking and reasoning skills in two domains: verbal and nonverbal. These two areas are then combined to yield an overall Full Scale IQ score.

Overall, Dominique obtained a Full Scale IQ score of 78, which is in the borderline range for a child his age. No significant differences were noted between his low end of the low average range verbal IQ score of 81, and his borderline range nonverbal IQ score of 77.

In the verbal domain, some significant intra-subtest scatter was noted. Dominique displayed high average ability to understand and explain verbal absurdities. All other verbal skills, however, were below average. These include explaining position and direction on maps, short term verbal memory, vocabulary skills, and verbal quantitative reasoning.

Similarly, in the nonverbal domain, some intra-subtest scatter was noted. Average skills were note in Dominique's ability to complete form patterns (puzzle assembly). Below average skills however, were noted in all other domains. These include his ability to observe absurdities visually in pictures, short term visual memory (block tapping), nonverbal quantitative reasoning, and solving matrices.

<u>Achievement skills</u>: Achievement skills were measured with the Wechsler Individual Achievement Test – Second Edition. This is a test that measured Dominique's abilities in reading, math, and writing.

In *reading*, Dominique displayed below average skills and below what one would expect given his IQ score (SS=55). In *basic reading*, Dominique displayed below average skills (SS=63; grade equivalent 2:7). Dominique was able to read words such as oxygen, known, and flexible, but could not read words such as enough, during, and shut. Similarly in *pseudoword decoding*, below average skills were noted (SS=60; grade equivalent 1:9). Dominique was able to read "words" such as herp, sote, clurt, but was not able to read "words" such as pon, sluck, and nad. Dominique's further displayed below average skills in *reading comprehension* (SS=64; grade equivalent 3:0).

In *mathematics*, Dominique displayed borderline skills (SS=77). A significant difference, however, was noted between his low average skills in *numerical operations* (SS=85; grade equivalent 5:5), and his borderline skills in *mathematics reasoning* (SS=73; grade equivalent 4:2).

In *written language*, Dominique displayed below average skills (SS=61). A significant difference was noted, however, between his borderline skills in *spelling* (SS=72; grade equivalent 2:5), and his below average skills in *written expression* (SS=62; grade equivalent 2:5).

<u>Executive functioning</u>: Executive functioning was measured with the Behavior Rating Inventory of Executive Functioning, with the mother and teacher as the informants on the parent and teacher forms respectively. The BREIF consists of two subscales: behavioral regulation, and metacognition. These two domain scores are then combined to yield an overall General Executive Composite score.

Overall, neither the mother nor the teacher rated Dominique's GEC score to be in the "clinical significant" range (T=59; T=63). The "behavioral regulation" index also did not reach "clinical significance" (T=46; T=56).

The "metacognition" index did reach "clinical significance both on the parent and teacher forms (T=64; T=65). Examples of items that both the parent and mother endorsed include: "is not a self-starter", "has a short attention span", "is easily distracted by noises", "has trouble finishing tasks". "becomes overwhelmed by large assignments", "written work is poorly organized", "does not check work for mistakes", and "leaves work incomplete".

Behavioral functioning: Behavioral functioning was measured with the Behavior Assessment System for Children (BASC), with the mother completing the parent form and the teacher completing the teacher form. The BASC measures "typical" behavioral problems in children. Neither the mother nor the teacher rated Dominique to be a "behavioral problem". In contrast, they both noted that he was helpful and polite both to adults and to peers. Some concerns, however were noted, specifically with attention and memory related to his executive metacognitive difficulties noted above.

Social-emotional functioning: Social emotional functioning was measured with self-report scales. Dominique completed the Reynold's Adolescent Depression Scale – Second Edition. This is a scale that measures depressive symptoms in adolescents. This scale did not reach "clinical significance". Of note, however, was that Dominique stated that he worries about school, feels mad about things, feels "bored", and gets "stomachaches".

Dominique further completed the Revised Children's Manifest Anxiety Scale. This is a test that measures anxiety symptoms in children. Overall, Dominique did not rate himself as being overly anxious. He did, however, endorse some of the following items: "I have trouble making up my mind", "I worry about what my parents will say to me", "I worry about what is going to happen", "My feelings get hurt easily when I am fussed at", "I am nervous", "I worry about what other people think of me", "I feel that others do not like the way I do things".

Summary and Recommendations:

Dominique was referred for a psychological evaluation by his mother who was concerned about his current level of cognitive, academic, and social-emotional functioning. Overall, results from this evaluation noted borderline/low average cognitive skills. This will have impact at home and at school as he will require more time than is typical of children his age to acquire concepts.

Of particular note, however, was his weakness in reading. His reading skills were below what one would expect given his cognitive skills. He will require special intervention in this area at school as he has difficulties with basic reading, phonics, and reading comprehension.

Written language was also a weakness for him and he will continue to require special services in this area. Both in reading and writing, he is currently functioning at the second/third grade level.

5

Although his scores did not reach clinical significance in executive functioning, he does have difficulties paying attention at home and at school. He makes careless mistakes, has a hard time starting projects on his own, and is easily distracted. He will require special resource and help with his attentional issues.

Of particular note, however, is that Dominique has a *very sweet disposition*. He is cooperative and well liked. He denied any depressive symptoms and seems to be pretty well adjusted.

*Given this, the following is recommended:*

1. A copy of this report should be shared with the educational management team at Dominique's school to help address IEP goals and objectives
2. A copy should further be shared with his medical management team to help assess his attentional difficulties.
3. Specific attention should be made for his reading and writing deficits. He will need specific intervention in phonic and basic reading skills.
4. Dominique should continue to participate in activities that he enjoys. He gets along well with others and he likes to be social.
5. Dominique may also benefit from having an "organizational coach" who can help his with organization and managing his work.

I have enjoyed working with Dominique and his mother very much. If there are any questions or concerns, please do not hesitate to contact me.

Erik Scott, Ph.D.
Senior Pediatric Psychologist
Licensed Psychologist
Mt. Washington Pediatric Hospital-PG
Department of Pediatric Psychology/Neuropsychology

Phone: 301-618-6933
Fax:   301-618-6935
Email:  escott@mwph.org

681

07-14-2006 11:25 FAX 2024425517                DCPS SPECIAL EDUCATION

DISTRICT OF COLUMBIA PUBLIC SCHOOLS Division of Special Education
WASHINGTON, D.C.

_ PUBLIC    _X_ DPCS CHARTER    _ LEA CHARTER    _ NONPUBLIC    _ PRIVATE/RELIGIOUS

## RESOLUTION MEETING NOTES

Meeting Confirmation Date: [          ]    Meeting Held: [ 7/14/06 ]

Student: [ Dominique Hawkins ]    DOB: [ 8/28/92 ]    School: [ SAIL PCS ]

| PARTICIPANTS: (Print Name) | PARTICIPANTS (Sign Name) | POSITION |
|---|---|---|
| Peggy L. Peagler | *signature* | SEA/CRS |
| Paul Dalton | Via Telephone | Attorney for School |
| Donna L. Wulkan | | Attorney for parent |
| Jenna Umansky | | SEC- SAIL |
| Esteban Morales | | Principal @ SAIL |
| Laura Duos | | Attorney for SAIL |
| Stefan Black | | Law Clerk for parent |
| Michelle Hawkins | | Parent |
| | | |
| | | |
| | | |

[ ] Resolved    [ X ] Unresolved

Participants introduced themselves to each other. A copy of the parent manual was
provided to the parent's attorney. The complaint was reviewed and discussed. DCPS
was invited to participate in the resolution meeting held at SAIL PCS, today at 10am by
SAIL PCS. DCPS received via fax today a cover letter from parent attorney, outlining
complaint against SAIL PCS and a copy of the Due Process Complaint Notice. To date,
DCPS has not received pertinent information from SAIL to determine placement
consideration. SAIL PCS stated their school is not an appropriate setting for this
student. Parent and attorney are requesting school placement at Katherine Thomas or
Chelsea School for the 2006-2007 school year. Attorney for parent stated, as of today,
the student has not been accepted to either of these schools, however the student has
completed visitation to one of the schools. Letters of acceptance will be submitted to
DCPS in August. A MDT meeting is scheduled for Tuesday, August 8, 2006 at 10am to
discuss school placement for the 2006-2007 school year. SAIL PCS will submit to
DCPS by the close of the business, (7/14/06), relevant and pertinent information about
this student in order to determine school placement for the 2006-2007 school year. The
complaint was not resolved.

**EXHIBIT**
**P-10**

RESOLUTION MEETING NOTES        Page _____        July 11, 2005

682

Law Office Of
**DONNA L. WULKAN**
1765 N. Street, NW, Carriage House
Washington, DC 20036
--
(telephone) (202) 682-3909
(fax) (202) 955-1015

July 14, 2006

Peggy L. Peagler
825 N. Capitol Street, NE
Sixth Floor
Washington, DC 20002

BY FAX AND MAIL

RE:  Dominique Hawkins

Dear Dr. Peagler:

As the parents' attorney, I am writing to clarify two statements included in DCPS's July 14, 2006 Resolution Meeting notes.  First, the notes state that a copy of the parent manual was provided to the parents' attorney.  I did not receive a copy of that manual at or prior to the meeting.  Second, the notes indicate that "DCPS received via fax today a cover letter from parent attorney, outlining complaint against SAIL PCS and a copy of the Due Process Complaint Notice."  In order to clarify that it was SAIL and not my office that sent documents to DCPS, the notes should read, "DCPS received via fax today from SAIL's attorney a copy of the parents' due process complaint notice and hearing request letter."

If you have any questions or objections regarding these clarifications, please do not hesitate to contact my office.

Sincerely,

Donna L. Wulkan/gmb

Donna L. Wulkan

cc:      Laura Duos, Esq.
         Dalton, Dalton, & Houston, P.C.
         1008 Pendleton Street
         Alexandria, VA 22314

EXHIBIT
P-11



# FAX TRANSMISSION

### Law office of
### DONNA L. WULKAN
**1765 N Street, N.W.**
**Carriage House**
**Washington, D.C. 20036**

───

**(202) 682-3909**
**telecopier (202) 955-1015**

| | | | |
|---|---|---|---|
| **To:** | Peggy L. Peagler<br>Charter Schools Placement Specialist<br>202.442.5517 | **Date:** | July 14, 2006 |
| **CC:** | Laura Duos, Esq.<br>Dalton, Dalton, & Houston, P.C.<br>703.739.2323 | **Pages:** | 2, including this cover sheet. |
| **From:** | Donna Wulkan | | |
| **Subject:** | Dominique Hawkins | | |

See attached letter...

The information contained in this telefacsimile message is transmitted by an attorney. It is privileged and confidential, intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If this communication has been received in error, please notify us immediately by telephone, collect if necessary, and return the original message to us at the above address

684

 

# Multi Communication Report

## JUL-14-2006 03:40 PM FRI

Fax Number    :  2029551015
Name          :  LAW OFFICE

Ref. Name     :
Pages         :  2

### 1. Successful

| Fax Number | Name |
|---|---|
| 2024425517 | |
| 7037392323 | |

### 2. Unsuccessful

| Fax Number | Name |
|---|---|
| | |

### 3. Multi Communication Journal

| No. | Name/Number | Start Time | Time | Mode | Page | Results |
|---|---|---|---|---|---|---|
| 999 | 7037392323 | 07-14 03:39PM | 00'16" | ECM BC | 002/002 | [O.K] |
| 999 | 2024425517 | 07-14 03:40PM | 00'16" | ECM BC | 002/002 | [O.K] |

685

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, D.C.**
**INDIVIDUALIZED EDUCATIONAL PROGRAM**

DCPS - IEP  Page 1 of 4
Additional Comments: ☐

## I. IDENTIFICATION INFORMATION

Student Name: Last Hawkins　First Dominique　MI

Student ID 9038630　Soc. Sec. No.　Age: 13　Grade 7

Gender ☒ M ☐ F　Date of Birth 8-23-92　Ethnic Group Afr American

Address 3000 20th St. NE

　　WDC 20018
House No.　Street Name　Quadrant　Apartment #
　　City　State　Zip Code

☐ Non-attending

Attending School SAIL PCS　Home School

☐ Elem. ☒ Mid/JHS ☐ SHS ☐ CWS /

Parent M. Hawkins (mom)

Address of (if different from student):　☒ Parent ☐ Guardian ☐ Surrogate

House No.　Street Name　Quad　Apt. No.　City　State　Zip Code
Telephone: Home　Work

### II. CURRENT INFORMATION

Date of IEP Meeting: 3-15-06

Date of Last IEP Meeting: 3-21-05

Date of Most Recent Eligibility Decision: 10-18-05

Purpose of IEP Conference:
☐ Initial IEP　☒ Review of IEP
☐ Requested Eval.　☐ 3yr ReEval.

Indicate Level of Standardized Assessment ___4___

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

| BEHAVIOR | ☒ | TRANSPORTATION |
| ESY | | TRANSITION |

## III. LANGUAGE

| | Language | Language Used for Evaluation | Language Used In Conference | Communication Requirements |
|---|---|---|---|---|
| Student | English | English | — | N. Lang |
| Parent | English | — | English | N. Lang |
| Home | English | | | N. Lang |

To be completed by Office of Bilingual Education English and Math Proficiency Assessment
Oral
Rdg / Written
Instrument:
Date:

## IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd SpEd Total | FREQUENCY Hrs/ Min D/W/M. | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # wks /mos |
|---|---|---|---|---|---|
| Specialized Instruction | 20 | H W | Special Ed Cert Teacher | 3-16-06 | 101 M |
| OT | 160 | M W | COTA/OT | 3-16-06 | 101 M |
| S | 160 | M W | SLT/VP | 3-16-06 | 101 M |
| TOTAL | 132 | Hours Per Week | | | |

## V. Disability(ies)

MD (SLI/SLD)

☐ (Check if setting is general Ed.)

Percent of time in Specialized Instruction and Related Services
☐ 0-20%　☐ 21-60%　☒ 61-100%

Percent of time NOT in a Regular Education Setting

## VI. IEP TEAM (Participants in the development of the IEP)

Print and sign your name below.

T. Flaherty-Math　M. Hawkins - Parent
T. Fell.　A. Muldoon - Dir d/Sped
J. Tarbok - LA　K. Rizvi - SLP
Hotrak　L. Nolan - OTR-L
　　　J. Hranosky - Spec ed

Michelle Hawkin
S Muldoon
Katy A Rizvi, MA, CC-SLP
via phone conference
Jen Hranosky

☒ I AGREE with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.
Parent/Guardian Signature Michelle Hawkins　Date 3/15/06

District of Columbia Public Schools　07-02-2001　Division of Special Education　Appendix - A

EXHIBIT
P-12
86

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT REFERRAL DATE: _____          MEETING DATE: 3-15-06

STUDENT: Dominique Hawkins          SCHOOL: SAIL PCS

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| M. Hawkins | Michelle Hawkins | Parent |
| A. Muldeen | A Muldeen | dircd Spect |
| K. Rizvi | Katyn Rizvi MA CCC-SLP | SLP |
| L. Nolan | via phone conference | OTR-L |
| I. Flaherty | I H.L. | Math |
| I. Tabak | Tabak | English |
| J. Uminsky | Jerral Mary | Spec ed |

Team members were introduced. Ms. Hawkins was given a
copy of her parental rights. She signed to verify.
Dominique is a student w/an identified MD (SLD | SEI)
Based on evaluations (reviewed 6/05), observations
and classroom data Dominique continues to be
eligible for special education services to
include SL and OT services.

THE PARENT ☑ IS PRESENT ☐ IS NOT PRESENT AT THE MEETING

AFTER A REVIEW OF THE ASSESSMENTS, IT IS DETERMINED THAT Dominique Hawkins

☑ CONTINUES TO BE ELIGIBLE FOR SPECIAL EDUCATION

☐ IS TO BE EXITED FROM SPECIAL EDUCATION

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

INDIVIDUALIZED EDUCATION PROGRAM
(IEP)
MEETING NOTES

STUDENT _Dominique Hawkins_   SCHOOL _SAIL PCS_   DATE: _3-15-_

| PARTICIPANTS: | PARTICIPANTS: (Sign Name) | DISCIPLINE |
|---|---|---|
| M. Hawkins | Michelle Hawkins present | parent |
| A. Muldoon | A Muldoon | dir of Sped |
| K. Rizvi | Katy N Rizvi M cc-SLP | SLP |
| L. Nolan | via phone conference | OTR-L |
| T. Flaherty | | MATH |
| J. Tabak | J Tabak | English |
| J. Umansky | J Umansky | Sped. Ed teacher |

Team members were introduced. Ms. Hawkins was given a copy of her parental rights-she signed to verify. Dominique is a Student who identified MD (SLI/SED). He currently recieves 32 hrs of Specialized instruction to include OT + SL services. The purpose of today's ~~prog~~ meeting is to review progress + develop a current IEP.

Katy (SLP): Dominique's decoding has improved as well as his overall comprehension when in a small group setting. In class his attention still seems to be an issue. He continues to work on aural comprehension + reading comprehension + increased decoding/encoding

fluency w/ multi-syllable words. It is recommended to continue w/ SL services for 60 mins a week in a small group/classroom consult setting. Team AGREES.

688

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, DC

MULTIDISCIPLINARY TEAM (MDT)     Page: _2_ of _3_
CONTINUATION MEETING NOTES
MEETING TYPE: __IEP__

STUDENT: __Dominique Hawkins__     DATE OF BIRTH: __8-25-92__
SCHOOL: __SAIL PCS__     DATE: __3-15-06__

_Liraa_ (OT) - Based on Fall eval (Spr 05). Dominique has improved greatly in OT. He scored a 48 (med discrepancy). In past tests DH scored well over 50. His muscle tone and handwriting is improving as well as co-ordination + balance. Dominique will continue to work on fine motor skills + tracking + muscle tone. It is recommended Dominique continues to work in OT for 30 mins per week in a small group setting + 30 mins per week in classroom consultation. Team agrees w/ goals + time. Great gains have been seen in OT w/ Dominique. His handwriting is improving, his cursive is stronger than printed. He is reading more of what he is writing.

_Tabak/Umansky_: (LA) Dominique when focused does well + is progressing in language arts. Dominique is able to write a 5 sentence story w/ topic maintenance, retell a story read to him (no more than 8 sentence) + maintaining a topic. He will continue to work on self editing, sentence structure + punctuation + endmarks. Decoding + vowel goals were addressed in Speech + language. Team agrees w/ goals.

- _Umansky_: will continue to work on organizational goals created in 10/05 in order to maintain skills. Dominique will also continue to wear his glasses for reading during class time. Team agreed w/ goals.

689

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, DC

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES
MEETING TYPE: __IEP__                    Page: _3_ of _3_

STUDENT: __Dominique Hawkins__          DATE OF BIRTH: __8-28-92__
SCHOOL: __SAIL__                        DATE: __3-15-06__

Mr Flaherty/Umansky (Math) : Dominique shows strength in math + does well when he is in his "comfort zone". He is doing well one add/sub + single digit multiplication. He continues to work on word problems w/ more than 1 step, fractions, decimals, and will continue to work on division skills as well. Team agrees w/ goals. Dominique does try + makes efforts.

Mom: Is concerned @ the open space in the building + is requesting that his classes not be in open space. The over spring break walls/ceilings are being added, so open space will not be an issue after break. Mom said DH is in basketball, Taekwondo + is watching what he eats. He also has hoo 2 pairs of glasses one for school + one for home. Mom is seeing growth in math, but DH doesn't let her help him w/ homework.

FAPE was discussed. In order to ensure FAPE Dominique requires

① Transportation to/from SAIL to ensure his safe arrival + departure

② level 4 accomodations for state/district testing as stated in his IEP

③ 32 hours of specialized instruction in an 'out of general ed' setting to include 1 hour of OT + SL services (2-30min) sessions

④ ESY was discussed + recommended at this time regression is shown + ESY is needed

Team agreed + signed to verify

690

IEP Attachment - D
ESY Services
Page 1 of 2

District of Columbia Public Schools
Division of Special Education

## IEP ADDENDUM FOR ESY SERVICES

Student Name: Dominique Hawkins Initial _____    Date of Birth: 8-28-92

Gender: ☑Male ☐Female    Grade 7

School: SAIL    Date IEP Written 3-15-06

Checklist:

|  |  | Yes | No |
|---|---|---|---|
| 1. | IEP is appropriate and reasonable for student | ☑ | ☐ |
| 2. | All or most IEP goals and objective are being achieved | ☑ | ☐ |
| 3. | Severity of student's disability requires individualized programming in areas of : | ☑ | ☐ |
|  | • Self sufficiency and independence from caretaker or |  |  |
|  | • academic |  |  |
| 4. | Student record shows serious regression following interruptions in the school program. | ☑ | ☐ |
| 5. | Student record shows inability to recoup skills a reasonable time following regression. | ☑ | ☐ |
| 6. | Student has critical need for continuity in programming to facilitate achieving educational benefit from her or his education program. | ☑ | ☐ |
| 7. | Transportation services needed *if not at neighborhood school* | ☑ | ☐ |

**Determination**

After review the IEP team RECOMMENDS the provision of an
extended school year program for the above student.    ☑ ☐

**Reason**

Dominique shows a significant amount of regression during breaks + ESY is required in order to retain emergent + progressing skills

691

## Special Education Goal and Objective for ESY

Goals and objectives from the IEP which are to be specifically addressed during ESY are:

| Annual Goal(s) | Skills Area(s) |
|---|---|
| Academic - see IEP goals | math |
| Academic - see IEP goals | Language arts |
| SC - see IEP goals | SC |
| OT - see IEP goals | OT |

| Special Education Services for ESY | | RELATED SERVICES | | | | |
|---|---|---|---|---|---|---|
| Skills Area(s) | *Setting | Time to be Provided | | | Projected Date of Initiation | Number of Weeks |
| | | Amount | Unit ( Hours/ Mins ) | Period ( D/ W/ M ) | | |
| Academic | C | 20 | H | W | TBD | 6 |
| SC | C | 1 | H | W | TBD | 6 |
| OT | C | 1 | H | W | TBD | 6 |

* Setting : A - Full Time General Education; B - Combo. General Education / Resources Classroom ; C - Out of Regular Education

| ESY Least Restrictive Environment (LRE) | | |
|---|---|---|
| ☐ Placement as in regular school year | Hours/Week | |
| ☑ Placement different from regular school year | | |
| Placement<br>Specify placement (setting and alternate) of ESY service: | | |
| Explain why options selected above are the most appropriate and the least restrictive.<br><br>SAIL does not have a summer school program | | |
| Describe any other options considered, and provide reasons those options rejected. | | |

| Parent Name<br>Michelle Hawkins | Date<br>3/15/06 | Signature<br>*Michelle Hawkins* |
|---|---|---|

692

| Student Name | Dominique Hawkins | Managing School | SAIL | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | DCB 9 | Attending School | SAIL | Page 2 of 4 |

## VII. Present Educational Performance Levels in Areas Affected by the Disability

Additional Comments: WIAT

**Academic Areas: (Evaluator)** _Teacher_

Math Strengths:

Dominique is doing well w/ single digit
multiplication

Impact of disability on educational performance in general education curriculum:

Dominique adjicits in math negatively impedes his
learning w/o IEP support

Reading Strengths:

Dominique is improving in decoding & fluency

Impact of disability on educational performance in general education curriculum:

Dominique's comprehension negatively impedes his
learning w/o IEP support

Score(s) When Available
Math Cal. 77
Math Rea. 85  5.5
See goal page: 73  4.2
Date: 3/05

Rdg. Com  64  3.0
Rdg. Basic  63  2.7
Written Ex.  62  2.5
See goal page: 61
Spelling
72  2.5
Date:

**Communication (Speech & Language) (Evaluator)** _K. Prizvi SLP-CCC_

Strengths:

Demonstrates ability to increase decoding fluency
and use graphic organizers to enhance comprehension &
expressive skills & academic context

Impact of disability on educational performance in general education curriculum:

Dominique continues to struggle with interpretive
processing of both aural & written language making
academic progress in genl Ed difficult & IEP support

Score(s) When Available
Exp.Lang.  65  ELI
Rec. Lang.  73  RLI
Artic  WNL
Voice  WNL
Fluency  WNL
Exp. Voc.  WCG  SS-5
Rec. Voc.  WCR  SS=6
See goal page:
Date: 6/05  CELA-4

**Motor/Health (Evaluator)** _L. Nolan - OTR-L_

Strengths:

Dominique has made great gains in balance,
co-ordination & self regulation.

Impact of disability on educational performance in general education curriculum:

Dominique adjicits in fine motr & visual motor
negatively impact his learning w/o IEP support

Score(s) /Results
When Available
QNST-45  mod discrep
Being YP  SS=86
Being MC  SS=85
Being VM  SS=74
See goal page:
Date: 5/05

**Social Emotional Behavioral Areas: (Evaluator)**

Strengths:

Impact of disability on educational performance in general education curriculum:

Score(s) When Available  STD Binst
FSIQ - 78
VIQ  81
VCR VIQ 77
See goal page:
Date: 3/05

**Cognitive/Adaptive Behavior: (Evaluator)**

Strengths:

Impact of disability on educational performance in general education curriculum:

Score(s) When Available
See goal page:
Date:

**Prevocational Skills: (Evaluator)**

Strengths:

Impact of disability on educational performance in general education curriculum:

Score(s) When Available
See goal page:
Date:

693

| Student Name | D. Hawkins | Managing School | | DCPS - IEP |
| Student ID Number | 008 | Attending School | | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**    Additional Comments:    Goal Number: [ ]

Area addressed by goal: _Sensorimotor_

ANNUAL GOAL: (including mastery criteria.)

Dominique will increase postural control + motor planning skills as a foundation for success in the home + classroom

Provider(s): OT

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| (1) Dominique will walk heel to toe for six feet forwards + backwards w/ 2" of a straight line w/ eyes closed w/ occasional verbal prompts from the therapist for 3/5 trials | | quarterly |
| (2) Dominique will sustain a "superman" position while prone on a scooterboard or chair, during a game of catch for 3 minutes w/ occasional breaks | | |
| (3) Dominique will accurately target w/ 3" a target w/ medium size beanbag at ① 6 feet ② 10 feet + ③ 15 feet while engaged in a spinning or movement activity for 4/5 trials | | |
| (4) Dominique will demonstrate 3 strategies to facilitate retention of sensory information to short + long term memory w/ occasional prompts from his therapist | | |
| (5) Dominique will demonstrate accurate finger spelling to reinforce visual + spatial motor skills as well as basic decoding skills. | | |

**EVALUATION PROCEDURE(S)**

Portfolio    (Log)    (Chart)    Test    (Documented Observation)    Report    Other _Observation_

| Student Name | Dominique Hawkins | Managing School | Sail | | DCPS - IEP |
|---|---|---|---|---|---|
| Student ID Number | 9038030 | 008 8-28-92 | Attending School | Sail | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: | | Goal Number: |
|---|---|---|---|

Area addressed by goal: **Daily Living - Organization**

ANNUAL GOAL: (including mastery criteria.)

Dominique will achieve 10 months growth in the STO's below with 80% accuracy.

Provider(s): Sped Teacher/Gen. Ed. Teacher Asst Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Dominique will determine what books & materials are necessary for two periods with 80% accuracy in 4 out of 5 trials. | | |
| Dominique will use a folder system to keep track of homework assignments with 80% accuracy in 4 out of 5 trials. | | |
| Dominique will use an organizer to keep track of homework assignments with 80% accuracy in 4 out of 5 trials. | | |
| Dominique will learn how to keep a filing system in a three ring binder with 80% accuracy in 4 out of 5 trials | | |
| In 4 out of 5 spot checks by teachers Dominique will be wearing his glasses with 80% accuracy. | | |
| | | |
| | | |

EVALUATION PROCEDURE(S)

Portfolio    (Log)    (Chart)    Test    Documented Observation    Report    Other **Teacher Observation**

Student Name: Dominique Hawkins

Student ID Number: 9038030　　DOB 8-28-92

Managing School: SAIL

Attending School: SAIL

DCPS - IEP
Page 3 of 4

**VIII. SPECIALIZED SERVICES**　　Additional Comments:

Goal Number: [　]

Area addressed by goal: _English_

ANNUAL GOAL: (including mastery criteria.)

Dominique will demonstrate three months growth in the area of English as measured by school based pre and post tests by mastering the following short term objectives

Provider(s): Special Ed. Teacher / Gen El. Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| When writing Dominique will use proper gramar, spelling and punctuation rules with minimal verbal prompts in 4 out of 5 trials with 80% accuracy. | | |
| Given a topic Dominique will write a 3-5 paragraph essay with opening & concluding paragraphs and supporting details and a topic sentence in each paragraph in 4 out of 5 trials with 80% accuracy | | |
| Given an essay Dominique has written, Dominique will be able to self edit for capitalization & punctuation and correct at least 3 mistakes with verbal prompts in 4 out of 5 trials with 80% accuracy | | |
| Given a 1-3 page story or essay Dominique will use a graphic organizer to identify the plot, main idea, setting, characters and resolution with minimal verbal prompts in 4 out of 5 trials with 80% accuracy | | |
| | | |
| | | |

EVALUATION PROCEDURE(S)

Portfolio　　(Log)　　(Chart)　　Test　　Documented Observation　　Report　　Other _Teacher Observation_

696

Student Name: Dominique Hawkins
Student ID Number: 9038030    DOB 8-28-92

Managing School: SAIL
Attending School: SAIL

DCPS - IEP
Page 3 of 4

**VIII. SPECIALIZED SERVICES**    Additional Comments:    Goal Number: [ ]

Area addressed by goal: **Math**

ANNUAL GOAL: (including mastery criteria.)

Dominique will demonstrate three months growth in the area of math as measured by school based pre and post test by mastering the following short term objectives.

Provider(s): Special Ed. Teacher / Gen. Ed. Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | | Evaluation Schedule |
|---|---|---|---|
| Given 10 sets of 2 fractions with unlike denominators, Dominique will be able to add, subtract, multiply and divide the fractions with minimal verbal prompts in 4 out of 5 trials with 80% accuracy | | | |
| Given a word problem Dominique will identify the operation necessary to solve (+, -, x, ÷) and then solve the word problem in 4 out of 5 trials with 80% accuracy | | | |
| Given a decimal, Dominique will be able to convert the number in to a fraction with minimal verbal prompts in 4 out of 5 trials with 80% accuracy | | | |
| Given 10 mixed numbers, Dominique will be able to convert each number to an improper fraction with minimal verbal prompts in 4 out of 5 trials with 80% accuracy | | | |
| Given 10 equations that require dividing a two digit number by a one digit number with minimal verbal prompts in 4 out of 5 trials with 80% accuracy | | | |
| | | | |

**EVALUATION PROCEDURE(S)**

Portfolio    (Log)    (Chart)    Test    Documented Observation    Report    Other  Teacher Observation

| Student Name | Dominique Hawkins | Managing School | |
|---|---|---|---|
| Student ID Number | 0C8 | Attending School | SAIL |

DCPS - IEP
Page 3 of 4

**VIII. SPECIALIZED SERVICES**   Additional Comments:

Goal Number: 3

Area addressed by goal: _Speech-Language-Communication_   '06 - '07

ANNUAL GOAL: (including mastery criteria.)

By the time of the next annual IEP review (3/07) Dominique will demonstrate increased comprehension of both aural and written language and increased expressive language skills including using logic and organizational scaffolds to integrate and expand on academic concepts.

Provider(s): SLP, SPED Resource teachers   CR teachers

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| 1) Demonstrate increased decoding fluency of 1 & 2-3 syllable words mixed — 1 syllable words — by reading 1 sentence aloud, incorporating using word attack strategies and context-meaning testing to decode 2+ syllable words without "stopping" — 4/5 sentence trials | 1 | |
| 2) Demonstrate increased encoding accuracy with 1-2 syllable words by using at least 1 of the possible sound-symbols to represent the sounds in the target word, and make the judgment of "correct" or not before asking for assistance in 4/5 trials. | 2 | |
| 3) Demonstrate increased knowledge of and facility with compound and complex sentence structures by completing exercises to dissect and/or diagram sentences and label parts of speech (n, adj, adv, v, object, conjunctions, clause vs. phrase) in 4/5 trials. | 3 | |
| 4) Demonstrate emergent independent use of graphic organizers to take notes of written-aural information as reflected by using such a format in 10% of classroom demonstrations of note-taking activities | 4 | |
| 5) Demonstrate use of logical strategies (process of elimination, "cloze" - fill-in-the-blank, etc.) to complete test assessment and study/review exercise items that make use of MC, fill-in-blank-matching formats | 5 | |

EVALUATION PROCEDURE(S)  — Progress Notes
— Quarterly Progress Reports

| Portfolio | Log | Chart | Test ✓ | Documented Observation ✓ | Report | Other |
|---|---|---|---|---|---|---|

by CR teacher
SPED Resource

698

| Student Name | Dominique Hawkins | Managing School | SAIC | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | DC6 | Attending School | SAIC | Page 4 of 4 |

**Additional Comments:**

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION
## SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in regular education?   Yes   (No)

Explanation for removal out of regular education classroom.

Dominique require a small group setting w/
constant repetition of skills for attainment.

## X. Supplementary Aids and Services

| Classroom Needs (Do not name products or companies.) | SETTING | | | FREQUENCY | | PROVIDER (by discipline) | BEGINNING DA (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| | GenEd | SpEd | Total | Hrs/ Min | Days/M. | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Check and list modifications and/or accommodations for testing:       None needed

| | |
|---|---|
| Timing/Scheduling: | extended time, frequent breaks |
| Setting: | one-on-one |
| Presentation: | read entire test |
| Response: | oral response, extra response |
| Equipment: | calculation |

## XI. STATE AND DISTRICT ASSESSMENTS:

Level I .Tested with non-disabled peers under standard conditions without accommodations.

Level III (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations

Level V  Portfolio

Level II   (Describe accommodations for level II) Tested under standard conditions with special accommodations.

(Level IV)   (Describe the alternative assessment)

one-on-one

## XII. Areas Requiring Specialized Instruction and Related Services:

| | | |
|---|---|---|
| (Reading) | (Physical/Sensory) | Transition |
| (Mathematics) | Social Emotional | Vocational |
| (Written Expression) | Physical Development | Independent Living |
| Other: | | (Speech/Language) |
| None | | |

Modifications:
- Language Arts/English
- Social Sciences
- Biological & Physical Sciences
- Fine Arts

Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECT |
|---|---|---|
| out of general | accept | |
| gen ed | reject | academic failure |
| comm - resource | reject | NILRE |

Modification(s)/Accommodation(s) to address the harmful effects:

multi sensory approach, arts infused, repetition of skills /directio
read alouds, oral response, frequent breaks, extended time,
checks for understanding,

Location for Services   SAIC PCS

## DOCUMENTED LEVEL OF SERVICE
### Complete and attach to MDT/IEP meeting notes

| | | | |
|---|---|---|---|
| School: SAIL PCS | Principal G. Gaudette | Special Education Coordinator A. MuNoor | |
| Date 3/16/06  Case Manager | | Technical Support Supervisor | |
| Student D. Hawkins | DOB 6-28-92 Age 12  Grade 7  ID# 9038030  SSN# | | |
| Parent M. Hawkins | Telephone (H) 2/832-7843  (W) | | |
| Address: 3001 20th ST  NE  WDC 20018 | | | |
| Street  Street | Quad  Apt No  City | | State  Zip Code |
| REFERRAL SOURCE: (Check)  120 Day  Reeval.  HOD  SA  MA | | | |
| Nonpublic  Residential  Citywide  Courts  Local School  Other: PCS | | | |
| Previous least restrictive environment (LRE Setting): | | | |

## JUSTIFICATION FOR SETTING CONSIDERATION
### (Submit TAT/MDT Documentation)
### SUPPORTIVE DATA/DOCUMENTATION

| 2. ACCOMMODATIONS/ MODIFICATIONS | 3. DATA REQUIREMENTS | | |
|---|---|---|---|
| Multi sensory approach  · repetition of | Current IEP | Yes | No |
| arts infused  skill direction | Signatures of required participants (MDT notes) | Yes | |
| frequent breaks  staff | Intervention Behavior Plan | Yes | |
| one-on-one for testing | Copies of current class work and homework assignments: | | |
| oral response | Medical Report: | Yes | No |
| Checks for understanding | Clinical Reports: | Yes | No |
| extended time | Psychiatric Reports | Yes | No |
| ALLOT | Medications: | Yes | No |
| | Attendance Record | Yes | |
| | Copies of most recent evaluation(s) | Yes | |

| 4. Results of all interventions: (TAT, MDT, etc. and attach meeting notes.) | 5. Resources needed for program implementation |
|---|---|
| 10 - 18 - 05 | |
| 3 - 21 - 05 | |
| 5 - 13 - 04 | Calculator |
| 5 - 20 - 03 | |
| 5 - 31 - 02 | |

## 6. CURRENT SETTING CONSIDERATIONS

| ROW | SETTING in neighborhood school (Determined through the IEP team.) | SERVICE PROVIDER (Based on documented need) | LEVEL OF SERVICE (Based on documented need) |
|---|---|---|---|
| 1 | in general education classroom setting | general educators with consultation from special education staff | between 0% and 20% of service time |
| 2 | combination general education and resource classroom | combination of general educators, special educators and related service providers ✓ | between 21% and 60% of service time |
| 3 | ✓ out of general education classroom | special educators and related service providers | between 61% and 100% of service area |

*In providing or arranging for the provision of nonacademic and extracurricular service and activities, including meals, recess period, and the services and activities, each public agency shall ensure that each child with a disability participates with non-disabled children in those services and activities (300.306) to the maximum extent appropriate to the needs of that child. (300.553) Nonacademic settings)

### Check the level of need as indicated:
### DIRECTIONS:

| | |
|---|---|
| If two or three boxes are checked in the Row 1, check LOW. If two or three boxes are checked in the Row 2, check MODERATE. If two or three boxes are checked in the Row 3, check HIGH. | If one box is checked in each row, check either MODERATE or HIGH, depending on the need of the student. |

## 7. LEVEL OF NEED

| LOW | MODERATE | HIGH ✓ |
|---|---|---|

07-02-2001

Attention: Technical Support Supervisor / PERM Compliance Team

STATE EDUCATION AGENCY
SPECIAL EDUCATION
DISTRICT OF COLUMBIA PUBLIC SCHOOLS AND CHARTER SCHOOLS
825 North Capitol Street, N.E.
Washington, D.C. 20002-4232

Caring for Our Students with Disabilities
A Procedural Manual for Parents

RECEIPT

I, _____M. Hawkins_____, received a copy of *A Procedural*
     (Parent/Guardian Name)

*Manual for Parents* from _____A. Muldoon_____ /Title _dir of Spec ed_
                              (Person Issuing Document)

at _____SAIL PCS_____
        (School)

_3 , 15 , 06_
     (Date)

_Michelle Hawkins_
Parent/Guardian Signature

(This receipt is to remain in a designated file in the school.)

7/1/2005

701

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.
INDIVIDUALIZED EDUCATIONAL PROGRAM

DCPS - IEP Page 1 of
Additional Comments:

## I. IDENTIFICATION INFORMATION

Student Name: Last **HAWKINS**   First **DOMINIQUE**   MI

Student ID **9028030**   Soc. Sec. No. _____   Age: **11**   Grade **6**

Gender ☒M ☐F   Date of Birth **8-25-92**   Ethnic Group **African-American**

Address **3001 24th ST, NE**

☐ Non-attending   Home No. _____   Street Name   Quadrant   Apartment #   **WDC   20018**   City   State   Zip Code

Attending School **SAIL PCS**   Home School _____

☐ Elem ☐ Mid/JHS ☐ SHS ☐ WSI

Parent **M. Hawkins**

Address of (if different from student): ☒ Parent ☐ Guardian ☐ Surrogate

Home No. _____   Street Name   Quad   Apt. No.   City   Score   Zip Code
Telephone: Home **2)832-7843**   Work **2)529-6666 x 7662   081-1365**

## II. CURRENT INFORMATION

Date of IEP Meeting: **3-21-0**

Date of Last IEP Meeting: **5-12-0**

Date of Most Recent Eligibility Decision: **5-31-0**

Purpose of IEP Conference:
☐ Initial IEP   ☒ Review of IE
☐ Requested Eval.   ☐ 3yr ReEval.

Indicate Level of Standardized Assessment **IV**

ADDENDA TO BE ATTACHED AS NEEC
Check the appropriate border(s)

| BEHAVIOR | | ✓ | TRANSPORTAT |
|---|---|---|---|
| ESY | | | TRANSITION |

## III. LANGUAGE

| III. LANGUAGE | Language | Language Used for Evaluation | Language Used In Conference | Communication Requirements |
|---|---|---|---|---|
| Student | english | english | | N. lang |
| Parent | english | | english | N. lang |
| Home | english | | | N. lang |

To be completed by Office of Bilingual Educatic
English and Math Proficiency Assessment
Oral _____
Reg / Written _____
Instrument _____
Date: _____

## IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd SpEd Total | FREQUENCY Hrs/Min DAY/M. | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # wks./mos. |
|---|---|---|---|---|---|
| Specialized Instruction | 30 | H W | Teacher | 3-22-05 | 10 M |
| OL | 60 | M W | SLP/Therapist | 3-22-05 | 10 M |
| OT | 60 | M W | OT | 3-22-05 | 10 M |
| TOTAL | 32 H | Hours Per Week | | | |

## V. Disability(ies)

**MD (SD)(SLI)**

☐ Check if setting is general Ed.

Percent of time in Specialized Instruction and Related Service
☐ 0-20%   ☐ 21-60%   ☒ 61-70%

Percent of time NOT in a Regular Education Setting

## VI. IEP TEAM (Participants in the development of the IEP)

Print and sign your name below.

| | |
|---|---|
| Ms. HAWKINS | PARENT |
| Ms. AMY | DIR. SPEC ED |
| Ms. KAY | SPEECH |
| Mr. MICHAEL | OT |
| Ms. JEN | TEACHER |

☑ **I AGREE** with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.

Parent/Guardian Signature _____   Date **3/21/05**

District of Columbia Public Schools   07-02-2001   Division of Special Education   Appendix - A   IEP Page 1 of

EXHIBIT P-13

702

The Treatment and Learning Centers - High School at Katherine Thomas School



# The Katherine Thomas School

A Private Non-profit Agency

| Home | About TLC | Donate Now | Events | Community Education | News Room | Contact Us | Job Opp |
|------|-----------|------------|--------|---------------------|-----------|-----------|---------|
| The Outpatient Services | The Family Hearing Center | The Testing and Tutoring Service | The Katherine Thomas School | The Katherine Thomas School High School Program | Camp Littlefoot | The Outcomes Service | The Ear C |



... a family of services where caring comes...

## Services

301.738.9691 (phone)
301.738.8897 (fax)
Email

## The Katherine Thomas School High School Program

Services | Special Features | Staff | Enrollment | Success Story | Open House Dates | School Calendar | FAQs

The Katherine Thomas School High School Program is an independent day school for students in ninth and tenth grades, with language and learr disabilities and high functioning autism. The school's mission is to enable students to reach their full educational potential through a multi-sensor developmental, language-intensive curriculum. The program, within a small group or individualized setting, provides intensive remediation in rea and written expression, and math, as well as the strategies needed for academic, social, and post-graduation success. The high school program complete its expansion through 12th grade by 2007.



## Services

### Team Approach
Our teaching staff of specialists includes special educators, teacher assistants,

The typical Katherine Thomas School high school student is of average intelligence or higher but has moderate to severe language and learning disabilities, and high functioning autism. These students need support, resources and individualized instruction. The student body includes those who will specialized help can expect to attend college as well as students who expect to transition into employment after completing high school.

EXHIBIT
P-14

703

Page

http://www.ttlc.org/high school.htm

The Treatment and Learning Centers - High School at Katherine Thomas School

transition service teachers, speech-language pathologists, occupational and physical therapists, social workers and counselors. Working together as a multi-disciplinary team, they provide highly integrated programs with a unique blend of educational and therapeutic services. The staff-to-student ratio is 1:3.

## Academic Curriculum

Through a hands-on multi-sensory approach, each of the students receives instruction in the full range of high school courses mandated by the State of Maryland for earning a diploma, including math, science, history, English, PE, health, and technology. In addition, students earn elective credits in art, music, drama, Spanish, reading, and computer-related and vocational cluster courses.

## Career and Technology Education

For students who do not expect to attend college, the school offers training and classes geared toward helping them transition into the world of work. The three vocational components being offered on-site are restaurant management, office technology, and childcare. Other, off-site opportunities are available as well.

## Transition Services

Working closely with a transition support teacher, students are exposed to a variety of work opportunities through job shadowing, internships, job try-outs and jobs that will build their skills. All students, whether entering the workforce, attending college or a technical school, receive transitional services to prepare for post-secondary opportunities, that may include a comprehensive vocational assessment. Educational options, career preparation, and independent living skills are addressed. College counseling is provided to assist students in choosing the appropriate program and school.

(back to top)

## Special Features

- Staff assist students in discovering their learning styles, strengths, and weaknesses, and then teach them practical approaches for studying, time-management, self-advocacy, interpersonal relationships, and independence.
- Computers, multi-media equipment, and assistive technology bring excitement to learning, help students compensate for motor and processing difficulties, and prepare them for the world of tomorrow.

http://www.ttlc.org/high_school.htm

- Community service activities expose the students to the value of assisting others within the community, while improving decision-making and leadership skills.
- Extra-curricular activities are available to Katherine Thomas School high school students including sports, the drama club, and the chess club. Students can run for office in the student government, become a peer mediator, and/or help to operate the school store.



(back to top)

## Staff

The staff includes special education teachers, teacher assistants, speech-language pathologists, occupational therapists, physical therapist, social workers, psychologists, special subject teachers (art, music, drama, physical education, restaurant management, and child development), a library technician, and a health room technician.

**Rhona Schwartz,** M.A., High School Director
**Patricia A. Ritter,** Ph.D., Education Director
**Sylvia Valdivia,** Program Coordinator
**Deborah Lourie,** LCSW-C, ACSW, Admissions Coordinator

(back to top)

## Enrollment

Admission applications may be submitted at anytime for the following school year or for any openings that may occur during the school year. Please call our Admissions Coordinator at 301.738.9691, ext. 193 to schedule a visit at our school, or to have an admissions package sent to you. You may also access the admissions applications for high school below.

- High School Admissions Application

The Treatment and Learning Centers - High School at Katherine Thomas School



(back to top)

# Katherine Thomas School Success Stories

## Julia

When Julia was in elementary school, she attended TLC's Katherine Thomas School. KTS is an independent day school for children, preschool through tenth grade, with language and learning disabilities and high functioning autism; it offers smaller class sizes, a multi-sensory, developmental, language-intensive curriculum, and a nurturing environment to help foster self-esteem and enhance social skills. After elementary school, Julia left KTS to receive home schooling. During that time, she continued receiving services from TLC's outpatient departments in speech, occupational therapy, and tutoring. She attended Montrose Christian School for high school.

When Julia left KTS, the staff did not expect to hear from her or her parents very often. In 2001, however, they received a volunteer application from Julia, now 16. She wanted to return to KTS to work in the classroom with children undergoing the same struggles she faced. KTS accepted Julia as a volunteer and, because of her personal understanding of each child's experience; she formed a strong connection with the children and quickly became one of KTS's best volunteers.

Julia's story is one of success on multiple levels. Her time as an elementary student at KTS clearly compelled her to give back; following her first volunteer experience at age 16, Julia returned to KTS every summer. This contributed to her future academic success; in 2003, Julia graduated high school and prepared to attend Elon College in North Carolina. Attending a four-year college was a major milestone that, due to her learning disabilities, Julia hoped, but did not necessarily expect, to achieve. Today, she is succeeding and achieving: in fall 2005 she begins her junior year at Elon as a special/elementary education major.

Because of Julia's accomplishments as a KTS volunteer, TLC's Camp Littlefoot hired her as a paid teaching assistant.

She will be a wonderful role model for the Littlefoot campers; with Julia as a mentor, we hope they will realize that their own perseverance, combined with help from TLC, can help them achieve all of their goals.

**Tom**
When Tom came to the Katherine Thomas School at TLC as a kindergartener, he couldn't read, draw, or write. He wouldn't even pick up a crayon for fear that his classmates would ridicule him. He was diagnosed has having Attention Deficit Disorder, poor motor skills, and there was a huge gap between his verbal ability and his performance.

After just two days at the Katherine Thomas School, Tom wrote the letter "A." After two years, the school's teachers, speech-language pathologists, and occupational therapists had given Tom the skills to help himself. His mother credits KTS small classes and the complete integration of specialists with much of his success.

In September 1999, Tom started fourth grade in a public school - completely mainstreamed into a regular classroom. He is in the most advanced reading and math groups, is learning to ski, and has lots of friends. Now, he can read books and The New York Times, requires only minimal tutoring.

Tom's mother says, "The Katherine Thomas School turned Tom's life around. His teacher there was the first person who understood him and how to help him. She and everyone else at KTS gave him pride and allowed him to succeed. There is no way he could do what he's doing now if he hadn't been a part of this wonderful community."

(back to top)

Educational Programs | Child Care | Vocational Services | Hearing Loss | Sensory Integration
Speech-Language Disorders | Learning Disabilities | ADD/ADHD | Service Directory | Espanol

© 2006 TLC - The Treatment and Learning Centers. All Rights Reserved.

**TLC - The Treatment and Learning Centers**

Administration, The Outpatient Services
The Family Hearing Center, The Testing Service
The Outcomes Service

2301 Research Blvd, Suite 110 & 220
Rockville, MD 20850

The Tutoring Service
The Katherine Thomas School (PreK – 10th)
The Early Learning Center
Camp Littlefoot

9975 Medical Center Drive
Rockville, MD 20850

The Early Learning Center

14910 Broschart Road
Rockville, MD 20850

http://www.tlc.org/high_school.htm

8/23/2006

707

The Ivymount and Lederhing Center - High School at Katherine Thomas School

**301.424.5200**
**TTY 301.424.5203**

**301.738.9691**
**TTY 301.424.5203**

**301.251.1369**
**TTY 301.424.5203**

Page 6 of 6

The Katherine Thomas School

## FAQs

**Q: What is the student population?**

A: TLC – The Katherine Thomas School accepts students with moderate to severe language and learning disabilities, and with high functioning a

**Q: What is the age and grade range?**

A: TLC– The Katherine Thomas School ranges from pre-school through 10th grade (11th grade in fall 2006, and 12th in fall 2007), serving studen ages 4 – 17.

**Q: What is the ratio of staff to students?**

A: Preschool – Consists of a teacher, teacher assistant, SLP, OT and PT for a classroom with a maximum of 8 to 10 children. Elementary through Middle School – A teacher and teacher assistant for no more than 10 students in a classroom. High School classes currently have one teacher with up to 8 students in a class. Classes with 9 or 10 students will have a teacher and an assista

Frequently, related service staff are in the rooms due to the integrated service model, so the staff: student ratio can be much higher.

**Q: What are the qualification for the teachers and TAs and one-to-ones?**

A: Teachers are certified in special education or have their provisional license. High school teachers also have subject area certification. Teacher

709

The Katherine Thomas School - The Katherine Thomas School FAQs

Page 2 of 3

assistant and 1:1 assistants have a minimum of a HS diploma, but the majority of them have some college or college degrees. All staff participate in on-going in-service training.

**Q: What is the average length of stay in the program?**

A: The goal of TLC-The Katherine Thomas School is to have students attend school in the least restrictive environment. In the elementary and middle school programs, the average length of stay is 2 to 3 years. However, due to the severity of the students' language and learning disabilities, students may remain enrolled for a longer period of time. Staff continually meet with the parents, being part of the team, to determine the most appropriate placement for children.

**Q: Do you have grades? Are they on level with the public school curriculum?**

A: In the lower and middle schools, children are graded on the progress they make at their individual levels. High school students receive grade each class.

The entire school follows the Maryland Voluntary State Curriculum. Curriculum content corresponds with the student's chronological grade level, taught at a speed and skill level that is appropriate for each individual student.

The high school is a diploma-based program, with two pathways towards achieving the diploma. Students may follow a more traditional academic route, or follow a career and technology pathway. Currently, three programs are offered on-site: office technology, child development, and restaurant management. Other supervised on-the-job training opportunities will be available to students in the 2006-2007 school year.

**Q: What is the ratio of girls to boys?**

A: This varies from year to year. Currently from preschool to high school there are 80 boys and 38 girls.

**Q: How many students are funded and how many are private pay? Where are families from? Is transportation provided?**

A: Currently, about half the students are funded by local jurisdictions and half are private pay.
*40 students are funded by the District of Columbia Public Schools
*10 students are funded by Montgomery County Public Schools

Families are predominantly from DC and Montgomery County. However, we do have families from Northern Virginia, Howard County, and Prince Georges Counties. Funding jurisdictions provide transportation for their students. Private pay students provide their own, but carpools are avail

**Q: Is scholarship/financial aide available?**

710

The Treatment and Learning Centers - The Katherine Thomas School FAQs

**Q: What is the application process?**

A: There is scholarship money that has been donated to the school from outside families and supporters of KTS. The financial aide is decided by outside agency; The National Association of Independent Schools, on a needs basis.

A: Current psychological and educational evaluation tests, an IEP (if applicable), and any school progress and report cards, and any outside relevant evaluations from SLP's/OT's/ PT's/Social workers must be submitted with the application. Once a student is determined to be an appropriate candidate, a 2-day visit is scheduled. Admission is then decided upon by the school team. TLC-The Katherine Thomas School has rolling admission and packets may be obtained from the Admissions Coordinator.

**Q: Are related services included in the tuition?**

A: No, related services are a separate fee. The amount of time for related services is determined by the current IEP and/ evaluations.

Educational Programs, | Child Care | Vocational Services | Hearing Loss | Sensory Integration
Speech-Language Disorders | Learning Disabilities | ADD/ADHD | Service Directory | Espanol

© 2006 TLC - The Treatment and Learning Centers. All Rights Reserved.

**TLC - The Treatment and Learning Centers**

Administration, The Outpatient Services
The Family Hearing Center, The Testing Service
The Outcomes Service

The Tutoring Service
The Katherine Thomas School (PreK – 10th)
The Early Learning Center
Camp Littlefoot

The Early Learning Center

**2301 Research Blvd. Suite 110 & 220**
**Rockville, MD 20850**
**301.424.5200**
**TTY 301.424.5203**

**9975 Medical Center Drive**
**Rockville, MD 20850**
**301.738.9691**
**TTY 301.424.5203**

**14910 Broschart Road**
**Rockville, MD 20850**
**301.251.1369**
**TTY 301.424.5203**

711



The Katherine
Thomas School

# TLC
The Treatment and Learning Centers

9975 Medical Center Drive
Rockville, Maryland 20850
301.738.9691
Fax 301.738.8897
TTY 301.424.5203
www.ttlc.org

July 31, 2006

Re: Dominque Hawkins

Mr. Carlton Hawkins and Mrs. Michelle Hawkins
3001 20th Street, NE
Washington, DC 20018

Dear Mr. Carlton Hawkins and Mrs. Michelle Hawkins:

The Admissions Committee is pleased to offer your child, Dominque, a placement in The Katherine Thomas School for the 2006-2007 academic year. After we receive verbal notification from you within one week, a placement will be held for Dominque. The placement is contingent upon funding or payment of tuition by August 30, 2006.

Enrollment at The Katherine Thomas School is based upon the development of Individual Diagnostic-Prescriptive Goals (DPG) for each child, agreed to by parents, teachers, and professional staff. In addition to classroom goals and objectives, the program usually includes some direct individual or small group service in speech/language therapy, occupational therapy, and/or other related services, to be provided by the professional staff at The Katherine Thomas School during the school day. We must receive evaluation reports in order to schedule clinical staff, and write goals and objectives. If your child is funded, we will work with the public school system to develop and implement the DPG or IEP.

As we discussed, the Katherine Thomas School is a multi-graded program, and we will group children into classrooms according to a variety of factors, such as age, school experience, social maturity, academic skills, and learning style.

If you have any questions or concerns that you would like to discuss, please feel free to call me and to come in for a conference if you wish. We look forward to working with you and Dominque in the coming school year. Welcome to The Katherine Thomas School.

Sincerely,

Debbie Lourie
Admissions Coordinator

EXHIBIT
P-15

An Independent Day School for Students with Learning and Language Disabilities

The Outcomes Service • The Family Hearing Center • The Katherine Thomas School
The Early Learning Center • The Outpatient Services • The Testing and Tutoring Service • Camp Littlefoot

712

# JOETTE DEANNA JAMES

## PERSONAL INFORMATION:

Address: 1401 Blair Mill Road, Silver Spring, MD, 20910
SSN: 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
Phone: 301-587-8271 (Home), 240-381-6617 (Cell)
E-mail: joettedj@aol.com, joettedj@verizon.net

## EDUCATION:

**2003:**

Received Doctor of Philosophy (Ph.D.) in Clinical Psychology from Northwestern University Medical School, Department of Psychiatry and Behavioral Sciences, Division of Psychology, Chicago, Illinois

Dissertation Title: Functional Health Status and Psychological Adjustment in Low Birth Weight Jamaican Preadolescents

Advisor: John Lavigne, Ph.D.

**1995:**

Received Bachelor of Arts (B.A.) in Honors Psychology with Distinction from Huron College, University of Western Ontario, London, Ontario, Canada

## SUPERVISED CLINICAL EXPERIENCE:

**September 2004-August 2006:**

**Postdoctoral Fellow in Pediatric Neuropsychology (Children's National Medical Center, Washington, DC)**

Conducting neuropsychological evaluations with school-age children and adolescents with wide range of developmental and acquired neurological difficulties, rotations in epilepsy, hematology/oncology, Executive Function clinic, member of Autism Team, conducted diagnostic evaluations using the Autism Diagnostic Observation Schedule (50 hours/week)

Supervised by Gerard Gioia, Ph.D., Lauren Kenworthy, Ph.D., Jennifer Janusz, Psy.D., ABPP-Cn; Licensed Pediatric Neuropsychologists

**January 2004-August 2004:**

**Postdoctoral Fellow in Pediatric Neuropsychology (Children's Evaluation Center, Newton, MA)**

Conducted neurodevelopmental and neuropsychological assessments with children from birth to adolescence with wide range of developmental and learning issues (focus on autism spectrum disorders) in private practice setting (40 hours/week)

Supervised by Rafael Castro, Ph.D., Licensed Pediatric Neuropsychologist

**September 2002-July 2003:**

P-16 713

**Advanced fellow in pediatric psychology (Children's Hospital, Boston, Developmental Medicine Center)**

Primary treatment provider for children with emotional, behavioral and academic difficulties in the outpatient primary health care clinic (PHA) of Children's Hospital; Member of multidisciplinary team conducting developmental assessments with children from birth to 3 years; Member of multidisciplinary team conducting psychiatric diagnostic interviews with children from 8 to 11 years. Conducted psychoeducational assessments of school-aged children with learning difficulties. (35 hours/week)

Supervised By Elaine LeClair, Ph.D., Jayne Singer, Ph.D., Licensed Clinical Psychologists


**September 2001 – August 2002:**

**Advanced fellow in pediatric psychology (Children's Hospital, Boston, Developmental Medicine Center)**
**LEND fellow (Leadership Education in Neurodevelopmental Disabilities-Maternal and Child Health Bureau)**

Member of multidisciplinary team conducting developmental assessments and treatment with children from birth to 6 years with range of emotional, behavioral and developmental challenges (including Autism Spectrum Disorders); Participated in several infant and preschool diagnostic clinics; Participated in social skills training group for preschool children with Autism Spectrum Disorders, co-led parent group (children with newly diagnosed ASD) and co-led toilet training group for preschool children; (60 hours/week)

Supervised by Lauren Murphy, Ph.D., Jayne Singer, Ph.D., Elaine LeClair, Ph.D., Licensed Clinical Psychologists


**September 2000 - August 2001:**

**Predoctoral Intern, Harvard Medical School (Children's Hospital, Boston)**
(Department of Psychiatry)

Completed 6-month rotation (September 2000-February 2001) in neuropsychological assessment, inpatient medical consultation-liaison, emergency room consultation; 6-month rotation (March 2001-August 2001) in neurodevelopmental assessment, inpatient psychiatry; Full-year rotation in the Behavioral Medicine Clinic (included training in biofeedback); (50-55 hours/week)

Supervised by Celiane Rey-Casserly, Ph.D., Betsy Kammerer, Ph.D., Anthony Rao, Ph.D., Elaine LeClair, Ph.D., Jayne Singer, Ph.D., Peter Hunt, Ph.D., Elizabeth Wharff, Ed.D., David DeMaso, M.D., Pamela Beasley, M.D., Licensed Clinical Psychologists and Board Certified Child and Adolescent Psychiatrists


**January 1998 – May 2000:**

**School Counselor, United Stand (Chicago, IL)**

Conducted individual, group, and family counseling, teacher consultation, student staffing and psychoeducational assessment with children and adolescents in the Catholic elementary school system (St. Adrian's Elementary, Nativity of the Blessed Virgin Mary, St. Benedict's the African); Participated in in-services for teaching staff. Presenting problems included poor school adjustment, academic difficulties, aggressive behavior, abuse and neglect; Led anger management, social skills and primary prevention groups (8 hours/week); Conducted short and long-term counseling with children, adolescents and families at the United Stand Counseling Center (3 hours/week)

Supervised by Sister Kim Mis, Ph.D., Licensed Clinical Psychologist


**July 1998 - June 1999:**

714

**Psychology Extern, Cook County Hospital, Provident Hospital (Chicago, IL)**
(Clinical practica sites in the Department of Child Psychiatry)

Duties included individual, group, family therapy and case management with children and adolescents aged 3 to 17 years. Presenting problems included aggressive behavior, poor academic performance, attention problems, parenting difficulties and effects of abuse and neglect. Attended interdisciplinary school staffings. Member of Child Protective Services team, participated in weekly meetings discussing case dispositions and consulted on inpatient medical floors regarding child maltreatment issues (20 hours/week)

Supervised by Paul Driscoll, Ph.D., Licensed Clinical Psychologist, Gabrielle Woloshin, M.D., Board Certified Child and Adolescent Psychiatrist

**July 1997 - June 1998:**

**Psychology Extern, Children's Memorial Hospital (Chicago, IL)**
(Clinical practicum site at the Pediatric Neuropsychology Clinic)

Conducted comprehensive neuropsychological evaluations of preschool, school-aged children with a wide range of psychiatric and neurological diagnoses, interpreted results and prepared reports, communicated findings to parents/caregivers, interacted on child's behalf with caseworkers, teachers, other professionals. Attended weekly assessment seminar (20 hours/week)

Supervised by Frank Zelko, Ph.D., Licensed Clinical Neuropsychologist

**July 1996 - June 1997:**

**Psychology Extern, Lakeside Veterans Administration Hospital (Chicago, IL)**
(Clinical practicum site)

Completed 6-month rotations in Outpatient Substance Abuse and Outpatient Mental Health respectively. Performed individual therapy, group therapy and assessment (neuropsychological, intellectual, and personality) with adults. Conducted weekly intakes during outpatient mental health rotation. Attended weekly interdisciplinary meetings during substance abuse rotation. Presenting problems included dementia, substance abuse disorders, PTSD and anxiety disorders, mood disorders and disorders of personality (20 hours/week)

Supervised by Eve Gordon, Ph.D. and Luke Shanley, Ph.D., Licensed Clinical Psychologists

## ADDITIONAL CLINICAL EXPERIENCE:

**December 2005:**
Completed clinical training for Autism Diagnostic Interview- Revised (ADI); Washington. DC

**February 2005:**

Completed clinical training for Autism Diagnostic Observation Schedule (ADOS); Washington, DC

**April 2003:**

Certified in Touchpoints Method by T. Berry Brazelton, M.D. (Individual Level Training), Boston, MA

**July 1999 – March 2000:**

**Crisis Worker, Northwestern Memorial Hospital Emergency Room (Chicago, IL)**

Evaluated psychotic, suicidal and homicidal crises in patients of various ages, determining need for inpatient psychiatric hospitalizations, consulted on ER medical cases, facilitated patient transfers to private & state facilities, conducted chemical dependence assessments, answered crisis telephone calls, referred for community treatment (20 hours/week)

1997:

Volunteer, Project Hope, Columbus Hospital (Chicago, IL)

Summer child care worker in a substance abuse recovery program for women; facilitated developmentally appropriate play activities with infants, toddlers and preschoolers (4 hours/week)

September 1996 - May 1997:

Tutor, Cabrini-Green Housing Project Tutoring Program (Chicago, IL)

Tutored a second grade male student in basic reading and mathematics (2 hours/week)

September 1994 - April 1995:

Volunteer, Children's Psychiatric Research Institute (London, Ontario, Canada)

Volunteered in the behavior modification clinic of the residential school with 7 to 13-year-old children presenting with physical, intellectual and behavioral handicaps (4 hours/week)

University of Western Ontario (London, Ontario)

Tutored an 11-year-old boy with a nonverbal learning disability (1 hour/week)
Conducted behavior therapy (systematic desensitization) with a phobic student client (1 hour/week)

September 1993 - April 1994:

Children's Psychiatric Research Institute (London, Ontario)

Instructed (math, reading and social skills) 13 to 15-year-old boys with behavioral, social and emotional problems in a residential school (4 hours/week)

TEACHING EXPERIENCE:

February 1999 – May 1999:

Lecturer, University College, Northwestern University (Evanston, IL)

Taught freshman/sophomore level course in introduction to social psychology. Responsible for all aspects of teaching including syllabus construction, preparing and delivering lectures, leading discussions, selection of assignments, constructing examinations and assigning grades. Attended five 2-hour teacher-training workshops. Class length: 2½ hours/week

September 1997 – December 1997:

Teaching Assistant, Northwestern University Medical School (Chicago, IL)

716

Co-led laboratory portion of introductory statistics course for first-year graduate students. Duties included selecting and presenting assignments, answering questions and working through exercises with students, teaching students to use a computerized statistical program (SPSS for Windows). Class length: 2 hours/week

**September 1993 – April 1994:**

**University of Western Ontario Volunteer-In-Progress Program (London, Ontario)**

Taught the Procrastination Workshop and participated in group and individual counseling with undergraduate students (3 hours/week)

## RESEARCH EXPERIENCE:

**January 1999 – April 1999:**

*Evaluator, Child Study Center, National Association for Perinatal Addiction Research and Education* (Chicago, IL)

Conducted neurodevelopmental assessments with infants and preschool children as part of a research study comparing types of treatment management with children removed from their homes due to parental substance abuse; position also involved conducting play observations, giving oral performance feedback to foster parents and writing reports (8 hours/week)

Supervised by Amy Anson, Ph.D., Licensed Clinical Psychologist

**December 1996 - June 1998:**

**Evaluator, Child Study Center, National Association for Perinatal Addiction Research and Education** (Chicago, IL)

Conducted neuropsychological assessments with children 7-11 years of age as part of a research study examining the effects of prenatal drug exposure on child development and learning, position also involved scoring and coding research data, conducting performance feedback sessions with parents and writing reports (15 hours/week)

Supervised by Amy Anson, Ph.D., Licensed Clinical Psychologist

**December 1996 - January 1998:**

**Research Assistant, Northwestern University Medical School, Department of Psychiatry and Behavioral Sciences (Chicago, IL)**

Assisted with all aspects of clinical drug trials, including recruitment, written and verbal communication with the Institutional Review Board and study sponsor, preparation of case report forms for monitoring, contact with patients and caregivers and neuropsychological evaluation of patients with dementia (10 hours/week)

Supervised by Sanford Finkel, M.D., Director of Geriatric Psychiatry

**January 1996 - July 1997:**

**Interviewer, ADHD Project, University of Chicago, Adolescent and Child Psychiatry**

Performed intellectual, behavioral and educational assessments of preschool and young school-aged children and

717

semi-structured diagnostic interviews and computerized assessments with parents as part of a research study examining the validity of subtypes of Attention Deficit Hyperactivity Disorder (8 hours/week)

Supervised by Ben Lahey, Ph.D., Licensed Clinical Psychologist

1995:

**Summer Research Assistant, Centre for Studies of Children at Risk (Hamilton, Ontario)**

Studied developmental pathways in conduct disorder using data from the Ontario Child Health Study and Follow-Up, conducted literature review on the therapeutic effects of camping on children and adolescents (40 hours/week)

Supervised by Dan Offord, M.D., Child and Adolescent Psychiatrist, Director

## PRESENTATIONS AND PUBLICATIONS:

James, J.D., Gibbs, M.C., Lee, P., Gilotty, L., Wallace, G., & Kenworthy, L. (2005). Executive Functioning and weak central coherence: Exploring the relationship between theories that purport to underlie cognitive processing in children with autism. Poster presented at the International Meeting for Autism Research. Boston, MA. USA. May 5-7, 2005.

Presented paper on the psychological effects of war-related trauma in Liberia for Leadership Education in Neurodevelopmental Disabilties (LEND) program, based on research conducted for the nonprofit organization Universal Human Rights Incorporated (April 2002).

James, J.D. (1995). Group status: Cognitive and perceptual determinants. Unpublished bachelor's thesis, University of Western Ontario, London, Ontario, Canada.

James, J.D. (1993). Proprioceptive stimuli dependence as affected by habituation. The Huron College Journal of Learning and Motivation, 31, 103-119.

## PERSONAL ACCOMPLISHMENTS:

Awarded the University Scholarship through Northwestern University (1995-1996), (1996-1997), (1997-1998)
Awarded the Colonel Ibbotson Leonard Huron College Entrance Scholarship (1991-1995)
Dean's Honors List at the University of Western Ontario (1991-1995)
200 hours volunteer service, Chedoke-McMaster Hospitals (1988)

## PROFESSIONAL ASSOCIATION MEMBERSHIP:

Member, American Psychological Association
Student Affiliate, International Society for Autism Research

## SKILLS/COURSES:

Fluent in French, both written and spoken
Completed 8-week course in introductory Spanish
Proficient in the use of Windows XP, WordPerfect, Microsoft Word, SPSS for Windows
Completed Red Cross First Aid/CPR course

718

**OTHER ACTIVITIES:**

2002-2003: Member of Harvard Children's Initiative Global Mental Health Work Group
1996 -2000: Park Community Church Choir
1995-1998: Junior Board member, Pediatric AIDS Chicago
1989-1993, 1994-1995, 1999-2000: Voice Lessons, classical, jazz
1981-1990: Piano (Royal Conservatory- Grade 7 Practical, Grade 2 Theory)

**REFERENCES:**
Available upon request.

August 2006

# CURRICULUM VITAE

# LAUREN S. KRIVITZKY, Ph.D.

**Address:**

Work:
Children's National Medical Center    (CNMC)
Montgomery County Outpatient Center
14801 Physicians Lane
Suite 173
Rockville, MD 20805

National Rehabilitation Hospital    (NRH)
Department of Psychology
102 Irving Street, NW
Washington, DC 20010

**Phone:**    Primary office: (202) 877-1697 at NRH
CNMC office: (301)-738-8930 (no voicemail)

**Email:**    lkrivitz@cnmc.org or lauren.krivitzky@medstar.net

## EDUCATION

**MCP-HAHNEMANN UNIVERSITY,** *APA Accredited, Philadelphia, PA*
Ph.D. Degree in Clinical and Health Psychology, May 2002
Concentration in Neuropsychology
Cumulative GPA: 3.93/4.00

**MCP-HAHNEMANN UNIVERSITY,** *Philadelphia, PA*
Masters in Clinical and Health Psychology, 1999

**UNIVERSITY OF PENNSYLVANIA,** *Philadelphia, PA*
Bachelor of Arts in Biological Basis of Behavior, May 1997
Concentration in Behavioral Neuroscience
Bachelor of Arts in Psychology
Minor in Anthropology
Cumulative GPA: 3.7/4.00

P-17

## CLINICAL POSITIONS

**CHILDREN'S NATIONAL MEDICAL CENTER,** *Washington, DC*
**Faculty member**                                                                                    **August 2004-present**

Full time faculty position in the Division of Psychiatry/Psychology in the Pediatric Neuropsychology Program. Position is part of the joint pediatric rehabilitation consortium established between CNMC, National Rehabilitation Hospital (National Center for Children's Rehabilitation), and the HSC Pediatric Center. Primary duties include providing psychological and neuropsychological services to children in the inpatient rehabilitation setting. Position will also include research responsibilities, which currently entail designing a study to examine neuroimaging in children with mild Traumatic Brain Injury. Licensed in the District of Columbia and Maryland.

**CINCINNATI CHILDREN'S HOSPITAL MEDICAL CENTER,** *Cincinnati, OH*
**Postdoctoral Fellowship in Neuropsychology**                                              **2002-2004**

Two year postdoctoral fellowship (APPCN Member Program) specializing in pediatric neuropsychology following the guidelines established by the INS and APA Division 40 for training in clinical neuropsychology. Program involves concentrated training with pediatric populations referred from various disciplines (i.e., neuro-oncology, neurology, pediatrics, and rehabilitation), as well as part-time training with adult populations at the Cincinnati V.A. Medical Center. Responsibilities include year long rotations working in the first year with the neuro-oncology team and in the second year with the inpatient brain injury rehabilitation team. Clinical activities include comprehensive assessment, inpatient consultation services, individual and group psychotherapy, and a rotation rounding with the pediatric house-staff in neurology and neurosurgery. Supervised by M. Douglas Ris, Ph.D., ABPP-Cn, E. Ted Barrett, Ph.D., ABPP-Cn, Dean Beebe, Ph.D., and Marsha Nortz, Ph.D.

**KENNEDY KRIEGER INSTITUTE/JOHNS HOPKINS UNIVERSITY HOSPITAL,** *Baltimore, MD*
**Predoctoral Psychology Internship– APA accredited**                                     **2001-2002**
*Major Rotation: Department of Neuropsychology:*

Duties involved comprehensive neuropsychological assessment, cognitive rehabilitation, and consultation with children birth through young adulthood. Working within an interdisciplinary rehabilitation team was also an integral part of this rotation. Patients were seen through the inpatient brain injury service, the outpatient department, and consultation with other medical services (e.g., orthopedic rehabilitation, genetics, and metabolic disorders). Supervised by E. Mark Mahone, Ph.D., ABPP-Cn and Beth Slomine, Ph.D., ABPP-Cn.

*Major Rotation: Behavior Management Clinic:*

Provided short-term, outcome based training to care providers to address behavior problems common to preschool and school age children (e.g., noncompliance, tantrums, meal and bedtime problems, toileting difficulties, school behavior difficulties). Treatment was often protocol driven and typically occurred across multiple environments such as the clinic, home, and school/daycare. Duties also included conducting evaluations, brief functional assessments, developing treatment objectives, and implementing treatment programs. Supervised by Susan Perkins-Parks, Ph.D.

**ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN,** *Section of Neurology, Philadelphia, PA*
**Pediatric Neuropsychology Practicum Student**                                           **1999-2001**

Conducted neuropsychological assessments with children with various medical diagnoses and associated neuropsychological complications. Other responsibilities included interpretation of test results, report writing, and participating in research projects on different samples of clinical populations. Supervised by Mitzie Grant, Ph.D.

**PRIVATE PRACTICE,** *Mt. Laurel, New Jersey*
**Psychometrician**                                                                              **2000**
   Duties included administration and scoring of a full neuropsychological battery, mostly with an adult
   population. Legal issues were the primary reason for referral.

**PROJECT CHALLENGE,** *MCP-Hahnemann University, Philadelphia, PA*
**Assessment Clinician**                                                                    **Spring 1999**
   Duties included administering a full assessment battery to mentally retarded individuals and writing full
   reports of these evaluations. Assessment battery included various measures of intellectual assessment,
   academic functioning, and behavior competency.

**JUVENILE JUSTICE CENTER,** *Philadelphia, PA*
**Therapy Practicum Student**                                                              **1998-1999**
   Provided therapy to children and their families referred to the agency with various psychological
   problems. Most cases involved children in foster care because of issues of abuse or neglect by their
   natural parents. Responsibilities involved providing therapy in an outpatient clinic along with providing
   mobile therapy and WRAP around services.


## RESEARCH EXPERIENCE


**CINCINNATI CHILDREN'S HOSPITAL MEDICAL CENTER,** *Cincinnati, OH*
**Postdoctoral Fellowship in Neuropsychology**                                             **2002-Present**
   Involved in research activities focusing on the examining sleep problems in a population of children with
   traumatic brain injuries.

**EASTERN PENNSYLVANIA PSYCHIATRIC INSTITUTE (EPPI),** *Philadelphia, PA*
**Research Assistant**                                                                     **1997-2001**
   Duties included being in charge of data management for a research project on selective attention deficits
   in schizophrenic patients and data analysis on a study of patients dually diagnosed with substance abuse
   and schizophrenia. Duties also included administering a neuropsychological testing battery to both
   normal controls and schizophrenic patients in both an inpatient and outpatient setting at EPPI and
   Norristown State Hospital. Other responsibilities included designing studies, analyzing data and writing
   up findings for poster presentation and publication. Supervised by Joseph Tracy, Ph.D.

**ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN,** *Section of Neurology, Philadelphia, PA*
**Pediatric Neuropsychology Researcher**                                                   **1999-2001**
   Experience included participating in research projects on different samples of clinical populations,
   including the pediatric AIDS population, and the children in the Phenylketonuria clinic. One specific
   project involved investigating the relationship between neuropsychological functioning in HIV positive
   children and immunologic and virologic markers of disease progression. A second project, and topic of
   my dissertation research, examined daily cognitive functioning in children with PKU.

**MEDICAL COLLEGE OF PENNSYLVANIA/ HAHNEMANN UNIVERSITY,** *Philadelphia, PA*
**Researcher**                                                                             **1997-2001**
   Experience included working in collaboration with fellow students and professors on various research
   projects in the field of Neuropsychology. Areas of study included mild traumatic brain injury and visual
   and verbal memory. Supervised by Mike Williams, Ph.D.

722

**THE BRAIN AND BEHAVIOR LABORATORY,** *The Hospital of the University of Pennsylvania,*
*Philadelphia, PA*
**Research Assistant**                                                                    **1996-1997**
   Under the direction of Dr. Ruben Gur, duties included: designing and implementing a research project
   studying different aspects of emotion including cross-cultural differences in expression, inputting
   neuropsychological data, and assisting on data searches.

## TEACHING EXPERIENCE/ CONFERENCE PRESENTATIONS

**CONFERENCE PRESENTATION:** "Real Life Rehabilitation: Behavior and Transition"
**Speaker**                                                                               **March 2004**
   Presented two conference sessions entitled "Tips for Navigating Behavioral Problems in the School for
   Children/Adolescents with TBI". Conference was at Cincinnati Children's hospital and was geared
   towards healthcare professionals, educators and families dealing with the brain injured individual.

**PSYCOLOGY COLLOQUIM,** *Cincinnati OH*
**Speaker**                                                                               **Spring 2004**
   Presented on "The Basics of Brain Injury and Behavior" to psychologists and other mental health
   providers at Cincinnati Children's Hospital.

**CINCINNATI CHILDREN'S HOSPITAL MEDICAL CENTER,** *Cincinnati, OH*
**Postdoctoral Fellowship in Neuropsychology**                                           **2002-Present**
   Provided supervision to graduate students and research assistants through didactics and clinical cases.

**MCP-HAHNEMANN UNIVERSITY,** *Philadelphia, PA*
**Instructor**                                                                            **1999-2000**
   Taught master's level classes in the Clinical and Health Psychology Program on the topics of basic
   psychometric principles, intellectual and academic assessment, and basics of report writing.

## PROFESSIONAL AFFILIATIONS:

Member of the National Academy of Neuropsychology
Member of the International Neuropsychology Society
American Psychological Association

## RESEARCH PRESENTED AT A CONFERENCE SESSION

   Askinazi, L., Kervick, R. & Williams, J.M. (1998, November). In search of lost factors: A monte carlo
study of the factor structure of memory tests. Poster session presented at the annual meeting of the National
Academy of Neuropsychology (NAN), Washington, DC.

Kervick, R., Askinazi, L. & Williams, J.M. (1998, November).  <u>The neuropsychological outcome of mild traumatic brain injury: A narrative and meta-analytic review</u>.  Poster session presented at the annual meeting of the National Academy of Neuropsychology (NAN), Washington, DC.

Askinazi, L., Tracy, J.I. Christensen, H.L., & Josiassen, R.C. (1999, November). <u>The relative influence of cognitive and language deficits on the severity of "speech" disorder in schizophrenia.</u> Poster session presented at the annual meeting of the National Academy of Neuropsychology (NAN), San Antonio, TX.

Askinazi, L.A., Grant, M.L., Legido, A. & Bagarazzi, M.L. (2000, November), <u>The relationship between performance on neuropsychological test measures and immunologic and virologic markers of disease progression in children who are HIV positive</u>.  Poster session presented at the annual meeting of the National Academy of Neuropsychology (NAN), Orlando, FL.

Askinazi, L.S., D. Beebe, D., Wells, C., Wade, S., Taylor, H.G., & Yeates, K.O.  (2003, February).  <u>Sleep disturbances following pediatric traumatic brain injury</u>.  Poster session presented at the Associated Professional Sleep Societies, Chicago, IL.

Askinazi, L.S. , Grant, M., Melvin, J. Legido, A. (2003, August). <u>Parental perceptions of cognitive and academic functioning in children with PKU</u>.  Poster session presented at the annual meeting of the American Psychological Association (APA), Toronto, ON.

## MANUSCRIPTS SUBMITTED/IN PREPARATION

Beebe, D., Askinazi, L.S., Wells, C., Wade, S., Taylor, H.G., & Yeates, K.O.  (submitted to Journal of PM&R).  <u>Sleep disturbances following pediatric traumatic brain injury</u>.

Askinazi, L.S., Grant, M., Melvin, & J. Legido, A. (in preparation). <u>Parental perceptions of cognitive and academic functioning in children With PKU</u>.

724

# STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA STATE ENFORCEMENT AND INVESTIGATION DIVISION (SEID) SPECIAL EDUCATION PROGRAMS

Dominque Hawkins )
)
v. )
) September 1,2006
) H.O. Tonya Butler Truesdale,
)
SAIL, PCS )

## Praecipe

COMES NOW, SAIL, P.C.S., by and through counsel, to submit additional records for the consideration by the Hearing Officer. Also in light of the request by the Hearing Officer to have Petitioner's Counsel provide a chart of several cited cases decided in the District Court of the District of Columbia, counsel has submitted copies of pertinent regulations and a copy of an *amicus curiae* brief filed today in the Blackman-Jones Class Action Suit.

As argued at the hearing, 5 D.C. Mun. Regs. §3019.11 states:

"If, following the appeal or notification described in §§3019.9 and §§3019.10 above, DCPS, as the LEA (or SEA , if applicable), agrees that a charter school cannot serve the child in question, DCPS will assume responsibility for the child and the charter school will remit to DCPS the child's entire per-pupil allotment, prorated for the time spent in the charter school during the school year. "

Thus, once DCPS, accepted that SAIL could not serve Dominque, it assumed responsibility for placement. DCPS has done this by offering Prospect. Based on the above, the hearing should have been continued to allow DCPS to defend its placement or in the alternative counsel's motion for a directed finding on this issue should have been granted.

1

Respectfully submitted,

Paul S. Dalton, Esq.
Dalton, Dalton, & Houston, P.C.
1008 Pendleton Street
Alexandria, Virginia 22314
703-739-4300
703-642-2323 – fax

## Certificate of Service

I certify that a copy of the foregoing, **Praecipe** was faxed on this 1st day of September, 2006, to:

Donna L. Wulkan, Esq.
1765 N Street, NW,
Carriage House
Washington, DC 20036
fax no. 202-955-1015

Paul S. Dalton
Counsel for SAIL, PCS

2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MIKESHA BLACKMAN, *et al.*          )
                                    )
          Plaintiffs,               )
                                    )          Civil Action No. 97-1629 (PLF)
     v.                             )          *Consolidated With*
DISTRICT OF COLUMBIA, et al.,       )          Civil Action No. 97-2402 (PLF)
                                    )
          Defendants,               )

## AMICUS CURIAE BRIEF OF SPECIFIC PUBLIC CHARTER SCHOOLS WHO HAVE ELECTED TO ACT AS THEIR OWN LOCAL EDUCATIONAL AGENCY

COMES NOW, certain Public Charter Schools,[1] by and through counsel,

---

[1] The following D.C. Public Charter Schools are represented:

Academia Bilingue de la Comunidad, Public Charter School
Academy for Learning Through The Arts, Public Charter School
Bridges, Public Charter School
Capital City, Public Charter School
Community Academy, Public Charter School
District of Columbia Bilingual, Public Charter School
D.C. Preparatory Academy, Public Charter School
Eagle Academy, Public Charter School * elected to be an LEA Charter as of 2006-2007 SY
Edison, Public Charter School - Blow Pierce Campus
Edison, Public Charter School - Chamberlain Campus
Edison, Public Charter School - Collegiate Campus
Edison, Public Charter School - Woodridge Campus
E. L. Haynes, Public Charter School
Friendship Southeast Elementary Academy, PCS (formally Southeast Academy, PCS became an independent LEA with the 2005-2006 SY)
Hyde Leadership, Public Charter School
Integrated Design and Electronics Academy, (IDEA) Public Charter School
Maya Angelou, Public Charter School
Meridian, Public Charter School
Options, Public Charter School
The SEED School of Washington, DC, Public Charter School
The School for Arts in Learning (SAIL), Public Charter School
Elsie Whitlow Stokes Community Freedom, Public Charter School
The Tree of Life Community, Public Charter School

727

pursuant to the Court's order of July 12, 2006, and files this *amicus curiae* brief on the issue of: "*Are the Defendants legally responsible for ensuring timely hearings and timely implementation of HOD's [Hearing Officer Decisions] and SAs [Settlement Agreements] for charter school students?*" As shown below, Defendants have such responsibility under both federal and D.C. law.

## I.    LEGAL FRAMEWORK.

Congress enacted the IDEA and its predecessor statutes "to assure that all children with disabilities have available to them... a free appropriate public education..." 20 U.S.C. § 1400(c).  To effectuate this goal, Congress placed the ultimate responsibility of compliance with the state educational agency ("SEA"), declaring that in order for the State to receive federal IDEA funds, the SEA "shall be responsible for assuring that the requirements of this [Act] are carried out..." 20 U.S.C. § 1412(6).  To qualify for this assistance, each SEA must submit a plan to the Department of Education's Office of Special Education Programs ("OSEP") detailing the state's policies and procedures that assure compliance with the Act. 20 U.S.C. § 1412-1413.

After the SEA submits a plan to OSEP, the SEA receives IDEA funds from the Department of Education.  Upon receiving the funds, the SEA is not only responsible for distributing IDEA funds to each LEA, but is also responsible for assuring local compliance.

-2-

728

More specifically, in the SEA's application to OSEP, the SEA must submit a plan that assures, among other things, that: (1) funds received under IDEA are expended in accordance with the provisions of the Act, 20 U.S.C. §§ 1413(a)(1)-(2); (2) an adequate number of special education personnel are adequately and appropriately trained through a comprehensive system of personnel development, 20 U.S.C. § 1413(a)(3); and (3) the SEA annually evaluates the effectiveness of the IDEA programs in meeting the educational needs of children with disabilities, 20 U.S.C. § 1413(a)(11).

In order to obtain IDEA funds, each LEA must submit an application to the SEA setting forth assurances, inter alia that: (1) funds will be used for programs that implement the provisions of IDEA, 20 U.S.C. § 1414(a)(1); (2) the LEA will maintain records and furnish information as may be necessary for the SEA to perform its duties under IDEA, 20 U.S.C. § 1414(a)(3); and (3) the LEA will establish or revise individual education programs ("IEP") for each disabled child at the beginning of each school year, 20 U.S.C.§ 1414(a)(5).

Thus, the provisions of IDEA delegate to the SEA's the responsibility for compliance as well as the supervisory power to implement policies and procedures to make certain that LEAs have complied with the Act. Alternatively, if the LEA is unable or unwilling to provide services in compliance with the Act, the SEA must provide services directly to such students. 20 U.S.C. § 1414(d)(1). However, when the LEA is able and willing to provide services to disabled students, the LEA is responsible for providing services directly to disabled children, primarily through IEP's. 20 U.S.C. § 1414(a)(5).

-3-

Because of D.C.'s unique government structure, defendant, the District of
Columbia Public Schools (DCPS) is both the LEA and the SEA. D.C. Code §38-
2907(b). A charter school in D.C. may elect to be part of DCPS functioning in its
capacity as LEA or to be its own LEA. D.C. Code §38-1802.10(c); D.C. Mun Reg. §5-
3019.1. IDEA provides that, whether or not a D.C. charter school elects to be an LEA,
the school remains under the supervisory responsibility of DCPS as the SEA. 20
U.S.C. § 1412((a)(1). As the SEA, DCPS is obligated under federal law to ensure
implementation of IDEA for all D.C. students, including charter school students. 20
U.S.C. § 1412(a) (1)-(25).

## II.  SUMMARY OF ARGUMENT.

a. DCPS as an SEA is directly responsible for ensuring timely hearings and
timely implementation of HODs and SAs for students in charter schools that have
elected to be part of DCPS.

b. Additionally, DCPS as the SEA is responsible for ensuring timely hearings
and timely implementation of HODs and SAs for students in charter schools that have
elected to be their own LEA.

c. Even if DCPS were not responsible as the SEA for timely hearings and
implementation of HOD's and SAs, defendant District of Columbia has such
responsibility.

## III.  ARGUMENT.

Rather than repeat the extent and depth of authority cited by the Plaintiffs
Memorandum; this brief simply adopts both the authority and conclusion reached in that

-4-

730

Memorandum. However, to the extent the Defendant's Memorandum expresses opinions that do not accurately reflect either the position expressed or the authority cited; they will be addressed.

First, the assertion by defendants that the issues raised are so complex that it is not clear whether an across-the-board solution, applicable to all charter schools, is appropriate is simply not supported by either the authority cited or their arguments. As a review of the cases cited by the Defendants will show, part of the reason for any "complexity" may arise from how Defendants are presenting authorities cited to this Court. As this assertion is a very general one; it will be addressed in of our response to each assertion, authority cited, or opinion expressed by Defendants as such require a response.

On page 2 of Defendants Memorandum, they state no authority for their contention that the Board of Education(BOA), not DCPS, is the State Education Agency(SEA) other than a DCMR citation[2] in apparent conflict with the uncited section 38-2907(b) of the D.C. Code and sections 3019.9, 3019.11 and 3019.12 of Title 5 of the D.C. Mun. Regs. which identifies DCPS as the SEA[3]. Furthermore, §38.-2907(b) states DCPS shall perform **all** state education agency functions for public charter schools that

---

[2] 5 D.C. Mun. Regs. Section 3801.1

[3] (b) "DCPS in its function as the state education agency for the District of Columbia shall perform all state education agency functions for Public Charter Schools that it performs for private schools and for DCPS in its function as a local education agency." see also, IDEA Public Charter School v. Belton, Civ. No. 05–467(RMC) (D.D.C. March 15, 2006) wherein the Court cites section 3019.9 as the authority for saying that when a public charter school elects to be its own LEA, then DCPS fulfills the role of the State Education Agency ("SEA") under IDEA. Id at 4.

it performs for DCPS schools. (emphasis added). This was the prelude Defendants

offered, prior to their long discourse on the requirement that public charter schools who

elect to be their own LEA must provide FAPE under IDEA.

    Defendants reliance on the opinions collected in their Appendix H submitted to

the court is disingenuous at best. In its recitation of the facts in the cases of IDEA

Public Charter School v. Belton, Civ. No. 05-467(RMC)(D.D.C. March 15, 2006), and

Hyde Leadership Public Charter School v. Clark, Civ. No. 05-0722(JR) (D.D.C. March

27, 2006) they omit the pertinent comments of both Judge Collyer and Judge

Robertson, that the charter schools in each case agreed with the Defendants position

that they should be dismissed.[4] This omission is compounded by the Defendant's

failure to show any nexus between a Public Charter School's initial responsibility to

provide FAPE and their conclusion that DCPS, in its capacity as the SEA, is not

responsible for ensuring timely implementation of HODs and SAs for charter school

students.

    The school's position that each Public Charter School which acts as its own LEA

is initially responsible for the provision of FAPE under IDEA is simply an honest

admission of the law both at the federal and state level.[5] That fact, however, should not

be the basis for exploitation by the defendants to promote the position expressed in its

---

   [4] Both courts point out that the school's position in both cases was that DCPS should not be a party and they only named DCPS because of two previous decisions, Integraded Design Elecs. Acad. Pub. Charter Sch. v. Gooding, No. 03-1224 (D.D.C. Dec. 5, 2003) ( Mem.Op. & Order) and Sch. for the Arts in Learning (SAIL) Pub. Charter Sch. V. Mena, No. 02-1772 (D.D.C. July 25, 2003) (Memorandum).

   [5] 20 U.S.C. § 1414(a)(5) and  5 D.C. Mun. Regs. Section 3019.2.

memorandum to the Court; when at the same time, they fail to explain how this fact is embraced by the Public Charter Schools in the cases cited.

Contrary to the assertions made by the Defendants, in the District of Columbia the responsibilities of public charter schools are clear. LEA Charters are responsible for IDEA compliance in their schools, including "documentation of required policies and procedures," D.C. Mun. Reg. § 5-3019.2, "special education evaluations, and, if necessary, IEP's and placements for [disabled] children," *id.* § 5-3019.4. By contrast, DCPS is responsible for these duties for District Charters. *Id.* 3019.7. Thus while LEA Charters are initially responsible for the provision of FAPE and many other things under IDEA, just as District Charters, that fact alone does not alter the responsibilities of DCPS in its role as the SEA. What is clear is that there is an equality of responsibility among all LEAs and an equality to all LEAs from the SEA.

Inasmuch as DCPS, as the SEA, must assume the responsibility of compliance with IDEA provisions when its District Charters or its Public Schools cannot do so, so must DCPS as the SEA assume those same responsibilities when an LEA Charter cannot or will not fulfill its obligations under IDEA.[6]

Another contention Defendants put forth is that the cases are divided as to the responsibilities of SEAs to ensure compliance with IDEA, even though their own cases do not support this. The only case cited by Defendants suggesting a division of authority is, A.A. ex rel. J.A. v. Phillips, 386 F.3d 455 (2nd Cir. 2004) which in the context cited, dealt with which party had the burden of proof in establishing whether the

---

[6] 20 U.S.C. § 1414(d)(1).

-7-

SEA had complied with its responsibilities to ensure that the local education agency had fulfilled its responsibilities under IDEA. The quoted portion of the opinion provided by Defendants merely reflects the view of the Court that anyone challenging whether an SEA has fulfilled its obligations under IDEA bears the burden of proof and that SEAs have some discretion in how they work with LEA's to ensure compliance with IDEA.[7]

Defendants portrayal of the case Gadsby v. Grasnick, 109 F.3d 940 (4th Cir. 1997) gives only the suggestion that it differs from the A.A. case but in reality they both support the proposition that SEAs have the sole responsibility within their borders of ensuring that all LEAs within the State are in compliance with IDEA requirements. This counsel's research of this issue finds no authority to support that the cases are divided as suggested by the Defendants. In fact, there is a long line of authority dating back to 1981 which consistently, without exception, affirms that it is the sole responsibility of the SEA to ensure compliance with IDEA of all LEAs within their jurisdiction. Kruelle v. New Castle County School Dist., 642 F.2d 687 (3d Cir.Del. 1981) and P. v. Ambach, 669 F.2d 865 (2d Cir. N.Y. 1982);

Continuing this long history of affirming the role of the SEA under IDEA is the case of Corey H. by Shirley P. V. Board of Educ., 995 F. Supp. 900, (N.D. Ill.1998). Concerning the failure of the SEA to remedy unequal educational environments within the Chicago public schools the court stated:

> While the local schools and the children's parents are the "front line" providers of educational services for children with disabilities, the IDEA squarely places the ultimate responsibility for ensuring compliance with its mandates on the state educational agencies, such as the ISBE." citing 20 U.S.C. § 1412 (6) id. at 2.

---

[7] Id at 459.

-8-

The Court in *Corey H.*, provides a lengthy summary of IDEA statutory and regulatory mandates to SEAs as to their responsibilities with respect to ensuring compliance with IDEA:

1) Upon receiving funds the SEA is not only responsible for distributing funds to each LEA, but is also responsible for assuring local compliance.[8]

2) SEA's must annually evaluate the effectiveness of LEA programs under IDEA.[9]

3) In order to receive funds LEAs must certify to the SEA that they will spend funds received only in accordance with IDEA provisions, they will maintain records and furnish information to the SEA to perform its duties under IDEA, they will establish and revise IEP's for all students as necessary.[10]

4) That the legislative history of IDEA makes it clear that Congress wanted one agency to be responsible for the rights of all handicapped children within a particular State.[11]

5) The SEA must establish "procedures to ensure that, to the maximum extent

---

[8] *Id.* at 904.

[9] *Id.* at 904, 20 U.S.C. § 1413(a)(1).

[10] *Id.* at 904, 20 U.S.C. § 1414(a)(1), 20 U.S.C. § 1414(a)(3), 20 U.S.C. § 1414(a)(5).

[11] *Id.* at 904-5, 20 U.S.C. § 1412(6), Senate Report on Pub.L. 94-142 at 905. In fact the Senate Report concludes: "Without this requirement, there is an abdication of responsibility for the education of handicapped children. Presently, in many states, responsibility is divided, depending upon the age of the handicapped child, sources of funding, and types of services delivered. While the committee understands that different agencies may, in fact, deliver services, the responsibility must remain in a central agency overseeing the education of handicapped children, [**12] so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency." Id.

735

appropriate, children with disabilities ... are educated with children who are not disabled..."[12]

However, the Court in *Corey H.*, also appropriately noted that when an LEA is able and willing to provide services to disabled students, the LEA is responsible for providing services directly to disabled children, primarily through IEPs.[13] It is only when the LEA is unwilling or unable to carry out its responsibilities under IDEA that it becomes the responsibility of the SEA to take over and ensure that students are receiving the proper services under IDEA.[14] Thus through a consistent line of authority, these statutory provisions provide a clear unambiguous framework for determining the responsibilities of both the LEA and the SEA.

With regard to the Defendants allegation that LEA Charter Schools are not cooperative in furnishing information to DCPS in its role as the SEA, no mention has been made of District Charter Schools lack of cooperation. Furthermore, counsel's firm represents the vast majority of LEA Charter Schools. In that capacity, counsel's firm is aware of nearly all due process hearings involving independent LEAs and appeals to the District Court of the District of Columbia. Counsel can assure the Court that his office has never received any complaints concerning requests for information. To the contrary, on enumerable occasions, counsel's firm has had to supply DCPS with information in order for DCPS to meet its current obligations to ensure timely

---

[12] 20 U.S.C. § 1412(5). 34 C.F.R. §§ 300.550 - 300.556 detail the mandate as well as the SEA's responsibilities to assure compliance.

[13] *Id* at 4, 20 U.S.C. § 1414(a)(5).

[14] 20 U.S.C. § 1414(d)(1); 5 D.C.Mun. Regs. 3019.9, 3019.11, 3019.12

-10-

implementations of HOD's and SA's, for both charter and non-charter school students.

Even the declaration of Rex Yancy, submitted by Defendants, as Appendix F of their Memorandum, gives no specifics and recognizes LEA Charter Schools responsibilities under, 20 U.S.C. § 1414(a)(3) and D.C. Mun. Reg. § 5-3019.2, to maintain records and furnish information to the SEA to perform its duties under IDEA. Thus it seems apparent that, in addition to no legal barriers to DCPS carrying out their responsibilities as the SEA, there are no practical barriers.

## IV.    CONCLUSION.

For the reasons stated above, this Court should find that Defendants are legally responsible for holding timely hearings and for timely implementation of HODs and SAs for charter school students.

DATE:        September 1, 2006                Respectfully submitted,


                                              /s/
                                              Paul S. Dalton, Esq.
                                              D.C. Bar No. 439118
                                              Dalton, Dalton, & Houston, P.C.
                                              1808 Pendleton Street
                                              Alexandria, Virginia 22314
                                              (703) 739-4300 (O)
                                              (703) 739-2323 (F)
                                              Counsel for listed Charter Schools

-11-

737

period unless it is determined by the LEA Charter that it can not serve the child, whereupon it shall make an appeal to DCPS pursuant to § 3019.9 of this chapter.

3019.6    When a child is enrolled in more than one LEA during the applicable period for assessment and placement, the LEAs are jointly responsible for the child's evaluation and, if necessary, IEP and placement. Every effort will be made by both LEAs to cooperate to achieve the necessary timelines and legal requirements.

3019.7    DCPS is responsible for special education evaluations, and, if necessary, IEPs and placements for children enrolled in District Charters.

3019.8    LEA and District Charters are responsible for providing all necessary related services to children with disabilities enrolled in their facilities, consistent with these children's IEPs.

3019.9    When an LEA Charter concludes that it cannot serve a child with a disability enrolled in its facility using the funds available to it, it shall appeal to DCPS, in its role as designee for the State Education Agency (SEA), for assistance.

3019.10    When a District Charter concludes that it cannot serve a child with a disability enrolled in its facility using the funds available to it, it shall notify DCPS, in its role as Local Education Agency (LEA), for assistance.

3019.11    If, following the appeal or notification described in §§ 3019.9 and 3019.10 above, DCPS, as the LEA (or SEA, if applicable), agrees that a charter school cannot serve the child in question, DCPS will assume responsibility for the child and the charter school will remit to DCPS the child's entire per-pupil allotment, prorated for the time spent in the charter school during the school year.

3019.12    DCPS, in its role as the SEA, will arrange for and fund special education mediation and due process hearings involving charter schools if asked to do so by the charter school.

3019.13    Except as provided in § 3019.14 below, LEA Charters shall provide their own representation at, and be responsible for implementation of all agreements or decisions resulting from, mediation and due process hearings involving children enrolled in their school, unless implementation of the agreement or decision is the responsibility of DCPS as a result of any actions or inactions of DCPS while a child had been enrolled at an LEA Charter school or pursuant to federal or local law or regulation.

3019.14    When, in a mediation or due process hearing involving an LEA Charter, a responsibility or action of another LEA is at issue, the second LEA shall

738

**STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA
STATE ENFORCEMENT AND INVESTIGATION DIVISION
SPECIAL EDUCATION PROGRAMS**

| | | |
|---|---|---|
| DOMINIQUE HAWKINS, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | September 6, 2006 |
| | ) | H.O. Tonya Butler-Truesdale |
| SAIL PCS | ) | |

### Plaintiff's Opposition to Defendant's September 1, 2006 Filing

COMES NOW, Michelle Hawkins, mother of Dominique Hawkins, by and through

counsel, to enter her opposition to Defendant's filing submitted September 1, 2006 which

included a Praecipe and a copy of an amicus brief filed in the *Blackman-Jones Class Action Suit*.

Because opposing counsel waived his right to present a summation when he walked out of the

hearing on August 30, 2006 and because opposing counsel had three opportunities to brief this

issue for the Court prior to the hearing, SAIL should not be allowed to present any additional

arguments for Your Honor's consideration.


**ARGUMENT**

When counsel for SAIL announced that he was waiving his right to conduct a closing

argument and walked out of the hearing room, he exercised SAIL's right to forego the

presentation of any additional arguments. *See Herring v. New York*, 422 U.S. 853, 860 (1975)

(recognizing that a party may waive his or her right to summation). If SAIL now wishes to

revoke that waiver and unilaterally re-open the record, it must show good cause. However, it is

difficult to comprehend what reason SAIL could proffer that would justify waiting until after the

739

hearing has taken place to address an issue so central to the outcome of the dispute - especially given that (1) SAIL had no less than three occasions in which it could have addressed the issue of who is responsible for implementing HODs involving charter school students (i.e. in its initial Motion to Dismiss, in its second Motion to Join, and at the August 30th hearing), and (2) the issue had been decided in Plaintiff's favor almost six weeks prior to the hearing. Absent good cause, equity demands that SAIL be estopped from re-opening the record. Any other outcome would encourage future litigators to submit briefs citing no authority, to ignore decisions issued by Hearing Officers, and to arrive at due process hearings ill-prepared to argue the relevant issues. SAIL has had multiple opportunities to address the question of charter school liability; it should not be afforded yet another bite at the apple now.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this court not take into account SAIL's latest filing.

Respectfully submitted,

*Donna Wulkan /sb*

Donna Wulkan, Esq.
Unified D.C. Bar No. 370961
1765 N Street, NW
Carriage House
Washington, DC 20036
202.682.3909
fax: 202.955.1015

740

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Plaintiff's Opposition to Defendant's September 1, 2006 Filing was served upon the following parties via first-class mail and via fax (if available) on the 6th day of September, 2006.


Paul Dalton, Esq.
Dalton, Dalton, & Houston, P.C.
1008 Pendleton Street
Alexandria, VA 22314

Mr. and Mrs. Hawkins.
3001 20th Street, NE
Washington, DC 20018


Donna Wulkan, Esq
1765 N Street, NW
Carriage House
Washington, DC 20036
202.682.3909
fax: 202.955.1015

741

STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA
STATE ENFORCEMENT AND INVESTIGATION DIVISION
SPECIAL EDUCATION PROGRAMS

DOMINIQUE HAWKINS,                    )
     Plaintiff                          )
                                        )
v.                                    )          September 6, 2006
                                        )          H.O. Tonya Butler-Truesdale
SAIL PCS                              )

### Compensatory Education Plan

COMES NOW, Michelle Hawkins, mother of Dominique Hawkins, by and through

counsel, to submit her proposed compensatory education plan.  The plan outlines what services

Dominique requires to make up for SAIL's past denials of FAPE and the length of time those

services should be administered.

Respectfully submitted,

_Donna Wulkan / sb -_

Donna Wulkan, Esq.
Unified D.C. Bar No. 370961
1765 N Street, NW
Carriage House
Washington, DC 20036

742

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Compensatory Education Plan was served upon the following parties via first-class mail and via fax (if available) on the 6th day of September, 2006.

Paul Dalton, Esq.
Dalton, Dalton, & Houston, P.C.
1008 Pendleton Street
Alexandria, VA 22314

Mr. and Mrs. Hawkins.
3001 20th Street, NE
Washington, DC 20018

Donna Wulkan / sb

Donna Wulkan, Esq.
Unified D.C. Bar No. 370961
1765 N Street, NW
Carriage House
Washington, DC 20036
202.682.3909
fax: 202.955.1015

743

**Dominique Hawkins**
**Compensatory Education Plan**
**September 6, 2006**

This compensatory education plan recommends services to remediate SAIL Public Charter School's failure to implement Dominique Hawkins' full-time IEP as well as its failure to provide an appropriate special education in an appropriate setting.    Full-time IEPs for at least the last two years were submitted into evidence by the parent at the August 30, 2006 hearing.    Because these IEPs were not fulfilled, remediation for Dominique is required in the form of compensatory education for the failure to provide a free and appropriate public education.    This Compensatory Education Plan has been developed in consultation with Dr. Joette D. James, the pediatric neuropsychology fellow at Children's National Medical Center who testified at the August 30 hearing, and with Judy Owens, director of the lower and middle schools of the Katherine Thomas School, where Dominique is enrolled.

Because he did not receive the full-time special education required by his IEP, Dominique's academic achievement is far below grade level and far below his intellectual capacity.  Specifically, as Dr. James testified at the hearing, while Dominique has low average intelligence, his academic skills range from mid-second to early fourth grade levels.  They are what might be expected from a child with Mental Retardation.  As Dr. James explained in her testimony, Dominique will always struggle academically due to his moderate to severe learning disabilities.  However, his learning disabilities and special education needs have been known for years.  Appropriate implementation of his IEP should have resulted greater progress and a smaller gap between his cognitive capability and academic achievement.  There does not appear to be another reason for this child, who has average intelligence and no significant behavior problems, to be failing to make progress or to be achieving this far below grade level.

Dominique is diagnosed with Reading Disorder (dyslexia), Mathematics Disorder, Disorder of Written Expression, and Attention Deficit Hyperactivity Disorder (ADHD), Predominantly Inattentive Type.  He has moderate to severe speech and language impairment, fine motor skills deficits, and difficulty with executive functions that necessitate specific instruction in reading, planning and organization.  Although fourteen years old and in the eighth grade, his reading achievement scores are presently on the second to third grade level.  His reading comprehension is *below the first percentile for his age,* far below his intelligence.  He works on the third to early fourth grade level in math.

**Overview of Compensatory Education Plan**

Intensive work on both reading and organization are foundational to academic progress in any area for Dominique.  Therefore, compensatory instruction focuses on these two critical issues.  This plan requests that compensatory education be provided in both the

744

school and home settings. At school, the plan calls for Dominique to receive 90 minutes per week of tutoring in the afterschool program at the Katherine Thomas School. At home, the plan provides two specific pieces of educational software, consistent with the recommendations of Dr. James and Judy Owens, the educational director of the Katherine Thomas School. The software programs, described below, provide instruction and support in the areas of reading, organization and writing.

## After-school Tutoring at the Katherine Thomas School in Reading and Study Skills/Organization

There is an afterschool tutoring program at the Katherine Thomas School that can provide compensatory education to build upon and augment what Dominique is being taught in the classroom. The after-school program is run by the same organization -- Treatment and Learning Centers (TLC) -- that runs the Katherine Thomas School, and employs trained special education teachers, many of whom are on the faculty of the Katherine Thomas School. On tutoring days, Dominique would have a fifteen minute break at the end of classes, and then proceed with tutoring. It has been arranged so that Dominque can receive the additional reading and study skills/organization instruction from the same reading specialist who is working with him during the school day. Provision of these tutoring services by Katherine Thomas/TLC obviously will facilitate coordination and collaboration with Dominique's classroom team, and enhance the benefit to Dominique.

Specifically, Dominique would receive 1:1 tutoring for ninety minutes per week, consisting of one hour of reading instruction and 30 minutes of instruction on study skills and organization. It is recommended that these services be provided over the course of the forty week School Year and the six week Extended School Year at Katherine Thomas.

## Computer Software for Instruction and Support in Reading, Organization and Writing

In her report and testimony, Dr. James recommended the use of technology to assist Dominique in making educational progress. Computer programs can provide reading instruction -- to teach and strengthen skills -- as well as reading assistance that would allow Dominique to complete reading assignments in textbooks and elsewhere that would be too arduous for him otherwise. For writing, computer programs provide graphic organizers and other methods that help students organize, research, analyze, and present information. Dr. James recommended that this type of support be available for Dominique to use both at home and at school.

The Katherine Thomas School will be utilizing the type of software Dr. James recommends at school. Providing it to Dominique at home will not only afford continuity, but it will also support his compensatory education. Dominique's after-school tutors can give him assignments to complete at home between sessions that will

2

745

supplement what he is doing in class. The software will give Dominique guidance and assistance when the tutors cannot be present, effectively increasing the availability and efficacy of compensatory education for Dominique, and enabling him to progress more rapidly. For example the reading program, as described below, will actually help Dominique read the pages of his textbooks.

The following reading and writing software will be provided to Dominique to further his compensatory education plan. Katherine Thomas School uses the Kurzweil 3000 software to assist with reading, and the Inspiration, CoWriter, and Write Out Loud software for writing. It is recommended that Kurzweil and one of the three writing programs – to be determined by Dominique's educational team at Katherine Thomas -- be provided for Dominique to use on his home computer. The Kurzweil program, among other things, allows teachers to scan material from textbooks and other sources onto a disc, which will then be read aloud by the computer to the student. The organization and writing program that is chosen will support Dominique in completing his homework and in doing the additional work that is required for tutoring.

**Extended School Year**

Dominique matriculated for an extended period of time at a school that did not provide the full-time special education he requires and was promised in his IEP. In addition, although his mother requested ESY for Dominique at the March 2006 IEP meeting due to Dominique's regression and his problems with retention, ESY was not included in his IEP by the SAIL team. A commitment should therefore be made to provide Dominique with ESY services at Katherine Thomas for 2006-2007. The tutoring services provided in this plan extend through the ESY period.

**Summary of Compensatory Education Plan**

1. After-school tutoring in reading at the Katherine Thomas School program, 1 hour per week for the 40 weeks of the school year and the six weeks of the Extended School Year.
2. After-school tutoring in study skills and organization at the Katherine Thomas School program, 30 minutes per week for the 40 weeks of the school year and the six weeks of the Extended School Year.
3. Provision of reading software for use at home (Kurzweil 3000 Learnstation)
4. Provision of writing software for use at home (Inspiration or CoWriter or Write Out Loud)
5. Extended School Year at Katherine Thomas for the 2006-2007 school year, to include the after-school tutoring indicated above.

3